# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SCHUTT SPORTS, INC., *et al.*,[1] | Case No. 10-12795 (____) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF ROLLEN JONES
## IN SUPPORT OF THE DEBTORS' CHAPTER 11
## PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

ROLLEN JONES hereby declares, under penalty of perjury, as follows:

1.       I am the Chief Financial Officer ("**CFO**") of Schutt Sports, Inc. and its affiliated chapter 11 debtors and debtors in possession (collectively, the "**Debtors**") and submit this declaration (the "**Declaration**") in support of the Debtors' chapter 11 petitions and requests for relief filed contemporaneously herewith .

## I.
## INTRODUCTION

2.       As the CFO of the Debtors, I perform my duties out of the Debtors' headquarters located at 710 South Industrial Drive, Litchfield, Illinois 62056.

3.       I have approximately 18 years of experience working in the sporting goods equipment industry and have been the CFO of the Debtors since April 21, 2008.  I started my career as a Certified Public Accountant in the audit department of an audit, tax and advisory firm before working in the sporting goods equipment industry.

---

[1]  The Debtors, along with the last four digits of each Debtor's tax identification number, are: Mountain View Investment Company of Illinois (3563), Schutt Sports, Inc. (0521), Circle System Group, Inc. (7711), Melas, Inc. (9761), R.D.H. Enterprises, Inc. (2752), and Triangle Sports, Inc. (6936).

4.     On the date hereof (the "**Petition Date**"), the Debtors commenced their chapter 11 cases by filing voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

5.     The Debtors intend to conduct their business in the ordinary-course and "business-as-usual" fashion for the duration of these chapter 11 cases.  To minimize the adverse effects on the Debtors' business as a result of the commencement of these cases, the Debtors request, contemporaneously herewith, various types of relief in certain "first day" applications and motions (collectively, the "**First Day Motions**") filed herewith.  A list of the First Day Motions is annexed hereto as **Exhibit "A"**.  In the First Day Motions, the Debtors seek, among other things, to: (a) establish procedures for the efficient administration of these cases, (b) continue the Debtors' operations while in chapter 11 with as little disruption as possible; (c) maintain the confidence and support of key constituencies, including employees, vendors and customers; (d) obtain debtor-in-possession financing; (e) obtain authority to use cash collateral; and (f) retain a claims and noticing agent.  Gaining and maintaining the support of the Debtors' key constituencies as well as operating the Debtors' day-to-day business with minimal disruption and erosion will be crucial to the success of the Debtors' efforts in these cases.

6.     In addition to the relief sought in the First Day Motions, the Debtors determined that the most effective way to maximize the value of the Debtors' estates for the benefit of all stakeholders is to file for chapter 11 protection in order to pursue either or both of the following strategic alternatives: (A) to sell some or all of the Debtors' businesses, as going concerns (the

"Sale") and/or (B) to reorganize the Debtors' business and recapitalize the Debtors' balance sheet through a chapter 11 plan of reorganization (the "**Plan**"). Under chapter 11, the Debtors will explore strategic options to maintain their long-term financial health, including a Sale of some or all of the businesses or raising additional equity. The Debtors have received a proposal for a Plan funded by a rights offering, backstopped by a group of investors. The proposed Plan would also provide for a significant deleveraging of the Debtors' balance sheet. The Debtors are considering this proposal, while they also seek other equity sponsors and acquirers for their businesses. If one of these transactions were to materialize, it would be implemented via a Plan or an auction transaction under section 363 of the Bankruptcy Code. The Debtors have engaged Oppenheimer & Co., Inc. ("**Oppenheimer**") as their investment banker to explore these strategic options.

7.      In addition to the personal knowledge that I have acquired while working with the Debtors, I have knowledge of and familiarity with the Debtors' books and records as well as their financial and operational affairs. I have also participated directly or indirectly in communications and negotiations with the Debtors' secured lenders, vendors, customers, and others and have worked closely with the Debtors' personnel, counsel and other advisors. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, and other relevant documents and information prepared or collected by the Debtors' employees. In making the statements herein, I have therefore relied in part upon others to accurately record, prepare, and collect any such documentation and information.

8.     I submit this Declaration in support of the Debtors' petitions and First Day Motions. As the CFO of the Debtors, I am authorized to submit this Declaration on behalf of the Debtors.

9.     If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, my review of the Debtors' books and records, information conveyed to me by other representatives of the Debtors, including discussions with managers, other employees, and outside advisors, my professional opinion, as well as my experience and knowledge of the Debtors' operations and financial condition.

10.     Part II of this Declaration provides an executive summary of these cases. Part III of this Declaration describes in more detail the Debtors' business, the developments which led to the Debtors' chapter 11 filing and their goals in these cases. Part IV sets forth relevant details of the various First Day Motions.

## II.
## EXECUTIVE SUMMARY

11.     The Debtors are a leading designer, manufacturer, distributor and marketer of team sporting equipment, offering an extensive line of protective gear and complementary accessories, most prominently in football. The Debtors' product lines are anchored by their football helmet offering, for which the Debtors have the number-one position in the country, both in terms of technological advancement and market share. The Debtors lead the market in football faceguards and offer products in other related sports with significant demand for high performance protective equipment, such as baseball and softball. The Debtors also maintain leading and growing market positions in shoulder pads, women's fast-pitch softball equipment, baseball protective gear, baseball bases and sports collectibles.

12.     The Debtors possess a unique combination of advanced product technology and an unparalleled distribution network. The Debtors' sales network structure, consisting of a lean in-house sales force, regional independent sales representatives and a vast network of local Team Dealers (as defined below), combined with the Debtors' market leading innovation and technology, enables the Debtors to be one of the top two competitors in the football equipment market.

13.     As described further in Part III of this Declaration, the Debtors cannot sustain their operations under the current circumstances. The Debtors are overleveraged under their current capital structure and do not have sufficient cash resources to continue funding their operations.

14.     The Debtors have violated certain financial covenants under both of their Prepetition Loans (as defined below). The Debtors' Prepetition Secured Loans (as defined below) mature in December 2010, and the Debtors currently have no prospect of securing an alternative source of financing. The Debtors have failed to meet a certain payment obligation under their Prepetition Subordinated Notes (as defined below).

15.     The Debtors also have been incurring significant litigation costs associated with the Circle Frauds (as defined below) and the Riddell Litigation (as defined below), which have generated added burdens on the Debtors at a time when the global economy has been undergoing an unprecedented crisis and the United States domestic market has also suffered and continues to struggle through a significant slowdown. As described in further detail below, the Debtors are faced with a softer demand for their products due to cutbacks in school budgets and, at the same time, operate under an over-leveraged capital structure with piling litigation costs, a $29 million judgment against them in favor of the largest competitor in the marketplace, Riddell (as defined

below), and continued litigation attacks from Riddell as recently as five days ago. Absent a prompt sale or a reorganization that results in a strengthened operation, the value of the Debtors' estates will continue to decline.

16.     In order to operate during these chapter 11 proceedings and thereby have an opportunity to complete an orderly sale of their assets and/or to restructure their capital structure through a plan of reorganization, the Debtors will need additional financing, almost immediately. Therefore, after substantial negotiations, the Debtors and their Secured Lenders (as defined below) reached an agreement to fund the Debtors' operations to allow for a competitive sale process or a successful restructuring. The DIP Facility (as defined below) involves financing by the Prepetition Secured Lenders in the amount of up to $34,000,000 on a final basis, in accordance with the terms and conditions set forth in the proposed DIP Loan Documents (as defined below). The liens and security interests granted to the Agent (as defined below), as agent under the DIP Loan Documents, by the Debtors will constitute first priority and valid liens upon and security interests in all of the Debtors' assets and will not be subject to any claims, set-offs, or defenses by the Debtors.

17.     A chapter 11 filing is not only reasonable, but necessary, to prevent further deterioration of value and maximize the value of the Debtors' estates for the benefit of their stakeholders. The Debtors' board of directors (the "**Board**") ultimately determined that the most effective way to maximize the value of the Debtors' estates for the benefit of all of their stakeholders was to seek protection under chapter 11 in order to pursue either or both of a Sale or a Plan resulting in a strengthened operation, while the Debtors enjoy a breathing spell from the litigation attacks of Riddell. During a special board meeting held on September 3, 2010 and continued to September 5, 2010, the Board met and voted to approve a resolution giving

authority to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code for each of the Debtors.

## III.
## BACKGROUND

**A.     Overview of the Debtors**

18.     The Debtors manufacture protective gear for athletes primarily in football, baseball and softball.  The Debtors serve a broad range of clientele, including youth, high school, college and professional teams throughout the United States and Canada.  The Debtors also serve clients overseas, including those in Canada, Germany and Japan, but the vast majority of the Debtors' customers are located within the United States.  The Debtors' presence in the football helmet and faceguard markets is unparalleled.  In football, the Debtors hold a number-one position in the youth and face-guard markets and a number-two position in the varsity market and reconditioning business.  The Debtors' market leading position in football gear is sustained by their superior products, robust new product pipeline and significant investment in technology and intellectual property.  Such leading position in the football market enables the Debtors to penetrate other sporting equipment markets requiring protective gear, such as baseball and softball.

