## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SCHUTT SPORTS, INC., *et al.*,[1] | Case No. 10-12795 (KJC) |
| Debtors. | (Jointly Administered) |

**Hearing Date: September 22, 2010 at 11:30 a.m.**
**Objection Deadline: September 20, 2010 at 12:00 p.m. (Deadline Extended for the Committee)**

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING (A) SECURED POSTPETITION FINANCING ON A SUPER PRIORITY BASIS PURSUANT TO 11 U.S.C. § 364, (B) USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (C) GRANTING OF ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 363 AND 364, AND (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(C)

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its proposed counsel, hereby submits this Objection (the "Objection") to the Motion of Debtors and Debtors in Possession for Interim and Final Orders (I) Authorizing (A) Secured Postpetition Financing on a Super Priority Basis Pursuant to 11 U.S.C. § 364, (B) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (C) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c) (the "Motion").[2] In support of its Objection, the Committee respectfully represents as follows:

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: Mountain View Investment Company of Illinois (3563), Schutt Sports, Inc. (0521), Circle System Group, inc. (7711), Melas, Inc. (9761), R.D.H. Enterprises, Inc. (2752), and Triangle Sports, Inc. (6936).

[2] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion.

## PRELIMINARY STATEMENT

1.     This Court should deny the relief requested in the Motion because the Debtors' proposed post-petition financing (the "DIP Financing") violates fundamental principles of bankruptcy law and would render the chapter 11 process a sham.  The Debtors' chapter 11 cases are classic examples of a secured lender utilizing the bankruptcy process to preserve and liquidate its collateral in an efficient and economic manner.  Yet, the Debtors and the lender in these cases propose to do so on extremely onerous terms that only benefit the secured creditor and prejudice the rights of the estates and other creditors.  While the goal of the Debtors and its prepetition and postpetition lender is to quickly liquidate or recapitalize all of the Debtors' assets, the desire to expedite a sale process or confirm a plan of providing for such recapitalization cannot come at the expense of cutting off the unsecured creditors' rights to obtain meaningful information about the Debtors' businesses, to conduct a full investigation of potential claims and to participate in the sale and plan process.  The terms of the Final Order are too onerous and simply do not provide sufficient time to maximize the value of the Debtors' assets for the benefit of all creditors.

2.     As set forth in more detail herein, the Committee objects to the Motion and the entry of the Final Order authorizing and approving same.  The limited funds being made available under the DIP Facility and limited use of cash collateral that is proposed under the Final Order pales in comparison to the burdens imposed on the Debtors and the substantial benefits that are provided to the Secured Lender.  The Final Order should not be approved on the terms presently proposed.  Accordingly, the Committee submits that the DIP Motion must be denied on a final basis unless the DIP Facility is modified to address the substantial deficiencies identified herein.

**JURISDICTION**

3.     The Court has jurisdiction to consider the Motion and this Objection under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of these cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

**FACTUAL BACKGROUND**

4.     On September 6, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

5.     No trustee or examiner has been appointed in the Debtors' bankruptcy cases.

6.     On the Petition Date, the Debtors filed the Motion [Docket No. 12], which sought authorization on an interim and final basis to use the cash collateral of certain prepetition lenders (the "Cash Collateral"), obtain post-petition senior secured super-priority financing, grant adequate protection to certain alleged prepetition secured parties and grant related relief (collectively, the "DIP Financing").  Bank of America, N.A. is the agent and lender (the "Secured Lender") for the financing arrangement proposed in the Motion.

7.     On September 8, 2010, the Court entered an interim order [Docket No. 51] (the "Interim DIP Order") granting the Motion on an interim basis and scheduling a final hearing on the Motion for September 22, 2010 (the "Final Hearing").  Pursuant to the Interim DIP Order, *inter alia*, the Debtors are authorized to enter into the DIP Loan Documents, borrow from the Secured Lender pending the entry of an order approving the Motion on a final basis (the "Final Order"), grant the Postpetition Liens, and otherwise perform their obligations in accordance with the terms and conditions contained in the DIP Loan Documents.  Moreover, the Interim DIP

Order authorized the Debtors to use the Secured Lender's Cash Collateral pursuant to certain terms and conditions contained therein, and granted certain adequate protection to the Secured Lender, as detailed in the Interim DIP Order (collectively, the "DIP Credit Facility"). The Interim DIP Order set a deadline of September 20, 2010 at 12:00 p.m. for the Committee to file an objection to the Motion (the "Objection Deadline").

8. On September 16, 2010, the Office of the United States Trustee appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code. On that date, the Committee selected Lowenstein Sandler PC and Womble Carlyle Sandridge & Rice PLLC to serve as its counsel. The Committee has scheduled a conference call on September 21, 2010 to select its financial advisor.

9. As a result of certain issues relating to scheduling and the composition of the Committee, the Committee is in the process of reviewing the Motion and the related documents. Three of the seven members of the Committee are located in Asia and were required to return home after the Committee formation meeting. The delay caused by such travel, coupled with the intervening Jewish holiday, has hampered the Committee members' ability to discuss the Committee's objections to the Proposed DIP Facility and to select a financial advisor to review the DIP Loan Documents and the Prepetition Loan Documents. Additionally, the holiday has hindered Committee counsel's ability to discuss the DIP Facility with the Secured Lender and the Debtors.

10. On Saturday, September 18, 2010, Committee counsel conferred telephonically with counsel for the Debtors and the Secured Lender with respect to the Committee's concerns relating to the DIP Facility. During that call, Committee counsel suggested that it would make good sense to adjourn the Final Hearing for a week to ten days, subject to the Court's calendar, to allow the Committee sufficient time to retain a financial advisor and get fully up to speed before having to address issues raised by the Final DIP Order. *See*, *e.g.,* Local Bankr. Rule

4001-2(c) ("Ordinarily, the final hearing shall be held at least seven (7) days following the organizational meeting of the creditors' committee contemplated by 11 U.S.C. § 1102."). Counsel for the Secured Lender indicated that they would consider this suggestion with their client but expressed doubt as to whether they would be willing to proceed in such a fashion.

