# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SCHUTT SPORTS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 10-12795 (KJC)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 331**<br>**Hearing Date: November 29, 2010 at 9:00 a.m.**<br>**Objection Deadline: November 29, 2010 at 9:00 a.m.** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF ORDERS: (A)(I) APPROVING BID PROCEDURES RELATING TO SALE OF THE DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS; (III) SCHEDULING A HEARING TO CONSIDER THE SALE; (IV) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION; (V) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; AND (VI) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION, SALE AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF</u>**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 cases of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by and through its proposed counsel, hereby submits this Objection (the "**Objection**") to the Motion of Debtors and Debtors in Possession for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: Mountain View Investment Company of Illinois (3563), Schutt Sports, Inc. (0521), Schutt Holdings, Inc. (0276), Circle System Group, Inc. (7711), Melas, Inc. (9761), R.D.H. Enterprises, Inc. (2752), and Triangle Sports, Inc. (6936).

1

Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtors Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief (the "**Bidding Procedures Motion**").[2] In support of its Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The proposed Bidding Procedures (the "**Proposed Bidding Procedures**") are prejudicial to competing bidders and to the interests of the bankruptcy estates, violate fundamental principles of fairness and equity underlying the Bankruptcy Code, and do not accomplish the goals of facilitating an open auction process and maximizing the value for the bankruptcy estates. Therefore, the Court should deny the relief requested in the Bidding Procedures Motion.

2. Through the Bidding Procedures Motion, the Debtors seek Court approval of a sale process based on a stalking horse bid (the "**Stalking Horse APA**") submitted by Kranos Intermediate Holding Corporation (the "**Stalking Horse Bidder**") in connection with the sale of substantially all of the Debtors' assets (the "**Sale**"). The Debtors also seek court approval of the Proposed Bidding Procedures, which outline the suggested procedures for submitting and evaluating higher and better offers for the Sale.

3. Pursuant to the Stalking Horse APA, the Stalking Horse Bidder would pay $25.1 million in cash and assume certain liabilities (the "**Assumed Liabilities**") valued at $2.1 million in exchange for substantially all of the Debtors' assets. As presently structured, it appears that the Sale would result in insufficient funds to pay the Senior Secured Lenders, the bankruptcy

---

[2] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion.

2

professional fees, and the wind-down costs, and would leave no funds for distribution to unsecured creditors. Although the Committee is deeply concerned about the seeming lack of sufficient funds in the Stalking Horse Bid for wind-down and for distribution to the unsecured creditors, the Committee will focus herein on the Proposed Bidding Procedures, and expressly reserves its rights as to the remaining issues, pending the Auction and subsequent Sale Hearing.

4. The Proposed Bidding Procedures appear designed simply to allow Bank of America, N.A., as lender and agent for the syndicate of lenders (collectively, the "**Senior Secured Lenders**") the ability to liquidate their collateral as quickly as possible, with little regard to the financial wreckage left behind.

5. In addition, certain aspects of the Proposed Bidding Procedures will chill participation in the Auction and thus will prevent the realization of the maximum value for the Debtors' assets.

6. The Senior Secured Lenders' desire to quickly liquidate the Debtors' assets in order to be made whole on their loans cannot come at the expense of the bankruptcy estates or at the expense of the remaining creditors, and cannot come at the expense of the fair and equitable bankruptcy process envisioned by Congress.

7. As set forth in more detail herein, the Committee objects to the Bidding Procedures Motion as currently proposed and objects to the entry of an order authorizing same. Accordingly, the Committee submits that the Bidding Procedures Motion must be denied unless it is modified to address the deficiencies identified herein.

**JURISDICTION AND VENUE**

8. The Court has jurisdiction to consider the Motion and this Objection under 28 U.S.C. §§ 157 and 1334.

9. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

10. Venue of these cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

11. On September 6, 2010 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

12. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession. No trustee or examiner has been appointed in the Debtors' bankruptcy cases.

