# Exhibit A

**SECOND AMENDED AND RESTATED
ASSET PURCHASE AGREEMENT**

by and among

**SCHUTT HOLDINGS, INC. AND ITS SUBSIDIARIES,**
as Sellers

and

**KRANOS INTERMEDIATE HOLDING CORPORATION,**
as Purchaser

**Dated as of December 15, 2010**

ARTICLE I PURCHASE AND SALE OF ASSETS ......................................................... 2
    1.1    Agreement to Purchase and Sell ......................................................... 2
    1.2    Description of Purchased Assets ......................................................... 2
    1.3    Excluded Assets ......................................................... 4
    1.4    Designation of Additional Assigned Contracts ......................................................... 2
    1.5    Assignment of Assigned Contracts ......................................................... 6

ARTICLE II ASSUMPTION OF LIABILITIES ......................................................... 7
    2.1    Agreement to Assume ......................................................... 7
    2.2    Description of Assumed Liabilities ......................................................... 7
    2.3    Excluded Liabilities ......................................................... 8

ARTICLE III PURCHASE PRICE, MANNER OF PAYMENT; CLOSING; DEPOSIT ........... 9
    3.1    Purchase Price ......................................................... 9
    3.2    Working Capital Adjustment ......................................................... 10
    3.3    Time and Place of Closing ......................................................... 10
    3.4    Manner of Payment of the Purchase Price; Holdback ......................................................... 10
    3.5    Determination of Final Closing Payment and Working Capital ......................... 11
    3.6    Disputes Regarding Closing Balance Sheet ......................................................... 11
    3.7    Allocation of Purchase Price ......................................................... 11
    3.8    Deposit ......................................................... 11

ARTICLE IV REPRESENTATIONS AND WARRANTIES ......................................................... 11
    4.1    General Statement ......................................................... 11
    4.2    Representations and Warranties of Purchaser ......................................................... 12
    4.3    Representations and Warranties of Sellers ......................................................... 13
    4.4    "As Is Where Is" Transaction ......................................................... 20

ARTICLE V CONDUCT PRIOR TO THE CLOSING ......................................................... 21
    5.1    General ......................................................... 21
    5.2    Sellers' Obligations ......................................................... 21
    5.3    Purchaser's Obligations ......................................................... 23
    5.4    Joint Obligations ......................................................... 24

ARTICLE VI CONDITIONS TO CLOSING ......................................................... 25
    6.1    Conditions to Sellers' Obligations ......................................................... 25
    6.2    Conditions to Purchaser's Obligations ......................................................... 26

ARTICLE VII CLOSING ......................................................... 27
    7.1    Form of Documents ......................................................... 27
    7.2    Purchaser's Deliveries ......................................................... 27
    7.3    Sellers' Deliveries ......................................................... 28

ARTICLE VIII POST-CLOSING AGREEMENTS ......................................................... 29
    8.1    Post-Closing Agreements ......................................................... 29
    8.2    Inspection of Records ......................................................... 29

i

| | | |
|---|---|---|
| 8.3 | Certain Tax Matters | 29 |
| 8.4 | Payments of Accounts Receivable | 31 |
| 8.5 | Insurance Claims | 32 |
| 8.6 | Cooperation | 32 |
| 8.7 | Name Change | 32 |
| 8.8 | Further Assurances | 32 |
| 8.9 | Leased Real Estate | 33 |

ARTICLE IX EMPLOYEES AND EMPLOYEE BENEFIT PLANS ........................ 33
| | | |
|---|---|---|
| 9.1 | Employment of Sellers' Employees | 33 |
| 9.2 | Plans and Benefits | 34 |

ARTICLE X BANKRUPTCY COURT APPROVAL ........................ 35
| | | |
|---|---|---|
| 10.1 | Bankruptcy Court Approval | 35 |
| 10.2 | Certain Bankruptcy Undertakings | 36 |
| 10.3 | Break-Up Fee; Expense Reimbursement | 36 |
| 10.4 | Competing Transaction | 36 |

ARTICLE XI TERMINATION; REMEDIES AND ENFORCEMENT ........................ 37
| | | |
|---|---|---|
| 11.1 | General | 37 |
| 11.2 | Intentionally Omitted | 37 |
| 11.3 | Right to Terminate | 37 |
| 11.4 | Deposit | 38 |
| 11.5 | Certain Effects of Termination | 38 |
| 11.6 | Remedies | 38 |
| 11.7 | Right to Monetary Damages | 39 |

ARTICLE XII MISCELLANEOUS ........................ 39
| | | |
|---|---|---|
| 12.1 | Survival; Certain Post-Closing Matters | 39 |
| 12.2 | Entire Agreement | 39 |
| 12.3 | Publicity | 40 |
| 12.4 | Notices | 40 |
| 12.5 | Expenses | 41 |
| 12.6 | Non-Waiver | 41 |
| 12.7 | Counterparts | 41 |
| 12.8 | Severability | 42 |
| 12.9 | Applicable Law | 42 |
| 12.10 | Binding Effect; Benefit | 42 |
| 12.11 | Assignability | 42 |
| 12.12 | Amendments | 42 |
| 12.13 | Headings | 42 |
| 12.14 | Governmental Reporting | 42 |
| 12.15 | **WAIVER OF TRIAL BY JURY** | 43 |
| 12.16 | Consent to Jurisdiction | 43 |
| 12.17 | Time of the Essence | 43 |
| 12.18 | Rule of Construction | 43 |

\
*CHI 60576803v10 December 15, 2010*

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Appendix 1 | Defined Terms |
| Exhibit A | Form of Bid Procedures Order |
| Exhibit B | Form of Sale Order |
| Schedule 1.2(f) | Certain Assigned Contracts |
| Schedule 1.3(h) | Excluded Deposits and Rebates |
| Schedule 1.4 | Certain Restricted Contracts |
| Schedule 2.2 | Estimate of Cure Amounts |
| Schedule 3.1 | Additional Payment Amounts |
| Schedule 5.3(b) | Required Consents |

Disclosure Schedules:

| | |
|---|---|
| Schedule 4.3(b) | Foreign Good Standing |
| Schedule 4.3(d) | Governmental Consents |
| Schedule 4.3(f) | Title to Purchased Assets |
| Schedule 4.3(g) | Contracts |
| Schedule 4.3(h) | Permits |
| Schedule 4.3(i) | Employees |
| Schedule 4.3(j)(ii) | Employee Matters |
| Schedule 4.3(l) | Environmental |
| Schedule 4.3(m) | Real Estate |
| Schedule 4.3(n) | Intellectual Property |
| Schedule 4.3(p) | Taxes |
| Schedule 4.3(q) | Financial Statements |

\
CHI 60576803v10 December 15, 2010

## SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

THIS SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT ("Agreement") is made as of December 15, 2010, by and among Schutt Holdings, Inc., a Delaware corporation ("Holdings"), Schutt Sports, Inc., an Illinois corporation ("Schutt"), Triangle Sports, Inc., an Illinois corporation ("Triangle"), Mountain View Investment Company of Illinois, a Delaware corporation ("Mountain"), R.D.H. Enterprises, Inc., an Illinois corporation ("RDH"), Melas, Inc., an Illinois corporation ("Melas"), and Circle System Group, Inc., a Pennsylvania corporation ("Circle System", along with Holdings, Schutt, Triangle, Mountain, RDH and Melas, each a "Seller" and collectively, the "Sellers"), and Kranos Intermediate Holding Corporation, a Delaware corporation ("Purchaser"). Capitalized terms used but not otherwise defined in the text of this Agreement have the meanings set forth in Appendix 1 attached hereto, which is incorporated herein and made a part of this Agreement.

## R E C I T A L S

A.    Sellers are engaged in the design, manufacture, distribution, marketing and sale of team sporting goods equipment (including, without limitation, helmets and other protective equipment), the reconditioning and refurbishment of team sporting goods equipment and the design, manufacture, distribution, marketing and sale of sports collectibles (collectively, the "Business").

B.    On September 6, 2010 (the "Petition Date"), all Sellers (other than Holdings) filed voluntary petitions for relief, and on September 15, 2010, Holdings filed a voluntary petition for relief, under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which cases are jointly administered under Case No. 10-12795 (KJC) (the "Bankruptcy Case").

C.    Sellers and Purchaser entered into that certain Asset Purchase Agreement (the "Original APA") dated as of November 19, 2010, entered into an Amended and Restated Asset Purchase Agreement dated as of November 21, 2010 (the "First Amended and Restated APA"), and the parties desire to amend and restated in its entirety the First Amended and Restated APA pursuant hereto.

D.    On the terms and subject to the conditions set forth in this Agreement, (i) Purchaser desires to purchase from Sellers, and Sellers desire to sell to Purchaser, the Purchased Assets and (ii) Purchaser desires to assume, and Sellers desire to assign and transfer to Purchaser, the Assumed Liabilities.

E.    It is intended that the acquisition of the Purchased Assets will be accomplished through the sale, transfer and assignment of the Purchased Assets by Sellers to Purchaser in a sale undertaken pursuant to §363 of the Bankruptcy Code and that certain executory contracts and unexpired leases will be assumed by Sellers and assigned to Purchaser pursuant to §365 of the Bankruptcy Code in connection therewith.

# AGREEMENTS

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## Purchase and Sale of Assets

1.1     Agreement to Purchase and Sell.  On the terms and subject to the conditions contained in this Agreement, Purchaser agrees to purchase from Sellers, and Sellers agree to sell, transfer and convey to Purchaser, all of Sellers' assets, properties, rights and interests as of the Closing Date, wherever situated or located, other than the Excluded Assets.  All of such assets, properties, rights and interests (other than the Excluded Assets) are collectively referred to in this Agreement as the "Purchased Assets".  All of the Purchased Assets shall be sold, transferred and conveyed to Purchaser free and clear of any and all Liens and Claims, in each case to the extent resulting from the Sale Order, other than Permitted Liens and Assumed Liabilities.

1.2     Description of Purchased Assets.  Without limitation of Section 1.1, the Purchased Assets shall include the following assets owned by Sellers as of the Closing Date, except to the extent that any of the following are also enumerated in Section 1.3 as being Excluded Assets:

(a)     all inventory (including, without limitation, raw materials, work in process, finished goods, service parts, packaging materials and supplies) (collectively, the "Inventory");

(b)     all furniture, fixtures, equipment (including office equipment), machinery, parts, computer hardware, tools, dies, jigs, patterns, molds, automobiles, trucks and all other tangible personal property (other than inventory) (collectively, the "Equipment");

(c)     those certain parcels of property (each, a "Real Property") located at (i) 710 S. Industrial Drive, Litchfield, Illinois 62056, (ii) 610 S. Industrial Drive, Litchfield, Illinois 62056 and (iii) 2510 S. Broadway Avenue, Salem, Illinois 62881, each of which is legally described on Schedule 4.3(m), together with all licenses, rights of way, privileges and easements belonging to, appertaining to or benefitting said Real Property in any way (collectively, the "Owned Real Estate"), and all buildings and other improvements located thereon;

(d)     provided that Purchaser requires Seller to assume and assign the Leased Real Estate in accordance with Section 8.9, Sellers' entire leasehold interest as lessee under the lease (the "Real Estate Lease") for those certain real properties located at (i) 8 McFadden Road, Easton, Pennsylvania 18045, (ii) 653 Bushkill Street, Easton, Pennsylvania 18042, (iii) 38 N. 17th Street, Easton, Pennsylvania 18042, (iv) 927 Northampton Street, Easton, Pennsylvania 18042 and (v) 1120-1130 Butler Street, Easton, Pennsylvania 18042 (collectively, the "Leased Real Estate");

2

(e)     all trade accounts receivable, notes receivable, negotiable instruments and chattel paper, except as set forth in Section 1.3(g) hereto (collectively, the "Accounts Receivable");

(f)     subject to Sections 1.4 and 1.5:

(i)     all sales orders, sales contracts and all other similar contracts entered into by any Seller with any customer of the Business,

(ii)     all purchase orders, purchase contracts and all other similar contracts entered into by any Seller with any supplier, vendor or third party supplying goods or services to the Business,

(iii)     all of Sellers' right, title and interest under all written employment agreements to which any Seller is a party, each of which is identified on Schedule 1.2(f), and

(iv)     all other contracts and agreements, including, without limitation, leases for personal property (including capitalized leases) under which any Seller is a lessee or lessor, distribution agreements, sales representative agreements, service agreements, franchise agreements and license agreements, in each case under this clause (iv) as identified on Schedule 1.2(f) (such contracts so identified on Schedule 1.2(f) under this clause (iv) and clause (iii) above, together with the contracts described in clauses (i) and (ii) of this Section 1.2(f), the Real Estate Lease and the Company Plans, are collectively referred to herein as the "Assigned Contracts");

(g)     subject to Section 1.5, all Permits and Environmental Permits, in each case, to the extent transferable after giving effect to the Sale Order;

(h)     subject to Section 1.4, all intellectual property rights (collectively, the "Intellectual Property Rights"), including, without limitation, patents and applications therefor, designs and applications therefor, know-how, unpatented inventions, trade secrets, secret formulas, business and marketing plans, copyrights and applications therefor, trademarks and applications therefor, service marks and applications therefor, trade names and applications therefor, logos, trade dress, and names and slogans used by Sellers (including, without limitation, the name "Schutt" and Sellers' corporate names), domain names, and all goodwill associated with such intellectual property rights;

(i)     all customer lists, customer records and information;

(j)     all books and records, including, without limitation, the following: blueprints, drawings and other technical papers; records related to payroll, employee benefits (excluding any employee benefit plans and excluding any records to the extent the transfer thereof is not permissible under law after giving effect to the Sale Order), accounts receivable and payable, inventory, maintenance and asset history; ledgers and books of original entry; and all insurance records and OSHA and EPA files;

3

(k)     subject to Section 1.4, all of Sellers' Company Plans and any assets or rights related thereto, including all insurance policies that constitute Company Plans;

(l)     all rights in connection with (i) prepaid expenses and (ii) advance payments, in each case, with respect to Purchased Assets;

(m)     subject to Section 1.5, all computer software, including all documentation and source code with respect to such software, and all licenses and leases of software identified on Schedule 1.2(f), in each case to the extent transferable or, if a consent to such transfer is required notwithstanding the Sale Order, such consent has been obtained;

(n)     all Avoidance Actions against vendors of the Business (the "Assigned Avoidance Actions");

(o)     except for the Retained Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) that relate to any of the Purchased Assets;

(p)     all sales and promotional materials, catalogues and advertising literature;

(q)     except to the extent set forth in Section 1.3(h), all deposits (including, without limitation, any security deposits) and vendor rebates and rights with respect to such deposits and rebates that relate to or arise from Purchased Assets;

(r)     50% of the Warehouse Lease Deposit; and

(s)     (i) if the Real Estate Lease is a Purchased Asset, all deposits (including, without limitation, any security deposits) under the Real Estate Lease (the "Lease Deposit") and all rights with respect thereto; (ii) if the Real Estate Lease is not a Purchased Asset and the Purchaser does not, on or prior to the Extended Assumption/Rejection Date, enter into a replacement lease with the landlord for Leased Real Estate, 50% of the Lease Deposit and all rights with respect thereto; and (iii) if the Real Estate Lease is not a Purchased Asset and the Purchaser does, on or prior to the Extended Assumption/Rejection Date, enter into a replacement lease with the landlord for Leased Real Estate, that portion of Lease Deposit equal to the deposit required by the landlord pursuant to such replacement lease, and all rights with respect thereto.