19.     Founded in 1918, the Debtors started as a manufacturer of basketball goals and dry line markers out of Mr. Bill Schutt's hardware store in Litchfield, Illinois.  Over the past century, the Debtors have grown to be a market leader in their industry with approximately $69 million of total revenue as of the fiscal year ended 2009, 80% of which is generated by the Debtors' manufacturing division and the rest, by their reconditioning division.  The Debtors employ approximately 360 permanent employees and approximately 160 additional temporary employees in months when they need additional workforce to fulfill their seasonal production

needs. The Debtors are the number-two employer in Litchfield, Illinois and the number-three employer in Salem, Illinois, thereby providing significant economic stability to those regions.

20.    For the Debtors' manufacturing division, their central location in Illinois provides efficient nationwide reach via land and air transportation for distribution. The Debtors' reconditioning business operates through their facilities in Easton, Pennsylvania. The Debtors utilize a domestic manufacturing strategy for their product lines, for which quality control is critical and speed to market and customization offer a significant competitive advantage.

21.    The Debtors invest heavily in their research and development ("**R&D**") and intellectual property to achieve their superior product quality and robust new product pipeline. The four core areas of the Debtors' R&D focus are protection, impact absorption, weight, and environment, all of which enhance the user's on-field experience by lessening impact, reducing fatigue and injuries, improving temperature control, and ultimately maximizing performance. Each year, the Debtors introduce and phase in new technology into their premier product lines. For example, after faceguards became mandatory in football in 1970, the Debtors underwent decades of innovative product development and introduction, including, but not limited to, the game's first titanium football faceguards, the world's first helmet with TPU cushioning with the same material traditionally used for military helmets, climate-controlled shoulder pads, and shock-absorbing helmets and faceguards.

22.    The Debtors use a multi-layered sales network, with a lean in-house sales and marketing department that manages independent sales representatives, who, in turn, manage over a thousand sales representatives at a local level (the "**Team Dealers**"), a lot of whom manage road salesmen. Each of the four in-house sales employees is responsible for one of the four broad regions, managing independent sales representatives in his region and collectively

covering the United States coast to coast. The 31 independent representatives work on commission and manage the relationships with an aggregate of more than 1,000 Team Dealers, who market, promote and sell Schutt products to the end customers at the local level. It is estimated that local sales representatives, such as the Team Dealers, sell and distribute over 50% of the $2.5 billion sporting goods equipment sold in the United States annually. Team Dealers consist of national, regional and local companies that sell sporting goods and other products to a variety of customers in their respective coverage areas, including recreational leagues, youth sports groups, high schools, colleges and professional teams. Team Dealers also sell directly to consumer end-users through retail locations. The institutional sporting equipment market is highly fragmented, and historical relationships and local knowledge are critical to the success in these markets. The Team Dealers have direct relationships with and access to the thousands of high schools, colleges, sports leagues and other institutional customers across the country and often use more than 3,000 road salesmen to sell product. The Debtors' sales network is based upon the intimate and long-standing relationships between these Team Dealers and the institutional end-customers, which relationships often span decades and provide invaluable insight into the end-consumers' needs and purchasing habits. As such, the independent sales representatives and Team Dealers are indispensable components of the Debtors' sales network.

23. The Debtors' business is extremely seasonal, because of the nature of their products. The Debtors' customers generally order new equipment in the Spring for the upcoming school year, the Debtors' manufacturing and shipping activities peak in August, the majority of their payables are collected by the end of October, and the sales and manufacturing activities subside significantly during the months of September through February.

24.     The Debtors' products are manufactured in Litchfield and Salem, Illinois, and warehoused initially in their warehousing facility in Litchfield. From their warehouse in Litchfield, the Debtors distribute their products through Team Dealers and other retail accounts as described above.

25.     The Debtors' reconditioning business is mainly located in Easton, Pennsylvania. The Debtors originally had a small reconditioning division, but acquired Circle System Group, Inc. ("**Circle System**") in September 2005 (the "**Circe Acquisition**" or "**Acquisition**"), which is currently the second largest athletic equipment reconditioning business in the United States after Riddell, which is the Debtors' largest competitor in the market space. Through Circle System, the Debtors provide value-added reconditioning services to their customers to maximize the useful life of their various products. Their services range from helmet refurbishing and recertification to shoulder pad refurbishing to in-season laundry, providing various youth teams, schools and leagues with viable alternatives to purchasing new equipment. The Debtors have a network of reconditioning dealers with wide coverage within the United States.

## B.    **Prepetition Capital Structure**

*Prepetition Secured Loans*

26.     Bank of America, N.A., as administrative agent and as lender (the "**Agent**"), along with other lender signatories (collectively and together with the Agent, the "**Prepetition Secured Lenders**") and Schutt Sports, Inc., Mountain View Investment Company of Illinois, Circle System Group, Inc., Melas, Inc., R.D.H. Enterprises, Inc., and Triangle Sports, Inc., as borrowers (collectively, the "**Borrowers**"), and Schutt Holdings, Inc. ("**Schutt Parent**"), as guarantor, are parties to that certain Amended and Restated Loan and Security Agreement dated as of September 30, 2005 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Credit Agreement**") and all collateral

and ancillary documents executed in connection therewith (the "**Prepetition Secured Loan Documents**"), pursuant to which, among other things, the Secured Lender agreed, subject to the terms and conditions set forth in the Prepetition Credit Agreement, to make certain loans and other financial accommodations to Debtors (the "**Prepetition Secured Loans**"). The principal amount of the Prepetition Secured Loans was not less than $34,820,675.20 as of the Petition Date, plus accrued and unpaid prepetition and postpetition interest, fees, expenses and other amounts chargeable under the Prepetition Secured Loan Documents.[2] The Prepetition Secured Loans mature on December 31, 2010.

*Prepetition Subordinated Notes*

27.     On September 30, 2005, and by amendment thereafter, the Debtors issued, pursuant to an Amended and Restated Subordinated Note Agreement, those certain unsecured notes due 2011 (the "**Prepetition Subordinated Notes**") to Windjammer Mezzanine & Equity Fund II, L.P. (the "**Noteholder**"). The Prepetition Subordinated Notes mature on December 31, 2011 and bear interest at the rate of 10% per annum plus the Applicable PIK Percentage (as defined in the Amended and Restated Subordinated Note Agreement). Payment of the Prepetition Subordinated Notes is guaranteed by Schutt Parent. As of the Petition Date, the Debtors owed not less than $12.3 million in principal amount on the Prepetition Subordinated Notes plus interest (together with the Prepetition Secured Loans, the "**Prepetition Loans**").

*Prepetition Subordination Agreement*

28.     The Prepetition Subordinated Notes are fully subordinated in right of payment to the Prepetition Secured Loans pursuant to the terms of that certain Amended and Restated

---

[2]  Unless otherwise specified, all capitalized terms used but not defined in the paragraphs in this section, entitled "Prepetition Capital Structure," shall have the meanings ascribed to them in the DIP Financing Motion (as defined below).

Subordination Agreement, dated as of September 30, 2005 (as amended, restated, supplemented, or otherwise modified, the "**Prepetition Subordination Agreement**"). Pursuant to the Prepetition Subordination Agreement, the Noteholder, as holder of 100% of the Prepetition Subordinated Notes, agreed, among other things, that upon the occurrence of any insolvency proceeding, (a) the Agent and the Prepetition Secured Lenders shall be entitled to receive payment in full in cash of any and all of the Prepetition Secured Loans prior to the payment of all or any part of the Prepetition Subordinated Notes, (b) any payment or distribution of any kind or character, whether in cash, securities or other property, which shall be payable or deliverable upon or with respect to any or all of the Prepetition Subordinated Notes shall be paid or delivered directly to the Agent for application to any of the Prepetition Secured Loans until the Prepetition Secured Loans have been paid in full, and (c) the Agent may assert the Noteholder's claims with respect to the Prepetition Subordinated Notes against the Borrowers until all of the Prepetition Secured Loans have been paid in full. *See* Prepetition Subordination Agreement, § 6.

*Equity*

29.     The Debtors' equity is owned 100% by their parent company, Schutt Holdings, Inc.

### C.     Events Leading to Debtors' Chapter 11 Filing

*Circle Acquisition*

30.     As described above, the Debtors' reconditioning business was expanded through the Circle Acquisition in September 2005 for a purchase price of $23.4 million. Even though the acquisition itself was supported by strong business rationale, the Circle Acquisition generated a significant burden on the Debtors, because of certain fraudulent activities, unknown to the Debtors at the time of the acquisition, that had taken place before the Debtors acquired Circle System.

31.     In Spring 2007, the Department of Justice discovered that the prior owners and management of Circle System had engaged in certain frauds (the "**Circle Frauds**"), including, but not limited to, bribery to government officials and accounting frauds. Such fraudulent activities resulted in an overstatement of Circle's EBITDA, based on which the consideration for the Acquisition was paid. In addition to overpaying for the Acquisition based on a fraudulently inflated EBITDA, the Debtors had to bear the litigation costs associated with the Circle Frauds and related cases, which demanded of the Debtors higher cash spending and an inordinate amount of management's time and attention and resulted in significant negative public relations, all of which generated a downward pressure on the Debtors' profitability. Even though a judgment was rendered in favor of the Debtors on the issue of liability against the former owners and management of Circle System, the tangible and intangible costs of the Circle Frauds and the related litigations have been a large detriment to the Debtors' business and profitability.