11.     In light of the Objection Deadline, on September 20, 2010, the Committee filed its Limited Objection to the Motion (the "Limited Objection") [Docket No. 112] in order to place the parties on notice of the Committee's objections.  Subsequently, the Committee has continued and is continuing its review of the Motion and relevant documents and now files this more formal Objection.  This Objection hereby incorporates the objections and arguments set forth in the Committee's Limited Objection as if set forth herein.

### OBJECTION

12.     While the Committee understands that the Debtors require continued financing in order to operate, the restrictions placed on the use of such financing must be fair and reasonable. The Debtors seek to obtain and use the DIP Financing and to use Cash Collateral in these cases upon terms that are designed solely for the benefit of the Secured Lender and are neither fair nor reasonable.  Many of the terms of the DIP Facility, the DIP Loan Documents, and the Interim DIP Order are inappropriate under the Bankruptcy Code and applicable law and, if continued in a final order granting the Motion, will unduly prejudice the rights and interests of the Debtors' estates and unsecured creditors.

13.     Several of the items that the Committee finds objectionable in the Motion relate to the fact that the Committee has not had the benefit of receiving and reviewing all the necessary financial and other information concerning the Debtors' operations.  Upon review of such information, the Committee may determine that additional grounds exist to object to the proposed terms for the use of the DIP Financing and for the use of Cash Collateral.  For these

reasons, the Committee respectfully requests that the Court defer consideration of the Final Hearing on the Motion until the Debtors provide the Committee with the financial and other information requested by the Committee to more fully analyze the relief requested in the Motion. However, to the extent that the Court is inclined to consider the Debtors' Motion at the Final Hearing, the Committee requests that the Final Order be modified to address the objections raised below.

**A.      The Motion Should Be Denied Because The DIP Financing Affords The Lenders Undue Control Over The Chapter 11 Process.**

14.      Post-petition financing may not be authorized if its primary purpose is to benefit or improve the position of a particular secured lender.  *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *In re Tenney Village Co., Inc.*, 104 B.R 562, 568 (Bankr. D.N.H. 1989) (debtor-in-possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit" of the secured creditor); *see also* Rule 4001-2(a) of Local Rules for the United States Bankruptcy Court of the District of Delaware (the "Local Rules") (requiring justification of financing terms providing for, inter alia, cross collateralization, waiver of § 506(c) rights, granting of liens against causes of action under Chapter 5 of the Bankruptcy Code, and use of postpetition loans to pay prepetition debt).

15.      Indeed, the law has long acknowledged the unequal bargaining power inherent in negotiations leading to proposed post-petition financing, as well as the very significant harm that can befall creditors if the proposed financier is enabled to exploit its leverage position.  *See In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic

injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

16.     A financing proposal that contemplates a delegation or compromise of the debtor's fiduciary responsibilities is especially problematic.  *See* 28 U.S.C. § 959(b) (debtor-in-possession shall manage and operate estate property in accordance with the requirements of applicable law); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996) (trustee or debtor-in-possession has a fiduciary duty to maximize the value of the estate, and in so doing is "bound to be vigilant and attentive in advancing [the estate's] interests") (internal quotations and citations omitted); *see also Tenney Village Co.*, 104 B.R. at 569 (denying approval of proposed debtor-in-possession financing that was so onerous as to violate the debtors' fiduciary obligations to the estate); *In re Roblin Indus., Inc.*, 52 B.R. 241, 243 (Bankr. W.D.N.Y. 1985) (denying approval of proposed debtor-in-possession financing where, as a condition to extending the loan, the debtors were required to waive avoidance actions against the lenders in violation of their fiduciary duties); *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 736 (Bankr. W.D. Ky. 1998) (agreements requiring a debtor to breach its fiduciary duties are illegal under the Bankruptcy Code and applicable state law).

17.     Here, the facts compel the conclusion that all the foregoing concerns have been triggered to a degree that mandates the denial of the Motion.  As noted herein, the Motion seeks relief that is calculated not to confer any real benefit for the estates of the Debtors, but rather to secure the existing prepetition and postpetition interests of the Secured Lender and bestow on the Secured Lender with overwhelming control and all remaining estate value.  While the filing of the Debtors' chapter 11 cases may have been substantially precipitated by the Debtors' litigation with Riddell, Inc., the Secured Lender now appears to be using this situation to shore-up its position and conduct a sale or recapitalization process that passes all of the risk to the Debtors' other creditors.

**B.     The Proposed Financing is Onerous Under the Circumstances and Does Not Provide a Commensurate Benefit to Justify the Cost to the Debtors' Estates.**

18.     While approval of the proposed DIP Facility remains within the Court's "informed discretion," and the Committee is not unmindful of the Debtors' financial condition and needs, the Court must balance the interests of the Secured Lender and the Debtors' general unsecured creditors.  Striking this balance requires that a debtor seeking postpetition financing on a superpriority basis demonstrate that the proposed financing comports with basic notions of fairness and equity and that it would ultimately inure to the benefit of the Debtors' estates.  *See Aqua Assocs.*, 123 B.R. at 196; *In re Ames Department Stores, Inc.*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990).  The Debtors, for the sake of obtaining postpetition financing promptly, cannot abrogate their fiduciary duties to their estates and creditors.  *Id.* at 38.

19.     Section 364 of the Bankruptcy Code is not a "secured lenders act" allowing a creditor to undo the more level "playing field" contemplated by the Bankruptcy Code.  The Court in *Ames Department Stores* stated:

> Acknowledging that Congress, in Chapter 11, delicately balanced the hope of debtors to reorganize and the expectations of creditors for payment, the courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits.