13. The Debtors' cases are being jointly administered pursuant to 11 U.S.C. §§ 1107(a) and 1108.

14. On September 16, 2010, the Office of the United States Trustee appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code. On September 16, 2010, the Committee selected Lowenstein Sandler PC and Womble Carlyle Sandridge & Rice PLLC to serve as its counsel. On September 21, 2010, the Committee selected BDO Consulting to serve as its financial advisors.

## OBJECTION

15. The Committee has limited the issues raised in this Objection to those that impact the Proposed Bidding Procedures only. Therefore, the Committee expressly reserves the right to subsequently raise any issues concerning any proposed Asset Purchase Agreement, the Sale Motion, the Sale Procedures, and any related sale documents, at or prior to the upcoming Sale Hearing.

16. The Bidding Procedures Motion should be denied because the Proposed Bidding Procedures will not result in sufficient recovery for the estates, nor will they ensure a fair Auction process. The following are the Committee's specific objections to the Bidding Procedures:

A. **The Proposed Break-Up Fee will Chill Bidding Activity**

17. The Break-Up Fee and Expense Reimbursement provided for by the Proposed Bidding Procedures are too high for a case of this size, are not necessary to preserve the Debtors' estates, and will substantially chill bidding activity.

18. The Bidding Procedures require that the Stalking Horse Bidder receive a Break-Up Fee of $800,000 plus $200,000 as an Expense Reimbursement (collectively, the "**Break-Up Costs**") if the Stalking Horse Bidder is not the successful buyer. The excessive Break-Up Costs have created a situation where the initial bidder must overbid the Stalking Horse Bidder by $1.2 million (the "**Minimum Initial Bid**"), and each successive Overbid must be at least $200,000 over the previous highest or best bid. This Minimum Initial Bid and the Overbid are so high that they will most certainly chill the bidding at the Auction.

19. According to the Debtors' own calculations, the requested Break-Up Costs total "approximately 4.7% of the cash Purchase Price." *Bidding Procedures Motion*, ¶ 38. Break-Up Costs this high are excessive and well above the acceptable range of 1.5% to 3% for a transaction of this size.

20. Break-up fees and expense reimbursements are treated the same as all other post-petition administrative expenses, and Bankruptcy Courts award such payments only where they represent "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b); *see also Calpine Corp. v. O'Brien Envt'l Energy, Inc.,* 181 F.3d 527, 535 (3d Cir. 1999).

21. A break-up fee may be necessary to preserve the value of a debtor's estate, and thus permissible as an administrative expense, where, *inter alia*, the fee is required to induce an initial bid. *In re Reliant Energy Channelview LP*, 2010 U.S. App. LEXIS 956, *12-*13 (3d Cir. Jan. 15, 2010); *Calpine Corp. v. O'Brien*, 181 F.3d at 535. However, where the bidder in question would have bid anyway, the fee is not a necessary expense of preserving the estate and is therefore impermissible under § 503(b) of the Bankruptcy Code. *See Reliant Energy*, 2010 U.S. App. LEXIS 956 at *13 ("[A] break-up fee is not 'necessary to preserve the value of the

5

estate' when the bidder would have bid even without the break-up fee.") (citing *Calpine Corp. v. O'Brien*, 181 F.3d at 535).

22. The Proposed Bidding Procedures Order includes findings of fact that the Break-Up Costs "induced the Stalking Horse Bidder to submit a bid" and "are reasonable and appropriate under the circumstances." *Proposed Bid Procedures Order* at G. However, the Break-Up Costs were not necessary in this case to induce the initial bid. The Stalking Horse APA expressly conditions payment of the Break-Up Costs on approval by the Court. *See Stalking Horse APA*, Article 10.3 ("Subject to the entry by the Bankruptcy Court of the Bid Procedures Order approving the Break-Up Fee and Expense Reimbursement and the terms and conditions for the payment thereof . . ."). Therefore, the Stalking Horse Bidder submitted the initial Stalking Horse Bid knowing that the Break-Up Costs might not be paid unless they were eventually approved by the Court.