1.3     Excluded Assets.  The Excluded Assets shall consist of the following items and assets (whether or not such assets are otherwise described in Section 1.2):

(a)     all cash on hand and in banks, cash equivalents, investments, letters of credit, and checks received (but not deposited or cleared);

4

(b)     Sellers' bank accounts, checkbooks and cancelled checks (it being understood that following the Closing, Purchaser shall have access to, and shall be entitled to make copies of, such cancelled checks, all at Purchaser's cost and expense);

(c)     contracts and agreements that do not constitute Assigned Contracts;

(d)     Permits and Environmental Permits that are not transferable;

(e)     except for insurance policies that constitute Company Plans, all current and prior insurance policies of Sellers and their predecessors (including, without limitation, directors' and officers' insurance policies or similar fiduciary policies) and all rights thereunder and in connection therewith, including refunds with respect to insurance premium payments;

(f)     all rights arising from prepaid expenses or advance payments, in each case with respect to Excluded Assets;

(g)     all receivables related to any Excluded Assets;

(h)     all rights with respect to the following deposits and rebates (i) except with respect to the Lease Deposit and the Warehouse Lease Deposit, all (A) deposits (including, without limitation, any security deposits) and vendor rebates identified on Schedule 1.3(h) and (B) deposits (including, without limitation, any security deposits) and vendor rebates with respect to Excluded Assets, (ii) with respect to the Lease Deposit, that portion thereof that does not constitute a Purchased Asset, and (iii) 50% of the Warehouse Lease Deposit;

(i)     all accounts receivable and notes receivable (in each case, of any nature or kind) owed or payable to any Seller by another Seller or any Affiliate thereof , as well as all other amounts, liabilities or obligations (in each case, of any nature or kind) owed or payable to any Seller by another Seller or any Affiliate thereof;

(j)     all rights arising from any refunds due from federal, state and/or local taxing authorities with respect to Taxes heretofore paid by Sellers, and all deferred tax assets;

(k)     all deposits of Sellers with the Internal Revenue Service, including, without limitation, tax deposits, prepayments and estimated payments;

(l)     all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) (collectively, "Retained Claims") which relate to:

(i)     the Excluded Assets and/or the Excluded Liabilities;

5

(ii)     the Riddell Matters (including, without limitation, any and all claims asserted therein or which could have been asserted by Sellers therein), any and all appeals thereof, all awards and judgments with respect thereto and all professional malpractice claims or other claims against third parties related thereto or related to the subject matter thereof;

(iii)    the Circle System Matters (including, without limitation, any and all claims asserted therein or which could have been asserted by Sellers therein), any and all appeals thereof, all awards and judgments with respect thereto and all professional malpractice claims or other claims against third parties related thereto or related to the subject matter thereof; and

(iv)     all Avoidance Actions (other than the Assigned Avoidance Actions);

(m)     Sellers' rights under this Agreement and the agreements and documents entered into in connection with the transactions contemplated hereby;

(n)     Sellers' corporate charters, minute and stock record books, corporate seals and tax returns; and

(o)     all shares of capital stock or other equity interests in any Seller or any Affiliate thereof or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests in any Seller or any Affiliate thereof.

For clarification purposes and without implication that the contrary would otherwise be true, it is understood and agreed that all rights and remedies with respect to the Excluded Assets and/or the Excluded Liabilities and which rights or remedies first arise after the Closing shall be retained by Sellers and shall not be transferred to Purchaser hereunder.

1.4     Designation of Additional Assigned Contracts. Notwithstanding anything herein to the contrary, seven (7) Business Days following the Sale Hearing, Purchaser shall be entitled in its sole discretion to request that Sellers add to the list of Assigned Contracts any executory contracts of Sellers by providing written notice thereof to Sellers, and any executory contracts so added shall constitute Purchased Assets; provided that Purchaser shall not be entitled to add to the list of Assigned Contracts any contracts of Sellers that, as of the date Purchaser provides written notice to Sellers, (a) any Sellers have rejected by Order of the Bankruptcy Court, (b) that have terminated or expired pursuant to their terms or by Order of the Bankruptcy Court, or (c) that are set forth on Schedule 1.4. If Purchaser adds any executory contracts to the Assigned Contracts in accordance with the foregoing, then, at Purchaser's request, and subject to Section 1.5, Sellers shall take such steps as are necessary to cause such executory contracts to be assumed by the Sellers and assigned to Purchaser, including to the extent necessary promptly filing appropriate pleadings with the Bankruptcy Court to obtain approval of such assumption and assignment.

1.5     Assignment of Assigned Contracts. To the maximum extent permitted by the Bankruptcy Code, but subject to applicable law and the other provisions of this Section 1.5, Sellers shall assume and transfer, sell and assign all Assigned Contracts, Permits and

6

Environmental Permits to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Assigned Contract, Permit or Environmental Permit (or any right thereunder) if an attempted assignment without the consent of a third party, which consent has not been obtained prior to the Closing (and is not provided for or satisfied by the Sale Order, the Bankruptcy Code or applicable law), would constitute a breach or in any way adversely affect the rights of the Purchaser or Sellers thereunder (and the parties acknowledge and agree that the Closing shall proceed with respect to the remaining Assigned Contracts, Permits and Environmental Permits without any reduction in the Purchase Price).

## ARTICLE II
### Assumption of Liabilities

2.1 <u>Agreement to Assume</u>. At the Closing, Purchaser shall assume and agree to pay, perform and discharge when due, the liabilities and obligations of Sellers as described in Section 2.2 (the "<u>Assumed Liabilities</u>"). Purchaser shall only be liable for Assumed Liabilities. All other liabilities and obligations of Sellers, including those enumerated in Section 2.3, are collectively referred to herein as "<u>Excluded Liabilities</u>". Purchaser shall not assume, be deemed to have assumed, or otherwise be responsible for, the Excluded Liabilities.

2.2 <u>Description of Assumed Liabilities</u>. The following liabilities and obligations of Sellers (and only the following liabilities and obligations) shall constitute the Assumed Liabilities:

(a)     in addition to Sections 2.2(b) and (c) below, all liabilities and obligations of Sellers under the (i) Assigned Contracts and (ii) Permits and Environmental Permits that constitute Purchased Assets, in each case, to the extent relating to, or arising from, the period commencing on or after the Closing Date;

(b)     all trade payables, accrued expenses, accrued royalties, accrued dues and the like of Sellers, in each case, to the extent arising on or after the Petition Date;

(c)     all Cure Amounts (the "<u>Purchaser Cure Amounts</u>");

(d)     all liabilities and obligations relating to or arising from the Purchased Assets or the operation of the Business, but only to the extent relating to, or arising from, the period commencing on or after the Closing Date;

(e)     all liabilities and obligations for warranty liabilities, repairs, replacements, returns, allowances and rebates with respect to products sold, or services provided, by the Business, but only to the extent relating to, or arising from, the period commencing on or after the Closing Date;

(f)     all Taxes to the extent allocated to Purchaser pursuant to Section 8.3 hereof;

7

(g)     accrued payroll, accrued commissions, accrued and unused vacation, time-off or sick leave, and accrued payroll Taxes and other similar Taxes with respect to the foregoing, in each case, as of the Closing Date and with respect to the Employees; provided, however, that Sellers shall pay all liabilities and obligations described in this Section 2.2(g) as and when due through the Closing Date consistent with Sellers' past practices; provided, further that this Section 2.2(g) shall exclude all Management Incentive Plans;

(h)     subject to Section 1.4, liabilities and obligations of Sellers under the contracts described in Section 1.2(f)(iii), in each case, to the extent such contracts constitute Assigned Contracts and to the extent relating to, or arising from, the period commencing on or after the Closing Date; provided, however, that Sellers shall pay all liabilities and obligations described in this Section 2.2(h) as and when due through the Closing Date; provided, further that this Section 2.2(h) shall exclude all Management Incentive Plans; and

(i)     the liabilities referenced in Article IX to be assumed by Purchaser.

2.3     Excluded Liabilities. The Excluded Liabilities shall consist of all liabilities and obligations (whether direct or indirect, matured or unmatured, known or unknown, absolute, accrued, contingent or otherwise, whether now existing or hereafter arising) of Sellers, other than the Assumed Liabilities.    The Excluded Liabilities shall include, without limitation, the following:

(a)     except to the extent set forth in Sections 2.2(f) or (g) hereof, any and all liabilities and obligations of the Sellers for Taxes arising from or with respect to the Purchased Assets or the Business to the extent attributed to the Sellers or the Business prior to the Closing Date;

(b)     any and all liabilities for indebtedness of Sellers to banks or other financial institutions, in each case with respect to borrowed money (but excluding obligations with respect to capitalized leases that are Assigned Contracts);

(c)     to the maximum extent permitted by law, any and all liabilities and obligations arising under any Environmental Law or any other law (including as a result of any action or inaction of Sellers or of any third party) relating to the storage, use or operation of the Purchased Assets prior to the Closing;

(d)     to the maximum extent permitted by law, any and all liabilities or obligations for any violation of any law, rule, regulation, judgment, injunction, Order or decree occurring prior to the Closing;

(e)     any and all claims, liabilities and obligations for infringement of the intellectual property or similar rights of third parties arising from or relating to products sold by, or other conduct of, Sellers at any time prior to the Closing;

(f)     (i) any and all liabilities and obligations for that certain judgment for $29,024,750 in the litigation captioned *Riddell, Inc. v. Schutt Sports, Inc.* Civil Action No.

8

3:08-cv-00711-BBC in the United States District Court for the Western District of Wisconsin; (ii) any and all liabilities and obligations for any judgment in the litigation captioned *Riddell, Inc. v. Schutt Sports, Inc.*, Civil Action No. 10-cv-000504, pending in the United States District Court for the Western District of Wisconsin; (iii) any and all other liabilities and obligations relating to or arising out of the Riddell Matters; and (iv) any and all liabilities and obligations relating to or arising out of the Circle System Matters;

(g)     any and all liabilities and obligations for: (i) costs and expenses incurred by Sellers or owed in connection with the administration of the Bankruptcy Case (including, without limitation, the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Sellers, and the official creditors' committee, the fees and expenses of the post-petition lenders and pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); and (ii) all costs and expenses of Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement;

(h)     all claims against officers and directors of the Sellers to the extent relating to, or arising from, any and all periods prior to the Closing;

(i)     any and all claims, liabilities and obligations for personal injury or death arising from or relating to products manufactured by Sellers at any time prior to the Closing;

(j)     all liabilities and obligations for warranty liabilities, repairs, replacements, returns, allowances and rebates with respect to products sold, or services provided, by the Business to the extent relating to, or arising from, any and all periods prior to the Closing; and

(k)     all other liabilities of Sellers which are not included within the Assumed Liabilities.

## ARTICLE III
### Purchase Price, Manner of Payment; Closing; Deposit

3.1     Purchase Price.  The aggregate purchase price (the "Purchase Price") for the Purchased Assets shall be $32,925,000 (which shall be comprised of (a) $25,425,000 (the "Cash Payment"), subject to adjustment under Section 3.2, plus (b) an aggregate of $7,500,000 in cash (the "Additional Cash Payments") to be paid in the amounts and to the parties as set forth on Schedule 3.1 attached hereto and made a part hereof), plus the Assumed Liabilities.  The Additional Cash Payments shall be delivered to a third party escrow agent mutually acceptable to Sellers and Purchaser within two Business Days following the Closing, to be disbursed in accordance with this Agreement.  In addition, Supplemental Schedule 3.1 Funds (as defined in Schedule 3.1) shall likewise be transferred to such escrow agent when available for transfer as determine in Schedule 3.1.

9

3.2    Working Capital Adjustment.  The Cash Payment (and, without duplication, the Purchase Price) will be decreased on a dollar-for-dollar basis by the amount by which the Working Capital is less than $20,600,000.  For purposes of this Agreement, "Working Capital" means the amount, determined in the manner set forth in Section 3.5, by which (a) that portion of the Purchased Assets which are treated under GAAP as current assets (excluding in any event the Lease Deposit) exceeds (b) the sum, without duplication, of (i) that portion of the Assumed Liabilities (excluding, for the avoidance of doubt, all Purchaser Cure Amounts, Additional Cash Payments and all incurred but not reported claims under Company Plans pursuant to Article IX below) which are treated under GAAP as current liabilities and (ii) to the extent that such liabilities should, in accordance with GAAP, be accrued on the Closing Balance Sheet (whether or not classified as current or long term liabilities), those Assumed Liabilities described in Sections 2.2(b), (g) and (i) hereof (it being understood and agreed that any liabilities discharged or otherwise satisfied by Sellers on or prior to the Closing Date shall not be Assumed Liabilities or otherwise taken into account as liabilities for purposes of determining Working Capital).  Notwithstanding anything expressed or implied herein to the contrary, all Purchaser Cure Amounts, Additional Cash Payments and all incurred but not reported claims under Company Plans pursuant to Article IX below shall not be taken into account as liabilities (of any nature) for purposes of determining Working Capital.

3.3    Time and Place of Closing.  Subject to Section 11.3 hereof, the transaction contemplated by this Agreement shall be consummated (the "Closing") at 10:00 a.m. local time at the offices of Greenberg Traurig, LLP, 77 W. Wacker Drive, Suite 3100, Chicago, Illinois 60601 or such other time and location as the parties may agree on the earlier to occur of (a) December 15, 2010 or (b) or on such other date or at such other time or place, as shall be mutually agreed upon by Sellers and Purchaser.  Notwithstanding the foregoing, if any condition to Closing has not been satisfied or waived by December 15, 2010, then Sellers may, in their sole discretion and subject to the rights of the parties under Section 11.3 hereof, extend the date of the Closing until all of the conditions to Closing have been satisfied or waived.  The date on which the Closing occurs in accordance with the preceding sentence is referred to in this Agreement as the "Closing Date".  Upon consummation of the Closing, the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall be deemed to have occurred, and the calculation of Working Capital contemplated under Section 3.5 hereof shall be made, as of 11:59:59 p.m. (Chicago time) on the day prior to the Closing Date.

3.4    Manner of Payment of the Purchase Price.  For purposes of the Closing, Sellers shall make a good-faith estimate (the "Closing Payment") of the Cash Payment, calculated in good faith based upon the most recent ascertainable financial information of the Business and taking into account Sellers' good faith estimate of the adjustment set forth in Section 3.2, and deliver the same to Purchaser on the Closing Date.  At the Closing, Purchaser shall:

(i)    assume the Assumed Liabilities,

(ii)    pay the Closing Payment, less the Deposit, by wire transfer of immediately available funds to such account as Sellers shall designate by written notice delivered to Purchaser on or prior to the Closing Date, and

(iii)    direct the Escrow Agent to disburse the Deposit to Sellers.

10

3.5    Determination of Closing Payment and Working Capital. The Final Closing Payment and Working Capital shall be determined from an estimated balance sheet and other records of the Business as of 11:59:59 p.m. (Chicago time) on the day prior to the Closing Date (the "Closing Balance Sheet"). The Closing Balance Sheet shall be prepared, in good faith, by or at the direction of Sellers. The Closing Balance Sheet shall be prepared in accordance with GAAP, and shall only reflect the Purchased Assets and Assumed Liabilities constituting Working Capital. Sellers shall deliver the Closing Balance Sheet to Purchaser no less than three (3) Business Days prior to the Closing Date. Purchaser and Sellers shall, throughout the entire period from the date of this Agreement to the Closing Date, meet and discuss any and all financial and business matters relating to such process and the preparation of the Closing Balance Sheet.