*Economic Crisis*

32.     As the Debtors were struggling to survive the negative impact of the Circle Frauds, the global economy started to collapse in the Fall of 2008. Since the domestic financial and economic markets also went through an unprecedented downturn, school budgets were significantly reduced, and overall demand for varsity football products decreased substantially. Such reduction in school budgets and decrease in demand resulted in lower sales, lower margins and, ultimately, lower profitability for the Debtors.

*Covenant Violations and Events of Default*

33.     As a result of the economic crisis as well as the Circle Frauds, the Debtors have been operating with an overleveraged balance sheet and in violation of certain financial covenants under both of their Prepetition Loans, thereby causing further stress on their business. On July 1, 2010, the Agent under the Prepetition Credit Agreement provided notice to the

Debtors of an event of default. On August 18, 2010, the Agent provided another notice to the Debtors of the existence of further events of default, in addition to the existing event of default notified on the July 1, 2010 letter, and continuation thereof. As a result of such events of default, the Prepetition Secured Lenders have no obligation under the Prepetition Secured Loan Documents to provide any further financing, and the Agent is entitled to certain rights and remedies, including, without limitation, the right to charge interest at the Default Rate. The Debtors also failed to make a certain AHYDO (Applicable High Yield Discount Obligation) payment under the Prepetition Subordinated Notes in April 2010. Consequently, the Debtors are faced with defaults under their Prepetition Loans and their Prepetition Secured Loans maturing in December 2010.

*Riddell Litigation*

34.     In the meantime, in December 2008, Riddell, Inc. ("**Riddell**") filed a lawsuit against Schutt Sports, Inc. ("**Schutt**"), claiming patent infringement on certain specific football helmet features (the "**Riddell Litigation**" or the "**Litigation**") with regard to two of Schutt's most successful products -- its "DNA" and "ION" model football helmets, which were introduced in 2004 and 2007, respectively. Riddell also filed claims against the Debtors asserting a violation of the Lanham Act, trade libel and product disparagement and false and misleading statements to the purchasing public about Riddell's products and about the Debtors. The Debtors denied Riddell's allegations, asserted various affirmative defenses, and filed counterclaims against Riddell, including a claim for false advertising and deceptive trade practices. The Riddell Litigation was filed in the United States District Court for the Western District of Wisconsin (the "**Riddell Court**") and styled as *Riddell, Inc. v. Schutt Sports, Inc.*, Civil Action No. 3:08-cv-00711-BBC.

35. Even though the Debtors and their litigation counsel believe that such patent infringement claims were frivolous, following a jury trial on August 5, 2010, the jury found that the Debtors' "DNA" and "ION" football helmet models infringed Riddell's "Football Helmet" and "Sports Helmet" patents. On August 9, 2010, the jury awarded Riddell lost profit damages in the amount of $24 million. The jury also awarded Riddell $5 million for sales for which it found Riddell was not entitled to lost profits but was entitled to a reasonable royalty. Finally, the jury awarded Riddell $24,750 in damages for infringement of its "Face Guard For A Sports Helmet" patent. The jury did not find in favor of the Debtors on their counterclaims seeking declarations of invalidity, unenforceability and non-infringement. The jury did not render any verdicts on Riddell's claims for violation of the Lanham Act, trade libel and product disparagement or the Debtors' claims for false advertising and deceptive trade practices. Shortly after the jury verdict, Riddell made an oral motion for an injunction.

36. Following the jury verdict, on August 10, 2010, Riddell and Schutt entered a stipulation to postpone any hearing on Riddell's motion for permanent injunction until August 23, 2010 or as soon thereafter as the Riddell Court's schedule allowed. On or about August 18, 2010, a judgment was entered in accordance with the jury verdict. Subsequently, on August 20, 2010, Riddell and Schutt entered into another stipulation that, among other things, (i) stays all proceedings in the Riddell Litigation, including any hearing, disposition or order on Riddell's motion for permanent injunction until September 6, 2010; (ii) allows Schutt to continue selling the allegedly infringing products in the ordinary course of business; and (iii) stayed the enforcement of the $29 million judgment until September 10, 2010 (the "**Stipulation**").

37. Notably, the trial of the Litigation revealed that Riddell had known of the alleged infringing helmet since 2003, and, without notifying the Debtors of any alleged infringement,

Riddell waited for five years before bringing the Litigation. Riddell also did not request any preliminary injunctive relief to stop Schutt from manufacturing, selling and distributing its "DNA" and "ION" football helmets during the pendency of the Litigation, which lasted over one-and-a-half years, and only sought such relief after the jury verdict.

38.     On August 10, 2010, Schutt filed a Motion for Judgment as a Matter of Law of Non-Infringement and, in the alternative, a Motion for a New Trial. Riddell filed its Opposition to Schutt's motion on August 25, 2010, and Schutt's reply in support of its motion is due on September 7, 2010. Moreover, additional post-trial motions (including motions for judgment as a matter of law and motions for a new trial) are due on September 15, 2010.

39.     While the Debtors strongly contend that the DNA and ION football helmets do not infringe Riddell's patents, and while the Debtors believe that Schutt will be vindicated on appeal, the Debtors have nonetheless undertaken a good faith effort to retool their helmets to avoid the purported infringement. In this regard, the Debtors recently produced a sample second generation DNA/ION football helmet, which will not infringe on the Riddell patents, no matter the outcome of the Riddell Litigation. The Debtors will be able to offer a non-infringing alternative product in approximately four months.

40.     On September 1, 2010, Riddell brought another lawsuit against Schutt this time claiming that certain of the Debtors' "AiR Flex" shoulder pads infringe upon Riddell's "384 patent" entitled "Shoulder Pad for Contact Sports." Riddell requested, among other things, that it be awarded treble damages with prejudgment interest, attorneys' fees and expenses as well as actual and compensatory damages, that the Debtors be preliminarily and permanently enjoined from producing the allegedly infringing shoulder pads, and that a trial by jury be conducted. This new litigation is filed before the same court that heard the Riddell Litigation. The lawsuit

was filed in the United States District Court for the Western District of Wisconsin and styled as *Riddell, Inc. v. Schutt Sports, Inc.*, Civil Action No. 3:10-cv-00504-BBC.

*Decision to File for Chapter 11 Protection*

41.     As shown above, the Debtors have gone through a variety of external and internal events that have led to a decline in their operating performance.  The Circle Acquisition, which was based on prudent business reasoning, brought an unexpected burden to the Debtors, because of the pre-acquisition fraudulent activities unbeknownst to the Debtors.  The global economy went into an unprecedented credit crisis and slowdown.  While the Debtors were struggling to survive the impacts of the Circle Acquisition and the recession, the Debtors' biggest rival brought a patent infringement suit, and the Debtors are now faced with a judgment in the aggregate of approximately $29 million, which, if upheld on appeal, the Debtors cannot sustain. In addition, while the Stipulation was in effect and Riddell was receiving confidential information about the Debtors pursuant to the terms of the Stipulation, Riddell brought yet another patent infringement lawsuit against the Debtors.

42.     Riddell's parent, Easton Bell, is one of the largest competitors in the sporting goods equipment industry, especially for protective gear in football through Riddell, and its overall business dwarfs the Debtors, which is the next most prominent manufacturer in the football equipment industry, in terms of sales, revenues, profits, employee numbers and market share.  The Debtors firmly believe that Riddell is inundating the Debtors with multiple frivolous lawsuits, in an effort to drive the Debtors out of the market and enjoy what would essentially be a monopoly in Riddell's favor.

43.     The combination of the deteriorating revenues and margins, the continued burden of litigation costs in connection with the Circle Frauds and the Riddell Litigation, the onerous jury verdict in the Riddell Litigation, the covenant violations and defaults under their Prepetition

Loans, the prospect of having no alternative source of financing once their Prepetition Secured Loans mature and their inability to generate sufficient cash flow to meet their obligations under the Prepetition Loans made it necessary for the Debtors to seek protection under chapter 11.

**D.     The Debtors' Intentions in Chapter 11**

44.     In chapter 11, the Debtors have an opportunity to effectuate their strategy to avoid further deterioration of their business and achieve maximum values for all constituents.  The Debtors believe that chapter 11 protection will allow the Debtors to sell their assets as a going concern and/or restructure their capital structure so that they can continue as a strong competitor in the industry.  In order to maintain the Debtors' enterprise value, additional financing and use of cash collateral are required to fund the Debtors' business in the ordinary course, including the funding of payroll, additional materials purchases, other general expenses and funding interest. Under the chapter 11 protection and the relief afforded therein, the Debtors will be able to sell to an entity with a financially stronger balance sheet or restructure their balance sheet to operate with a sustainable level of leverage, reconfigure their products to be unaffected by the Riddell Litigation and maximize value for their stakeholders.