*Id.*. at 37.  *See also Tenney Village Co.*, 104 B.R. at 568.

20.     In keeping with the principles annunciated by the Courts above, the Committee submits that certain provisions of the DIP Loan Documents and Final Order are unduly prejudicial to the rights of unsecured creditors and, therefore, must be stricken or modified.

21.    Chapter 11 is not to be run for the benefit of secured creditors.  It is directed towards rehabilitation of debtors and preserving value for unsecured creditors.  *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389 (1993) ("Whereas the aim of a Chapter 7 liquidation is the prompt closure and distribution of the debtor's estate, Chapter 11 provides for reorganization with the aim of rehabilitating the debtor and avoiding forfeitures by creditors.") (emphasis added); *see also Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) (stating that the "policies underlying Chapter 11" are "preserving going concerns and maximizing property available to satisfy creditors").

22.    Moreover, Chapter 11 is not to be used in a way that shifts the costs of liquidating secured creditor's collateral to unsecured creditors.  *See, e.g., Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . . The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . . . ") (internal citation omitted); *In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs."); *In re AFCO Enters., Inc.*, 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense.  It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors."); *Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) ("[U]nsecured creditors should not be required to bear the cost of protecting property that is not theirs and to require the secured party to bear the cost of preserving or disposing of its own collateral.").

23.     Preliminarily, the Committee believes that the DIP Facility, as proposed, is unnecessary or, at best, disproportionate to the Debtors' actual capital requirements in these cases and questions the need for DIP financing in these cases.   While the proposed DIP Financing is in the maximum amount of $34 million, the Debtors have alleged that the Prepetition Secured Indebtedness as of the Petition Date was not less than $34,820,675.20, plus accrued and unpaid prepetition and postpetition interest, fees, expenses and other amounts chargeable under the Prepetition Secured Loan Documents.  *See* Motion, p. 5.  Accordingly, it appears that the Secured Lender is providing no "new money" under the DIP Facility. Moreover, during the budget period ending November 12, 2010, the total debt outstanding to the Secured Lender will decline by $11 million.   Thus, it appears there is no need for the DIP facility.

24.     Nevertheless, the Secured Lender and the Debtors seek approval of a $34 million facility and all of the fees and expenses that go along with such a large loan.  The Committee objects to the excessive fees proposed to be paid to the Lender in connection with the DIP Facility.   The Committee submits that the DIP Facility should be scaled back to address the Debtors' actual capital needs during the approximately four month term of the DIP Facility and the fees and costs adjusted appropriately.

25.     The DIP Loan Documents and Interim Order further provide the Secured Lender will be entitled to receive a DIP Closing Fee of 1% on the entire DIP Facility of $34 million. This represents at least 10.2% of the purported $3.56 million overadvance being provided to the Debtors.  The Secured Lender will also receive a monthly servicing fee of $10,000.  Here, the Debtors plan to borrow from the Secured Lender for a short period of time, and the Secured Lender's sole purpose for lending is to ensure completion of a sale or recapitalization, which *benefits only the Secured Lender*.  There is no justification for a fee in excess of 10%, which represents no more than a "kicker" of extra interest that would be impermissible if called by its proper name.  The Court should reduce the Closing Fee.

26.     Moreover, all of the Secured Lender's reasonable out-of-pocket expenses, including audit fees and out-of-pocket audit expenses, and including reasonable consultants', appraisers', attorneys' and paralegals' fees of Secured Lender, and other costs and expenses incurred in connection with the Secured Indebtedness, shall be paid by the Debtors on a monthly basis and added to the DIP Indebtedness. Given the limited new financing actually provided by the DIP Facility, the payment of these fees, on top of the interest, is offensive and unwarranted.

27.     Moreover, the Secured Lender can be paid such fees and expenses only under section 506(b) of the Bankruptcy Code which permits paying "to the holder" of an oversecured claim "any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose," but only "[t]o the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim . . ." 11 U.S.C. § 506(b). Furthermore, section 506(b) of the Bankruptcy Code is limited to "reasonable fees." The Court and the Committee should have a reasonable period of time to review the reasonableness of the Secured Lender's fees and expenses, and the Committee and other parties in interest should have the explicit right to file objections to the payment of such amounts, if appropriate.

28.     Additionally, although it is unclear what the interest rate on the DIP Facility actually is, it appears that the interest rate will increase from the Default Rate of 2.0% plus the interest rate otherwise applicable thereto to either 4.25% or 5% over the Base Rate (which is "the rate of interest announced or quoted by Bank from time to time as its prime rate for commercial loans, whether or not such rate is the lowest rate charged by Bank to its most preferred borrowers"). When considered together with the other costs built into the DIP Facility, particularly the payment of the Secured Lender's professional fees, the Closing Fee which represents more than 10% of the draw under the DIP Facility and the Service Fees, the cost of this lending scheme is excessive.

29.     The costs and fees associated with the DIP Facility appear well above market.  A court must review the terms of proposed post-petition financing to determine whether those terms are reasonable and beneficial to the Debtors' estates and creditors.  *See Aqua Assocs.*, 123 B.R. at 195-96; *Ames Dep't Stores*, 115 B.R. at 37.  A court is not supposed to "rubber stamp" economic terms, lending its imprimatur to above-market fees and interest rates.  Here, the true cost of the DIP Facility is significantly disproportionate to the risk profile of the loan given the super-priority claim.

**C.     The Roll-Up of the Debtors' Prepetition Indebtedness Is Improper.**

30.     Moreover, the DIP Facility provides that the Debtors, upon entry of the Final Order, are authorized to borrow the Replacement DIP Loan and use the proceeds thereof to refinance in full the Outstanding Prepetition Secured Revolving Indebtedness.  The Replacement DIP Loan allows the Secured Lender to convert substantially all of its prepetition debt into a postpetition secured claim that enjoys super-priority administrative expense status and that is secured with estate assets (such as avoidance actions or their proceeds) that are not currently encumbered.  There is no legal or factual justification for such use of the chapter 11 process.