23. In *Reliant Energy*, the stalking-horse bidder made its bid prior to Bankruptcy Court approval of any break-up fee, and its proposed sale agreement expressly recognized that the payment of the break-up fee was not guaranteed, but instead was subject to court approval. *Reliant Energy*, 2010 U.S. App. LEXIS 956 at *16-*17. There, the court observed that the first bidder in a sale under section 363 of the Bankruptcy Code always takes a risk by investing the time, money, and energy necessary to prepare its bid, but stated,

> [n]evertheless, while we understand that the first bidder may be motivated in part to submit its bid by the possibility that it will receive a break-up fee, it does not follow from that motivation that the bidder will withdraw its bid, pass up on the opportunity to acquire the asset to be sold, and nullify its work in preparing its bid if a court, when ordering that there be an auction of assets, declines to authorize a break-up fee to be paid to the initial bidder. Surely O'Brien makes that clear because even though [the proposed purchaser] had made its bid contingent on the award of a break-up fee, it competed at the auction after the Bankruptcy Court rejected the request for a break-up fee.

*Id.* at *15-*16.

24. Here, as in *Reliant Energy*, "there is no escape from the fact that [the Stalking Horse Bidder] did make its bid without the assurance of a break-up fee, and this fact destroys [the] argument that the fee was needed to induce it to bid." *Reliant Energy*, 2010 U.S. App. LEXIS 956 at *16-*17.

25. The Proposed Bidding Procedures Order also includes findings of fact that payment of the Break-Up Fee and the Expense Reimbursement is "necessary to induce the Stalking Horse Bidder to continue to . . . be bound by the Agreement." *Proposed Bidding Procedures Order* at ¶ F.

26. The Committee notes that numerous other parties showed significant interest in the Debtors' assets during the prepetition marketing process, most of whom were considering presenting bids higher than the amount finally proposed by the Stalking Horse Bidder. Thus, the Stalking Horse Bidder neither created a market for the Debtors' assets, nor established a price floor, nor came through with a "Hail Mary" bid that could not have been realized otherwise. Indeed, the Bidding Procedures Motion reveals that the Debtors received expressions of interest from fifty-nine (59) prospective purchasers during the prepetition marketing process, received thirteen (13) "indications of interest" from prospective purchasers, and received five (5) "letters of intent" from prospective purchases. *Bidding Procedures Motion*, ¶¶ 22-24. Thus, there was sufficient interest in the Debtors' assets, and the Break-Up Fee was not necessary to create any additional interest in this property, and the Stalking Horse Bidder does not need any "incentive" to remain in the running. Therefore, approval of the Break-Up Costs is not warranted in these cases.

27. In *Reliant Energy*, the stalking horse bid was $468 million, while the disputed break-up fee was $15 million – less than 3% of the bid price. *See Reliant Energy*, 2010 U.S. App. LEXIS 956 at *3 -*4. The Bankruptcy Court found that this break-up fee was so high that it would deter other potential purchasers from bidding. *See id.* at *18 ("[T]he Bankruptcy Court believed that the provision for the fee would deter other possible purchasers from bidding for the

plant and would outweigh any possible benefit achieved for the estate by keeping [the stalking-horse bidder] committed to the purchase through the provision of the break-up fee.").

28. Here, the proposed Break-Up Costs (4.7% of the proposed cash consideration, by the Debtors' calculation) is a larger percentage of the bid than the break-up fee denied by the Bankruptcy Court, the District Court, and the Third Circuit in *Reliant Energy*.