3.6    No Disputes or Adjustments Regarding Closing Balance Sheet. The parties agree that the Closing Balance Sheet and the Closing Payment resulting therefrom shall be final and binding in the form delivered in good faith by Sellers and that there shall be no dispute procedure or post-closing adjustment with respect thereto.

3.7    Allocation of Purchase Price. The Purchase Price shall be allocated among the Purchased Assets within thirty (30) days after the Closing Date in the manner required by Section 1060 of the Code, and as proposed by Sellers prior to the Closing and consented to by Purchaser (such consent to not be unreasonably withheld). Notwithstanding the foregoing, nothing in this Agreement shall be construed to mean that a party hereto or other person must: (a) use, for any one or more purposes, any price or other allocation set forth or provided for in this Agreement if such party or person reasonably believes or reasonably is advised that such use is not in accordance with law; or (b) make or file, or cooperate in the making or filing of, any return or report to any Governmental Authority in any manner that such party or person reasonably believes or is reasonably advised is not in accordance with law.

3.8    Deposit. Prior to the date hereof, Purchaser has made a deposit by wire transfer of immediately available funds in an amount equal to $2,500,000 (the cash deposit together with any interest accrued thereon, the "Deposit") to the Escrow Agent. In the event that the Closing occurs, the Deposit will be applied to satisfy an equal portion of the Cash Payment, and Purchaser shall execute any documentation required by the Escrow Agent to release the Deposit to Sellers or its designee at the Closing. In any other event, the Deposit shall be released by the Escrow Agent to the party entitled thereto in accordance with Section 11.4 and the parties shall execute any documentation required by the Escrow Agent with respect to such release. The Deposit shall only constitute property of the Sellers' bankruptcy estates in the event that the Deposit is required to be released to Sellers by the Escrow Agent in accordance with the terms of an escrow agreement executed by Sellers and Purchaser.

## ARTICLE IV
### Representations and Warranties

4.1    General Statement. The parties make the representations and warranties to each other which are set forth in this Article IV. All representations and warranties of Sellers are made subject to the exceptions which are noted in the Schedule delivered by Sellers to Purchaser

11

concurrently herewith and identified by the parties as the "Disclosure Schedule". Any disclosure set forth on any particular Schedule shall be deemed disclosed in reference to all applicable schedules and sections of this Agreement to the extent that from the face of such disclosure, such disclosure appears to be relevant to such other schedules and sections.

4.2     Representations and Warranties of Purchaser. Purchaser represents and warrants to Sellers that as of the date of this Agreement:

(a)     Organization. Purchaser is a Delaware corporation duly organized, existing and in good standing, under the laws of its state of organization.

(b)     Power and Authority. Purchaser has full corporate power and authority to enter into and perform this Agreement. The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated hereby has been duly and validly approved by the sole director of Purchaser. No other corporate proceedings are necessary on the part of Purchaser to authorize the execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated hereby. This Agreement has been duly executed and delivered by Purchaser and constitutes a legal, valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, except to the extent that enforcement may be affected by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application with respect to creditors, (ii) general principles of equity and (iii) the power of a court to deny enforcement of rights and remedies generally based upon public policy.

(c)     Consents. Other than the Bid Procedures Order and the Sale Order, no consent, authorization, Order or approval of, or filing or registration with, any Governmental Authority is required for or in connection with the consummation by Purchaser of the transactions contemplated hereby.

(d)     Conflicts Under Constituent Documents or Laws. Neither the execution and delivery of this Agreement by Purchaser, nor the consummation by Purchaser of the transactions contemplated hereby, will conflict with or result in a breach of any of the terms, conditions or provisions of its organizational documents, or of any statute or administrative regulation, or of any Order, writ, injunction, judgment or decree of any court or Governmental Authority or of any arbitration award.

(e)     Conflicts Under Contracts. Purchaser is not a party to any unexpired, undischarged or unsatisfied written or oral contract, agreement, indenture, mortgage, debenture, note or other instrument under the terms of which performance by Purchaser according to the terms of this Agreement will be a default or an event of acceleration, or grounds for termination, modification or cancellation, or whereby timely performance by Purchaser according to the terms of this Agreement may be prohibited, prevented or delayed.

12

(f)     Solvency.     Immediately after giving effect to the transactions contemplated hereby and the incurrence of any indebtedness in connection therewith, Purchaser shall be solvent.

(g)     Funding.     Purchaser currently has, and on the Closing Date will have, readily available funds in such amount as is required to consummate the transactions contemplated hereunder.

(h)     Adequate Assurances.     Purchaser is and will be capable of satisfying the conditions contained in Section 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

(i)     Brokers.     Neither Purchaser, nor any of its Affiliates has dealt with any Person who is entitled to a broker's commission, finder's fee, investment banker's fee or similar payment from Purchaser or Sellers for arranging the transactions contemplated hereby or introducing the parties to each other.

(j)     Independent Investigation.     Purchaser has conducted its own independent investigation, review and analysis of the Purchased Assets, the Assumed Liabilities, the Business and its operations, assets, liabilities, results of operations, financial condition and prospects, and acknowledges that Sellers have provided Purchaser with reasonable access to the personnel, properties, premises and records of the Business for this purpose. Purchaser has conducted its own independent review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with Bankruptcy Case. In making its determination as to the propriety of the transactions contemplated by this Agreement and in entering into this Agreement, Purchaser has relied solely upon its own investigation, review and analysis and on the representations and warranties of Sellers expressly contained in Sections 4.3 of this Agreement.

4.3     Representations and Warranties of Sellers.     Sellers represent and warrant to Purchaser that as of the date of this Agreement, except as set forth in the Disclosure Schedule and subject to the Bankruptcy Code, the Bid Procedures Order and the Sale Order (in each case as applicable):

(a)     Organization.     Each Seller is a corporation duly organized, existing and in good standing, under the laws of its state of incorporation. Each Seller has all necessary corporate power and authority to own the Purchased Assets owned by such Seller and conduct the Business as the Business is now being conducted.

(b)     Foreign Good Standing.     Each Seller has qualified as a foreign corporation, and is in good standing, under the laws of all jurisdictions where the nature of the Business or the nature or location of its assets requires such qualification and where the failure to so qualify would have a Material Adverse Effect.

(c)     Power and Authority.     Subject to Bankruptcy Court approval, each Seller has full power and authority to execute and perform this Agreement. The execution and delivery of this Agreement by each Seller and the performance by each Seller of all of its obligations under this Agreement have been duly approved prior to the date of this

13

Agreement by all requisite action of its board of directors. This Agreement has been duly executed and delivered by each Seller and, subject to Bankruptcy Court approval, constitutes a legal, valid and binding agreement of each Seller, enforceable against each Seller in accordance with its terms, except to the extent that enforcement may be affected by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application with respect to creditors, (ii) general principles of equity and (iii) the power of a court to deny enforcement of rights and remedies generally based upon public policy.

(d)     Governmental Consents.     Except for Bankruptcy Court approval, no consent, authorization, Order or approval of, or filing or registration with, any Governmental Authority is required for or in connection with the consummation by Sellers of the transactions contemplated hereby, except for consents, authorizations, Orders, approvals, filings or registrations, which, if not obtained or made, would not, individually or in the aggregate, have a Material Adverse Effect.

(e)     Conflicts Under Constituent Documents or Laws.     Neither the execution and delivery of this Agreement by Sellers, nor the consummation by Sellers of the transactions contemplated hereby, will conflict with or result in a breach of any of the terms, conditions or provisions of any Sellers' certificate or articles of incorporation or by-laws, or of any statute or administrative regulation, or of any Order, writ, injunction, judgment or decree of any court or Governmental Authority or of any arbitration award to which any Seller is a party or by which any Seller is bound, in each case, subject to the effect of applicable bankruptcy law and the Sale Order and except for conflicts or breaches that would not, individually or in the aggregate, have a Material Adverse Effect.

(f)     Title to Purchased Assets.     Each Seller has good and marketable title to or interest in (as applicable) the Purchased Assets of such Seller, all of which will be transferred or assigned to Purchaser as contemplated hereby. The Purchased Assets constitute, in all material respects, all of the assets necessary to operate the Business as presently operated.

(g)     Contracts.     To Sellers' Knowledge, the Assigned Contracts are enforceable in accordance with their respective terms in all material respects (subject to payment of the applicable Cure Amount), except to the extent that enforcement may be affected by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application with respect to creditors, (ii) general principles of equity and (iii) the power of a court to deny enforcement of rights and remedies generally based upon public policy. Sellers have duly performed all of their material obligations under each material Assigned Contract to the extent that such obligations to perform have accrued, and no material breach or default, or, to Sellers' Knowledge, alleged material breach or default or event that would (with the passage of time, notice or both) constitute a material breach or default by any Seller or other party to such Assigned Contract has occurred. As used in this Section 4.3(g), "Assigned Contract" shall not include any Company Plan, the representations and warranties with respect to which are exclusively provided for in Section 4.3(i) hereof.

CHI 60576803v10 December 15, 2010

(h)    Permits. Schedule 4.3(h) sets forth a true and complete list of all material permits and all pending applications therefor held by Sellers. To the Knowledge of Seller, each such Permit has been duly obtained, is valid and in full force and effect, and is not subject to any pending or threatened administrative or judicial proceeding to revoke, cancel, suspend or declare such Permit invalid in any respect. The Business is not being conducted by Sellers in a manner that violates any of the terms or conditions under which any Permit was granted, which violation would have a Material Adverse Effect.

(i)    Employees. With respect to employees of Sellers:

(i)    Schedule 4.3(i)(i) contains a true, correct and complete list of all employee benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and each employment, bonus, deferred compensation, incentive compensation, retention, severance, equity or equity-like, change-in-control, or termination pay plan or arrangement, medical, disability, life or other insurance, retiree medical, disability or life insurance supplemental unemployment benefits, profit-sharing, pension or other retirement, supplemental retirement, vacation, or sick leave program, agreement or arrangement, and other employee benefit plan, program, agreement or arrangement, in either case, which the Sellers have any liability or which is sponsored, maintained or contributed to or required to be contributed to by the Sellers or by any trade or business, whether or not incorporated, that together with the Sellers or any of their subsidiaries would be deemed a "single employer" within the meaning of Section 414 of the Code, for the benefit of any current or former employee, independent contractor or director of the Sellers, or any of its subsidiaries or any affiliates (all of the foregoing, excluding the Management Incentive Plans, the "Company Plans"). Except as required by applicable law, the Sellers do not have any formal plan or commitment, whether legally binding or not, to create any additional Company Plan or modify or change any existing Company Plan.

(ii)    With respect to each Company Plan, the Sellers have heretofore made available to Purchaser true, correct and complete copies of each such Company Plan (or written summary where such Company Plan is not in writing) and any amendments thereto, and to the extent applicable, any related trust or other funding vehicle, the two latest versions of any annual report on Form 5500 filed with the IRS with respect to each Company Plan (if any such report was required) with all required attachments and the most recent summary plan description (if required) and summaries of material modification with respect to any Company Plan for which a summary plan description is required, the most recently prepared actuarial report and financial statement in connection with each Company Plan and the most recent determination letter received from the IRS with respect to each Company Plan intended to qualify under Section 401 of the Code. With respect to the Company Plans, there has been no event that would increase materially the expense of maintaining such Company Plans over the cost of doing so for the most recently completed plan year.

15

(iii) None of the Company Plans are subject to Title IV of ERISA. The Company does not contribute to and has never contributed to a multi-employer plan within the meaning of ERISA Section 3(37).

(iv) Each Company Plan is now and has always been operated and administered in all material respects in accordance with its terms and applicable law, regulation and rules. The Sellers have performed all obligations required to be performed by them under, and not in any respect in default under or in violation of, and have no Knowledge of any default or violation by any party to, any Company Plan. No event has occurred with respect to any Company Plan that would reasonably be expected to result in payment or assessment by or against the Sellers under Sections 4972, 4975, 4976, 4977, 4979, 4980B, 4980D, 4980E or 5000 of the Code.

(v) Each Company Plan intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable IRS determination letter with respect to such qualification and the Tax-exempt status of its related trust, and no circumstances exist which could reasonably be expected to result in material liability to the Sellers or their subsidiaries in respect of such qualified status.

(vi) There are no pending or, to the Knowledge of the Sellers, threatened, actions, claims or audits involving any Company Plan or by any current or former employee, independent contractor or director against the Sellers or any of their subsidiaries, other than routine claims for benefits.

(vii) (A) Neither the Sellers nor any of their subsidiaries has any Liability in respect of post-retirement health, medical or life insurance benefits for former or current officers, employees, independent contractors or directors of the Company or any of its subsidiaries, other than as required by Section 4980B of the Code or Part 6 of Title I of ERISA, and (B) Sellers have never represented, promised or contracted (whether in oral or written form) to any employee (either individually or to employees as a group) or any other person that such employee or other Person would be provided with health, disability or life insurance benefits, except to the extent required by statute.

(viii) The consummation of the transactions contemplated by the Agreement will not (either alone or together with any other event) cause or result in the accelerated vesting, funding, or delivery of, or increase the amount or value of, any payment or benefit to any employee, officer or director of the Sellers or any of their subsidiaries or trigger any payment of funding (through a grantor trust or otherwise) of compensation or benefits under, or increase the amount payable or trigger any other obligation pursuant to, any Company Plan or any collective bargaining agreement, and no such amount or benefit will constitute an "excess parachute payment" within the meaning of Section 280G of the Code.

16

(ix)     Each Company Plan that constitutes a "non-qualified deferred compensation plan" within the meaning of Section 409A of the Code complies in form and operation with Section 409A of the Code, except as could not reasonably be expected to result in material liability.

(x)     Each Company Plan can be amended. terminated or otherwise discontinued at any time without material liability, to Purchaser, Company or any of their ERISA Affiliates other than ordinary administration expenses). Neither Company nor any affiliate has, prior to the Closing Date and in an material respect, violated any of the health care continuation requirements of COBRA.

(xi)     All contributions. premiums or payments required to be made or accrued with respect to any Company Plan have been made on or before their due dates. All such Company Plans are fully funded and there exists no event or condition that has or will subject either Purchaser or Company to any liability under the terms of such Company Plans, ERISA, the Code or any other applicable law, other than contributions, benefits or liabilities contemplated by such Company Plans.

(j)     Employee Matters.

(i)     Except as set forth in Schedule 4.3(j)(i), (i) Sellers are not a party to any collective bargaining agreement or other labor union contract applicable to persons employed by the Sellers, and currently there are no organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit that could affect Sellers; (ii) there are no controversies, strikes, slowdowns or work stoppages pending or to the best Knowledge of Sellers after due inquiry, threatened between Sellers and any of its employees, and Sellers have not experienced any such controversy, strike, slowdown or work stoppage within the past three years; (iii) Sellers have not engaged in any unfair labor practice, and there are no unfair labor practice complaints pending against Sellers before the National Labor Relations Board or any other Governmental Entity or any current union representation questions involving employees of Sellers; (iv) Sellers are currently in material compliance with all applicable laws relating to the employment of labor, including those related to ways, hours, eligibility for and payment of overtime compensation, worker classification (including the proper classification of independent contractors and consultants), Tax withholding, collective bargaining. unemployment insurance, workers' compensation, immigration, harassment and discrimination in employment, disability rights and benefits, affirmative action, plant closing and mass layoff issues, occupational safety and health laws.