45.     In order to effectuate strategies to maximize value for all constituents, including unsecured creditors, the Debtors were forced to commence these cases now and respectfully seek the relief set forth in the First Day Motions summarized below.

**IV.**
**FIRST DAY MOTIONS** [3]

46.     Concurrently with filing the voluntary petitions to commence these cases, the Debtors will be filing a number of First Day Motions.  The Debtors anticipate that the Court will

---

[3]  Capitalized terms used in Part IV and not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Motions.

conduct a hearing within a business day or two after the commencement of these cases (the "**First Day Hearing**"), during which the Court will entertain the argument of counsel with respect to the relief sought in each of the First Day Motions.

47.     Generally, the First Day Motions have been designed to meet the immediate goals of: (a) establishing procedures for the efficient administration of these cases; (b) continuing the Debtors' operations during these cases with as little disruption and loss of productivity as possible; and (c) maintaining the confidence and support of vendors, customers, employees and other key constituencies.

48.     I have reviewed each of the First Day Motions, including the exhibits thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve success in these cases.  Moreover, I have carefully reviewed each of the factual statements in the First Day Motions and believe each such factual statement to be accurate.  Based upon the foregoing statement, as opposed to repeating each and every factual recitation in the First Day Motions, all of the facts set forth in the First Day Motions shall be incorporated herein by reference.

49.     The First Day Motions are identified, listed and more fully described below:

*Administrative Motions*

A.     **Motion of the Debtors for Entry of an Order
       <u>Directing Joint Administration of Chapter 11 Cases</u>**

50.     By this motion (the "**Joint Administration Motion**"), the Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for all of the Debtors' chapter 11 cases under the Schutt Sports, Inc. case and also request that an entry be

made on the docket of each of the Debtors' chapter 11 cases, other than that of Schutt Sports, Inc., to reflect the joint administration of these cases.

51.     Schutt Sports, Inc. is the main operating entity among all of the other Debtors in these cases, and all of the Debtors are wholly owned and controlled by the same parent entity, Schutt Holdings, Inc., a non-debtor.  The Debtors' financial affairs and business operations are closely related, and the Debtors anticipate that numerous notices, applications, motions, other documents, pleadings, hearings, and orders in these cases will affect all of the Debtors.  With six (6) affiliated Debtors, each with its own case docket, the failure to administer these cases jointly would result in numerous duplicative pleadings being filed and served upon parties identified in separate service lists.  Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Debtors, the Clerk of this Court (the "**Clerk**"), creditors, and other parties-in-interest in these cases.

52.     The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases, because the relief sought is purely procedural and is in no way intended to affect substantive rights.  Each creditor and party-in-interest will maintain claims or rights it has against the particular estate in which it allegedly has a claim or right.  Indeed, the rights of all creditors will be enhanced by the efficiencies and reductions in costs resulting from joint administration.  The Court also will be relieved of the burden of entering duplicative orders and keeping duplicative files.  Supervision of the administrative aspects of these cases by the Office of the United States Trustee also will be simplified.

53.     Given the integrated nature of the Debtors' operations, joint administration of these cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings and orders that will arise in these

chapter 11 cases will jointly affect each of the Debtors. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the Office of the United States Trustee and all parties in interest to monitor these cases with greater ease and efficiency. Accordingly, the Debtors believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and will minimize the burden that would otherwise be imposed on such parties as well as the Court.

**B.** **Motion of the Debtors for Entry of an Order Granting Administrative Expense Status to Debtors' Undisputed Obligations Arising from the Postpetition Delivery of Goods Ordered Prepetition**

54. By this motion (the "**Postpetition Obligations Motion**"), the Debtors request entry of an order granting administrative expense priority status to those undisputed obligations of the Debtors arising from supplies, materials and/or services ordered pursuant to prepetition purchase or service orders with various Vendors, to the extent such supplies, materials and/or services are received and actually accepted by the Debtors subsequent to the commencement of these cases. The Debtors intend to satisfy such undisputed obligations to Vendors in the ordinary course of business.

55. The Debtors are only seeking the Court's grant of administrative expense priority to those goods and services that they receive and accept postpetition. In the ordinary operation of the Debtors' businesses, the Vendors provide the Debtors with goods (*i.e.*, supplies and materials) and/or services necessary for their continued operations. As of the Petition Date, and in the ordinary course of their businesses, the Debtors had numerous prepetition purchase or service orders outstanding with the Vendors (collectively, the "**Outstanding Orders**"). Due to the volume of orders typically placed in the ordinary course of business, the Debtors cannot readily determine the exact amount they will owe under the Outstanding Orders; however, based

on estimates of the past few months, the Debtors believe that Outstanding Orders may aggregate up to approximately $4.6 million. Importantly, any and all amounts owing for postpetition delivery of goods or postpetition performance of services accepted by the Debtors (and so necessary to the preservation of the estates) constitute administrative expenses as a benefit to the Debtors' estates.

56. The relief requested herein ensures the continuous performance of services and supply of goods and materials that are indispensable to the Debtors' continuing operations and integral to a successful reorganization. Absent such relief, the Vendors may require the Debtors to reissue prepetition service or purchase orders in order to obtain administrative expense priority for their claims relating to supplies, materials or services being received postpetition. The time spent issuing such replacement orders, and any disruption in the flow of goods or services, could jeopardize the Debtors' operations at this critical time during which the Debtors must maintain the confidence of, among others, the suppliers that are essential to the Debtors' businesses. Further, the requested relief does not alter the substantive rights of any party, since the Vendors are providing a direct postpetition benefit to the Debtors' estates and would accordingly be entitled to administrative expense treatment even absent the relief requested in this Motion. As such, the relief requested is akin to a "comfort order" that will provide a necessary degree of comfort and stability to the Debtors' suppliers.

57. Accordingly, the Debtors believe that the relief requested in the Postpetition Obligations Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 with minimal disruption.

*Operational Motions*

**C.     Motion of the Debtors for Entry of an Order (I) Authorizing
Debtors to Pay (A) All Prepetition Employee Obligations, and (B) Prepetition
Withholding Obligations, and (II) Directing Banks to Honor Related Transfers**

58.     The Debtors filed a motion requesting the authority, in their sole discretion, to pay

prepetition claims, honor obligations and to continue programs in the ordinary course of business

and consistent with past practices relating to Employee Obligations (the "**Employee Wage**

**Motion**").  As of the Petition Date, the Debtors employ approximately 520 employees, of which

approximately 160 are temporary seasonal workers and 360 are permanent workers.  The number

of employees is generally lower from September through December and then increases from

March through August during the peak of the football manufacturing season.  As of the Petition

Date, the Debtors estimate they owe approximately $604,000 on account of prepetition wages,

salaries and other compensation, excluding reimbursable expenses and paid time off.  In addition

to their Employees, the Debtors have agreements with a total of approximately 31 individuals

who work with the Debtors as independent sales representatives (the "**Independent Sales**

**Reps**"), who, through their long-standing relationships with dealers and road salesmen, are the

driving force behind their sale structure.   The Independent Sales Reps receive commissions

based on their sales; however, the Debtors withhold 10% of the Independent Sales Reps'

commissions during the calendar year, which amounts are typically paid in January.   If the

Debtors are unable to continue to pay the Independent Sales Reps their withheld commissions,

they will lose the services of the Independent Sales Reps and their sales network will collapse.

The Debtors estimate that, as of the Petition Date, in the aggregate, there will be approximately

$130,000 in accrued and unpaid commissions associated with the withheld commissions and

approximately $320,000 in accrued and unpaid commissions associated with sales activity in

August of this year.  Integrated Payroll Services, Inc. ("**IPS**") processes payroll for the Debtors

at all locations. The Debtors pay IPS a total of approximately $2,500 per month on account of payroll administration and certain other payroll related services. IPS deducts the monthly fee of $2,500 from the Debtors' accounts. The Debtors estimate that there are no accrued and unpaid costs in connection with IPS. However, out of an abundance of caution, the Debtors request the authority to pay, if any, prepetition accrued and unpaid fees to IPS and continue pay IPS the monthly fee in the ordinary course of business.

59.     In addition, the Debtors are seeking authority in the Employee Wages Motion to continue the Debtors' various employee benefit plans and policies, including, without limitation, health care, dental and vision plans, workers compensation benefits, paid personal time off, basic life insurance, additional voluntary life insurance and dependent life insurance and a 401(k) plan.

60.     Employees are essential to the continued operation of the Debtors' business and the Employees' morale directly affects their effectiveness and productivity. Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date. If the checks issued and electronic fund transfers requested in payment of any of the compensation or other Employee obligations are dishonored, or if such obligations are not timely paid postpetition, the Employees may suffer extreme personal hardship and may be unable to pay their daily living expenses. Loss of Employee morale and goodwill at this crucial juncture would undermine the Debtors' stability, and undoubtedly would have a negative effect on the Debtors, their customers, the value of their assets and business, and their ability to achieve their objectives in chapter 11.