31.     That cross-collateralization and grant of a super-priority administrative claim for the benefit of the DIP Lenders' prepetition debt improperly circumvents the Bankruptcy Code's priorities and distribution framework.  *See In re Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1494-96 (11th Cir. 1992) (noting that cross-collateralization is inconsistent with bankruptcy law because (a) it is not authorized as a means of postpetition financing pursuant to Section 364, and (b) it is directly contrary to the fundamental priority scheme of the Bankruptcy Code); *Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569n.4 (M.D. Pa. 2005) (noting that roll-up provisions "have the effect of improving the priority of a prepetition creditor"); *Tenney Vill.*, 104 B.R. at 570 (holding that Section 364 of the

Bankruptcy Code does not authorize the granting of administrative expense priority for prepetition debt).

32.     The Replacement DIP Loan is objectionable on several grounds.  First, the Replacement DIP Loan will be treated as a fully secured claim in these cases on which the Debtors must make current payments of interest which would otherwise accrue at a lower interest rate.  Additionally, the Replacement DIP Loan will eliminate any defects in the Secured Lender's prepetition collateral position; and, as discussed above, it will generate additional fees and expenses for the Secured Lender.

33.     At this early stage of these cases, it has not been possible for the Committee to complete its evaluation of the proposed roll-up and its alleged benefits for the Debtors' estates and creditors.  For these reasons, the Committee requests that, at a minimum, any ruling in respect of the Replacement DIP Loan be subject to the Committee's right to "unwind" the Replacement DIP Loan to the extent it become secured by property that was unencumbered on the Petition Date.

**D.     The Motion Does Not Provide the Committee with Adequate Time to Review the Proposed Sale and Prevents the Committee from Participating in the Plan Process.**

34.     The Motion, the DIP Loan Documents and, presumably, the proposed Final Order, impose deadlines for the marketing and sale of substantially all of the assets of the Debtors, without providing the Committee with adequate time to review information about the Debtors' businesses or the assets to be sold.  In particular, the Debtors should be required to demonstrate that the prepetition marketing efforts were adequate and will result in the maximum recovery for creditors of these estates.

35.     Furthermore, a DIP financing motion should not be used as a means to lock in the terms of a plan of liquidation before the Committee has had a meaningful chance to participate in

the plan process. Accordingly, the Committee believes that the Motion, a disguised *sub rosa* plan, should be denied as proposed.

36.     Courts have rejected proposed post-petition agreements between debtors and select creditors that have the effect of dictating material terms of a plan without complying with the Bankruptcy Code's procedural requirements for plan confirmation. *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983) ("The debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with a sale of assets"). *See also In re Decora Industries*, 2002 WL 32332749 (D. Del. 2002) ("the focus of 'sub rosa' plan analysis is oriented toward those situations in which a debtor proposes to sell 'all' or 'substantially all' of its assets without the benefit of a confirmed plan or a court-approved disclosure statement."); *In re Swallen's, Inc.*, 269 B.R. 634, 638 (BAP 6th Cir. 2001) ("At least when a party in interest objects, a bankruptcy court cannot issue orders that bypass the requirements of Chapter 11, such as disclosure statements, voting, and a confirmed plan, and proceed to a direct reorganization on the terms the court thinks best, no matter how expedient that might be.").

37.     In the instant case, the DIP Credit Facility requires that the Debtors meet the following sale deadlines:

> **October 29, 2010 -** receive one or more binding letters of intent from third parties for the purchase of substantially all of the Collateral;
>
> **November 12, 2010 -** enter into a stalking horse agreement on terms and conditions acceptable to Secured Lender in its sole discretion with a purchase price that is sufficient to generate net sale proceeds of at least $250,000 in excess of the Secured Indebtedness as of the closing of such sale, a $2,000,000 "Payoff Holdback" for the benefit of the Secured Lender, and administrative expenses incurred and unpaid from the Petition Date through the Termination Date as of the closing of such sale and filed a motion to approve bidding procedures with the Court a

corresponding a motion for the approval of bidding procedures and the protections (if any) set forth in the Stalking Horse Agreement;

**November 22, 2010 -** obtain an order approving sale procedures and scheduling an auction date and final sale hearing, in form and substance reasonably acceptable to Secured Lender;

**December 10, 2010 -** conduct an auction of substantially all of Debtors' assets;

**December 15, 2010 -** obtain an order approving an Acceptable Sale Transaction, in form and substance reasonably acceptable to Secured Lender;

**December 27, 2010** - close the Acceptable Sale Transaction and deliver sufficient net proceeds of such sale (after provision for Accrued Administrative Expenses through the closing of the sale and the other amounts provided for in the Interim DIP Order, including the Carve-Out) to Secured Lender in cash to repay all outstanding Secured Indebtedness (including the Payoff Holdback) in full.[3]

*See* Proposed Final Order, pp. 33-35, ¶ 17.

38.     Prior to imposing this expedited schedule for the sale process, the Debtors should be required to demonstrate that these tight deadlines are both necessary and in the best interests of these estates.  The milestones in the DIP Loan Documents dictate a sale process that is too short and, without any realistic mechanisms to obtain and implement extensions, virtually eliminates the potential to increase the value of the Debtors' assets through a competitive bidding process.  The Debtors have not disclosed what marketing efforts were engaged in pre-petition or

---

[3]     The DIP Loan Documents and Interim DIP Order impose a similarly tight schedule on the recapitalization of the Debtors' financial obligations, requiring that all solicitation for proposals for the recapitalization be completed by October 29, 2010, and the Debtors to have entered into a binding agreement (subject only to Court approval) for the recapitalization of the Debtors' existing business structure, including binding commitments for any related financing, on terms and conditions acceptable to Secured Lender in its sole discretion, by November 12, 2010.  Three days later, by November 15, 2010, the Debtors must file a plan of reorganization and accompanying disclosure statement to effectuate the Acceptable Recapitalization.  An order approving the disclosure statement must be entered by December 15, 2010 and an order confirming the plan must be entered by January 15, 2011.

whether it is possible to sell the Debtors' assets on such a tight schedule given the disputes that exist with Riddell.