29. The justifications proffered by the Debtors for the Break-Up Costs are illusory. Absent the Break-Up Costs, the Stalking Horse Bidder would remain bound by its bid. However, even if the Stalking Horse Bidder withdrew, numerous other potential purchasers who have already come to the table during the prepetition marketing process would likely come back. Requiring potential purchasers to pay the Stalking-Horse Bidder's million-dollar consolation prize does little more than ensure that other potential bidders do <u>not</u> participate in the auction process. Such a result may benefit the Stalking Horse Bidder and the Senior Secured Lenders, but is detrimental to the Debtors, to the Debtors' estates, and to the Committee's constituents.

30. Because the Break-Up Costs are not necessary to preserve the value of the Debtors' estates and because they will stifle bidding, they should be denied. Failure to deny the current Break-Up Costs does nothing more than ensure that the Stalking Horse Bidder is the successful purchaser by deterring other bidders from participating in the auction process. Accordingly, the Court should deny approval of the Break-Up Costs.

31. Finally, regardless of whether the proposed Expense Reimbursement of $200,000 appears reasonable to the Debtors, the Committee should have an opportunity to review the professional fees and expenses incurred by the Stalking Horse Bidder prior to payment of the Expense Reimbursement.

B. **The Proposed Bidding Procedures do not Grant Parties Sufficient Time to Meaningfully Participate**

32. The Proposed Bidding Procedures contain an aggressive timeline that is too restrictive and will not allow prospective bidders sufficient time to participate fully in the Auction.

33. Assuming the Court approves the Bidding Procedures at the November 29, 2010 hearing, each Potential Bidder will have until December 3, 2010 – **only 4 calendar days** – to comply with the Participation Requirements, and until December 10, 2010 – **only 7 more calendar days** – to submit a Qualifying Bid.

34. The rigid timeline proposed by the Debtors does not allow adequate time for Potential Bidders to prepare and submit bids, and is designed simply to assure that the Senior Secured Lenders are paid as quickly as possible without regard to the fundamental goal of maximizing the value of the Debtors' assets.

35. The Bidding Procedures must be amended to allow Potential Bidders sufficient time to conduct due diligence and secure financing, if necessary.

36. The Proposed Bidding Procedures propose the following deadlines, all of which make it nearly impossible for other Potential Bidders to participate in the Auction and provide the Debtors with the highest and best price for their assets:

> a. **November 29, 2010** – Bidding Procedures Hearing and Objection Deadline. *Bidding Procedures Motion*, ¶ 77.
>
> b. **December 3, 2010 –** Deadline for Potential Bidders to meet the Participation Requirements. *Bidding Procedures Motion*, ¶ 35(a); *Bidding Procedures* at 2.
>
> c. **December 8, 2010 at 5:00 P.M.** – Deadline to file objections to the Sale,[3] the proposed Sale Order, the proposed Cure Amounts, and the proposed Assumptions and Assignments. *Bidding Procedures Motion,* ¶ 49(a).
>
> d. **December 10, 2010** – Bid Deadline. *Bidding Procedures Order* ¶ 9; *Bidding Procedures Motion*, ¶ 35(a); *Bidding Procedures* at 3.
>
> e. **Dec. 13, 2010 at 12 P.M. (Prevailing Eastern Time ("P.E.T.")) –** Determination of Qualified Bid and Notification of Qualified Bidder. *Bidding Procedures* at 5.

---

[3] Pursuant to an e-mail dated November 24, 2010, the Debtors have agreed to extend the Committee's deadline for filing an objection to the Sale "until a date after the auction (if there is one)." If there is no auction, the Committee's deadline for filing an objection to the Sale has been tentatively set for December 11, 2010.