(ii)     Schedule 4.3(j)(ii) contains a true and complete list of (i) all individuals who serve as employees of or consultants to Sellers as of the date hereof, (ii) in the case of such employees, the position, base compensation payable, bonus opportunity, date of hire, employment status and job classification

17

(exempt or non-exempt) to each such individual, and (iii) in the case of each such consultant, the consulting rate payable to such individual.

(k)     Compliance with Laws.  Except for laws, rules and regulations relating to the environment (the representations and warranties with respect to which are exclusively provided for in Section 4.3(l) hereof), no Seller is in violation of, or delinquent in respect to, any material decree, Order or arbitration award or law, statute, or regulation of or agreement with, or Permit from, any Federal, state or local Governmental Authority (or to which its properties, assets, personnel, business activities or the Owned Real Estate or Leased Real Estate are subject or to which it, itself, is subject), which violation or delinquency would have a Material Adverse Effect.

(l)     Environmental.  No hazardous materials have at any time been generated, used, treated or stored on, transported to or from, or released or disposed of on, the Owned Real Estate or Leased Real Estate in violation of Environmental Laws.  Sellers are in compliance, in all material respects, with all Environmental Laws and Environmental Permits.  There are no past, pending or threatened environmental claims against Sellers or any of the Owned Real Estate or Leased Real Estate.  To the Knowledge of Sellers, there are no facts or circumstances, conditions or occurrences regarding the business or operations of Seller, the Owned Real Estate, Leased Real Estate or any property adjoining or adjacent to any Owned Real Estate or Leased Real Estate, that could reasonably be anticipated (i) to form the basis of any environmental claim against Sellers or the Owned Real Estate or Leased Real Estate or (ii) to cause such Owned Real Estate or Leased Real Estate to be subject to any restrictions on its ownership, occupancy, use or transferability under any environmental law other than restrictions applicable generally.    There are no consent decrees, consent orders, judgments, judicial or administrative orders, agreement with (other than Environmental Permits) or encumbrances by, any Governmental Authority or quasi-governmental entity under any Environmental Law which regulate, obligate or bind Sellers except as are applicable generally.

(m)     Real Estate.

(i)     Schedule 4.3(m) accurately sets forth the street addresses and legal descriptions of the Owned Real Estate.    The Sellers identified on Schedule 4.3(m) hold fee simple title to the Owned Real Estate identified thereon, subject only to real estate taxes not delinquent and Permitted Liens.  The Owned Real Estate is not subject to any leases or tenancies.  Any easements, building lines and other matters as shown on the Unrecorded Plat of Tracts microfilmed under Slide No. 316, and the terms and provisions relating thereto, as the same relate to the Owned Real Estate located at 610 S. Industrial Drive, Litchfield, Illinois 62056 do not, individually or in the aggregate, materially interfere with the use of such Owned Real Estate in the ordinary conduct of the Business.  In addition, such easements, building lines and other matters do not result in a Material Adverse Effect.

18

(ii)     The Leased Real Estate is leased to the applicable Seller pursuant to a written lease, a true, correct and complete copy of which (including any notices or elections of non-renewal) has been provided to Purchaser prior to the date hereof. Seller is not in default under any material term of any agreement relating to the Leased Real Estate nor, to Sellers' Knowledge, is any other party thereto in material default thereunder. The Leased Real Estate is not subject to any leases or tenancies of any kind, except for the Seller's lease.

(n)     Intellectual Property. Schedule 4.3(n) sets forth a complete and accurate list of all of Sellers' (i) U.S. and foreign copyright registrations and copyright applications (collectively, "Copyrights"), (ii) U.S. and foreign patents and patent applications (collectively, "Patents"), (iii) U.S. and foreign trademark and service mark registrations and trademark and service mark applications (collectively, "Trademarks"), (iv) internet domain name registrations and (v) licenses of rights in computer software (other than "off-the-shelf" shrink wrap software), Trademarks, Patents and Copyrights, whether to or by a Seller. Other than as identified in Schedule 4.3(n): (1) no Patent has been or is now involved in any interference, reissue, re-examination or opposition proceeding; (2) no Patent is infringed or to Sellers' Knowledge has been challenged or threatened in any way and non of the products sold or manufactured, nor any process or know-how used by Sellers infringes or is alleged to infringe any patent or proprietary right of any other person; (3) (A) none of the products sold or manufactured, nor any process or know-how used by Sellers infringes any patent or proprietary right of any other person, and (B) none of the products sold or manufactured, nor any process or know-how used by Sellers is alleged to infringe any patent or proprietary right of any other person; and (4) no Trademark is infringed or to Sellers' Knowledge has been challenged or threatened in any way, and none of the Trademarks used by Sellers infringes or is alleged to infringe on the Trademark or service mark of any Person.

(o)     Brokers. Except for Oppenheimer & Co., Inc. (the fees of which shall be paid by Sellers), Sellers have not dealt with any person or entity who is entitled to a broker's commission, finder's fee, investment banker's fee or similar payment from Purchaser for arranging the transaction contemplated hereby or introducing the parties to each other.

(p)     Taxes. Sellers have timely filed all Tax reports or returns ("Tax Returns") required to be filed pursuant to applicable legal requirements with respect to the Business, and all such Tax Returns are complete, true and accurate in all material respects. Seller has timely paid all Taxes that have become due or made adequate provision for the payment of such Taxes. There are no Taxes due yet unpaid which would result in a Lien on the Purchased Assets, or which would otherwise impair the use, operation or ownership of the Business or the Purchased Assets. To the extent Taxes are or may be due but cannot be paid until after the Sale Order is entered and is final, Sellers agree to provide a listing of the same to Purchaser and to pay such Taxes prior to, or as part of the Closing. None of the Tax Returns filed by Sellers or Taxes payable by Sellers have been the subject of an action, arbitration, audit, hearing, public investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving,

19

a Governmental Authority or arbitrator ("Proceeding") in respect of Taxes or Tax matters with respect to Sellers, and no such Proceeding is currently pending or, to Sellers' Knowledge, threatened. No Governmental Authority in a jurisdiction in which Sellers do not file Tax Returns has notified Sellers in writing that any Seller is or may be required to file Tax Returns in, or is or may be subject to Tax by, that jurisdiction.

(q) Financial Statements. The Disclosure Schedule contains true and correct copies of (i) the audited consolidated statements of income and statements of cash flow for the Business for the fiscal year ended October 31, 2009, and the audited consolidated balance sheets of the Business at such dates (the "Financial Statements") and (ii) the unaudited balance sheet of the Business as at September 30, 2010 and the related unaudited statement of income and statement of cash flow for the Business for the eleven months then ended (the "Interim Financial Statements"). The Financial Statements and the Interim Financial Statements present fairly, in all material respects, the consolidated financial position of the Sellers as of the dates thereof (including, without limitation, the current assets and current liabilities of the Sellers) and the consolidated results of operations and cash flows of Sellers for the periods covered by such statements, in accordance with GAAP consistently applied through the periods covered thereby, except as disclosed therein, and, in the case of the Interim Financial Statements, except for (1) normal year-end adjustments and (2) the omission of footnote disclosures required by GAAP.

4.4 "As Is Where Is" Transaction. Purchaser hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in Section 4.3 of this Agreement, Sellers make no express or implied representations or warranties whatsoever, including, without limitation, any representation or warranty as to physical condition or value of any of the Purchased Assets, the future profitability or future earnings performance of the Business, or otherwise with respect to any matter related to the Purchased Assets, the Assumed Liabilities or the Business. **WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ALL IMPLIED WARRANTIES OF MERCHANTABILITY, USABILITY, SUITABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH ARE EXPRESSLY EXCLUDED.** Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of Sellers, the Purchased Assets, the Assumed Liabilities, the Business and its operations, assets, liabilities, results of operations, financial condition and prospects, and all such other matters relating to or affecting the foregoing as Purchaser deems necessary or appropriate and that in proceeding with its acquisition of the Purchased Assets and assumption of the Assumed Liabilities, Purchaser is doing so based solely upon such independent inspection and investigation. Accordingly, Purchaser will accept the Purchased Assets and assume the Assumed Liabilities at the Closing **"AS IS," "WHERE IS" AND "WITH ALL FAULTS"**. Without limiting the foregoing, Purchaser further acknowledges that no representation, warranty, covenant, agreement, statement made or information communicated (orally or in writing) or material provided to Purchaser (including any opinion, information, or advice which may have been provided to Purchaser or any of its Affiliates by any stockholder, partner, director, officer, employee, accounting firm, financial advisor, investment banker, legal counsel, or other agent, consultant, or representative of Sellers) will create any representation or warranty of any kind, whether express or implied, with respect to Sellers (or any other Person), the Purchased Assets,

20

the Assumed Liabilities, the Business or its operations, assets, liabilities, results of operations, financial condition or prospects, and Sellers disclaim all liability and responsibility for any of the foregoing. **ANY AND ALL PRIOR REPRESENTATIONS AND WARRANTIES MADE BY ANY PARTY OR ITS REPRESENTATIVES, WHETHER VERBALLY OR IN WRITING, ARE DEEMED TO HAVE BEEN MERGED INTO THIS AGREEMENT, IT BEING INTENDED THAT NO SUCH PRIOR REPRESENTATIONS OR WARRANTIES SHALL SURVIVE THE EXECUTION AND DELIVERY OF THIS AGREEMENT.**

## ARTICLE V
### Conduct Prior to the Closing

5.1     General. Sellers and Purchaser have the rights and obligations with respect to the period between the date hereof and the Closing Date which are set forth in the remainder of this Article V.

5.2     Sellers' Obligations. The following are Sellers' obligations:

(a)     Sellers shall give to Purchaser's officers, employees, agents, attorneys, consultants, prospective lenders and accountants reasonable access during normal business hours to all of the properties, books, contracts, documents, records and personnel of the Business and shall furnish to Purchaser such information as Purchaser may at any time and from time to time reasonably request, in each case if (i) permitted under law, (ii) such items and information are not prohibited to be disclosed to Purchaser pursuant to the terms of any confidentiality agreement (after providing Purchaser the opportunity to comply with any conditions to such disclosure set forth therein); and (iii) disclosing such items and information would not adversely affect any attorney client, work product or other legal privilege.

(b)     Without the prior written consent of Purchaser (not to be unreasonably withheld, conditioned or delayed), and without limiting the generality of any other provision of this Agreement, Sellers shall not take any of the following actions except as required under the Bankruptcy Code (or other applicable law) or any Order of the Bankruptcy Court:

(i)     materially increase the annual level of compensation or benefit payable or to become payable by Sellers to any of their employees, except, in each case, as required by law, or as required by any plans, programs or agreements existing as of the date hereof and disclosed to Purchaser, or as approved by the Bankruptcy Court with respect to Sellers' management incentive plan, or become a party to any employment agreement; and

(ii)     sell, transfer or otherwise dispose of any material asset or property that would otherwise constitute a Purchased Asset hereunder, except for sales of Inventory in the ordinary course of business consistent with past practice or pursuant to an Alternative Transaction accepted by Sellers (it being understood that this clause (ii) shall not restrict use of cash collateral (as defined in

21

Section 363 of the Bankruptcy Code) in accordance with the Cash Collateral Order).

(c)    Sellers shall reasonably cooperate (without having to incur any material cost, financial obligation or liability) with Purchaser to obtain the Required Consents, to obtain any other consents to the assignment and assumption of any Assigned Contracts or to the assignment, transfer or other approvals required in connection with the permits set forth on Schedule 4.3(h).

(d)    Subject to the Bankruptcy Code and any Orders of the Bankruptcy Court, between the date of this Agreement and the Closing Date, the Sellers shall use commercially reasonable efforts (and without material cost to Sellers, unless consistent with the ordinary course of business of Sellers) to do each of the following:

(i)    keep the Business and the Purchased Assets substantially intact and maintain present operations, physical facilities, working conditions, and relationships with lessors, licensers, suppliers, customers and employees;

(ii)    maintain the tangible Purchased Assets in the same condition as on the date of this Agreement, ordinary wear and tear excepted;

(iii)    keep in full force and effect any liability and casualty insurance held by the Sellers;

(iv)    perform all of their respective obligations under and not amend, alter or modify any material provision of the Assigned Contracts including but not limited to Company Plans;

(v)    preserve their respective organizations intact, keep available the services of their officers, employees and agents and maintain in effect their current relationships with their employees, suppliers and customers;

(vi)    promptly advise Purchaser of any event that could reasonably be expected to have a Material Adverse Effect on the Business or the Purchased Assets;

(vii)    maintain and collect the Account Receivables and extend credit terms to their customers in the ordinary course of business consistent with past practices;

(viii)    maintain cash management systems in the ordinary course of business consistent with past practices;

(ix)    subject to Section 5.2(a), confer with Purchaser (upon request) with respect to the status and operation of the Business;

(x)    make no material changes in management personnel without prior consultation with Purchaser; and

22

(xi)    grant no license or sub-license with respect to any Intellectual Property Rights.

(e)    Sellers shall provide Purchaser with prompt written notice of Sellers' Knowledge of the breach of any representation, warranty or covenant of Sellers that has rendered, or that would, in Sellers' good faith judgment, reasonably be expected to render unlikely or impractical, the satisfaction of any condition to the obligations of Purchaser set forth in Section 6.2.

(f)    Sellers will, at the request of Purchaser to the extent necessary for Purchaser's auditors or prospective lenders, perform a physical count of the Inventory and in which Purchaser's auditors or prospective lenders and their respective representatives may participate, such count to be conducted at mutually acceptable times and in a commercially reasonable manner so as to avoid material disruption to the Business.

(g)    From and after November 22, 2010, Sellers shall cooperate in good faith with Purchaser to assist Purchaser in negotiating with Sellers' suppliers regarding potential terms and conditions of post-Closing commercial arrangements.

(h)    Sellers shall use commercially reasonable efforts (at Sellers' cost) to provide Purchaser with evidence that U.S. Patent Nos. 5,685,790 and 5,628,506, both entitled "Breakaway basketball rim", have been duly assigned by the inventor, Russell L. Vaught, to Melas, Inc. or a predecessor entity.

(i)    Prior to the Closing Date, Sellers shall pay in full all 401k matching contribution amounts for all periods ending on or prior to October 31, 2010, and deliver evidence thereof to Purchaser.

(j)    With respect to each permit listed on Schedule 4.3(h) that expires, or for which renewal or extension applications are required (in order to avoid such permits lapsing or otherwise resulting in the loss of any material right thereunder) to be made prior to the date that is 30 days following the Termination Date, Sellers shall file all such applications for renewal or extension and shall pay all associated fees prior to the Closing Date, and shall deliver evidence thereof to Purchaser.

(k)    Sellers shall make all appropriate section 8 and section 15 filings with the United States Patent and Trademark Office (and paid all associated fees) respect to the trademark CATCHER-COMFORT (US Reg. No. 2849584) on or before December 1, 2010, and deliver evidence thereof to Purchaser.