61.     In order to enable the Debtors to retain their current Employees to minimize the personal hardship such Employees may suffer if prepetition employee-related obligations are not paid when due, or honored as expected, and to maintain morale, the Debtors filed the Employee

Wage Motion to seek authority, in their discretion, to pay and/or honor (a) all prepetition wage and salary claims of Employees, up to the statutory cap of $11,725 per Employee, (b) any claims or payments pursuant to the Employee Benefit Plans, and (c) all prepetition federal and state withholding obligations, as well as an order directing all banks to honor the Debtors' prepetition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

**D.  Motion of the Debtors for Entry of an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System, and (C) Granting Administrative Expense Status to Postpetition Intercompany Claims**

62.     By this motion (the "**Cash Management Motion**"), the Debtors seek an order: (a) authorizing the maintenance of Bank Accounts and continued use of existing Business Forms; (b) authorizing but not directing continued use of existing Cash Management System; (c) waiving certain of the Guidelines set forth by the Office of the United States Trustee; (d) granting administrative expense status to postpetition intercompany claims; and (e) providing any additional relief required in order to effectuate the foregoing.

63.     Prior to the Petition Date, and in the ordinary course of their business, the Debtors maintained seven (7) Bank Accounts. The Bank Accounts are part of a carefully-constructed and highly-automated Cash Management System that ensures the Debtors' ability to efficiently monitor and control their cash position. The Debtors' Cash Management System is maintained primarily with Bank of America. In addition, the Debtors maintain two small accounts with LNB. The Debtors' current Cash Management System has been in place for nearly five (5) years. Currently, the Debtors utilize Bank of America for a majority of their banking needs, only using the LNB Accounts on rare occasions.

64. The Debtors' Cash Management System as of the Petition Date is summarized as follows:

a. Lockbox Account: The Debtors maintain a Lockbox Account (the "**Lockbox Account**") with Bank of America, to which deposits from each of the Debtors' business locations are made multiple times each day. The Lockbox Account is subject to a control agreement with Bank of America. All funds received therein are automatically applied to reduce the Debtors' obligations to Bank of America under that certain Amended and Restated Loan and Security Agreement, dated September 30, 2005 (as amended or modified to date, the "**Loan Agreement**"). Deposits made into the Lockbox Account include checks, wire transfers, automated clearinghouse transfers, credit card payments (VISA, MasterCard, Discover and American Express as well as other debit cards), and cash receipts.

b. Operating Account: The Debtors also maintain an operating account (the "**Operating Account**") with Bank of America, which funds all of the Debtors' operations. On an as-needed basis, and generally multiple times daily, the Operating Account draws on a Bank of America line of credit to fund the operations of the Debtors' businesses. The Operating Account then distributes those funds to certain of the accounts described below. In addition, when necessary to pay for certain expenses, the Operating Account also remits wire payments and automated clearinghouse transfers.

c. Disbursement Accounts: The Debtors maintain three (3) disbursement accounts (the "**Disbursement Accounts**"), which operate for certain dedicated purposes. One Disbursement Account makes payments in respect of the Debtors' employees' medical reimbursements (the "**Medical Account**"). The Debtors are a self-funded medical coverage provider, and after a request for reimbursement for medical expenses has been properly approved, the Medical Account draws on the Operating Account to fund the reimbursement. In addition, another of the Disbursement Accounts is an accounts payable and payroll account (the "**A/P & Payroll Account**"). The A/P & Payroll Account process payments to vendors and other trade creditors, as necessary. Moreover, the A/P & Payroll Account, on a bi-weekly basis, remits payments to the Debtors' payroll processor in order to fund payroll and certain related employee benefit obligations. The Debtors' third Disbursement Account is an account for the Debtors' Easton, Pennsylvania plant (the "**Easton Account**"), which remits payments for obligations incurred in respect of the Debtors' reconditioning facility in Easton, Pennsylvania. Each of the Disbursement Accounts are zero balance accounts.

d. LNB Accounts: The Debtors maintain two accounts at LNB (the "**LNB Accounts**"). One of the LNB Accounts is a general account, which the Debtors have used for deposits received from entities such as eBay, Inc. In addition, the Debtors maintain a miscellaneous account at LNB, in which they hold funds from sales of miscellaneous items (*i.e.*, not the Debtors' manufactured products) such

as unused corrugated cardboard or other similar excess or unused material relating to the manufacturing operations that are sold. The Debtors do not process distributions or make payments from the LNB Accounts. In addition, the LNB Accounts are rarely used and generally hold *de minimis* amounts, if any.

65.     The Debtors reconcile cash receipts on a daily basis, and perform a reconciliation of all of the deposits and debits in the Cash Management System once a month. I believe the Debtors' transition into chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of these cases with the same account numbers and, where applicable, automated relationship. The Debtors further request authority to deposit funds in and withdraw funds from all such accounts by all usual means including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers, and other debits and to treat the Bank Accounts for all purposes as debtor-in-possession accounts.

66.     In addition, in the ordinary course of business, the Debtors use pre-printed check stock with the relevant Debtor's name printed thereon. In addition, the Debtors maintain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials, and other business forms (collectively, along with the Debtors' checks, the "**Business Forms**"). To minimize administrative expense and delay, the Debtors request authority to continue to use their Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' "Debtor-in-Possession" status.

67.     Furthermore, the Debtors maintain business relationships with each other that give rise to intercompany claims (the "**Intercompany Transactions**"). The Debtors maintain records of substantially all Intercompany Transactions, including fund transfers, and thus can ascertain, trace and account for Intercompany Transactions. The Debtors reconcile all Intercompany Transactions on a monthly basis. The Debtors will continue to maintain records and appropriately reconcile all Intercompany Transactions postpetition. The Debtors request that

the Court grant administrative expense priority to the Intercompany Transactions, subject only to any claims of Bank of America, which are valid and enforceable under section 364 of the Bankruptcy Code.

68.     The Debtors believe that the relief requested in the Cash Management Motion will help ensure the Debtors' smooth transition into chapter 11 and avoid the possible disruptions and distractions that could otherwise divert the Debtors' attention from more pressing matters during the initial days of these cases.

**E.      Motion of the Debtors for Entry of Interim and Final Orders
         Pursuant to Sections 105(a) and 366 of the Bankruptcy Code
         (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service,
         (II) Deeming Utilities Adequately Assured of Future Performance, and
         (III) Establishing Procedures  for Determining Adequate Assurance of Payment**

69.     The Debtors seek entry of interim and final orders (a) prohibiting their Utility Providers (as defined below) from altering, refusing, or discontinuing service; (b) deeming Utility Providers adequately assured of future performance; and (c) establishing procedures for determining adequate assurance of payment (the "**Utility Motion**").   In addition, the Debtors request that the Court set a final hearing on the Debtors' proposed adequate assurance procedures.

70.     In connection with the operation of their business and management of their estates, the Debtors obtain electricity, gas, water, sewer services, internet services, alarm services, telephone services, and/or other similar services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Providers**").

71.     In the ordinary course of business, the Debtors regularly incur utility expenses for Utility Services provided by various Utility Providers.  The Debtors have a long and established payment history with most or all of the Utility Providers.  The Debtors' aggregate average monthly cost for utility services is approximately $81,621.

72.     Uninterrupted utility services are essential to the preservation of the Debtors' estates and assets, and therefore, to the success of these cases. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to preserve and maximize the value of their respective estates could be severely and irreparably harmed. Specifically, lack of electricity and phone service would render the Debtors' burglar and fire alarm systems, which are necessary to maintain insurance coverage, inoperable. In addition, the lack of electricity would cause a sudden halt in the Debtors' production. It is therefore critical that utility services continue uninterrupted.

73.     In light of the severe consequences to the Debtors of any interruption in services by the Utility Providers, but recognizing the right of the Utility Providers to evaluate the Proposed Adequate Assurance on a case-by-case basis, the Debtors propose that the Procedures Order approve and adopt the Adequate Assurance Procedures.

74.     The Debtors intend to pay all postpetition obligations and expect that revenues generated from their business operations and the financing available to them will be sufficient to pay all undisputed postpetition obligations owed to the Utility Providers in a timely manner. However, to provide adequate assurance of payment for future services to the Utility Providers as set forth in section 366(c) of the Bankruptcy Code, the Debtors propose to deposit an initial sum equal to the Debtors' estimated average cost for two (2) weeks of Utility Services (the "**Adequate Assurance Deposit**"), into a segregated account (the "**Adequate Assurance Account**") as soon as practicable after the date hereof, and after interim approval of the Debtors' postpetition financing and use of cash collateral. Because the Debtors' approximate two-week spending on Utility Services is approximately $38,090, the Adequate Assurance Deposit will be approximately $38,090.

75.     The Debtors further propose to maintain the Adequate Assurance Account with a minimum balance equal to the Debtors' estimated average two-week cost of Utility Services through the Final Hearing on the Motion. Thereafter, the Debtors propose to adjust the amount in the Adequate Assurance Account to reflect the following factors: (i) the termination of Utility Services by the Debtors regardless of any Additional Assurance Requests (as defined below), and (ii) agreements with the Utility Providers.