39.     Even more troubling is the fact that the DIP Credit Facility attempts to control the distribution of the proceeds from the proposed sale. Specifically, the DIP Credit Facility requires that all of the net proceeds from the sale of the Debtors' Assets be used to pay the Debtors' obligations under the Secured Indebtedness (after provision for Accrued Administrative Expenses through the closing of the sale and the other amounts provided for in the Interim DIP Order, including the Carve-Out), potentially leaving nothing for the remaining creditors of these estates. *See* Interim DIP Order, p. 37, ¶ 17(f)(iv). This control is further bolstered by the provision of the Interim DIP Order, and presumably the proposed Final Order, providing that the entry of any order of a court of competent jurisdiction that in any way impedes the application of all sale proceeds toward the Secured Indebtedness will cause the occurrence of the Termination Date. *See* Interim DIP Order, p. 14, ¶ 5(xv).

40.     The Secured Lender is using the chapter 11 process, through the DIP Credit Facility and this Motion, to preserve and liquidate its own collateral. In so doing, the Secured Lender is attempting to significantly improve its lien position, charge the estates with exorbitant fees, costs and interest and leave nothing for distribution to other creditors. Such misuse of the chapter 11 process cannot be permitted. The Debtors should not be required to sell out their fiduciary obligations to *all* creditors with respect to the sale process as a condition to obtaining DIP financing, particularly where the need for such financing is at best unclear and being obtained at great cost to the Debtors' estates.

41.     Accordingly, the Motion, which is nothing more than *sub rosa* plan designed to benefit only the Secured Lender, should be denied as proposed. The Committee must be afforded a reasonable and appropriate amount of time to perform necessary due diligence before sale procedures are approved and a plan should be properly proposed to address distribution of

any proceeds. Assuming, *arguendo,* that the Court determines that the Motion should be approved on a final basis, the Committee submits that certain provisions of the Final Order, the DIP Credit Facility and the DIP Loan Documents, to the extent applicable, are unduly prejudicial to the rights of unsecured creditors and, therefore, must be stricken or modified.

**E.      The Covenants and Termination Events Of The DIP Facility May Be Tripwires.**

42.      In addition to the onerous effective rate of interest and fees and short maturity, the DIP Facility contemplates a number of financial and other covenants by which the Debtors must abide or be in default.  Additionally, the Interim DIP Order sets forth numerous events that will trigger a Termination Date.  By their nature, these provisions appear highly problematic.  The proposed covenants may expose the Debtors to potential default as a result of other events beyond the Debtors' control.  In the short time since the Committee's formation, the Committee and its professionals have spent significant time reviewing the prepetition loan documents and the DIP Loan Documents, as well as conducting due diligence of the Debtors' corporate and financial structure.  The Committee has not yet been able to prepare a sensitivity analysis regarding the Debtors' ability to meet these covenants.  However, the Committee is concerned that the covenants are too restrictive and may not be achievable.

43.      One of the provisions in particular cannot be countenanced at this time.  The Interim DIP Order provides that the termination of Ernst & Young without the prior written consent of Secured Lender (which consent may be withheld in its reasonable discretion) on or before November 12, 2010, by the Debtors for any reason will "immediately and automatically terminate" the "Secured Lender's willingness to extend DIP Financing hereunder and Secured Lender's consent to the Debtors' use of Cash Collateral."  *See* Interim DIP Order, p. 14, ¶ 5(xvi). To date, Ernst & Young has not been retained by the Debtors.  In fact, no application for the employment of Ernst & Young has been filed.  The Committee has no information regarding the fees to be charged by Ernst & Young or the specific services to be provided.  Moreover, the

Committee notes that the Debtors have already filed an application seeking the employment of Oppenheimer & Co. Inc. ("Oppenheimer"), as financial advisor and investment banker to the Debtors [Docket No. 71]. The potential duplication of effort and the respective roles of Ernst and Young and Oppenheimer cannot be ascertained at the present time. It is also unknown whether Ernst and Young has any conflicts that will preclude its retention by the Debtors under the applicable Bankruptcy Code provisions. The Committee submits that such a provision requiring the employment of a particular financial advisor in a DIP financing order is improper and that such relief cannot be entered at this time.

**F.     The Granting of Liens and Super-Priority Administrative Claims Against Potentially Valuable Unencumbered Property, Including Avoidance Actions And Their Proceeds is Improper.**

44.     Paragraph 6 of the Interim DIP Order grants the Secured Lender liens on all present and after-acquired personal property of the Debtors, including all Avoidance Actions and all other unencumbered property of the Debtors' estates (the "DIP Liens") subject only to Prior Claims. *See* Interim DIP Order, pp. 15-16, ¶ 6. In addition, paragraph 7 of the Interim DIP Order grants the Secured Lender DIP Financing Superpriority Claims "which allowed claims shall be payable from and have recourse to all of the Collateral and all proceeds thereof including, without limitation, any proceeds or property recovered in connection with the pursuit of Avoidance Actions; provided, that the DIP Financing Superpriority Claims shall be subject and subordinate only to the payment of the Carve-Out." *See* Interim DIP Order, p. 17, ¶ 7. Finally, paragraph 8 of the Interim DIP Order grants Adequate Protection Replacement Liens on "upon all of the DIP Collateral, including, upon entry of the Final Order, any Avoidance Actions" and Adequate Protection Superpriority Claims, immediately junior to the DIP Financing Superpriority Claims and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, subject to the entry of the Final Order, all Avoidance Actions. *See* Interim DIP Order, pp. 17-18, ¶¶ 8(a)-(b). Accordingly, the Debtors have announced their intention to have the Final Order grant the

Secured Lenders liens in all unencumbered property, including, among other things, avoidance actions. The granting of liens, security interests and super-priority claims in previously unencumbered assets in favor of the Secured Lender is overreaching and prejudices the rights of creditors against the Debtors.