9

f. **Dec. 13, 2010 at 12 P.M. (P.E.T.)** – Notification of whether Auction will be held. *Bidding Procedures* at 5.

g. **Dec. 14, 2010 at 10 A.M. (P.E.T.)** – Auction. *Bidding Procedures* at 6; *Bidding Procedures Order* ¶ 12.

h. **Dec. 15, 2010 at 3 P.M. (P.E.T.) –** Deadline to have Sale Order entered. *Bidding Procedures Motion* ¶ 77.

i. **Dec. 24, 2010** – Stalking Horse APA terminates if Sale Order has not been entered. *Bidding Procedures Motion* at 19.

j. **Dec. 27, 2010 at 10 A.M. (Chicago Time)** – Closing. (Alternatively, two (2) business days following fulfillment of all conditions to closing, unless waived or otherwise agreed, whichever is earlier). *Bidding Procedures Motion* at 20.

k. **Dec. 27, 2010 11:59 P.M.** – Stalking Horse APA terminates if Sale doesn't close. Can be extended by sellers in their sole discretion to Dec. 31; can be extended by sellers and buyers according to their agreement. *Bidding Procedures Motion* at 20.

l. **Dec. 31, 2010** –If the Sale doesn't close by December 31, 2010, the Debtors are authorized (but not required) to deem the Back-Up Bidder the Successful Bidder and are authorized (but not required) to consummate the sale to the Back-Up Bidder. *Bidding Procedures* at 7.

m. **Jan. 21, 2011 –** The Back-Up Bid stays open and enforceable until Jan. 21, 2011 or until the deal is consummated with the Successful Bidder, whichever comes first. *Bidding Procedures* at 7.

n. **Jan. 21, 2011 –** Good Faith Deposit returned to Back-Up Bidder. *Bidding Procedures* at 8.

37. The timeline is so tight that it will interfere with a robust auction and sale process. For example, assuming the Bidding Procedures order is entered on Monday, November 29, 2010, the Debtors have three days to mail notice. Other parties-in-interest will not actually receive the notice until Friday, December 3 or Monday, December 6, 2010. Objections are due on December 8, 2010, and bids are due on December 10, 2010. Clearly, there is insufficient time built in to this timeline to allow for a fair process.

38. As another example, counter-parties to executory contracts and unexpired leases will have only approximately two days to review the Cure Notice, perform their due diligence on the amount proposed and on the Stalking Horse Bidder, and file an objection, if necessary. It is not reasonable to expect such a fast turnaround of responses from all parties involved. Furthermore, an additional week or two will not unduly prejudice any party-in-interest.

39. The Court should modify the proposed Bidding Procedures to allow sufficient time to ensure an open, fair sale process that will maximize the value that will be realized by the Debtor's estates.

C. **The Senior Secured Lenders Should Not Be Allowed to Credit Bid the Portion of their Claim that has not been Investigated and Verified by the Committee**

40. The Bidding Procedures Motion provides for unrestricted credit bidding by the Senior Secured Lenders up to the amount of their claims, to the fullest extent allowed under § 363(k) of the Bankruptcy Code. *Bidding Procedures Motion* ¶ 37.

41. While the Committee does not object to credit bidding by the Senior Secured Lenders to the extent of the claims secured by liens that are valid and perfected, the Senior Secured Lenders must not be given permission to credit bid with claims that have not yet been investigated and found to be valid, properly perfected, and allowed.

42. The Committee has not yet completed its investigation of the extent, validity, or perfection of the liens underlying all of the Senior Secured Lenders' claims. Therefore, certain claims have not yet been "allowed," as that term is defined by the Bankruptcy Code. Although the Senior Secured Lenders are entitled to credit bid in an amount up to the value of its allowed claims, it must pay cash or cash equivalents for any bid above and beyond that amount. *See, e.g., In re Akard St. Fuels, L.P.*, 2001 WL 1568332 (N.D. Tex. Dec. 4, 2001) (denying lender's ability to credit bid where lender's liens were subject to challenge and lender was "capable of bidding cash at the auction and later recovering the cash if it proved its liens"); *In re Octagon Roofing*, 125 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (permitting lender to credit bid so long as lender

11

posted irrevocable letter of credit drawn on other bank in order to protect estate if lien was later set aside).