5.3    Purchaser's Obligations. The following are Purchaser's obligations:

(a)    Purchaser agrees to be bound by and comply with the terms and provisions of that certain non-disclosure agreement dated as of September 15, 2010 between Holdings and Platinum Equity, LLC (the "Confidentiality Agreement"), as if Purchaser was an original party to such agreement. The Confidentiality Agreement is hereby incorporated into this Agreement by reference and made a part of this Agreement and

23

shall survive the execution of this Agreement notwithstanding the terms thereof. If a conflict arises between the provisions of this Agreement and the provisions of the Confidentiality Agreement, the provisions of the Confidentiality Agreement shall control. The provisions of this Section 5.3(a) shall terminate upon the Closing.

(b) Purchaser shall use commercially reasonable efforts to obtain the consents to the assignment of those Assigned Contracts, Permits and/or Environmental Permits identified by Sellers on Schedule 5.3(b) attached hereto (the "Required Consents") to the extent such consents are not provided for or satisfied by the Sale Order.

(c) With respect to each Assigned Contract, Purchaser shall provide adequate assurance of the future performance of such Assigned Contract by Purchaser.

(d) Purchaser shall provide Sellers with prompt written notice of Purchaser's knowledge of the breach of any representation, warranty or covenant of Purchaser that has rendered, or that would, in Purchaser's good faith judgment, reasonably be expected to render unlikely or impractical, the satisfaction of any condition to the obligations of Sellers set forth in Section 6.1.

5.4 Joint Obligations. The following shall apply with equal force to Sellers, on the one hand, and Purchaser, on the other hand:

(a) Each of the parties hereto shall use all commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated hereby as soon as practicable.

(b) No party shall intentionally perform any act which, if performed, or intentionally omit to perform any act which, if omitted to be performed, would prevent or excuse the performance of this Agreement by any party hereto.

(c) Without implication that such laws apply to the transactions contemplated hereby, Sellers and Purchaser shall not comply with the provisions of the Uniform Commercial Code of any state relating to bulk sales.

(d) Purchaser agrees to take any and all commercially reasonable steps necessary to avoid or eliminate each and every impediment under the HSR Act and under each other antitrust, competition or trade regulation law that may be asserted by any United States or non-United States governmental antitrust authority or any other Person so as to enable the parties to expeditiously close the transactions contemplated hereby no later than the Termination Date. In addition, Purchaser shall use its reasonable best efforts to defend any claim asserted in court by any Person in order to avoid entry of, or to have vacated or terminated, any decree, Order or judgment that would prevent the Closing by the Termination Date. In connection with the efforts referenced in this Section 5.4(d) to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement pursuant to this Section 5.4(d), without limiting the foregoing, provided that disclosing such items and information would not adversely affect any attorney client, work product or other legal privilege, each of Sellers and

24

Purchaser shall use all commercially reasonable efforts to: (i) cooperate in all respects with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (ii) keep the other party informed in all material respects of any material communication received by such party from, or given by such party to, any Governmental Authority and of any material communication received or given in connection with any proceeding by a private party; and (iii) except as otherwise prohibited by law, permit the other party to review any material communication given by it to, and consult with each other in advance of and be permitted to attend any meeting or conference with such Governmental Authority or, in connection with any proceeding by a private party, with any other Person, in each case regarding any of the transactions contemplated by this Agreement.

## ARTICLE VI
## Conditions to Closing

6.1    <u>Conditions to Sellers' Obligations</u>. The obligation of Sellers to consummate the transaction contemplated hereby is subject to the fulfillment of all of the following conditions on or prior to the Closing Date and as of the Closing Date, upon the non-fulfillment of any of which this Agreement may, at Sellers' option, be terminated to the extent permitted pursuant to and with the effect set forth in Article XI:

(a)    The representations and warranties made by Purchaser in this Agreement which are not qualified by Material Adverse Effect shall, taken as a whole, be true and correct in all respects as of the time of the Closing as though such representations and warranties were made at and as of such time (or, if made as of a specific date in the text of such representations and warranties, at and as of such date), and the representations and warranties made by Purchaser in this Agreement which are qualified by Material Adverse Effect shall each be true and correct in all respects as of the time of the Closing as though such representations and warranties were made at and as of such time (or, if made as of a specific date in the text of such representations and warranties, at and as of such date).

(b)    All material obligations of Purchaser to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which Purchaser would be required to perform at the Closing if the transaction contemplated hereby was consummated) shall have been fully performed.

(c)    No Governmental Authority of competent jurisdiction shall have entered a valid Order that is in effect and has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing.

(d)    The Sale Order shall have been entered by the Bankruptcy Court approving the transactions contemplated under this Agreement.

(e)    The Extension Order shall have been entered by the Bankruptcy Court.

25

6.2    Conditions to Purchaser's Obligations.    The obligation of Purchaser to consummate the transaction contemplated hereby is subject to the fulfillment of all of the following conditions on or prior to the Closing Date and as of the Closing Date (in each case, so long as Purchaser has complied with its obligations under this Agreement with respect to each of the matters set forth below), upon the non-fulfillment of any of which this Agreement may, at Purchaser's option, be terminated to the extent permitted pursuant to and with the effect set forth in Article XI:

(a)    The representations and warranties made by Sellers in this Agreement which are not qualified by Material Adverse Effect shall, taken as a whole, be true and correct in all respects as of the time of the Closing as though such representations and warranties were made at and as of such time (or, if made as of a specific date in the text of such representations and warranties, at and as of such date) except where the failure to be so true and correct would not have a Material Adverse Effect, and the representations and warranties made by Sellers in this Agreement which are qualified by Material Adverse Effect shall each be true and correct in all respects as of the time of the Closing as though such representations and warranties were made at and as of such time (or, if made as of a specific date in the text of such representations and warranties, at and as of such date).

(b)    All material obligations of Sellers to be performed hereunder through, and including on, the Closing Date (including, without limitation, all obligations which Sellers would be required to perform at the Closing if the transaction contemplated hereby was consummated) shall have been performed in all material respects.

(c)    Those Required Consents which have not been provided for or satisfied by the Sale Order shall have been obtained.

(d)    No Governmental Authority of competent jurisdiction shall have entered a valid Order that is in effect and has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing.

(e)    The Bid Procedures Order and the Sale Order shall have each been entered by the Bankruptcy Court approving the transactions contemplated under this Agreement.

(f)    [INTENTIONALLY OMITTED].

(g)    [INTENTIONALLY OMITTED].

(h)    [INTENTIONALLY OMITTED].

(i)    The Extension Order shall have been entered by the Bankruptcy Court and Sellers shall have provided Purchaser with a sublease or license allowing full and exclusive access (at Purchaser's sole cost and expense not in excess of Seller's current rental payments under the Real Estate Lease) to, and use of, the facilities and properties covered by the Real Estate Lease through the Extended Assumption/Rejection Date. If the landlord for the Leased Real Estate has not given its written consent to the foregoing

access and use arrangement, the Extension Order shall expressly authorize and approve the same.

## ARTICLE VII
### Closing

7.1 <u>Form of Documents</u>. At the Closing, the parties shall deliver the documents, and shall perform the acts, which are set forth in this Article VII. All documents which Sellers shall deliver shall be in form and substance reasonably satisfactory to Purchaser and Purchaser's counsel. All documents which Purchaser shall deliver shall be in form and substance reasonably satisfactory to Sellers and Sellers' counsel.

7.2 <u>Purchaser's Deliveries</u>. At the Closing, Purchaser shall execute and/or deliver to Sellers all of the following:

(a) the Closing Payment, less the Deposit;

(b) all documentation required by the Escrow Agent to release the Deposit to Sellers (or their designee);

(c) an assumption agreement, duly executed by Purchaser, under which Purchaser assumes the Assumed Liabilities in accordance with the terms hereof;

(d) a certified copy of Purchaser's organizational documents;

(e) a certificate of good standing of Purchaser, issued not earlier than ten (10) days prior to the Closing Date by the secretary of state of Purchaser's state of organization;

(f) an incumbency and specimen signature certificate with respect to the officers of Purchaser executing this Agreement and the other documents to be executed in connection with the transactions contemplated by this Agreement;

(g) a certified copy of resolutions of Purchaser's governing boards, authorizing the execution, delivery and performance of this Agreement and the other documents to be executed in connection with the transactions contemplated by this Agreement;

(h) a closing certificate executed by Purchaser to the effect that the conditions set forth in Sections 6.1(a) and 6.1(b) have been satisfied, and that all documents to be executed and delivered by Purchaser at the Closing have been executed by duly authorized persons;

(i) a release with respect to the Assigned Avoidance Actions;

(j) all documents necessary for Purchaser to assume the Company Plans in accordance with Article IX hereof;

27

(k)     [INTENTIONALLY OMITTED].

(l)     any other documents, instruments, affidavits, assignments or certificates, including without limitation, all recording and transfer tax declarations, forms and affidavits, reasonably required by Purchaser, the title insurance company or Escrow Agent to be delivered to consummate the transactions contemplated by this Agreement.

7.3     Sellers' Deliveries. At the Closing, Sellers shall execute (where applicable in recordable form) and/or deliver or cause to be executed and/or delivered to Purchaser all of the following:

(a)     an incumbency and specimen signature certificate with respect to the officers of Sellers executing this Agreement and the other documents to be executed in connection with the transactions contemplated by this Agreement;

(b)     a certified copy of resolutions of Sellers' governing boards, authorizing the execution, delivery and performance of this Agreement and the other documents to be executed in connection with the transactions contemplated by this Agreement;

(c)     a bill of sale, executed by Sellers, conveying all of the tangible personal property included in the Purchased Assets to Purchaser in accordance with the terms hereof;

(d)     an assignment to Purchaser, executed by Sellers, assigning to Purchaser all of the Purchased Assets (other than tangible personal property and the Owned Real Estate) in accordance with the terms hereof;

(e)     copies of the Required Consents which have been obtained by Sellers;

(f)     a special warranty deed for each interest in Owned Real Estate;

(g)     all documents necessary to for Sellers to transfer the Company Plans to Purchaser in accordance with Article IX hereof;

(h)     a closing certificate executed by Sellers to the effect that the conditions set forth in Sections 6.2(a) and 6.2(b) have been satisfied, and that all documents to be executed and delivered by Sellers at the Closing have been executed by duly authorized persons; and

(i)     any other documents, instruments, affidavits, assignments or certificates, including without limitation, all recording and transfer tax forms and affidavits, reasonably required by Purchaser, the title insurance company or Escrow Agent to be delivered to consummate the transactions contemplated by this Agreement.

Notwithstanding anything expressed or implied herein to the contrary, in the event any of the items identified in Sections 7.3(a), (b), (g), (h), (i) are not completed by the Closing, then Purchaser hereby waives satisfaction of such closing delivery and the Closing shall nonetheless occur, and Purchaser shall fully perform all obligations under Section 3.4 (including payment in

28

full of all amounts due thereunder) and all other obligations to be performed by Purchaser at or in connection with the Closing. As soon as practicable following the Closing, Sellers shall deliver to Purchaser those items identified in Sections 7.3(a), (b), (g), (h), (i) so that ownership of the Owned Real Estate is conveyed to Purchaser in accordance with the terms hereof and Purchaser can obtain the title insurance policies described in Section 8.10 hereof.

## ARTICLE VIII
## Post-Closing Agreements

8.1    Post-Closing Agreements. From and after the Closing, the parties shall have the respective rights and obligations which are set forth in the remainder of this Article VIII.

8.2    Inspection of Records. Purchaser shall make books and records constituting Purchased Assets in Section 1.2(j) hereof available for inspection by Sellers or by their representatives (without charge by Purchaser to Sellers or its representatives), that are reasonably necessary or appropriate for any of Sellers' bona fide accounting, auditing, tax, legal or other reasonable business purposes, at all reasonable times during normal business hours, until the later of (a) the sixth anniversary of the Closing Date or (b) the date the Bankruptcy Court enters an Order closing the Bankruptcy Case, with respect to all transactions occurring prior to and those relating to the Closing, the historical financial condition, results of operations and cash flows of the Business and the Assumed Liabilities. Such records shall be made available at Purchaser's executive office, and Sellers right of inspection shall include having access to any computerized information systems to the extent necessary to inspect such records. As used in this Section 8.2, the right of inspection includes the right to make extracts or copies (at Sellers' expense). In addition, Purchaser shall give reasonable assistance to Sellers, through Purchaser's employees and without charge by Purchaser to Sellers, in order for Sellers to record entries relating to the closing of Sellers' books relating to the Business, to prepare and file Tax returns related to the Business.

8.3    Certain Tax Matters.

(a)    All state and local sales, use, gross-receipts, transfer, gains, excise, value-added or other similar Taxes in connection with the transfer of the Purchased Assets and the assumption of the Assumed Liabilities (other than any such Taxes that constitute a franchise Tax or are otherwise imposed in lieu of an income tax), and all recording and filing fees that may be imposed by reason of the sale, transfer, assignment and delivery of the Purchased Assets (collectively, "Transaction Taxes"), shall be paid fifty percent (50%) by Sellers and fifty percent (50%) by Purchaser on or prior to their due date. Purchaser hereby waives compliance by Sellers with any applicable bulk sale or bulk transfer (or similar) laws in connection with the transactions contemplated hereby.

(b)    All real and personal property taxes and assessments on the Purchased Assets for any taxable period commencing on or prior to the Closing Date and ending on or after the Closing Date (a "Straddle Period") shall be prorated between Purchaser and Sellers as of the close of business on the Closing Date based on the best information then available, with (a) Sellers being liable for such Taxes attributable to any portion of a Straddle Period ending on the day prior to the Closing Date and (b) Purchasers being

29

liable for such Taxes attributable to any portion of a Straddle Period beginning on or after the Closing Date. Information available after the Closing Date that alters the amount of Taxes due with respect to the Straddle Period will be taken into account and any change in the amount of such Taxes shall be prorated between Purchaser and Sellers as set forth in the next sentence. All such prorations shall be allocated so that items relating to the portion of a Straddle Period ending on the day prior to the Closing Date shall be allocated to Sellers based upon the number of days in the Straddle Period prior to the Closing Date and items related to the portion of a Straddle Period beginning after the Closing Date shall be allocated to Purchaser based upon the number of days in the Straddle Period from and after the Closing Date; provided, however, that the parties shall allocate any real property Tax in accordance with Section 164(d) of the Code. The amount of all such prorations that must be paid in order to convey the Purchaser Assets to Purchaser free and clear of all Liens other than Permitted Liens (after giving effect to the Bankruptcy Code, the Sale Order and other applicable law) shall be calculated and paid on the Closing Date, and all other prorations shall be calculated and paid as soon as practicable thereafter.

(c)     Sellers and Purchaser shall (and shall cause their respective Affiliates to) cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection and copying (at such other party's expense) in a timely fashion such personnel, Tax data, relevant Tax Returns or portions thereof and filings, files, books, records, documents, financial, technical and operating data, computer records and other information as may be reasonably requested, including, without limitation, (a) for the preparation by such other party of any Tax Returns or (b) in connection with any Tax audit or proceeding including one party (or an Affiliate thereof) to the extent such Tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement.