76.     The Debtors submit that the Adequate Assurance Deposit, taken together with the facts and circumstances of the Debtors' chapter 11 cases (together, the "**Proposed Adequate Assurance**"), constitutes sufficient adequate assurance to the Utility Providers. Moreover, the Debtors are seeking approval of a debtor in possession financing arrangement that the Debtors believe will provide adequate liquidity to meet their cash needs during these cases. As a result, the Debtors are likely to continue paying, and be able to continue paying, their obligations to the Utility Providers postpetition. These protections ensure that all Utility Providers will have adequate assurance of payment throughout these cases, and the Debtors believe that no other or further assurance is necessary. However, if any Utility Provider believes adequate assurance is required beyond the protections described herein, it must request such assurance pursuant to the Adequate Assurance Procedures.

77.     The Debtors believe that the proposed Adequate Assurance Deposits are sufficient adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code. The Debtors anticipate that the debtor in possession financing will provide more than sufficient funds to pay operating costs, including the Utility Services. Moreover, the Debtors have a powerful incentive to stay current on their utility obligations because of their significant reliance on utility services to maintain their business operations. These factors - which the Court should consider

when considering the amount of any adequate assurance payments - justify a finding that the Proposed Adequate Assurance is more than sufficient to assure the Utility Providers of future payment. If the Utility Providers disagree with the Debtors' analysis, however, the procedures proposed in this Motion will enable the parties to negotiate and, if necessary, seek Court intervention without jeopardizing the Debtors' chapter 11 cases, while still protecting the rights of the Utility Providers under section 366 of the Bankruptcy Code.

78.     The Debtors' business would simply be paralyzed without the Utility Services, and the Debtors' prospect for a successful case will diminish drastically if the Debtors' Utility Providers refuse to provide the Utility Services. Accordingly, the Debtors respectfully submit that the Court's approval of the Utility Motion is reasonable, necessary and for the benefit of the Debtors' estates, their creditors and all stakeholders.

**F.      Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Pay Prepetition Sales, Use and Similar Taxes and Regulatory Fees in the Ordinary Course of Business, and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

79.     By this motion (the "**Tax Motion**"), the Debtors seek authority to pay, in the Debtors' sole discretion, prepetition Taxes and Fees owed to the Taxing and Regulatory Authorities, including, without limitation, Taxes and Fees subsequently determined to be owed for periods prior to the Petition Date, in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date) not to exceed $25,000.00.

80.     To the extent any check issued or electronic transfer initiated prior to the Petition Date to satisfy any prepetition obligation on account of Taxes or Fees has not cleared the banks as of the Petition Date, the Debtors request the Court to authorize the banks, when requested by the Debtors in their sole discretion, to receive, process, honor, and pay such checks or electronic transfers, provided that there are sufficient funds available in the applicable accounts to make

such payments. The Debtors also seek authorization to issue replacement checks, or to provide for other means of payment to the Taxing and Regulatory Authorities, to the extent necessary to pay such outstanding Taxes and Fees owing for periods prior to the Petition Date.

81. For the reasons described in the Tax Motion, among other things, the payment of prepetition Taxes and Fees will help the Debtors avoid serious disruption to their operations and reorganization efforts that would result from the failure to pay such taxes and fees, including the distraction and adverse affect on morale that could result from liability for nonpayment imposed upon the Debtors' directors and officers. Furthermore, nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in applicable jurisdictions, and seeking to lift the automatic stay, all of which could disrupt the Debtors' day-to-day operations, impose significant costs on the Debtors' estates, and destroy the going-concern value of the Debtors' businesses. Consequently, the Debtors believe that the relief requested in the Tax Motion is in the best interest of the Debtors' estates and all of the Debtors' stakeholders.

G.   **Motion of the Debtors for Entry of an Order
Authorizing the Debtors to (I) Maintain Existing Insurance
Policies and Pay All Policy Premiums and Brokers' Fees Arising
Thereunder, and (II) Continue Insurance Premium Financing Programs and
Pay Insurance Premium Financing Obligations Arising in Connection Therewith**

82. The Debtors believe it is in the best interests of their estates to permit the Debtors to honor their obligations under the current insurance contracts (including related brokers fees) and, therefore, seek authority to honor those obligations by this motion (the "**Insurance Motion**"). In the ordinary course of the Debtors' business, the Debtors maintain numerous insurance policies providing coverage for, *inter alia,* commercial general liability and pollution legal liability, umbrella liability, commercial auto, property, products and completed operations liability, package and workers compensation (collectively, the "**Policies**"). A list of the Policies

is attached to the Insurance Motion as **Exhibit "A"**. These Policies are essential to the preservation of the Debtors' business, properties, and assets, and, in many cases, such insurance coverages are required by various regulations, laws, and contracts that govern the Debtors' business conduct.

83.     The Debtors have determined in their business judgment that it is not economically advantageous for the Debtors to pay the premiums for all of their Policies on an annualized basis. Accordingly, in the ordinary course of the Debtors' businesses, the Debtors finance the premiums on certain of the Policies pursuant to premium financing agreements (each a "**PFA**") with First Insurance Funding Corp. ("**First Insurance**") and AON Premium Finance, LLC ("**AON**"), third-party lenders.

84.     If the Debtors are unable to continue making payments on the Policies, First Insurance and/or AON may be permitted to terminate certain of the Policies to recoup their losses. Furthermore, if the Debtors are unable to continue making payments on the Policies, the insurance companies may not allow the Debtors to renew these Policies at the current rates in the future. The Debtors would then be required to obtain replacement insurance on an expedited basis and at great cost to their estates. Even if the insurance companies were not permitted to terminate the Policies, any interruption of payments would have a severe adverse effect on the Debtors' ability to extend current Policies or acquire new insurance coverage in the future.

85.     As set forth above, the Debtors believe that payment of policy premiums and Brokers' fees is necessary to maintain good relationships with the Debtors' insurers and the Brokers, thereby ensuring the continued availability of insurance coverage and reasonable pricing of such coverage. As a result, the Debtors seek authority to continue making payments under their insurance policies as well as to continue their premium financing arrangements with

respect to the Policies and to renew or enter into new financing arrangements as may be required as the annual terms of existing arrangements expire.

**H.  Motion of the Debtors for Entry of an Order Authorizing (I) the Debtors to Pay Prepetition Claims of Critical Vendors and (II) Financial Institutions to Honor and Process Related Checks and Transfers[4]**

86.     The Debtors seek entry of an order (a) granting them the authority in their sole discretion (but not the obligation) to pay all or a portion of the prepetition obligations of certain Critical Vendors (as defined herein) (the "**Critical Vendor Claims**") and (b) authorizing banks to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing and (c) granting related relief (the "**Critical Vendor Motion**").

87.     The Debtors operate in a highly specialized industry and with limited choices for vendors.  Football is an all-American sport, whose prevalence is fairly limited to the United States.  Therefore, the football equipment industry primarily relies upon the U.S. domestic market and, therefore, has only a few dominant manufacturers.  As a result, there are only a small number of suppliers that serve those manufacturers, and certain suppliers and service providers are simply the only options available to the Debtors.

88.     In the ordinary course of business, the Debtors purchase supplies from a variety of vendors that manufacture various parts of the Debtors' products.  The Debtors also require services from temporary hiring agencies to efficiently manage the seasonality of their business and shipping companies to deliver their products.  As of the Petition Date, the Debtors and their affiliates own and operate several plants and deliver goods and services to many customers on a sometimes weekly basis.  In peak months, the Debtors receive supplies daily, in order to continue production to fill their orders before the school year begins.  Any delay or disruption in the flow

---

[4] The Critical Vendor Motion will not be heard at the First Day Hearing, but at a later hearing date.

of these critical goods to the Debtors would materially impact the Debtors' ability to maintain their reputation in the marketplace with their customers, and therefore, would cause irreparable harm to the Debtors and damage the Debtors' ability to reorganize.

89.     In many instances, the Debtors' vendors are "sole-source" suppliers that maintain an effective monopoly on the goods necessary to run the Debtors' operations. In other instances, it is simply too costly, both in terms of time and pricing, for the Debtors to find another vendor who would supply comparable parts. Certain of the Debtors' vendors have the institutional knowledge about the Debtors' needs and experience with the Debtors' products that are nearly impossible to replace. In addition, if the Debtors become unable to maintain working relationships with their Critical Vendors and, thus, have to change the current helmet designs and components, the Debtors may have to engage in extensive additional testing to meet certain National Operating Committee on Standards for Athletic Equipment ("**NOCSAE**") requirements. Some of the Debtors' vendors are smaller entities, who, while their products or services are essential for the Debtors, may not survive if the Debtors stop making payments to them for their products or services. Keeping these small yet essential vendors afloat is also important for the success in these chapter 11 cases and the Debtors' long-term viability.

90.     Thus, any delay or disruption caused by the vendors' stopping performance would result in an immediate harm and potentially catastrophic long-term consequences to the Debtors' operations and viability. Any erosion in creditor and customer confidence attendant to such a disruption would be difficult, if not impossible, to restore. Accordingly, the Debtors believe that the relief requested herein is necessary to avoid immediate and irreparable harm. The Debtors and their advisors have carefully examined whether the agreement to pay any vendor's unsecured claim, in the Debtors' discretion, in part or in full, and/or on an expedited basis would

reduce the immediate and irreparable harm to the Debtors' business operations that nonpayment of such claim would result in. Specifically, the Debtors have undertaken a thorough review of their accounts payable and their list of prepetition vendors to identify those vendors who are uniquely critical to the Debtors' operations.