45. Under no circumstances should the DIP Liens be secured by the proceeds of avoidance actions. Avoidance actions are distinct creatures of bankruptcy law designed to ensure equality of distribution among general unsecured creditors. Numerous courts severely restrict a debtor-in-possession's ability to pledge avoidance actions as security. *See, e.g., Official Comm. of Unsecured Creditors v. Goold Electronics Corp. (In re Goold Electronics Corp.),* 1993 WL 408366, *3-4 (N.D. Ill., Sept. 22, 1993) (vacating bankruptcy court order approving post petition financing to the extent that the order assigns to the bank a security interest in the debtor's preference actions). This is because avoidance actions are not property of a debtor's estate. *See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics, Corp.),* 226 F.3d 237, 244 (3d Cir. 2000) (avoidance actions are not property of the estate, but are essentially rights held by the estate for the benefit of creditors*); In re Sweetwater,* 55 B.R. 724, 731 (D. Utah 1985*), rev'd on other grounds*, 884 F.2d 1323 (10th Cir. 1989) ("The avoiding powers are not 'property' but a statutorily created power to recover property").

46. Because of the unique nature of avoidance actions, courts have recognized that, at least with respect to proceeds recovered pursuant to section 544(b) of the Bankruptcy Code, "empowering the trustee or debtor in possession to avoid a transaction by pursuing an individual creditor's cause of action is a method of forcing that creditor to share its valuable right with other unsecured creditors." *Cybergenics*, 226 F.3d at 244; *see also Buncher Co. v. Official Committee of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under § 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer").

47.     Because chapter 5 causes of action are not property of the Debtors' estates, there is no legal basis for the Court to grant the Secured Lender's liens and security interests, or a superpriority administrative expense claim on avoidance actions or the proceeds thereof. More fundamentally, it is unfair to allow the Secured Lender to receive liens and superpriority interests in what may be the unsecured creditors' only source of recovery. A successful reorganization of the Debtors' businesses requires the cooperation of and a shared risk by all parties in interest. Similar to numerous other provisions throughout the DIP Loan Documents, the Interim DIP Order and the proposed Final Order, granting the Secured Lender's liens and superpriority claims in avoidance actions would place an inequitable amount of that risk on unsecured creditors solely to provide additional benefits to the Secured Lender. Accordingly, proceeds of avoidance actions should not be subject to any liens, but should be preserved solely for the benefit of the Debtors' unsecured creditors.

**G.      The Carve-Out Fails to Make Adequate Provisions for the Payment of Administrative Claims.**

48.     Paragraph 14 of the Interim DIP Order (and presumably a parallel provision of the Proposed Final Order) subordinates the Secured Lender's liens, security interests, and super-priority administrative expense claims to the Carve-Out which consists of: (a) fees pursuant to 28 U.S.C. § 1930; (b) the allowed and unpaid professional fees and disbursements incurred by the Debtors' and the Committee's professionals prior to delivery of a notice of default (the "Trigger Notice"); (c) after delivery of a Trigger Notice, $100,000 of the Debtors' professional fees and expenses and $50,000 of the Committee's professional fees and expenses. Additionally, the Budget attached to the Interim DIP Order provides for a single weekly line item for "Bankruptcy professional fees." It is unclear whether this line item includes the professional fees of the Secured Lender. The Carve-Out and budgeted fees and expenses for the estate's professionals are inadequate and must be increased. Moreover, separate line items for each of the Debtors' and Committee's professionals should be provided in the Budget.

49.     Paragraph 14 of the Interim DIP Order further attempts to restrain the Committee's ability to investigate the Secured Lender's liens and security interests by providing for a $50,000 expense cap on the investigation of (but not a challenge of) the validity, extent, priority, avoidability or enforceability of the Prepetition Secured Indebtedness or the Secured Lender's prepetition liens on and security interests in the Prepetition Collateral.  Given the complexity of the Debtors' entities and capital structure, however, this limitation is woefully inadequate and would preclude the Committee from doing much more than obtaining UCC filing searches on the six Debtors - much less investigating the extent, validity, priority, and perfection of the Secured Lender's purported liens and security interests.  The Committee therefore objects to paragraph 14 of the Interim DIP Order and any parallel provision in the Proposed Final Order, and requests that the allowance for lien investigation expenses be increased to no less than $75,000.

50.     Moreover, the Carve-Out is patently deficient because nothing in the Motion or the attached Budget appears to provide for the payment, or at least the funding, of unpaid section 503(b)(9) claims.  Generally, section 503(b)(9) claims should be treated just like any other administrative claim.  *See generally In re Plastech Engineering*, 394 B.R. 147 (Bankr. E.D. Mich. 2008) (rejecting application of section 502(d) to section 503(b)(9) claims, Court holds that section 503(b)(9) claims should be treated like any other administrative claim).  Obviously, such claims must be paid at confirmation.  11 U.S.C. § 1129(a)(9).  In the absence of the funding of the section 503(b)(9) claims, these cases may be administratively insolvent.  Administrative insolvency may constitute "cause" or the conversion of dismissal of a chapter 11 case.  *See e.g., In re Midwest Communications, Inc.*, 269 B.R. 40, 42 (Bankr. N.D. Iowa 2001) (case dismissed on US Trustee's motion where chapter 11 debtor was administratively insolvent and where there was no likelihood of rehabilitation).  Under such circumstances, the Debtors should not be able to take on the DIP obligations that can have no conceivable benefit to anyone but the Secured Lender.  Rather, their cases should be converted.