43. The Court has discretion pursuant to § 363(k) to restrict or deny credit bidding for cause. *See* 11 U.S.C. § 363(k) (permitting credit bidding "unless the court for cause orders otherwise"). Cause exists in this case because permitting credit bidding prior to the allowance of each underlying secured claim and before the Committee has completed its investigation of the extent, validity, priority, and perfection of the Senior Secured Lenders' purported liens risks an irreparable dissipation of the value of the Debtors' estates.

44. Therefore, the Proposed Bidding Procedures Order should be amended to allow credit bidding by the Senior Secured Lenders only up to the amount of their <u>allowed</u> claims. To the extent that any portion of their claims is not allowed, or not yet allowed due to the Committee's ongoing investigation, the Senior Secured Lenders should be required to pay cash (or cash equivalents) for that portion of their bid.

45. Furthermore, credit bidding should only be permitted in conjunction with a cash component that is sufficient to (i) pay all administrative expenses and priority claims arising in connection with the Sale, (ii) provide sufficient funding for the wind-down expenses of the Debtors' estates, and (iii) provide for a recovery by unsecured creditors. This Court has repeatedly stated that it would not allow this Debtors' assets to be sold solely for the benefit of the Senior Secured Lenders while leaving an administratively insolvent estate behind. Allowing the Senior Secured Lenders to credit bid without an additional substantial cash infusion would result in just such administrative insolvency, along with zero recovery for the unsecured creditors, an unacceptable result under any but the direst circumstances. In *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983), for example, the Second Circuit held that while there need not be a showing of an emergency situation for selling substantially all of the debtor's assets, "[t]here must be some articulated justification, other than appeasement of major creditors, for using, selling, or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)." <u>Id</u>. at 1070-1071. Similarly, the court in *In*

*re Encore Healthcare Assocs.*, 312 B.R. 52 (Bankr. W.D. Pa. 2004) applied the *Lionel* standard and found no proper business justification for a § 363 sale where the sole purpose of the sale appeared to be to liquidate assets for benefit of secured creditors. Indeed, a sale that benefits secured creditors to the exclusion of unsecured creditors violates the good-faith requirement of all chapter 11 cases; therefore Purchasers that acquire businesses in section 363 sales must be prepared to provide some basic consideration to unsecured creditors. *In re Brown,* 951 F.2d 564 (3d Cir. 1991).

46. Alternatively, should the Court allow the Senior Secured Lenders to credit bid their entire purported claim, any order approving the Sale must make clear that the alleged liens, security interests, and claims held by the Senior Secured Lenders are not *ipso facto* deemed valid by the order allowing the credit bid. Case law in the District of Delaware provides that unless the Court expressly reserves the Committee's rights, the entry of an order permitting a credit bid is tantamount to an order approving the nature, extent, and validity of the lien claim, and may also prevent litigation against the lender for avoidance, reduction, recharacterization, disallowance, disgorgement, counterclaim, surcharge, subordination, marshalling, or other litigation claims. *See In re Radnor Holdings Corp.*, 353 B.R. 820 (Bankr. D. Del. 2006); *see also In re Miami General Hospital, Inc.*, 81 B.R. 682 (S.D. Fla. 1988) (permitting lender to credit bid but expressly preserving the right of the trustee to file an adversary proceeding or otherwise object to the extent, validity and priority of the lender's liens).

47. Therefore, any order confirming the Senior Secured Lenders' right to credit bid must expressly state that the Senior Secured Lenders are only entitled to credit bid the portion of their claim that has been verified by the Committee and allowed by the Court; that the value of any additional purported claim must be paid for in full and in cash; and that the ability of the Senior Secured Lenders to credit bid the allowed portion of their claims does not foreclose the

Committee's rights to challenge the remaining liens and interests for which the Committee still has challenge rights.[4]

**D. The Senior Secured Lenders Should Not be Paid in Full until their Liens and Claims have been Investigated and Verified by the Committee Pursuant to the Committee's Lien Challenge Rights**

48. The Bidding Procedures Motion and the Proposed Sale Order provides for payment in full to the Senior Secured Lenders of all obligations due under the DIP and the prepetition secured loans even though the alleged prepetition liens and security interests of the Senior Secured Lenders have not yet been confirmed as valid and enforceable.