(d)     After the Closing Date and until the expiration of all statutes of limitation applicable to Sellers' liabilities for Taxes, Purchaser shall retain possession of all accounting, business, financial and Tax records and information that (i) relate to the Purchased Assets and are in existence on the Closing Date and (ii) come into existence after the Closing Date but relate to the Purchased Assets before the Closing Date. After the Closing Date and until the expiration of all statutes of limitations applicable to Sellers' liabilities for Taxes (or, if earlier, the date the Bankruptcy Court enters an Order closing the Bankruptcy Cases), Sellers shall retain possession of all accounting, business, financial and Tax records and information that relate to the Excluded Liabilities. In addition, from and after the Closing Date, Purchaser shall provide to Sellers and its Affiliates (after reasonable notice and during normal business hours and without charge to Sellers) access to the books, records, documents and other information relating to the Purchased Assets as Sellers may reasonably deem necessary to properly prepare for, file, prove, answer, prosecute and defend any Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer.   Such access shall include access to any computerized information systems that contain data regarding the Purchased Assets.

(e)     If a Tax assessment is levied upon Sellers by an authorized tax jurisdiction for unbilled Transaction Taxes that are the obligation of Purchaser under this Agreement, then Purchaser shall promptly reimburse Sellers for those taxes including any interest and

penalty (other than any interest and penalties that are due to the actions, or inaction, of the assessed party).

(f)     Sellers will assign to Purchaser and will cooperate with Purchaser to obtain any necessary approvals or consents to affect such assignment, any and all interests in, or rights to, any property tax abatements, incentive agreements, or other similar arrangements with any taxing authority related to the Business or the Purchased Assets to the extent allowed under applicable law (except to the extent any of the foregoing constitute Excluded Assets).

(g)     With respect to employees of Sellers in the United States hired by Purchaser, Sellers will cooperate with Purchaser and Purchaser's agents to provide Purchaser the adequate payroll tax records required by federal and state agencies necessary for Purchaser to optimize federal and state payroll tax law relating to successor-in-interest transactions, including the transactions contemplated by this Agreement. Records shall include, but not be limited to, the following (excluding employee social security numbers, whether or not contained in any of the following):

(i)     an executed release form granting permission to Purchaser and its agents to obtain quarterly payroll data from all states within which the Business was conducted by the Sellers;

(ii)     when required by state taxing agencies, Sellers will provide signatures (or notarized signatures) necessary to grant permission for Purchaser to file for transfers of experience of payroll tax accounts in states which require a signed release by the predecessor Sellers;

(iii)     Sellers will provide Purchaser and its agents with the most recent Annual 940 Report (including Schedule A), and most recent years "tax rate notices" received from individual state agencies;

(iv)     Sellers will provide copies of all Sellers' quarterly wage detail reports filed with individual state agencies in the calendar year through the Closing Date;

(v)     if Sellers utilized an outside payroll tax administrator, then Sellers grant Purchaser permission to have access to relevant successor-in-interest reports from the payroll vendor, such as state tax rate notices, state quarterly contribution reports, W2s and federal recap reports such as 940 and 941. Sellers will provide Purchaser with a contact person at the payroll vendor.

Purchaser will furnish a Form W-2 to each Employee disclosing all wages and other compensation paid for the entire calendar year and taxes withheld therefrom, and Sellers shall be relieved of the responsibility to do so.

8.4     Payments of Accounts Receivable. In the event any Seller shall receive any payment, instrument of payment, cash or cash equivalents in respect of any of the accounts receivable that constitute Purchased Assets, such Seller shall hold same in trust for Purchaser

31

(same shall not become property of the Sellers' bankruptcy estates) and promptly deliver same to Purchaser within five (5) Business Days following receipt, endorsed where necessary, without recourse, in favor of Purchaser. In the event Purchaser shall receive any payment on account of receivables or other assets that constitute Excluded Assets, Purchaser shall deliver such payment to Sellers within five (5) Business Days following receipt, endorsed where necessary, without recourse, in favor of Sellers.

8.5     Insurance Claims. The parties acknowledge and agree that all insurance policies of Sellers (other than insurance policies that constitute Company Plans), all coverages and proceeds thereunder and all rights in connection therewith are Excluded Assets, and Purchaser shall not, and shall cause its Affiliates not to, assert, by way of claim, litigation or otherwise, any right to any insurance policies (or any benefits thereunder) of Sellers or any of their Affiliates.

8.6     Cooperation. Provided that reasonable cooperation does not adversely affect any attorney client, work product or other legal privilege, Purchaser shall reasonably cooperate with Sellers with respect to the prosecution and/or defense of any claims or litigation arising out of, relating to or that otherwise constitute Excluded Liabilities or Excluded Assets. With respect to the prosecution or defense of claims or litigation, "cooperate", "reasonably cooperate" or "cooperation" means that Purchaser shall cooperate as reasonably necessary or appropriate with Sellers and their counsel to permit Sellers to prosecute or defend any such matter in any manner as shall be reasonable or appropriate, including, without limitation, providing access to books, records, documents and other materials and information (including access to any computerized information systems that contain any of the foregoing), and making executives and employees available to counsel for investigation of facts, responding to discovery requests and motions, preparation for and attendance at depositions, hearings and trials, giving of testimony or affidavits and as is otherwise reasonably necessary or appropriate for the prosecution or defense of any such matter; provided, however, that Sellers shall be responsible for payment of bona fide and necessary out-of-pocket third party expenditures (which, for clarification, shall not include overhead, employees' wages, per diem amounts and the like) incurred by Purchaser in cooperating in accordance with this Section 8.6, and provided further that Purchaser shall not be obligated under this Section 8.6 to the extent such cooperation materially and adversely impacts Purchaser's ability to operate the Business.

8.7     Name Change. Sellers will deliver to Purchaser at the Closing, evidence as to the amendment of such Sellers' organizational documents changing Sellers' name to another name which does not include the name "Schutt". Upon the Closing, Sellers hereby irrevocably authorize Purchaser to file such amendment documents with the applicable Secretary of State of such Seller's jurisdiction of organization and in each state in which each such Seller is qualified to do business on each such Seller's behalf. Furthermore, after the Closing and subject to Bankruptcy Court approval, Sellers shall discontinue the use of the name "Schutt" in any corporate names and shall not subsequently change their names to or otherwise use or employ any name which includes the word "Schutt" without the prior written consent of Purchaser.

8.8     Further Assurances. The parties shall execute such further documents, and perform such further acts, as may be necessary to transfer and convey the Purchased Assets and Assumed Liabilities to Purchaser, on the terms herein contained, and to otherwise comply with the terms of this Agreement and consummate the transaction contemplated hereby without further approval by or order of the Bankruptcy Court.

32

8.9    Leased Real Estate.  In the event that Purchaser notifies Sellers in writing of Purchaser's intention to include the Leased Real Estate as a Purchased Asset on or before fourteen (14) days prior to the Extended Lease Assumption/Rejection Date, Sellers shall file a motion with the Bankruptcy Court on an expedited basis prior to the Extended Lease Assumption/Rejection Date seeking authorization to assume and assign the Leased Real Estate to Purchaser.

8.10    Certain Additional Post-Closing Matters.

(a)    Immediately following the Closing, Purchaser shall use its good faith efforts to obtain, and shall take all necessary and customary actions to arrange for or allow issuance of, and shall pay for all premiums or other charges required for the issuance of, an ALTA extended coverage policy of title insurance with respect to each Real Property constituting the Owned Real Estate issued by First American Title Insurance Company in an amount not less than that portion of the Purchase Price reasonably expected to be allocated to such Real Property (in accordance with Section 3.7) insuring Purchaser that Purchaser has fee title to such Real Property, subject only to taxes for the current fiscal year and those exceptions that are Permitted Liens.

(b)    Promptly following the Closing, Purchaser shall use its good faith efforts to obtain as soon as practicable following the Closing replacement letters of credit and other similar instruments and arrangements (including cash deposits, as applicable), in amounts, with terms and from financial institutions, as are necessary to replace (and relieve Sellers of all liability under) any such instruments, arrangements, deposits or obligations outstanding as of the Closing Date with respect to any of the Purchased Assets, and replacement of the deposits identified on Schedule 1.3(h).

(c)    From and after the Closing, Purchaser shall offer and commit to do business with each of Sellers' critical vendors, for a period of six (6) months following the Closing; provided that Sellers' critical vendors provide reasonable and customary trade terms and conditions, consistent with historical past practices.  Purchaser shall submit a list of Seller's critical vendors to the Official Committee of Unsecured Creditors within two Business Days following the Closing.

8.12    Infringing Inventory. After the Closing Date each of the Sellers covenants not to sell, transfer or otherwise market, distribute or dispose of Infringing Inventory other than (i) in a manner as consented to by Purchaser in writing, which consent may be withheld by Purchaser in its sole and absolute discretion, (ii) to destroy the Infringing Inventory or (iii) to permanently dismantle the Infringing Inventory and regrind the shells for use as raw material.


ARTICLE IX
Employees and Employee Benefit Plans

9.1    Employment of Sellers' Employees. Notwithstanding anything to the contrary contained herein, it is understood and agreed that the parties may not be in a position to effectuate the transfer of the Company Plans to, and assumption of the Company Plans by, Purchaser effective upon the Closing. If the parties cannot effectuate such transfer at the

33

Closing, the Closing shall nonetheless occur without modification hereunder and Purchaser and Seller shall cooperate in good faith and take such actions from and after the Closing to effectuate the transfer of the Company Plans to Purchaser as soon as practicable following the Closing. In connection therewith, it is understood and agreed that no employees of Sellers shall be terminated or transferred to Purchaser prior to such time that such Company Plans shall have been transferred to, and assumed by, Purchaser. For purposes of this paragraph, the term "Company Plans" shall mean only Sellers' 401(k) plan and health plans. Pending such transfer and assumption, all such employees shall remain employees of Sellers (subject to death, disability, ordinary course terminations, terminations for cause, and resignations), and shall be lent by Sellers to Purchaser, all at Purchasers sole cost and expense, including as to payroll, taxes, claims under Company Plans, and the like, and with indemnity by Purchaser with respect thereto, for the conduct of Purchaser's business. It is understood and agreed that Sellers shall have no liability of any kind or nature for or related to or arising out of such employees or any acts or omissions of such employees, and Purchaser shall indemnify and hold harmless Sellers therefore. Upon such transfer and assumption of the Company Plans, such employees shall be offered employment with Purchaser as contemplated hereby and the provisions of this Article IX shall apply with respect thereto.

On or before the Closing Date, Purchaser shall offer to employ or to continue to employ as of the Closing Date each of the employees of the Business (who are on Sellers' payroll as of the Closing Date) in positions, at compensation, with benefits and upon terms and conditions which, taken as a whole, are not materially less favorable to the employee than the position, compensation, benefits or terms or conditions in effect on the date hereof (other than as to equity or equity related plans or compensation) it being understood that this paragraph does not prevent Purchaser from removing any contract identified on Schedule 1.2(f) from the list of Assigned Contracts as permitted under Section 1.4 hereof). Each such person who is employed by Purchaser is hereinafter referred to individually as an "Employee" and collectively as the "Employees". Purchaser shall cover all Employees with group medical benefits for which all waiting periods and pre-existing condition exceptions are waived except to the extent that such waiting periods and pre-existing condition exceptions would apply under the then-existing Company Plans in which such Employees were participating immediately prior to Closing. Except for voluntary resignations, deaths and terminations for "cause", Purchaser shall continue to employ (a) each Employee who works at the Owned Real Estate until at least one (1) year after the Closing Date and (b) each Employee who works at the Leased Real Estate until at least three (3) months after the Closing Date, all on the same terms and conditions as to compensation and with benefits not less favorable in the aggregate as in effect on the closing date. Purchaser hereby assumes and shall be responsible for, and Sellers shall have no liability with respect to, any and all claims with respect to any employee employed by any Seller arising out of any action by Purchaser on or after the Closing Date.

9.2     Plans and Benefits.

(a)     From and after the Closing Date, Purchaser shall be liable for all claims and liabilities under Company Plans which were not discharged by Sellers prior to the Closing Date, regardless of when such claims or liabilities arise or are asserted. Sellers shall continue to pay all claims under Company Plans up to the Closing consistent with past practices. From and after the Closing Date, Purchaser shall, at no expense to Sellers,

34

provide the benefits, if any, required pursuant to Section 4980B of the Code or Part 6 of Title I of ERISA for any Employee (or spouse or dependent of such Employee) who is or becomes entitled to such continuation from a Seller or Purchaser at any time.

(b)     On the Closing Date, Sellers and Purchaser will execute amendments and continuation agreements effective as of the Closing Date for the continuation of Sellers' Company Plans and for the assumption by Purchaser of the sponsorship of such Plans. From and after the Closing Date, Purchaser shall assume the liability of Sellers for all claims and liabilities in respect of the Employees under the Plans, including each and every claim and liability not discharged prior to the Closing Date. Sellers shall continue to pay all claims under Company Plans up to the Closing consistent with past practices. Effective as of the Closing Date, Purchaser shall succeed to all rights, assets, other interests, obligations and duties of Sellers and its Affiliates in respect of the Employees under each Company Plan and Sellers shall transfer, assign, convey and deliver or cause to be transferred, assigned, conveyed and delivered to Purchaser (or to an appropriate funding arrangement designated by Purchaser) all such rights, assets, other interests, obligations and duties.

(c)     Just prior to the Closing Date and consistent with past practice, Seller shall contribute to the Company Plan for the benefit of the Employees (i) all contributions due with respect to the last pay period ending prior to the Closing Date and (ii) all employer and employee contributions for the pay period including the Closing Date to which the Employees are entitled with respect to compensation earned by the Employees as of the Closing Date.

The parties acknowledge and agree that nothing contained in this Article IX shall limit the generality of anything elsewhere herein contained or shall imply, or be deemed to mean, that any obligation or liability imposed upon Purchaser pursuant to this Article IX would otherwise not be an obligation or liability of Purchaser under this Agreement. As of the date hereof, to Purchaser's actual knowledge, no amounts accrued on the Sellers' balance sheet that will become Assumed Liabilities described in this Section 9.2 would be properly classified as long term liabilities in accordance with GAAP.

Except as set forth in Section 9.1 hereof, nothing contained in this Agreement shall alter the "at-will" nature of Employees who are at-will employees of Sellers at the time of Closing, entitle any Employee to employment by the Purchaser for any particular period of time, or otherwise limit or prohibit the Purchaser from terminating their employment at any time from and after the Closing, except where otherwise limited or prohibited by applicable law.

## ARTICLE X
### Bankruptcy Court Approval

10.1     Bankruptcy Court Approval.  The sale contemplated herein is subject to approval of a Bid Procedures Order by the Bankruptcy Court, as well as a Sale Order at a hearing under Sections 363 and 365 of the Bankruptcy Code (the "Sale Hearing").

35

10.2     Certain Bankruptcy Undertakings.  Subject to the Bid Procedures Order and the Auction, without limiting the other obligations of the parties hereunder, each of Sellers and Purchaser agrees to use reasonable best efforts to do such further acts and things and to execute and deliver such additional agreements and instruments as may reasonably be required to consummate, evidence, confirm or obtain Bankruptcy Court approval of the sale of the Purchased Assets or any other agreement contemplated hereby and to consummate the transaction contemplated hereby.  Purchaser shall provide reasonable adequate assurances as required under the Bankruptcy Code with respect to any Assigned Contracts along with payment of all Purchaser Cure Amounts due thereunder.