91.     In this regard, the Debtors have and continue to consult with the appropriate members of their management team to identify those vendors that are in fact critical to the Debtors' operations, using the following criteria: (a) whether the vendor in question is a "sole-source" or "limited source" provider; (b) whether the Debtors receive advantageous pricing or other terms from a vendor such that replacing the vendor postpetition would result in significantly higher costs to the Debtors; (c) the overall impact on the Debtors' operations if the vendor ceased or delayed shipments; and/or (d) whether the vendor might be able to obtain (or has obtained) mechanics liens, possessory liens, shippers liens or similar state law trade liens on property necessary to the Debtors' ongoing operations. Pursuant thereto, the Debtors have and, upon approval of this Court, will continue to designate, in their discretion, certain vendors who appropriately satisfy the above criteria as vendors critical to their operations (the "**Critical Vendors**").

92.     The Critical Vendors are absolutely essential to the Debtors' ability to operate their businesses. Indeed, the Debtors believe that the failure to provide a benefit to the Critical Vendors for their unsecured claims would, in the Debtors' business judgment, result in the Critical Vendors refusing to provide critical raw goods, parts and supplies to the Debtors postpetition which will have an immediate and devastating effect on the Debtors' ability to operate their businesses. Moreover, any delay attendant to a change from a Critical Vendor to another vendor of similar products (assuming one could be located) would very likely delay the

Debtors' ability to operate their businesses, which would potentially cripple the Debtors' operations at a time of great financial difficulty and fundamental change in the automotive industry.

93.     Accordingly, the Debtors believe that the relief sought herein is not only critical to the Debtors' reorganization efforts, but immediately necessary in light of the nature of the Debtors' operations. If the requested relief is not granted and certain critical trade vendors refuse to continue to supply goods and services to the Debtors postpetition, the Debtors will be out of the football equipment industry for the next school year and may well be entirely unable to continue their operation, which will certainly endanger the Debtors' successful reorganization and substantially harm all creditors.

I.      **Motion of the Debtors for Entry of an Order Pursuant to Section 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Practices and Programs in the Ordinary Course of Business**

94.     The Debtors seek entry of an order, authorizing, but not directing, the Debtors, in their sole discretion, to (a) honor outstanding obligations earned by and owing to their customers under the Debtors' customer-related programs, including without limitation, allowance for defects, promotional rebates, sales growth rebates, a warranty program, and prompt payment discounts (collectively, the "**Customer Programs**") and (b) provide refunds, credit adjustments and/or discounts to their customers in satisfaction of accrued prepetition obligations incurred by the Debtors under their Customer Programs (the "**Customer Programs Motion**"). The Customer Programs will help to maintain customer satisfaction and loyalty without interruption throughout the duration of these cases. All of the Debtors' Customer Programs are accurately described in the Customer Programs Motion.

95.     The success and viability of the Debtors' businesses and the Debtors' ability to successfully maximize value for their stakeholders in these cases are dependent in large part upon the patronage and loyalty of their customers.  To spur sales, maintain their customer base and induce prompt payment, the Debtors offer various individualized incentive programs to their customers, as well as certain limited programs to all of the Debtors' sales representatives at local level (collectively, the "**Team Dealers**").  Maintaining the Customer Programs is critical to the continuation of customer loyalty and satisfaction, and failure to continue these programs would severely and irreparably impair the Debtors' customer relations.  Accordingly, the Debtors request authority to continue the Customer Programs by honoring the rebates and allowances under the Customer Programs.

96.     The Debtors also maintain a warranty program for the benefit of their end-customers.  However, given the individualized and infrequent nature of applicable incidents, it is difficult to estimate at any one time the total amounts that may have accrued under the warranty program.  Nevertheless, the Debtors respectfully submit that maintaining the warranty program is vital to maintain the ongoing relationship between the Debtors and their current and future end-customers and is, therefore, critical to a successful reorganization during these chapter 11 cases. Accordingly, the Debtors seek the authority, in their sole discretion, to continue to honor their obligations under the warranty program as part of their Customer Programs.

97.     Continuation of the Customer Programs does not affect the Approved Budget (as such term is defined in the DIP Financing Motion), since (i) the Approved Budget was established based upon cash collections and trends from 2009, when the same Customer Programs were in place; and (ii) all obligations due under the Customer Programs are adjustments to the Debtors' account receivables and do not require any cash payments.

98.     It is beyond question that one of the Debtors' most valuable assets is their business relationships with the Team Dealers and customers. These business relationships have been developed, in part, through customer service policies aimed at guaranteeing customer satisfaction and fostering loyalty and performance incentives. At the time these Team Dealers and customers purchased merchandise from the Debtors, they fully expected that the Debtors' Customer Programs would be continuously maintained and honored. Discontinuance of these programs would likely undermine the satisfaction of the Team Dealers and customers, jeopardize their loyalty to the Debtors, and would negatively impact the future decisions by such Team dealers and customers. Such negative impact would, in turn, jeopardize the Debtors' ability to reorganize effectively and be competitive upon emergence from chapter 11.[5] Undoubtedly, these cases will cause potential future customers to have concerns about entering into a relationship with the Debtors. The Debtors desire to assuage any such fears by minimizing the effects of these cases through the relief sought in the Customer Programs Motion.

---

[5] With respect to services rendered after the Petition Date, the Debtors submit that they are authorized to maintain, modify, and apply the Customer Programs in the ordinary course of business and without approval from the Court, but out of an abundance of caution, request such approval by this Motion to the extent necessary.

**J.** **Motion of Debtors and Debtors In Possession for Interim and Final Orders (I) Authorizing (A) Secured Postpetition Financing On a Super Priority Basis Pursuant to 11 U.S.C. § 364, (B) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (C) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)** [6]

99.    In order to operate during these chapter 11 proceedings, the Debtors need additional financing immediately. In conjunction with their advisors, the Debtors did attempt, prior to commencement of cases, in an expedited process, to identify potential financial and strategic sources of the requisite debtor-in-possession financing. Given the short time frame and limited sources available in the current credit market, the only viable lender willing to lend was the Debtors' Prepetition Secured Lenders.

100.    After substantial negotiations, the Debtors and the Prepetition Secured Lenders reached an agreement pursuant to which the Prepetition Secured Lenders would extend postpetition financing to fund the Debtors to allow for a successful restructuring through a Plan and/or a competitive sale process through a Sale (the "**DIP Facility**"). The DIP Facility consists of a commitment in the maximum amount of up to $34,000,000, in accordance with the terms and conditions set forth in the definitive loan documents (the "**DIP Loan Documents**"). The liens and security interests granted to the Prepetition Secured Lenders by the Debtors with respect to the DIP Facility will constitute first priority and valid liens upon and security interests in Debtors' assets and will not be subject to any claims, set-offs, or defenses by the Debtors. I have reviewed each of the DIP Loan Documents and the terms and conditions of the DIP

---

[6] Capitalized terms otherwise not defined in this subsection shall have the meanings ascribed to them in the DIP Financing Motion and the *Interim Order (I) Authorizing (A) Secured Postpetition Financing On a Superpriority Basis Pursuant to 11 U.S.C. § 364, (B) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (C) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364 and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(C)* (the "**Interim DIP Order**"). To the extent there is inconsistency, the Interim DIP Order controls.

Facility, as negotiated and agreed to by the Debtors, are set forth within those DIP Loan Documents.

101. By the DIP Financing Motion (as defined below), the Debtors seek the following: (a) (i) to obtain DIP Financing, in the maximum amount of up to $34,000,000 from Bank of America, N.A. as agent and first-lien lender (the "**Secured Lender**"), which DIP Financing shall consist of (x) loans to fund operations and pay the Carve-Out and other administrative expenses and (y) upon entry of a Final Order, a loan to refinance the revolving portion of the Prepetition Secured Indebtedness, (ii) to grant the Secured Lender security interests in all of the Debtors' currently owned and after acquired property to secure the Debtors' obligations under the DIP Financing, and (iii) to grant the Secured Lender priority in payment with respect to such obligations over any and all administrative expenses; (b) to use the Secured Lender's Cash Collateral; (c) to provide adequate protection to the Secured Lender; (c) a Preliminary Hearing on the DIP Financing Motion to consider entry of an interim order, authorizing the Debtors to borrow from the Secured Lender under the DIP Financing up to an aggregate amount set forth in ordering paragraph 3 of the proposed interim order upon the terms and conditions set forth in such interim order related thereto pending the Final Hearing; and (d) a Final Hearing be scheduled by this Court to consider entry of a final order authorizing on a final basis, among other things, the DIP Financing.