## H.    Waiver of Estates' Rights Under Bankruptcy Code § 506(c) is Inappropriate.

51.    Paragraph 13 of the Interim DIP Order provides, in sum, that the Debtors will seek at the Final Hearing a waiver of rights under § 506(c) of the Bankruptcy Code.  The Interim DIP Order, and presumably the proposed Final Order, provide that the entry of an order or judgment in any of the Debtors' chapter 11 cases "imposing, surcharging or assessing against Secured Lender or any of its claims or any Collateral any costs or expenses, whether pursuant to § 506(c) of the Bankruptcy Code or otherwise" will cause the occurrence of the Termination Date.  *See* Interim DIP Order, p. 14, ¶ 5(xi).  This provision should be removed from the Final Order.

52.    The effect of the Section 506(c) waiver included in the Final Order is to eliminate a further avenue of recovery for the Debtors' estates and to guarantee that the costs of the Debtors' restructuring will be borne by the unsecured creditors alone even if the unsecured creditors receive no value.  As such, the waiver contravenes the intent behind Section 506(c) of the Bankruptcy Code.  *In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").  Congress' intent in enacting Bankruptcy Code § 506(c) was to ensure that a debtor-in-possession would be entitled to recover expenses from its secured lender to the extent that those expenses are necessarily and reasonably associated with preserving or disposing of a lender's collateral.  *Precision Steel Shearing, Inc: v. Fremont Fin. Corp. (In re Visual Industries, Inc.),* 57 F.3d 321, 325-26 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor .... The rule understandably shifts to the secured party ... the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate ....").

53. By waiving their rights under Bankruptcy Code § 506(c), the Debtors are agreeing to pay for any and all expenses associated with the preservation of the Prepetition Collateral for the benefit of the Secured Lender. The waiver covers all expenses that the Debtors can show "that absent the costs expended, the property would yield less to the creditor than it does as a result of the expenditure." *Brookfield Prod. Credit Ass'n v. Borron*, 738 F.2d 951, 952 (8th Cir. 1984). The Supreme Court has held that Bankruptcy Code § 506(c) waivers should never be lightly granted, nor may the management of a debtor-in-possession agree to such a waiver for any but the most compelling of reasons, because provisions such as these are binding on all parties in interest. *Hartford Underwriters Ins. v. Union Planters Bank N.A.*, 530 U.S. 1, 12 (2000) (debtor's decision to waive rights under Bankruptcy Code § 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require").

54. The Secured Lender's insistence upon a waiver of surcharge rights under Bankruptcy Code § 506(c) is particularly objectionable in the present cases because the DIP Loan Documents, as discussed above, reflect exorbitant fees and expenses associated with the Secured Lender. It is unreasonable for the Secured Lender to impose such fees on the Debtors, and then preclude the Debtors from exercising their § 506(c) rights if the Budget proves to be inadequate and the Debtors are forced to expend funds to preserve the Secured Lender's collateral. Moreover, such a waiver is improper and inappropriate in these cases particularly since the DIP Facility does not provide for payment of all administrative expenses.

I. **The Committee's Lien Review Period Should Be Ninety (90) Days From the Entry of a Final Order on the Motion and the Order Must Grant the Committee Standing to Commence any Such Action.**

55. The Interim DIP Order provides "parties in interest other than the Debtors" with "the earlier of (a) seventy-five (75) days from the entry of this Order and (b) the date of confirmation of a plan of reorganization in these Chapter 11 Cases," in which to which "to file,

on behalf of the Debtors, and to serve upon counsel for the Secured Lender, objections or complaints respecting (y) the claims, causes of actions and defenses released by the Debtors pursuant to ordering paragraph 24 above or (z) the validity, extent, priority, avoidability, or enforceability of the Prepetition Secured Indebtedness or the Secured Lender's prepetition liens on and prepetition security interests in the Prepetition Collateral… ."[4]  *See* Interim DIP Order, ¶ 26.  The proposed review period does not provide a sufficient opportunity for the Committee and its professionals to ascertain whether the prepetition liens are valid and/or properly perfected. The Committee will request documents from the Debtors relevant to a review and analysis of the Prepetition Secured Indebtedness or the Secured Lender's prepetition liens on and prepetition security interests in the Prepetition Collateral.  However, given the complexity of the Debtors' prepetition capital structure and the tight sale schedule that the Secured Lender and Debtors seek to impose, it is unreasonable to expect the Committee's investigation to be completed by the deadline set forth in the Interim DIP Order and, presumably, in the proposed Final Order. Moreover, the Debtors have not yet filed their Schedules of Assets and Liabilities and Statements of Financial Affairs.  Thus, the Committee has no way of knowing the extent of the Debtors' assets at this juncture.  It is unreasonable to expect that the Committee will be in a position to fully review and analyze the nature, extent, and validity of the Prepetition Secured Indebtedness or the Secured Lender's prepetition liens on and prepetition security interests in the Prepetition Collateral in the proposed time frame.

56.    The Committee therefore objects to the deadline set forth in paragraph 26 of the Interim DIP Order and requests that the Final Order provide a firm ninety (90) day lien review period calculated from the date of the entry of the Final Order.

_____

[4]  Seventy-five days from the entry of the Interim DIP Order is November 22, 2010.  Paragraph 26 of the Interim DIP Order also states that and "the Committee, if formed, shall have the earlier of (y) sixty (60) days from the date of its formation and (z) the date of confirmation of a plan of reorganization in these Chapter 11 Cases" to bring the adversary proceedings set forth in that paragraph.  The date that is sixty days from the appointment of the Committee is November 15, 2010.  Presumably, as a party in interest, the Committee would be entitled to the later deadline.

57. Additionally, the Committee requests that the Final Order permit an extension of the lien review period (i) by consent of the Committee and the Secured Lender without a further order of the Court, or (ii) upon motion by the Committee for cause if such consent is withheld for any reason.