49. As discussed above, the Committee has not yet completed its investigation of the extent, validity, or perfection of the liens underlying the Senior Secured Lenders' claims. Therefore, while the Committee does not object to payment to the Senior Secured Lenders to the extent of the claims represented by liens that are valid and perfected, the Senior Secured Lenders must not be paid on claims that have not yet been deemed valid, properly perfected, and allowed. If necessary, an escrow account can be set up to hold sale proceeds that may be at issue pursuant to the Committee's lien challenge rights, to be distributed only upon further order of this Court.

**E. The Senior Secured Lenders should pay the Break-Up Costs if they are the Successful Bidder, not the Bankruptcy Estates**

50. The Bidding Procedures provide that if the Senior Secured Lenders decide to credit bid and are chosen as the Successful Bidder, the Break-Up Costs will be paid via an advance under the DIP facility. *Bidding Procedures Order,* ¶ 4. In essence, this clause ensures that the bankruptcy estates will be paying the Break-Up Costs should the Senior Secured Lenders be the Successful Bidder.

---

[4] In addition, any credit bid must be sufficient to cover the administrative expenses, the wind-down costs, and the payment of a dividend to the unsecured creditors, points that the Committee will address, if necessary, at the Sale Hearing.

51. This Court should not approve a Sale that has the bankruptcy estates footing the bill for Break-Up Costs after the Senior Secured Lenders are paid in full, while leaving an administratively insolvent estate and a pool of unpaid unsecured creditors behind.

52. Instead, the Bidding Procedures should provide that should the Senior Secured Lenders credit bid and be named the Successful Bidder, the Senior Secured Lenders – and not the bankruptcy estates via a DIP advance – must pay the Break-Up Costs to the Stalking Horse Bidder.

**F. The Debtors must Obtain the Consent of the Committee or Permission of the Court Prior to Implementing Changes in the Proposed Bidding Procedures**

53. Various provisions in the Bidding Procedures Motion and in the Proposed Bidding Procedures grant the Debtors sole discretion over various aspects of the Auction, requiring only "consultation" with the Committee, and not "consent" of the Committee as originally contemplated.

54. For example, in the Bidding Procedures Motion, the Debtors have included certain reservation of rights clauses that previously called for "consent of the Committee and the Secured Lender" but which have now been changed to require only "consultation with the Secured Lender, the Committee, and the Stalking Horse . . . ." Control of the auction process is thus vested solely with the Debtors, albeit after the Debtors "consult" with the other parties.

55. For example one clause in the Bidding Procedures Motion reads:

> The Debtors, after consultation with the Secured Lender, the Committee and the Stalking Horse, reserve the right to: (a) waive terms and conditions set forth herein with respect to any or all potential bidders, (b) impose additional terms and conditions with respect to any or all potential bidders, (c) extend the deadlines set forth herein or the date for the Auction, (d) cancel or extend the sale of the Purchased Assets and/or Sale Hearing in open court; and (e) amend the Bid Procedures as they may determine to be in the best interests of their estates.

*Bidding Procedures Motion* ¶ 36. Another clause reads:

> The Bid Procedures may be modified by the Debtors, after consultation with the Secured Lender, the Committee and the Stalking Horse, provided that all such modifications are disclosed to all Potential bidders (if applicable) or Qualified Bidders (if applicable) prior to or during the Auction.