10.3     Break-Up Fee; Expense Reimbursement.  Subject to the entry by the Bankruptcy Court of the Bid Procedures Order approving the Break-Up Fee and Expense Reimbursement and the terms and conditions for the payment thereof, in consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of the assets of Sellers, in the event that Sellers consummate an Alternative Transaction (and Purchaser is not in material breach of this Agreement), Sellers shall pay and Purchaser shall receive, in addition to the refund of its Deposit, (a) a breakup fee equal to $800,000 to compensate Purchaser as a stalking-horse bidder (the "Break-Up Fee"), and (b) actual out of pocket costs and expenses of Purchaser incurred to third parties in connection with the negotiation of and diligence relating to this Agreement and the transactions contemplated hereby in an amount not to exceed $200,000 (the "Expense Reimbursement"), as further specified below.  Subject to approval of the Bankruptcy Court, the Break-Up Fee and the Expense Reimbursement shall be paid at the Closing, and from the proceeds, of the Alternative Transaction, in lieu of any damages or losses Purchaser may suffer, as liquidated damages and not as a penalty, as Purchaser's sole and exclusive remedy as a result of the termination of this Agreement in connection therewith.  Purchaser shall have no right to the Break-Up Fee or the Expense Reimbursement for any other reason.

10.4     Competing Transaction.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids. From the date hereof (and any prior time) and until the transaction contemplated by this Agreement is consummated, Sellers are permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, and negotiate with, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets.  In addition, Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Business and the assets of Sellers to, and negotiating with, prospective purchasers. Nothing in this Agreement shall preclude any Seller from taking any action required of it under the Bankruptcy Code, other applicable law or any Order of the Bankruptcy Court, or entering into an Alternative Transaction as contemplated by the Bid Procedures Order.

ARTICLE XI

Termination; Remedies and Enforcement

11.1    General.   The parties shall have the rights and remedies with respect to the termination and/or enforcement of this Agreement which are set forth in this Article XI.

11.2    Intentionally Omitted.

11.3    Right to Terminate.   This Agreement and the transaction contemplated hereby may only be terminated as follows, at any time prior to the Closing by prompt notice given in accordance with Section 12.4:

(a)    by the mutual written consent of Purchaser and Sellers;

(b)    by either Purchaser or Sellers upon (i) the issuance of a final and non-appealable Order by a Governmental Authority to restrain, enjoin or otherwise prohibit the purchase and sale transaction contemplated hereby, (ii) the appointment of an examiner with expanded powers or a Chapter 11 trustee in Sellers' Bankruptcy Case, or (iii) Sellers' Bankruptcy Case being converted into a case under Chapter 7 of the Bankruptcy Code or dismissed;

(c)    by either Purchaser or Sellers if the Bankruptcy Court has not entered the Sale Order by December 24, 2010 (provided that such date may be extended as otherwise agreed to in writing by Purchaser and Sellers, such date as so extended, the "Sale Order Date")); provided, however, that Purchaser's right to terminate this Agreement under this Section 11.3(c) shall not be available to Purchaser if Purchaser's failure to fulfill any of its obligations under this Agreement has been the cause of, or resulted in, the failure of the Sale Order to have been entered on or prior to the aforesaid date;

(d)    by Purchaser, (i) if any condition set forth in Section 6.2 becomes incapable of being satisfied prior to the Termination Date (other than through the failure of Purchaser to comply with its obligations under this Agreement) and Purchaser has not waived such condition, (ii) if Sellers close an Alternative Transaction or (iii) if the Closing shall not have occurred at or before 11:59 p.m. (Chicago time) on the Termination Date (provided, however, that Purchaser's right to terminate this Agreement under this clause (iii) of this Section 11.3(d) shall not be available to Purchaser if Purchaser's failure to fulfill any of its obligations under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or prior to the Termination Date); and

(e)    by Sellers, (i) if any condition set forth in Section 6.1 becomes incapable of being satisfied prior to the Termination Date (other than through the failure of Sellers to comply with their obligations under this Agreement) and Sellers have not waived such condition, (ii) at any time after completion of the Auction if Purchaser is not declared the winning bidder upon completion of the Auction or (iii) if the Closing shall not have occurred at or before 11:59 p.m. (Chicago time) on December 27, 2010 (provided that such date may be extended (A) by Sellers in their sole discretion to a date not later than

37

December 31, 2010, or (B) as otherwise agreed to in writing by Purchaser and Sellers, such date as so extended, the "Termination Date")).

11.4    Deposit.

(a)    If this Agreement is terminated pursuant to Section 11.3 and Purchaser is not in material breach of this Agreement at the time of termination, then the Deposit shall be returned to Purchaser within two Business Days of such termination.

(b)    If this Agreement is terminated pursuant to Sections 11.3 and Purchaser is in material breach of this Agreement at the time of termination, then the Deposit shall be disbursed to Sellers within two Business Days of such termination (it being understood and agreed that disbursement of the Deposit to Sellers shall not be liquidated damages and Sellers shall have all other rights and remedies contained herein and available to them at law or in equity).

(c)    Purchaser and Sellers hereby acknowledge that the obligation to deliver the Deposit (to the extent due hereunder) shall survive the termination of this Agreement and shall be paid pursuant to the terms herein.

11.5    Certain Effects of Termination.  In the event of the termination of this Agreement by either Seller or Purchaser as provided in Section 11.3: (a) Purchaser, if so requested by the other party, will return promptly every document furnished to it by any Seller or its representatives in connection with the transaction contemplated hereby, whether so obtained before or after the execution of this Agreement, and any copies thereof (except for copies of documents publicly available) which may have been made, and will cause its representatives and any representatives of financial institutions and investors and others to whom such documents were furnished promptly to return such documents and any copies thereof any of them may have made; and (b) the Confidentiality Agreement shall remain in effect.

11.6    Remedies.  Notwithstanding any termination right granted in Section 11.3, in the event of the non-fulfillment of any condition to a party's closing obligations, in the alternative, such party may elect to do one of the following:

(a)    proceed to close despite the non-fulfillment of any closing condition (to the extent legally permissible), it being understood that consummation of the Closing by such party shall be deemed a waiver of each breach of any representation, warranty or covenant of the other party and of such party's rights and remedies with respect thereto;

(b)    decline to close, terminate this Agreement as permitted by Section 11.3 above, receive the Deposit (to the extent set forth in Section 11.4) and the Break-Up Fee and the Expense Reimbursement (to the extent set forth in Section 10.3), and thereafter seek monetary damages to the extent permitted in Section 11.7; or

(c)    seek specific performance by the other party hereto of such other party's obligations hereunder which it has failed to perform so that Closing may proceed (it being acknowledged and agreed that the non-breaching party would be damaged irreparably, the remedies available at law to the non-breaching party would be inadequate,

38

and the performance of such other party's obligations under this Agreement may be specifically enforced).

11.7 <u>Right to Monetary Damages</u>. If this Agreement is terminated pursuant to Section 11.3, neither party hereto shall have any claim for monetary damages against the other, except (a) if the circumstances giving rise to such termination were caused by the other party's willful failure to comply with a material covenant set forth herein, in which event termination pursuant to Section 11.3 shall not be deemed or construed as limiting or denying any legal or equitable right or remedy of said party, and said party shall also be entitled to recover its costs and expenses which are incurred in pursuing its rights and remedies (including reasonable attorneys' fees) and (b) for the payment of the Deposit (as provided for in Section 11.4) and the payment of the Break-Up Fee and the Expense Reimbursement (as provided for in Section 10.3). **NOTWITHSTANDING ANYTHING IN THE AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL PURCHASER BE OBLIGATED TO SELLERS OR ANY OTHER PERSON IN CONNECTION WITH ANY BREACH OR TERMINATION OF THIS AGREEMENT FOR SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES OR LOSSES, INCLUDING LOST PROFITS AND REVENUE.**

## ARTICLE XII
### Miscellaneous

12.1 <u>Survival; Certain Post-Closing Matters</u>. Purchaser and Sellers acknowledge and agree that: (a) Sellers' representations and warranties set forth in this Agreement and in the documents and instruments delivered or entered into by Sellers in connection with this Agreement shall not survive the Closing and shall expire immediately upon the Closing; and (b) the covenants and agreements of Sellers set forth in this Agreement and in any documents and instruments delivered or entered into by Sellers in connection with this Agreement, in each case that do not by their terms extend beyond the Closing, shall not survive the Closing and shall expire immediately upon the Closing. Accordingly, for clarification purposes, it is acknowledged, understood and agreed by the parties that Sellers shall not have any liability or other obligation following the Closing with respect to any breach by Sellers or claimed breach by Sellers of (x) any representations or warranties contained in this Agreement or any of the documents or instruments delivered or entered into by Sellers in connection with this Agreement or (y) any of Sellers' covenants and agreements contained in this Agreement or any of the documents or instruments delivered or entered into by Sellers in connection with this Agreement that do not by their terms extend beyond the Closing. Notwithstanding anything expressed or implied herein to the contrary, the parties acknowledge and agree that (1) Purchaser shall be solely responsible for the ownership of the Purchase Assets from and after the Closing Date, the operation of the Business from and after the Closing Date, and acts or omissions of Purchaser with respect thereto, and (2) Sellers shall have no responsibility or obligation with respect to, or arising out of, any of the foregoing.

12.2 <u>Entire Agreement</u>. This Agreement, the agreements, documents and instruments to be delivered by the parties pursuant to the provisions hereof, and the Confidentiality Agreement constitute the entire agreement between the parties, amend, restate and supersede in its entirety the First Amended and Restated APA, and shall be binding upon and inure to the

benefit of the parties hereto and their respective legal representatives, successors and permitted assigns. Each Appendix, Exhibit, Schedule and the Disclosure Schedule, shall be considered incorporated into this Agreement. The inclusion of any item in the Disclosure Schedule is not evidence of the materiality of such item for the purposes of this Agreement. Purchaser acknowledges that any estimates, forecasts, or projections furnished or made available to it concerning Sellers or the Business or their properties, business or assets have not been prepared in accordance with GAAP or standards applicable under any securities laws, and such estimates, forecasts and projections, including any reflected in the Financial Statements, reflect numerous assumptions, and are subject to material risks and uncertainties. Purchaser acknowledges that actual results may vary, perhaps materially, and Purchaser is not relying on any such estimates, forecasts or projections.

12.3    Publicity. Except as otherwise required by law or applicable stock exchange rules, press releases and other publicity concerning this transaction shall be made only with the prior agreement of the Sellers and Purchaser (and, in any event, the parties shall use all reasonable efforts to consult and agree with each other with respect to the content of any such required press release or other publicity).

12.4    Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (a) on the day of service if served personally on the party to whom notice is to be given; (b) on the day of transmission if sent via facsimile transmission to the facsimile number given below if transmitted during regular business hours on a Business Day, and if not, then on the following Business Day; (c) on the day of transmission if delivered by electronic mail during regular business hours on a Business Day and, if not, then on the following Business Day; or (d) on the day of delivery (if a Business Day, and if not a Business Day, on the next Business Day) if sent by Federal Express or similar overnight courier or United States mail:

If to Sellers:

Addressed to:

Schutt Holdings, Inc.
710 South Industrial Drive
Litchfield, IL 62056
Attn:   Robert Erb, President
Email: rerb@schutt-sports.com
Fax:    (217) 324-2732

with a copy to:

Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Attn:   Nancy A. Peterman
        Peter H. Lieberman
Email: petermann@gtlaw.com

40

liebermanp@gtlaw.com
Fax:    (312) 456-8435

If to Purchaser or Parent:

Addressed to:

Kranos Intermediate Holding Corporation
c/o Platinum Equity, LLC
360 North Crescent Drive, South Bldg
Beverly Hills, California 90210
Attn.:  General Counsel
Email: ekalawski@platinumequity.com
Fax:    (310) 772-2694
with a copy to:

McGuireWoods LLP
625 Liberty Avenue, 23rd Floor
Pittsburgh, PA  15222
Attn.:  Mark E. Freedlander
Email: mfreedlander@mcguirewoods.com
Fax:    (412) 667-6050

Any party may change its address for the purpose of this Section 12.4 by giving the other party written notice of its new address in the manner set forth above.

12.5    Expenses.  Except as set forth in Article XI, each party hereto shall bear all fees and expenses incurred by such party in connection with, relating to or arising out of the negotiation, preparation, execution, delivery and performance of this Agreement and the consummation of the transaction contemplated hereby, including, without limitation, financial advisors', attorneys', accountants' and other professional fees and expenses.  For the avoidance of doubt, Sellers shall pay the fees and expenses of Oppenheimer & Co., Inc., and Purchaser shall pay any and all filing fees under the HSR Act.

12.6    Non-Waiver.  Except as otherwise contemplated herein, the failure in any one or more instances of a party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.  Except as provided in Section 11.6(a), no waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.

12.7    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.  This Agreement may be executed through the exchange of facsimile or pdf e-mail signature pages, which shall have the same legal effect as original signatures.

41

12.8    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, and, for purposes of such jurisdiction, such provision or portion thereof shall be struck from the remainder of this Agreement, which shall remain in full force and effect.  This Agreement shall be reformed, construed and enforced in such jurisdiction so as to best give effect to the intent of the parties under this Agreement.

12.9    Applicable Law.  This Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of Delaware applicable to contracts made in that state, without giving effect to any choice of law or conflict of law provision or rule that would cause the application of laws of any jurisdiction other than the State of Delaware.

12.10    Binding Effect; Benefit.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their successors and permitted assigns.  Nothing in this Agreement, express or implied, shall confer on any Person other than the parties hereto, and their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, including, without limitation, third party beneficiary rights.  Nothing in this Agreement is intended to relieve or discharge the obligations or liability of any third Persons to Sellers or Purchaser.  No provision of this Agreement shall give any third Persons any right of subrogation or action over or against Sellers or Purchaser.

12.11    Assignability.  This Agreement and the various rights and obligations arising hereunder inure to the benefit of and are binding upon Sellers and their respective successors and permitted assigns, and Purchaser and its successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be transferred or assigned (including by operation of law in connection with a merger or sale of stock, or sale of substantially all the assets, of a Person) by any of the parties hereto without the prior written consent of the other party or parties (not to be unreasonably withheld, conditioned or delayed).  Notwithstanding the foregoing, Purchaser may assign all or a part of its rights, interests and obligations under this Agreement to any other Person wholly-owned, directly or indirectly, by Purchaser and may make a collateral assignment of any rights or benefits hereunder to any lenders, all without consent of Sellers.  No assignment shall relieve a party of its liability or obligations hereunder.  Notwithstanding anything expressed or implied herein to the contrary, following the Closing, Sellers (or any of them) may assign all or any portion of their rights hereunder in accordance with an Order of the Bankruptcy Court.

12.12    Amendments.  This Agreement shall not be modified or amended except pursuant to an instrument in writing executed and delivered on behalf of each of the parties hereto.

12.13    Headings.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

12.14    Governmental Reporting.  Anything to the contrary in this Agreement notwithstanding, nothing in this Agreement shall be construed to mean that a party hereto or

42

other person must make or file, or cooperate in the making or filing of, any return or report to any Governmental Authority in any manner that such Person or such party reasonably believes or reasonably is advised is not in accordance with law.