102. The DIP Financing provides additional liquidity to the Debtors sufficient to enable them, among other things, to (a) minimize disruption and avoid immediate and irreparable harm to their business and operations, (b) preserve and maximize the value of the estate by conducting a sale/recapitalization process, and (c) enable the Debtors to fund expenses incurred in connection with the chapter 11 cases. Absent the financing provided for in the DIP

Amendment, the Debtors will not be able to meet their direct operating expenses, thereby preventing the Debtors from being able to preserve the value of their assets and jeopardizing their ability to successfully reorganize or maximize estate value pursuant to an asset sale.

103. Without prejudice to the rights of certain other party and in exchange for obtaining DIP Financing, (a) the Debtors have agreed to stipulate that, in accordance with the terms of the Prepetition Secured Loan Documents, the Debtors are truly and justly indebted to the Secured Lender under the Prepetition Secured Loan Documents, without defense, counterclaim or offset of any kind, and that as of the Petition Date the Debtors were liable to the Secured Lender in the amount of the Prepetition Secured Indebtedness, which was not less than the amount set forth in the immediately preceding paragraph above, and (b) as of the Petition Date, the Debtors, in consideration of the DIP Financing to be extended, have agreed to waive and release any and all causes of action and claims against the Secured Lender and its agents, representatives, assigns and successors.

104. Without prejudice to the rights of certain other party and in exchange for obtaining DIP Financing, the Debtors have agreed to stipulate that, by reason of the Prepetition Secured Loan Documents, the Prepetition Secured Indebtedness is secured by enforceable liens and security interests granted by the Debtors to the Secured Lender, upon and in substantially all of the Debtors' assets and property, including all of the Debtors' real property and all of the Debtors' assets and property in which a security interest can be obtained under the Uniform Commercial Code, including equipment, inventory, accounts receivable, instruments, chattel paper, general intangibles, contracts, documents of title, and all other tangible and intangible personal property and the proceeds and products thereof (including the setoff rights described below, the "**Prepetition Collateral**").

105. The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses or to pursue an asset sale or recapitalization to maximize the value of the Debtors' estates without the DIP Financing and the use of Cash Collateral. The ability of the Debtors to maintain business relationships with their vendors and suppliers, to maintain their inventory and otherwise finance their operations, is essential to the Debtors' continued viability while the Debtors pursue sale and recapitalization options. In addition, the Debtors' critical need for financing is immediate. In the absence of the DIP Financing and such use of the Cash Collateral, the continued operation of the Debtors' businesses, much of which is seasonal in nature and dependent upon incurring liability in September in advance of the school calendar year, would not be possible and serious and irreparable harm to the Debtors and their estates would occur.

106. The Secured Lender has agreed to provide credit support for a sale/recapitalization process, in accordance with the Interim DIP Order. The Debtors project that, during the term of the proposed sale/recapitalization process, *i.e.*, through November 12, 2010, they may require "overadvance loans", *i.e.*, loans above the Borrowing Base formula provided for in the Prepetition Credit Agreement (any such amount by which the loans and other financial accommodations exceed the Borrowing Base on any date of determination, an "**Overadvance**"), of up to $3.560 million (inclusive of any and all Overadvance loans that existed on the Petition Date). The Secured Lender has indicated that it is not willing to incur this additional credit exposure unless the DIP Financing is permitted in accordance with the Interim DIP Order and the DIP Loan Documents and in conjunction with an orderly, court-approved, sale/recapitalization process.

107. Given the Debtors' current financial condition and capital structure, the Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense. Financing on a postpetition basis is not otherwise available without the Debtors granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), and securing such indebtedness and obligations with the security interests in and the liens upon the property described below pursuant to Bankruptcy Code § 364(c).

108. The Debtors and the Secured Lender have negotiated in good faith regarding the Debtors' use of the DIP Financing to fund the administration of the Debtors' estates and continued operation of their businesses. The Secured Lender has agreed to permit the Debtors to use the DIP Financing for the period through the Termination Date, subject to the terms and conditions of the Interim DIP Order. In exchange, the Debtors have agreed to provide the Secured Lender with adequate protection for any Diminution in Value.

109. The Debtors and the Secured Lender have negotiated in good faith and at arm's length with respect to the credit to be extended and loans to be made to the Debtors pursuant to the terms of the Interim DIP Order.

110. The Debtors have requested immediate entry of the Interim DIP Order pursuant to Bankruptcy Rule 4001(c)(2). The permission granted in the Interim DIP Order to use Cash Collateral, enter into the DIP Financing and obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors. The entry of the Interim DIP Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, allow for the flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses, and allow the Debtors to pursue asset sale and recapitalization

options that will maximize the value of the Debtors' estates. Absent the immediate entry of the Interim DIP Order, the Debtors' ability to sustain the operation of their existing businesses and to pursue asset sale and recapitalization options, in order to maximize the value of the Debtors' estates, will be jeopardized.

111.    On or about August 19, 2010, the Debtors were informed that the Agent provided notice to the Noteholder of its intent to provide the DIP Financing to the Debtors.

112.    The Debtors believe that the relief requested in the DIP Financing Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 with minimal disruption.

113.    For purposes of interim approval, the Debtors are seeking authority to obtain up to the amount of the Approved Budget to and including the date of the Final Hearing, as calculated pursuant to Paragraph 3(a) of the Interim Order. In addition, provisions associated with the following are not effective until the entry of a Final Order: (i) the approval of the 1% DIP Closing Fee, (ii) granting of liens in favor of the Secured Lender on Avoidance Actions, (iii) waiver of costs, expenses, charge, lien, assessment or claim under section 506(c) of the Bankruptcy Code, (iv) prohibition on seeking approval of an alternative debtor-in-possession financing, (v) prohibition on priming the DIP Financing, (vi) prohibition on challenging the security interests in and liens on the Prepetition Collateral in favor of Secured Lender, subject to an investigation period (other than with respect to the Debtors who will consent to this relief upon entry of the Interim Order) and (vii) the general release in favor of the Secured Lender.

**K.** **Application of the Debtors for Order Pursuant to 28 U.S.C. § 156(c) Authorizing the Retention and Appointment of Logan & Company, Inc. as Claims, Noticing and Balloting Agent to the Debtors *Nunc Pro Tunc* to the Petition Date**

114.   By this application (the "**Logan Retention Application**"), the Debtors request entry of an order, authorizing the employment and retention of Logan & Company, Inc.. ("**Logan**"), effective as of the Petition Date as the notice, claims and balloting agent in accordance with the terms and conditions set forth in the Retention Agreement.

115.   The Debtors estimate that there are well over two hundred (200) creditors, former employees, and other parties-in-interest who require notice of various matters, and in particular, of the deadline for filing proofs of claim. Many of these parties may file proofs of claims and cast ballots with respect to a plan of reorganization or liquidation.

116.   The size of the Debtors' creditor body makes it impractical for the office of the Clerk to send notices, maintain a claims register, and tabulate ballots. In addition, the cost associated with Logan preparing and filing notices, maintaining copies of proofs of claims and proofs of interests filed, maintaining the official claims register, maintaining an up-to-date mailing list for all filed proofs of claims and proofs of interest, and other services as described below will be less than the cost associated with a law firm or other party providing these same services. To the Debtors' understanding, Logan has developed efficient and cost-effective methods in its area of expertise and is fully equipped to handle the volume of mailing involved in properly serving the required notices to creditors and other interested parties in these chapter 11 cases.

117.   The Debtors believe that the relief requested in the Logan Retention Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will help minimize any disruption caused by the filing of their chapter 11 cases.

# V.
## CONCLUSION

118.   Started out in Bill Schutt's hardware store 100 years ago, the Debtors have grown into a market leader in their industry that serves athletes across the entire country, employing hundreds of employees and using the services of thousands of sales agents.   The Debtors are one of the few remaining American manufacturers whose products serve youth, high school, college and professional athletes most prominently in football, baseball and softball.   The Debtors' primary manufacturing facilities are located in a region that has been most adversely affected by the economic collapse of the past few years and cannot afford to lose another major employer. The Debtors' reconditioning division enables many youth and local recreational leagues to work within their budgets by providing an alternative to purchasing expensive new equipment.   The Debtors are also a major customer to numerous vendors in the sporting goods equipment industry, whose viability depends significantly on their business with the Debtors.   Thus, the viability of the Debtors' business and the continuation of the Debtors' operations not only affect the interests of their creditors and economic stakeholders, but also touch the lives of hundreds of employees, thousands of sales representatives, a vast group of athletes of all ages and contribute to the economic stability and well-being of one of the nation's most depressed regions.   Through the First Day Motions described above, the Debtors seek to minimize certain adverse affects that these cases might otherwise have on their business, while the Debtors consummate a speedy sale of substantially all of their assets and/or a successful chapter 11 plan, in order to protect the going-concern value of the Debtors' business.

119.   To preserve the value of their business to the fullest extent possible, the Debtors' immediate objective is to maintain "business as usual" following the commencement of these cases by minimizing the adverse impact of the filing on the Debtors' assets and operations.   For

the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of the Debtors' creditors and other stakeholders will be substantially dependent on this Court's grant of the relief sought in each of the First Day Motions and respectfully request the Court to do so.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Dated: _Sept. 6_, 2010

ROLLEN JONES
CHIEF FINANCIAL OFFICER
Schutt Sports, Inc.,
Debtor and Debtor-in-Possession