58. Moreover, the Committee seeks clarification that the time period above is limited to challenges to the nature, extent, validity and priority of the Prepetition Secured Indebtedness or the Secured Lender's prepetition liens on and prepetition security interests in the Prepetition Collateral, not to issues concerning the amount and/or value of the Debtors' assets that allegedly secure the Secured Lender's purported liens or security interests. The lien review period should be limited to challenges to the Secured Lender's alleged prepetition liens on and prepetition security interests in the Prepetition Collateral and not all claims and causes of action that could be brought against the Secured Lender including, but not limited to, those causes of action set forth in paragraph 24 of the Interim DIP Order. The Committee's rights to assert or prosecute any claims and causes of action against the Secured Lender should not be restricted at all and should be deleted from the DIP Loan Documents and any order approving the DIP Facility on a final basis.

59. Additionally, the Committee submits that the provisions in the DIP Loan Documents and the Interim DIP Order and proposed Final Order entitling the Secured Lender to a "Payoff Holdback" of $2,000,000 from any sale or recapitalization are unwarranted and improper. *See* Interim DIP Order, p. 42, § 24. The Payoff Holdback would be reserved until the priority or validity of the Secured Indebtedness and the perfection, priority and validity of Secured Lender's prepetition or postpetition liens on the Collateral are, *inter alia*, not subject to any rights of any third party, including the Committee, to object and purportedly are to secure the Debtors' indemnification obligations under the Prepetition Secured Loan Documents and the DIP Loan Documents. The Payoff Holdback is another method by which the Secured Lender seeks to shift any and all potential the costs of liquidating the Secured Lender's Collateral to

unsecured creditors as well as an inappropriate attempt to hinder a review of the Secured Lender's liens and security interests. To the extent that any indemnification is warranted, and neither the Motion nor the First Day Affidavit detail any circumstances in which such indemnification would be warranted, the Secured Lender should be required to pursue indemnification when the Debtors' obligation arises.

60. The Committee also respectfully submits that the Final Order should expressly grant the Committee standing to challenge the Prepetition Secured Indebtedness or the Secured Lender's prepetition liens on and prepetition security interests in the Prepetition Collateral and to bring other claims and causes of action against the Secured Lender without the need to file a motion for standing at a later date.

61. In the alternative, in the event the Committee is required to file a motion to seek standing to challenge the Prepetition Secured Indebtedness or the Secured Lender's prepetition liens on and prepetition security interests in the Prepetition Collateral, the lien review period should be automatically extended to accommodate the motion practice involved in seeking such standing.

**J.      Other Objections to the Proposed Final Order.**

62. <u>Competent Evidence Must be Presented To Support Any Findings And Conclusions Contained In A Final Order Approving The DIP Motion</u>. The Interim DIP Order, and, presumably, the proposed Final Order contain a myriad findings, conclusions and stipulations. *See* Interim DIP Order at ¶¶ C-L. With respect to several of these findings and conclusions, the Committee requests that strict proof thereof be submitted to the Court at the Final Hearing.

63. <u>The Committee Must Have Equal Access To Information</u>: The Final Order approving the DIP Facility must direct the Debtors and the Secured Lender to provide the

Committee, through its counsel, with copies of all notices and any reports, budgets and/or financial data including, without limitation, projections, borrowing base statements, and reports, and any and all other documents the Debtors are required to provide, or otherwise do provide, to the Secured Lenders and/or Windjammer Mezzanine & Equity Fund II, L.P. ("Windjammer") pursuant to the DIP Loan Documents, the Prepetition Secured Loan Documents, or the Final Order. By the same token, and to the extent applicable, the Final Order should similarly direct the Secured Lender to provide the Committee with copies of all notices and reports they are required to provide or otherwise do provide to the Debtors and/or Windjammer pursuant to the DIP Loan Documents, the Prepetition Secured Loan Documents, or the Final Order.

64. <u>Right to Credit Bid or Offset Against Purchase Price:</u> Paragraph 19 of the Interim DIP Order provides that the Secured Lender shall have the right to credit bid for any asset or assets of the Debtors offered at a sale, lease or other disposition of any Collateral outside the ordinary course of business and the right to offset its secured claim against the purchase price of such asset or assets if the Secured Lender purchases such asset or assets. *See* Interim DIP Order, p. 39, ¶ 19. However, any such rights of the Secured Lender to credit bid or offset must be subject to the Committee's rights to challenge the Prepetition Secured Indebtedness or the Secured Lender's prepetition liens on and prepetition security interests in the Prepetition Collateral and the Secured Lender's right to credit bid.

## **RESERVATION OF RIGHTS**

65. The Committee reserves the right to raise further and other objections to the DIP Motion prior to or at the hearing thereon in the event the Committee's objections raised herein are not resolved prior to such hearing.

**WHEREFORE,** the Committee respectfully requests that the Court (a) deny the Motion or, in the alternative, (b) modify the Proposed Final DIP Order to address the Committee's

objections as set forth herein; and (c) grant the Committee such other and further relief as the Court deems just and appropriate.

Dated:  September 21, 2010

**WOMBLE CARLYLE SANDRIDGE**
**    & RICE, PLLC**

*/s/ Steven K. Kortanek*
Steven K. Kortanek (DE Bar No. 3106)
James M. Lennon (DE Bar No. 4570)
222 Delaware Avenue, Ste. 1501
Wilmington, DE  19801
Telephone:  (302) 252-4320
Facsimile:  (302) 252-4330
skortanek@wcsr.com
jlennon@wcsr.com

-and-

**LOWENSTEIN SANDLER P.C.**
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
Vincent A. D'Agostino, Esq.
Cassandra M. Porter, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone:  (973)597-2500
Facsimile:  (973) 597-2400

*Proposed Co-Counsel for the Official Committee of Unsecured Creditors*