*Bidding Procedures Motion ¶* 35(f). Still another clause reads:

> The Debtors, in their reasonable discretion, may, after consultation with the Secured Lender and the Committee, (a) determine which Qualified Bid, if any, is the highest or otherwise best offer; and (b) reject, at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of the Sale; or (iii) contrary to the best interests of the Debtors, their estates, their creditors and other stakeholders.

*Bidding Procedures Motion ¶* 35(f).

56. The Committee, as the statutory representative of the Debtors' entire body of unsecured creditors, has a fiduciary obligation to protect the interests of creditors, including ensuring that the Sale is conducted in a manner that is not detrimental to creditors. The Debtors, on the other hand, appear to favor a quick liquidation and wind-up, and thus have no incentive to ensure anything more than a quick sale—regardless of whether that sale is designed to produce the best recovery for all parties-in-interest, particularly unsecured creditors. These competing and often mutually exclusive goals make for a situation in which one party cannot fairly possess the right to change the rules of the game without the consent of the other party.

57. An effective auction requires that all potential bidders understand the ground rules in advance, and requires that the ground rules remain the same throughout the process. Allowing the Debtors to change the rules as they see fit, at their sole discretion, will repel potential bidders before the auction process is underway.

58. Although providing an opportunity for "consultation" with the Committee is a lovely gesture, as is the ability for the Committee to be "heard" by the Debtors, neither provides the Committee with any real ability to affect the process or the changes made thereto.

59. To enable the Committee to properly fulfill its fiduciary role, the Court should modify the Proposed Bidding Procedures to require that the Debtors consult with <u>and</u> obtain the consent of the Committee (or permission of this Court, after notice and hearing) prior to implementing any changes to either the Proposed Bidding Procedures or the timing or manner of the Sale.

### G. **The Committee Must Have Recourse to the Bankruptcy Court on Shortened Notice**

60. In light of the tight deadlines set forth in the Proposed Bidding Procedures, the Committee respectfully requests access to the Court on an expedited basis, subject to the Court's calendar and docket, in the event that the Committee disagrees with any actions taken by the Debtors in connection with the Auction and/or the Bidding Procedures. For example, in the event that the Debtors refuse to deem a Potential Bidder a Qualified Bidder, and the Committee disagrees with such a decision, the Committee should have expedited recourse to the Court.

### CONCLUSION

61. The paramount goal of any proposed auction process is to maximize the proceeds realized by the estate. The Court has both the discretion and the latitude necessary to structure, or restructure, a section 363 sale to accomplish this goal. Therefore, the approval of bid procedures is appropriate only in circumstances where the procedures and fees will preserve and benefit the estate, are reasonable, in the best interests of the estate, and designed in a fashion that will promote, enhance and encourage bidding. In the case at bar, where such procedural safeguards are absent, the Court must deny approval of the Bidding Procedures Motion.

### RESERVATION OF RIGHTS

62. The Committee reserves the right to revise, amend, or supplement this Objection at any time, including at the November 29, 2010 hearing on the Bidding Procedures Motion. The Committee also reserves the right to raise further and other objections to the Bidding Procedures Motion prior to or at the hearing thereon in the event the Committee's objections raised herein are not resolved prior to such hearing.

**WHEREFORE,** the Committee respectfully requests that the Court (a) deny the Bidding Procedures Motion or, in the alternative, (b) modify the Proposed Bidding Procedures Order and Bidding Procedures as necessary to address the Committee's objections as set forth herein; and (c) grant the Committee such other and further relief as the Court deems just and appropriate.

Dated: November 28, 2010

**LOWENSTEIN SANDLER P.C.**

　　*/s/ Jeffrey D. Prol*
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
Vincent A. D'Agostino, Esq.
Suzanne Iazzetta, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: 973-597-2500
Facsimile: 973-597-2400

-and-

**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**
Steven K. Kortanek (DE Bar No. 3106)
James M. Lennon (DE Bar No. 4570)
222 Delaware Avenue, Ste. 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330

*Counsel for the Official Committee of Unsecured Creditors*