12.15  **WAIVER OF TRIAL BY JURY. EACH OF THE PARTIES HERETO WAIVES THE RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING SEEKING ENFORCEMENT OF SUCH PARTY'S RIGHTS UNDER THIS AGREEMENT.**

12.16  Consent to Jurisdiction.  Purchaser and Sellers agree that the Bankruptcy Court shall retain sole jurisdiction over any legal action or proceeding with respect to this Agreement. Each of Purchaser and Sellers irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby.

12.17  Time of the Essence.  Time is of the essence of this Agreement.  When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

12.18  Rule of Construction.  The parties acknowledge and agree that each has negotiated and reviewed the terms of this Agreement, assisted by such legal and tax counsel as they desired, and has contributed to its revisions.  The parties further agree that the rule of construction that any ambiguities are resolved against the drafting party will be subordinated to the principle that the terms and provisions of this Agreement will be construed fairly as to all parties and not in favor of or against any party.  The word "including" means "including, without limitation."  The phrase "ordinary course of business" or words of similar import shall mean the ordinary course of business consistent with past custom and practice, subject, in the case of Sellers or the Business, to changes in the business, operations or custom or practice of Sellers to the extent resulting from matters arising as a result of, or in connection with, Sellers' status as a filer under Chapter 11 of the Bankruptcy Code.  All exhibits and schedules attached to this Agreement are incorporated therein and expressly made a part of this Agreement as though completely set forth therein.  All references to this Agreement or in any of the exhibits, the Disclosure Schedules or other schedules shall be deemed to refer to the entire Agreement, including all exhibits, these Disclosure Schedule and schedules.

*[SIGNATURE PAGES FOLLOW]*

43

IN WITNESS WHEREOF, the parties have executed this Second Amended and Restated Asset Purchase Agreement as of the date first above written.

**SELLERS:**

**SCHUTT HOLDINGS, INC.**

By:_____
Name:_____
Title:_____

**SCHUTT SPORTS, INC.**

By:_____
Name:_____
Title:_____

**TRIANGLE SPORTS, INC.**

By:_____
Name:_____
Title:_____

**MOUNTAIN VIEW INVESTMENT COMPANY OF ILLINOIS**

By:_____
Name:_____
Title:_____

Signature Page to Second Amended and Restated Asset Purchase Agreement

**R.D.H. ENTERPRISES, INC.**

By:_____
Name:_____
Title:_____


**MELAS, INC.**


By:_____
Name:_____
Title:_____


**CIRCLE SYSTEM GROUP, INC.**


By:_____
Name:_____
Title:_____

Signature Page to Second Amended and Restated Asset Purchase Agreement

**PURCHASER:**

**KRANOS INTERMEDIATE HOLDING CORPORATION**

By:_____
Name:_____
Title:_____

Signature Page to Second Amended and Restated Asset Purchase Agreement

## APPENDIX 1

## DEFINED TERMS

As used in this Agreement, the following terms shall have the following meanings:

"Accounts Receivable" is defined in Section 1.2.

"Affiliate" with respect to any Person means any other Person who directly or indirectly Controls, is Controlled by, or is under common Control with such Person including in the case of any Person who is an individual, his or her spouse, any of his or her descendants (lineal or adopted) or ancestors, and any of their spouses.

"Agreement" is defined in the Introduction to this Agreement.

"Alternative Transaction" means a transaction or series of related transactions for the sale of all or substantially all of the Purchased Assets to a purchaser or purchasers other than Purchaser (or any of its Affiliates).

"Assumed Liabilities" is defined in Section 2.2.

"Auction" means a sale in which the Purchased Assets shall be offered for sale to a bidder or bidders making the highest or best offer, which will be scheduled by the Bankruptcy Court in the Bankruptcy Cases.

"Assigned Avoidance Actions" is defined in Section 1.2.

"Assigned Contracts" is defined in Section 1.2.

"Assigned Avoidance Actions" is defined in Section 1.2.

"Avoidance Actions" means any and all claims and causes of action of a Seller arising under the Bankruptcy Code, including, without limitation, Sections 544, 545, 547, 548, 549 and 550 thereof.

"Bankruptcy Case" is defined in Recital B to this Agreement.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101, et seq., as in effect on the Petition Date, and as amended effective as of the Petition Date.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Bankruptcy Cases originally administered in the United States Bankruptcy Court for the District of Delaware.

"Bid Procedures Order" means an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit A with such changes as are reasonably acceptable to the parties,

Appendix 1

1

authorizing, among other things, the sale of the Purchased Assets and assumption and assignment of the Assigned Contracts and the assumption of the Assumed Liabilities pursuant to the bid procedures and bid protections (including the Break-Up Fee and the Expense Reimbursement) set forth therein.

"Break-Up Fee" is defined in Section 10.3.

"Business" is defined in Recital A of this Agreement.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Chicago, Illinois are permitted or required to be closed.

"Cash Collateral" means cash collateral as used in Section 363 of the Bankruptcy Code.

"Cash Collateral Order" means an Order in these Bankruptcy Cases approving Sellers' use of Cash Collateral on an interim or final basis, as such Order is modified from time to time.

"Cash Payment" is defined in Section 3.1

"Circle System" is defined in the Introduction of this Agreement.

"Circle System Matters" means all matters related to the Circle System acquisition, whether commenced before or after the Closing, including, without limitation, each of the following proceedings (and any and all appeals with respect to each of the following): (i) the breach of employment agreement action filed in the First Judicial District of Pennsylvania, Philadelphia County, styled as *Alan Abeshaus, et al. v. Circle System Group, Inc.*, Case No. 02797; (ii) the breach of stock purchase agreement, securities and common law fraud action filed in First Judicial District of Pennsylvania, Philadelphia County, styled as *Circle System Group, Inc., et al. v. Alan Abeshaus, et al.* No. 5:08-cv-05376-TMG; and (iii) the false claims act filed in the United States District Court for the Eastern District of Pennsylvania, styled as *Gerry Dale, et al. v. Circle System Group, Inc., et al.*, No. 06-cv-04747-JKG.

"Claim" means a claim against any or all of Sellers, whether or not asserted, as defined in Section 101(5) of the Bankruptcy Code.

"Closing" is defined in Section 3.3.

"Closing Balance Sheet" is defined in Section 3.5

"Closing Date" is defined in Section 3.3.

"Closing Payment" is defined in Section 3.4.

"Code" means the Internal Revenue Code of 1986, as amended.

Appendix 1

"Company Plans" is defined in Section 4.3(i).

"Confidentiality Agreement" is defined in Section 5.3.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through ownership of securities, by contract or otherwise.

"Copyrights" is defined in Section 4.3(m).

"Cure Amounts" means all amounts necessary to cure all defaults under the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code, as more specifically set forth in the Sale Order. Sellers' good faith estimate of the Cure Amounts (other than Cure Amounts with respect to those contracts identified on Schedule 1.4), as of the date hereof, are set forth on Schedule 2.2.

"Deposit" is defined in Section 3.8.

"Disclosure Schedule" is defined in Section 4.1.

"Equipment" is defined in Section 1.2.

"Employee(s)" is defined in Section 9.1.

"Environmental Law" means any law, Order or other requirement of law for the protection of the environment, or for the manufacture, use, transport, treatment, storage, disposal, release or threatened release of Hazardous Materials, petroleum products, asbestos, urea formaldehyde insulation, polychlorinated biphenyls or any substance listed, classified or regulated as "hazardous" or "toxic" or any similar term under such Environmental Law.

"Environmental Permits" means all environmental, health and safety permits, licenses, registrations, and approvals and authorizations from Governmental Authorities.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means Deutsche Bank, as escrow agent designated by Sellers and Purchaser to hold the Deposit in escrow in accordance with an escrow agreement executed on the date of this Agreement between Sellers, Purchaser and the Escrow Agent.

"Excluded Assets" is defined in Section 1.3.

"Excluded Liabilities" is defined in Section 2.3.

"Expense Reimbursement" is defined in Section 10.3.

Appendix 1

3

"Extended Assumption/Rejection Date" means the 210th day following the Petition Date, which is April 4, 2011.

"Extension Order" means an order of the Bankruptcy Court approving the Extended Assumption/Rejection Date.

"Financial Statements" means the consolidated audited financial statements of Sellers for the year ended October 31, 2009.

"GAAP" means United States generally accepted accounting principles, applied in a manner consistent with the preparation of the Financial Statements.

"Governmental Authority" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body, or other governmental entity, including the Bankruptcy Court.

"Hazardous Materials" means all explosive or radioactive substances or wastes, and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Holdings" is defined in the Introduction to this Agreement.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"HSR Approval" is defined in Section 5.4.

"Infringing Inventory" shall mean all current and previously existing Inventory of the Sellers consisting of helmet shells that have been specifically found to infringe patents of Riddell, Inc. in that certain civil action styled *Riddell, Inc. v. Schutt Sports, Inc.,* identified by civil action number 3:08-cv-00711 pending in the United States District Court of the Eastern District of Wisconsin (it being understood that "Infringing Inventory" shall not include (a) helmet liners, facemasks or any other components attached to the helmet shells or (b) helmet shells which have been reground for use as a raw material).

"Intellectual Property Rights" is defined in Section 1.2.

"Inventory" is defined in Section 1.2.

"IRS" means the Internal Revenue Service.

"Knowledge" shall mean the actual knowledge of Robert Erb, Rollen Jones, Kip Meyers, Andy Fischer and Courtney Warmouth, without giving effect to imputed knowledge or giving rise to any duty to investigate.

Appendix 1

4

"Lease Deposit" is defined in Section 1.2.

"Leased Real Estate" is defined in Section 1.2.

"Lien" means any charge against or interest in property to secure payment of a debt or performance of an obligation.

"Management Incentive Plans" means each of the management incentive plans approved by the Bankruptcy Court.

"Material Adverse Effect" means a material adverse effect on the business or financial condition of the Business, taken as a whole, provided that the foregoing shall not include any event, circumstance, change, occurrence, fact or effect resulting from or relating to (A) changes in economic conditions generally or in any region in which the Sellers or the Business operate, (B) changes in United States or global financial markets in general, (C) changes, occurrences or developments in or related to the general industry or industries (or portions thereof) in which the Sellers or the Business operate or are materially related thereto, (D) changes in law, GAAP or any authoritative interpretations thereof, (E) any action taken or failed to be taken by Sellers or any of their Affiliates or representatives at the request of Purchaser or that is required or contemplated by this Agreement, (F) a failure to meet Sellers' projections, or any changes in the prices or availability of raw materials used in the Business, (G) the identity of, or any action taken by, Purchaser or any of its Affiliates or representatives, (H) the Bankruptcy Case, (I) the announcement and performance of this Agreement and the other transactions contemplated by this Agreement, including termination of, reduction in or similar negative impact on relationships, contractual or otherwise, with any customers, suppliers, distributors, partners, officers or employees of the Business, (J) any actions required under this Agreement to obtain any approval or authorization required under applicable antitrust or competition laws for the consummation of the transactions contemplated by this Agreement, (K) acts of war (whether or not declared), armed hostilities, sabotage or terrorism occurring after the date of this Agreement or the continuation, escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreement, or (L) earthquakes, hurricanes, floods, or other natural disasters.

"Melas" is defined in the Introduction.

"Mountain" is defined in the Introduction.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

"Original APA" is defined in Recital C of this Agreement.

"Owned Real Estate" is defined in Section 1.2.

"Patents" is defined in Section 4.3(m).

Appendix 1

5

"Permits" means all licenses, permits, registrations and approvals from or with a Governmental Authority other than the Environmental Permits.

"Permitted Liens" means: (a) statutory Liens for current Taxes, assessments and other charges by Governmental Authorities that are not yet due and payable or that, although due and payable, are being contested in good faith; (b) mechanics', materialmen's, warehouseman's and similar Liens that relate to Assumed Liabilities; (c) such covenants, conditions, restrictions, easements, encroachments or encumbrances of record and any conditions, restrictions, easements, encroachments and other encumbrances that would be shown by a current, accurate survey or physical inspection of the Owned Real Estate; (d) zoning, building codes and other land use laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over real property; (e) a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any of the Real Estate Leases; or (f) Liens or encumbrances or matters caused by, or resulting from, the actions of Purchaser or any of its agents, employees or affiliates.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, bank, trust company, trust or other entity or group, whether or not legal entities, or any Governmental Authority.

"Petition Date" is defined in Recital B of this Agreement.

"Purchase Price" is defined in Section 3.1.

"Purchased Assets" is defined in Section 1.1.

"Purchaser" is defined in the Introduction to this Agreement.

"Purchaser Cure Amounts" is defined in Section 2.2.

"RDH" is defined in the Introduction to this Agreement.

"Real Estate Lease" is defined in Section 1.2.

"Real Property" is defined in Section 1.2.

"Required Consent" is defined in Section 5.3.

"Retained Claims" is defined in Section 1.3(l).

"Riddell Matters" means all matters related to Riddell, Inc. or any of its Affiliates for periods up to the Closing, whether commenced before or after the Closing, including, without limitation, each of the following proceedings (and any and all appeals with respect to the following): (i) *Riddell, Inc. v. Schutt Sports, Inc.*, Civil Action No. 3:08-cv-00711-BBC, pending in the United States District Court for the Western District of Wisconsin; (ii) *Riddell, Inc. v.*

Appendix 1

6

*Schutt Sports, Inc.*, Civil Action No. 10-cv-000504, pending in the United States District Court for the Western District of Wisconsin; (iii) *Schutt Sports, Inc. v. Riddell, Inc.*, Adversary Proceeding No. 10-52995, pending in the United States Bankruptcy Court for the District of Delaware; and (iv) Debtors' Motion to Hold Riddell, Inc. In Contempt of Court for Violation of the Automatic Stay, in *In re Schutt Sports, Inc., et al.*, Case No. 10-12795 (Jointly Administered), pending in the United States Bankruptcy Court for the District of Delaware.

"Sale Hearing" is defined in Section 10.1.

"Sale Order" means an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit B with such changes as are reasonably acceptable to the parties, approving, among other things, the transactions contemplated hereby, approving Purchaser as the party to purchase the Purchased Assets and the Assigned Contracts and Assumed Liabilities and authorizing Sellers to perform all of their obligations hereunder.

"Sale Order Date" is defined is Section 11.3.

"Seller(s)" is defined in the Introduction to this Agreement.

"Seller Avoidance Actions" is defined in Section 1.3.

"Schutt" is defined in the Introduction to this Agreement.

"Straddle Period" is defined in Section 8.3.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Taxes" means (a) all taxes, however denominated, and all like charges, levies, duties, imposts, unclaimed property, escheat obligations or other assessments, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes, Transaction Taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date and (b) any transferee, successor or other liability in respect of Taxes of another (whether by contract or otherwise) and any liability in respect of any Taxes as a result of any company being a member of any "affiliated group" as defined in Section 1504 of the Code, or any analogous combined, consolidated or unitary group defined under state, local or foreign Tax law.

"Termination Date" is defined in Section 11.3.

Appendix 1

7

"Trademarks" is defined in Section 4.3(m).

"Transaction Taxes" is defined in Section 8.3

"Warehouse Lease Deposit" means all deposits (including, without limitation, any security deposits) under the warehouse lease between Schutt Sports, Inc. and Paikes Enterprises.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Section 2101, et seq.

"Working Capital" is defined in Section 3.2

Appendix 1

8

# Exhibit B

# **NONE**