## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | **Chapter 11** |
| **SSI LIQUIDATING, INC., *et al.*,**[1] | **Case No. 10-12795 (KJC)** |
| **Debtors.** | **(Jointly Administered)** |

## DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

## FEBRUARY 18, 2011

**GREENBERG TRAURIG, LLP**
Keith J. Shapiro
Nancy A. Peterman
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601

-and-

Victoria W. Counihan
Sandra G. M. Selzer
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801

**Counsel for the Debtors and Debtors-in-Possession**

**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen
Jeffrey D. Prol
Vincent A. D'Agostino
Suzanne Iazzetta
65 Livingston Avenue
Roseland, New Jersey 07068

-and-

1251 Avenue of the Americas
New York, NY 10020

-and-

**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**
Steven K. Kortanek
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801

**Counsel for Official Committee of Unsecured Creditors**

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF THE PLAN. ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. THE DEBTORS AND THE COMMITTEE MAY SUPPLEMENT OR AMEND THIS DISCLOSURE STATEMENT OR ANY EXHIBITS ATTACHED HERETO AT ANY TIME PRIOR TO THE HEARING TO APPROVE THE DISLCOSURE STATEMENT.

---

[1] The new name for each of the Debtors, some of whose names have changed, along with the former name of each such Debtor and the last four digits of each Debtor's tax identification number, are: SSI Liquidating, Inc. (f/k/a Schutt Sports, Inc.) (0521), SH Liquidating, Inc. (f/k/a Schutt Holdings, Inc.) (0276), Mountain View Investment Company of Illinois (3563), Circle System Group, Inc. (7711), Melas, Inc. (9761), R.D.H. Enterprises, Inc. (2752), and Triangle Sports, Inc. (6936).

**IMPORTANT DATES**

- Date and time by which Ballots must be received: [_____], 2011 at [          ] (Prevailing Eastern Time)

- Date and time by which objections to Confirmation of the Plan must be Filed and served: [_____], 2011 at [          ] (Prevailing Eastern Time)

- Hearing on Confirmation of the Plan: [_____], 2011 at [_____] (Prevailing Eastern Time)

- Voting Record Date: [                ], 2011

- Date and time by which Estimation Motions must be Filed: [              ], 2011 at [          ] (Prevailing Eastern Time)

# DISCLAIMER

THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF LIQUIDATION FILED BY THE DEBTORS AND THE COMMITTEE, AS CO-PROPONENTS, AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND ANY OTHER PLAN DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT (A) THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF, OR (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS WITH "ADEQUATE INFORMATION" WITHIN THE MEANING OF THE BANKRUPTCY CODE, SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

NOTHING CONTAINED IN THE DISCLOSURE STATEMENT CONSTITUTES AN ADMISSION OR ACKNOWLEDGMENT THAT ANY CLAIMS DESCRIBED AND IDENTIFIED IN THE DISCLOSURE STATEMENT ARE VALID, ENFORCEABLE, ALLOWABLE, OR NOT SUBJECT TO DISPUTES, COUNTERCLAIMS OR SETOFFS.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT, RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS. PARTIES SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS, AND/OR TAX ADVISORS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.

THE DEBTORS AND THE LIQUIDATING TRUSTEE RESERVE THE RIGHT TO OBJECT TO THE AMOUNT OR CLASSIFICATION OF ANY CLAIM OR INTEREST.

THE ESTIMATES SET FORTH IN THIS DISCLOSURE STATEMENT CANNOT BE RELIED ON BY ANY CREDITOR WHOSE CLAIM IS SUBJECT TO AN OBJECTION. A CLAIM HOLDER WHOSE CLAIM IS SUBJECT TO AN OBJECTION MAY NOT RECEIVE THE SPECIFIED SHARE OF THE ESTIMATED DISTRIBUTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT.

# TABLE OF CONTENTS

IMPORTANT DATES ........................................................................................................ ii

DISCLAIMER ............................................................................................................... iii

TABLE OF CONTENTS ..................................................................................................... v

I.   INTRODUCTION ..................................................................................................... 1

    A.   Disclosure Statement Exhibits .............................................................. 2

    B.   Only Impaired Classes Vote .................................................................. 2

    C.   Voting Procedures .................................................................................. 3

    D.   Confirmation Hearing ............................................................................ 4

II.  OVERVIEW OF THE PLAN ................................................................................ 4

    A.   Summary of Treatment of Claims and Interests under the Plan .......... 4

III. GENERAL INFORMATION CONCERNING THE DEBTORS .................... 7

    A.   Overview of the Debtors' Business Prior to the Sale .......................... 7

        1.   General ....................................................................................... 7
        2.   The Debtors' Facilities ............................................................. 8
        3.   The Debtors' Focus on Research and Development ................. 9
        4.   The Debtors' Sales Team ......................................................... 9
        5.   The Debtors' Sale Cycle ......................................................... 10

    B.   The Debtors' Corporate Structure ...................................................... 10

    C.   The Debtors' Capital and Debt Structure ........................................... 10

        1.   Prepetition Secured Loans ..................................................... 10
        2.   Other Secured Debt ................................................................ 10
        3.   Unsecured Debt ...................................................................... 11
        4.   Interests .................................................................................. 12

    D.   The Debtors' Remaining Assets .......................................................... 12

    E.   Events Leading up to the Chapter 11 Filing ...................................... 12

        1.   The Circle Acquisition ........................................................... 12
        2.   The Economic Crisis .............................................................. 13
        3.   Covenant Violations/Events of Default ................................. 13
        4.   The Riddell Litigation ............................................................ 14
        5.   The Debtors' Decision to File for Chapter 11 Protection ...... 15

IV.  EVENTS DURING THE CHAPTER 11 CASES .............................................. 15

    A.   Continuation of Business after the Petition Date ............................... 16

        1.   First and Second Day Motions ............................................... 16
        2.   Retention Applications ........................................................... 17

        3.   Interim Compensation Procedures ................................................17

**B.**   **Appointment of a Creditors' Committee** ................................................18

**C.**   **Debtor-in-Possession Financing** ................................................18

**D.**   **The Committee's Lien Review** ................................................18

**E.**   **The Debtors' Schedules and the Statements of Financial Affairs** ................19

**F.**   **Riddell Disputes** ................................................20

**G.**   **Management Incentive Plan** ................................................21

**H.**   **The Sale Motion** ................................................22

        1.   The Auction ................................................22
        2.   Sale Hearing and Closing of Sale ................................................23
        3.   Riddell's Qualified Objection ................................................23
        4.   Mediation ................................................24
        5.   Settlement Motion ................................................24

**I.**   **Exclusivity Motion** ................................................26

**J.**   **Rejection Motion** ................................................26

**K.**   **The Bar Date Order** ................................................26

**V.**   **SUMMARY OF THE PLAN OF LIQUIDATION** ................................................27

**A.**   **Overview of Chapter 11** ................................................27

**B.**   **Plan Objectives** ................................................28

**C.**   **Overall Structure of the Plan** ................................................28

**D.**   **Classification and Allowance of Claims and Interests Generally** ................29

**E.**   **Treatment of Unclassified Claims under the Plan** ................................................29

        1.   Administrative Expense Claims ................................................29
        2.   Priority Tax Claims ................................................31

**F.**   **Treatment of Classified Claims and Interests under the Plan** ................................31

        1.   Class 1: Priority Non-Tax Claims ................................................31
        2.   Class 2: Secured Claims ................................................32
        3.   Class 3: General Unsecured Claims ................................................32
        4.   Class 4: Critical Trade Vendor Claims ................................................32
        5.   Class 5: Unsecured Convenience Claims ................................................33
        6.   Class 6: Intercompany Claims ................................................33
        7.   Class 7: Interests ................................................33

**G.**   **Miscellaneous Provisions** ................................................34

        1.   Reservation of Rights Regarding Claims ................................................34
        2.   Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ..........34
        3.   Controversy Concerning Impairment ................................................34
        4.   Elimination of Vacant Classes ................................................34

H.    **Means of Implementing the Plan**................................................................**34**

    1.   **Funding of Plan**...............................................................**34**
    2.   **Administrative Consolidation**.......................................**34**
    3.   **Liquidating Trust**..........................................................**35**
    4.   **Cancellation of Instruments and Stock**........................**39**
    5.   **Operating Reports**........................................................**39**
    6.   **Post-Confirmation Professional Fees and Expenses**....**39**
    7.   **Disposition of Books and Records**................................**39**
    8.   **Corporate Action**.........................................................**39**

I.    **Reserves and Distributions**.......................................................**40**

    1.   **Establishment of Reserves**...........................................**40**
    2.   **Disbursing Agent**..........................................................**41**
    3.   **Distributions by Liquidating Trustee**...........................**41**
    4.   **Waterfall**.......................................................................**41**
    5.   **Distributions on Account of the Allowed Windjammer Subordinated Note Claim**.......................................................................**41**
    6.   **Distributions on Account of Allowed Critical Trade Vendor Claims**............**42**
    7.   **Distributions on Account of Allowed General Unsecured Claims of ZHUHAI PUTO Commerce and Trading Company Limited and Manufacturing Solutions Co., LTD.**.......................**42**
    8.   **Timing of Distributions**................................................**42**
    9.   **Distributions upon Allowance of Disputed General Unsecured Claims**.........**43**
    10. **Undeliverable and Unclaimed Distributions**.................**44**
    11. **Interest on Claims**.........................................................**44**
    12. **No Distribution in Excess of Allowed Amount of Claim**...............**45**
    13. **Means of Cash Payment**................................................**45**
    14. **Delivery of Distributions**..............................................**45**
    15. **Record Date for Distributions**......................................**45**
    16. **No Distributions Pending Allowance**............................**45**
    17. **Withholding and Reporting Requirements**...................**45**
    18. **Setoffs**...........................................................................**46**
    19. ***De Minimis* Distributions**..........................................**46**

J.    **Claims Objections and Estimation of Claims**..........................**46**

    1.   **Claims Objection Deadline; Prosecution of Claims Objections**.....................**46**
    2.   **Estimation of Claims**....................................................**46**

VI.   **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**....................**47**

A.    **Executory Contracts and Unexpired Leases Deemed Rejected**..........................**47**

B.    **Bar Date for Rejection Damages**..............................................**47**

VII.  **CONFIRMATION AND CONSUMMATION OF THE PLAN**................**47**

A.    **Conditions Precedent to the Effective Date**.............................**47**

B.    **Notice of Effective Date**............................................................**48**

    C.      Waiver of Conditions Precedent to the Effective Date .............................................48

    D.      Effect of Non-Occurrence of Effective Date .............................................................48

VIII. EFFECTS OF CONFIRMATION OF THE PLAN .............................................................48

    A.      Exculpation and Releases .........................................................................................48

          1.    Exculpation and Limitation of Liability .............................................48
          2.    Releases by the Debtors .......................................................................49
          3.    Releases by Holders of Claims and Interests.......................................49
          4.    Exceptions to Releases .........................................................................50
          5.    Injunction Related to Exculpation and Releases..................................50

    B.      Injunction..................................................................................................................51

    C.      Term of Bankruptcy Injunction or Stays .................................................................52

    D.      Vesting Provision .....................................................................................................52

IX.     MISCELLANEOUS PLAN PROVISIONS ........................................................................52

    A.      Retention of Jurisdiction ..........................................................................................52

    B.      Modification of the Plan ...........................................................................................54

    C.      Subordination Rights.................................................................................................54

    D.      Dissolution of the Committee ...................................................................................55

    E.      Exemption from Section 1146 ..................................................................................55

X.      GENERAL INFORMATION ON VOTING AND CONFIRMATION
       PROCEDURE ....................................................................................................................56

    A.      Purpose of Disclosure Statement .............................................................................56

    B.      Voting On the Plan....................................................................................................56

    C.      Voting Record Date...................................................................................................57

          1.    Who May Vote.......................................................................................57
          2.    Eligibility..............................................................................................57
          3.    Binding Effect.......................................................................................57

    D.      Procedure/Voting Deadlines .....................................................................................57

    E.      Plan Confirmation Process ........................................................................................58

          1.    Requirements.........................................................................................58
          2.    Confirmation Hearing ...........................................................................61
          3.    Objections to Confirmation ..................................................................61

XI.     RISK FACTORS.................................................................................................................62

    A.      Bankruptcy Factors ..................................................................................................62

          1.    Classifications of Claims and Interests ................................................62
          2.    Non-Occurrence of the Effective Date .................................................63
          3.    Failure to Receive Requisite Accepting Votes .....................................63

  **4. Failure to Confirm the Plan** ..................................................................63

  **5. Risk of Additional or Larger Claims** ................................................64

  **6. Alternative Chapter 11 Plan** ...........................................................64

 **B. Other Risk Factors** ...............................................................................65

  **1. Variances from Projections** ...........................................................65

  **2. Litigation Risks** ..............................................................................65

**XII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES** ...........................65

 **A. Certain U.S. Federal Income Tax Consequences to the Debtors** ..........66

 **B. Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims** ..............................................................................................67

 **C. Importance of Obtaining Professional Tax Assistance** ......................68

**XIII. ALTERNATIVES TO THE PLAN** ..............................................................68

 **A. Liquidation under Chapter 7** ............................................................69

 **B. Dismissal** ...........................................................................................69

**XIV. RECOMMENDATIONS** ...........................................................................69

**XV. CONCLUSION** ........................................................................................69

**EXHIBITS** .....................................................................................................3

# I.    INTRODUCTION

SSI Liquidating, Inc. (f/k/a Schutt Sports, Inc.) ("**SSI Liquidating**"), SH Liquidating, Inc. (f/k/a Schutt Holdings, Inc.) ("**SH Liquidating**"), Mountain View Investment Company of Illinois ("**Mountain View**"), Circle System Group, Inc. ("**Circle System**"), Melas, Inc. ("**Melas**"), R.D.H. Enterprises, Inc. ("**RDH**"), and Triangle Sports, Inc. ("**Triangle Sports**"), the above-captioned debtors and debtors-in-possession (each, a "**Debtor**" and collectively, the "**Debtors**"), and the Official Committee of Unsecured Creditors (the "**Committee**" and, together with the Debtors, the "**Plan Proponents**") have Filed the Joint Chapter 11 Plan of Liquidation (the "**Plan**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). A copy of the Plan is annexed hereto as Exhibit A.

The Plan Proponents hereby submit this disclosure statement dated February 18, 2011 (the "**Disclosure Statement**") pursuant to the Bankruptcy Code in connection with the solicitation of acceptances on the Plan from certain Holders of Claims against and Interests in the Debtors.

The purpose of this Disclosure Statement is to set forth information (a) regarding the history of the Debtors, their businesses and the Chapter 11 Cases, (b) concerning the Plan and alternatives to the Plan, (c) advising the Holders of Claims against and Interests in the Debtors of their rights under the Plan, (d) assisting the Holders of Claims against and Interests in the Debtors in making an informed judgment regarding whether they should vote to accept or reject the Plan and (e) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of Chapter 11 of the Bankruptcy Code and should be confirmed.

Following a hearing held on [_____], 2011, this Disclosure Statement was approved by the Bankruptcy Court as containing "adequate information" in accordance with section 1125 of the Bankruptcy Code.  Pursuant to section 1125(a)(1) of the Bankruptcy Code, "adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests in the relevant class to make an informed judgment about the plan."  NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT.   ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN.

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION SUPPLEMENTARY TO THE PLAN AND IS NOT INTENDED TO TAKE THE PLACE OF THE PLAN. CREDITORS ARE ADVISED TO STUDY THE PLAN CAREFULLY TO DETERMINE**

**THE PLAN'S IMPACT ON THEIR CLAIMS OR INTERESTS. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. ALTHOUGH GREAT EFFORT WAS TAKEN TO ENSURE THE ACCURACY OF THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING PLAN, NEITHER THE DEBTORS, THE COMMITTEE, NOR THEIR RESPECTIVE PROFESSIONALS CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN AND THEREIN IS WITHOUT INACCURACIES OR ERRORS.**

This Disclosure Statement contains important information that may bear upon your decision to accept or reject the Plan. The Disclosure Statement also provides information regarding alternatives to the Plan. Each Holder of a Claim or Interest should read this Disclosure Statement and the Plan in their entirety, including the conditions precedent to the Effective Date of the Plan contained in Article X of the Plan.

If you are a Holder of a Claim or Interest that is entitled to vote to accept or reject the Plan, a ballot for the acceptance or rejection of the Plan (the "**Ballot**") is enclosed herewith. After carefully reviewing these documents, please indicate your vote with respect to the Plan on the enclosed Ballot and return it as instructed below and on the Ballot.

The Plan Proponents may supplement or amend this Disclosure Statement or any exhibits, schedules, and appendices attached hereto at any time prior to the hearing to approve this Disclosure Statement.

The information set forth herein is the product of the Debtors' books and records, historical material and public and non-public materials. Accounting and any valuation methods are as maintained by the Debtors.

**UNLESS OTHERWISE DEFINED HEREIN, ALL CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.**

## A.    Disclosure Statement Exhibits

Attached hereto as exhibits to this Disclosure Statement are copies of the following documents:

**Exhibit A**    The Plan

**Exhibit B**    The Debtors' Corporate Organization Chart

**Exhibit C**    Sources and Uses of Estate Assets Prior to the Effective Date (including projected wind-down expenses to and including the Effective Date)

**Exhibit D**    Liquidation Analysis

## B.    Only Impaired Classes Vote

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. If the holders of claims or interests in an impaired class do not receive or retain any

property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such Plan under section 1126(g) of the Bankruptcy Code and therefore, such holders do not cast votes on such Plan.  In addition, Classes of Claims or Interests that are "unimpaired" are deemed to have accepted the Plan and do not cast votes on the Plan.

Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and therefore deemed to accept the Plan.  Holders of Claims or Interests in Classes 3, 4, 5 and 7 are Impaired and are entitled to vote on the Plan.  Holders of Claims in Class 6 are Impaired and are deemed to reject the Plan and are not entitled to vote.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 3, 4, 5 AND 7.

Holders of Claims or Interests may obtain copies of the Plan Supplement that will be Filed with the Bankruptcy Court at least five (5) days prior to the Voting Deadline by: (a) accessing the website of the Debtors' claims, noticing and balloting agent, Logan & Company, Inc. (the "**Claims Agent**") at www.loganandco.com; (b) requesting the Plan Supplement by e-mail to info@loganandco.com; (c) calling the Claims Agent at 973-509-3190; or (d) by sending a request by mail to the Claims Agent at 546 Valley Road, Upper Montclair, NJ 07043.

For a summary of the treatment of each Class of Claims and Interests, see Section II of this Disclosure Statement, "Overview of the Plan" below.

## C.     Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot for the acceptance or rejection of the Plan is enclosed for the purpose of voting on the Plan.  If you hold Claims or Interests in more than one Class and you are entitled to vote Claims or Interests in more than one Class, you will receive separate Ballots that must be used to vote in each separate Class.  Please vote and return your Ballot(s) to the Claims Agent at the address set forth below by regular mail, overnight mail, or hand delivery:

Ballot Processing Department
c/o Logan & Company, Inc.
546 Valley Road
Upper Montclair, NJ 070043

TO BE COUNTED, YOUR BALLOT WITH ORIGINAL SIGNATURE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN **MUST BE RECEIVED BY THE CLAIMS AGENT** NO LATER THAN 5:00 P.M. (PREVAILING EASTERN TIME) ON [_____], 2011 (the "**Voting Deadline**").

If you are a Holder of a Claim or Interest entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact Logan & Co. by e-mail at info@loganandco.com, by phone at 973-509-3190, or by mail to 546 Valley Road, Upper Montclair, NJ 07043.

### D. Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for [_____], 2011 at [_____] (prevailing Eastern time) in the Bankruptcy Court, 5th Floor, 824 Market Street, Wilmington, Delaware 19801 (the "**Confirmation Hearing**"). The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and Filed on or before [_____], 2011, at 4:00 p.m. (prevailing Eastern Time) (the "**Confirmation Objection Deadline**") in the manner described in the Confirmation Hearing Notice accompanying this Disclosure Statement. The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time as to which the Confirmation Hearing has been adjourned or an appropriate Filing on the Bankruptcy Court's docket.

THE PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 3, 4, 5 AND 7 TO VOTE IN FAVOR OF THE PLAN. VOTING INSTRUCTIONS ARE DESCRIBED IN ARTICLE VI OF THIS DISCLOSURE STATEMENT.

The classification and treatment of Claims and Interests under the Plan are described in detail below. Because the Plan provides the greatest likelihood of recovery to all Holders of Allowed Claims or Allowed Interests in these Chapter 11 Cases, the Plan Proponents strongly encourage all Holders of Claims or Interests entitled to vote on the Plan to vote to accept the Plan.

## II. OVERVIEW OF THE PLAN

**THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN, THE PLAN SUPPLEMENT, AND ANY OTHER PLAN DOCUMENTS. CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES-IN-INTEREST ARE URGED TO REVIEW THE PLAN ITSELF, AND NOT TO RELY ON THE SUMMARY PROVIDED HEREIN. IN THE EVENT OF AN INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN SHALL CONTROL.**

### A. Summary of Treatment of Claims and Interests under the Plan

The table below summarizes the classification and treatment of Claims and Interests under the Plan. The table also sets forth the treatment of unclassified Claims.

The estimated recovery percentages set forth below have been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims or Allowed Interests in each Class. For certain Classes of Claims or Interests, the actual amounts of Allowed Claims or Allowed Interests could materially exceed or could be materially less than the estimated amounts shown in the table below. Therefore, the actual Distributions may differ from the estimates set forth in the table below.

The Plan Proponents have not yet fully reviewed and analyzed all Claims and Interests. Estimated Claim or Interest amount for each Class set forth below is based upon the Debtors'

review of the Debtors' books and records and Filed Proofs of Claim, and include estimates for a number of Claims that are Contingent, Disputed, and/or unliquidated.

For purposes of the estimates set forth below, the Plan Proponents (i) have not assigned any value to the Causes of Action; (ii) relied on the projections shown in Sources and Uses of Estate Assets Prior to the Effective Date, attached hereto as <u>Exhibit C</u>, which contains, among other things, projected wind-down expenses for administering these Chapter 11 Cases to and including the Effective Date; and (iii) used an estimate for each dollar amount of Allowed Claims, which estimate may change depending upon the proofs of Claim filed in these Chapter 11 Cases currently under review by the Debtors.

| Class | Estimated Aggregate Allowed Amount | Treatment Pursuant to the Plan | Estimated Recovery |
|-------|-----------------------------------|--------------------------------|--------------------|
| Unclassified: Administrative Expense Claims | $ | Unimpaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Administrative Expense Claim shall receive in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Expense Claim: (a) Cash equal to the amount of such Allowed Administrative Expense Claim; or (b) such other treatment as to which the Debtors, in consultation with the Committee, or the Liquidating Trustee, as applicable, and the Holder of such Allowed Administrative Expense Claim shall have agreed upon in writing. | 100% |
| Unclassified: Priority Tax Claims | $ 0 | Unimpaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim: (a) Cash equal to the amount of such Allowed Priority Tax Claim; or (b) such other treatment as to which the Debtors, in consultation with the Committee, or the Liquidating Trustee, as appropriate, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing. | 100% |
| Class 1: Priority Non-Tax Claims | $ 0 | Unimpaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Priority Non-Tax Claim shall receive in full and final satisfaction of such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Debtors, in consultation with counsel to the Committee, or the Liquidating Trustee, as applicable, and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. | 100% |
| Class 2: Secured Claims | $ 0 | Unimpaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Class 2 Claim shall receive (A) one of the treatments specified in section 1124 of the Bankruptcy Code; or (B) such other treatment which the Debtors, in consultation with counsel to the Committee, or the Liquidating Trustee, as applicable, and the Holder of such Allowed Secured Claim have agreed upon in writing. | 100% |

CHI 60,771,838v2 2-18-11

| Class | Estimated Aggregate Allowed Amount | Treatment Pursuant to the Plan | Estimated Recovery |
|---|---|---|---|
| Class 3: General Unsecured Claims | $ 15.9 million | Impaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed General Unsecured Claim shall receive in full and final satisfaction of such Allowed Class 3 Claim its Pro Rata share of Liquidating Trust Assets remaining after payment in full in Cash of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, Allowed Unsecured Convenience Claims and any expenses of the Liquidating Trust. | ___% |
| Class 4: Critical Trade Vendor Claims | $ 2.3 million | Impaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Critical Trade Vendor Claim shall receive in full and final satisfaction of such Allowed 4 Class Claim its Pro Rata share of Liquidating Trust Assets remaining after payment in full in Cash of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, Allowed Unsecured Convenience Claims and all expenses of the Liquidating Trust <u>provided, however</u> a Holder of an Allowed Critical Vendor Claim shall not receive any Distribution under the Plan until the Holders of Allowed General Unsecured Claims have received a percentage recovery under the Plan, on account of their Allowed General Unsecured Claims, that equals the percentage recovery received by such Holder of an Allowed Critical Vendor Claim, on account of its Allowed Critical Vendor Claim, from the Critical Trade Vendor Escrow. | ___% |
| Class 5: Unsecured Convenience Claims | $ ___ | Impaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Unsecured Convenience Claim shall receive in full and final satisfaction of such Allowed Class 5 Claim a Distribution from the Liquidating Trust equal to Cash in the amount of fifty (50%) of their Allowed Unsecured Convenience Claim. In order to elect into Class 5, a Holder of a General Unsecured Claim in excess of $_____ may elect to reduce such Claim to $_____ on the ballot accepting or rejecting the Plan, no later than the Voting Deadline. | 50% |
| Class 6: Intercompany Claims | $ 10.3 million | Impaired. On the Effective Date, all Intercompany Claims shall be deemed canceled, extinguished and discharged and of no force or effect, and the Holders of Intercompany Claims shall not be entitled to receive or retain any property on account of such Intercompany Claims. | 0% |

CHI 60,771,838v2 2-18-11

| Class | Estimated Aggregate Allowed Amount | Treatment Pursuant to the Plan | Estimated Recovery |
|---|---|---|---|
| Class 7: Interests | N/A | Impaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Interest shall receive in full and final satisfaction of such Allowed Class 7 Interest its Pro Rata share of Liquidating Trust Assets remaining after payment in full in Cash of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, Allowed Unsecured Convenience Claims, Allowed General Unsecured Claims, Allowed Critical Trade Vendor Claims and all expenses of the Liquidating Trust. The Holder of Allowed Interests shall be paid pursuant to the terms of any documents by and between the Debtors and such Holders, including without limitation, the corporate charter and any shareholder agreements. | 0% |

THE PLAN PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

NOTHING IN THE DISCLOSURE STATEMENT SHALL AFFECT THE RIGHTS OF THE DEBTORS, THE COMMITTEE, AND/OR THE LIQUIDATING TRUSTEE, TO OBJECT TO ANY PROOF OF CLAIM ON ANY GROUND OR FOR ANY PURPOSE, INCLUDING IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE PLAN.

### III.     GENERAL INFORMATION CONCERNING THE DEBTORS

#### A.     Overview of the Debtors' Business Prior to the Sale

As further described in Section VI.H of this Disclosure Statement, substantially all of the Debtors' assets were sold on a going-concern basis (the "**Sale**"), in accordance with the Bankruptcy Court's order, dated December 16, 2010, approving such Sale [Docket No. 438]. The below background on the Debtors describes the Debtors' pre-sale businesses. As of the date hereof, the Debtors no longer operate any businesses as a going-concern, but the Debtors continue to administer certain assets remaining in their Estates for liquidation and Distribution to the Creditors and Interest Holders under the Plan.

#### 1.     General

Founded in 1918, the Debtors started as a manufacturer of basketball goals and dry line markers out of Mr. Bill Schutt's hardware store in Litchfield, Illinois. Over the past century, the Debtors grew to be a market leader in their industry with approximately $69 million of total revenue as of the fiscal year ending 2009, 80% of which was generated by the Debtors' manufacturing division and the rest by their reconditioning division. The Debtors employed

approximately 360 permanent employees and approximately 160 additional temporary employees in months when they needed additional workforce to fulfill their seasonal production needs. The Debtors were the second largest employer in Litchfield, Illinois, and the third largest employer in Salem, Illinois, thereby providing significant economic stability to those regions.

Prior to the Sale, the Debtors were a leading designer, manufacturer, distributor, and marketer of team sporting equipment, offering an extensive line of protective gear and complementary accessories, most prominently in football. The Debtors served a broad range of clientele, including youth, high school, college, and professional teams throughout the United States. The Debtors also served clients overseas, including those in Canada, Germany and Japan, but the vast majority of the Debtors' customers were located within the United States.

The Debtors' presence in the football helmet and faceguard markets was unparalleled, and the Debtors' product lines were anchored by their football helmet offering, for which the Debtors had a top position in the country, both in terms of technological advancement and market share. For example, in football, the Debtors held a number-one position in the youth and face-guard markets and a number-two position in the varsity market and reconditioning business. The Debtors' market-leading position in football gear was sustained by their superior products, robust new product pipeline, and significant investment in technology and intellectual property.

Their leading position in the football market enabled the Debtors to penetrate other sporting equipment markets with significant demand for high-performance protective gear, such as baseball and softball. The Debtors also maintained leading and growing market positions in shoulder pads, women's fast-pitch softball equipment, baseball protective gear, baseball bases, and sports collectibles.

During their tenure as the market leader, the Debtors possessed a unique combination of advanced product technology and an unparalleled distribution network. The Debtors' sales network structure, which consisted of a lean in-house sales force, regional independent sales representatives and a vast network of local Team Dealers (as defined below), combined with the Debtors' market-leading innovation and technology, enabled the Debtors to be one of the top two competitors in the football equipment market.

## 2. The Debtors' Facilities

The Debtors utilized a domestic manufacturing strategy for their product lines, for which quality control was critical, and for which speed-to-market and customization offered a significant competitive advantage.

### (a) The Debtors' Manufacturing Facilities

The Debtors' products were manufactured in Litchfield, Illinois and Salem, Illinois, and warehoused initially in their warehousing facility in Litchfield, Illinois. From their warehouse in Litchfield, the Debtors distributed their products through Team Dealers (as defined below) and other retail accounts. The central location of the Debtors' manufacturing division in Illinois provided efficient nationwide reach via land and air transportation for distribution.

### (b) The Debtors' Reconditioning Facilities

The Debtors' reconditioning business operated mainly through their facilities in Easton, Pennsylvania. The Debtors originally had a small reconditioning division, but acquired Circle System Group, Inc. ("**Circle System**") in September 2005 (the "**Circle Acquisition**"). Circle System was the second largest athletic equipment reconditioning business in the United States after Riddell, Inc. ("**Riddell**"), which was the Debtors' largest competitor. Through Circle System, the Debtors provided value-added reconditioning services to their customers in order to maximize the useful life of the Debtors' various products. The Debtors' reconditioning services ranged from helmet refurbishing and recertification to shoulder pad refurbishing to in-season laundry, providing various youth teams, schools, and leagues with viable alternatives to purchasing new equipment. The Debtors had a network of reconditioning dealers with wide coverage within the United States.

### 3. The Debtors' Focus on Research and Development

The Debtors invested heavily in their research and development ("**R&D**") and intellectual property to achieve their superior product quality and robust new product pipeline. The four core areas of the Debtors' R&D focus were protection, impact absorption, weight, and environment, all of which enhanced the user's on-field experience by lessening impact, reducing fatigue and injuries, improving temperature control, and ultimately maximizing performance. Each year, the Debtors introduced and phased new technology into their premier product lines. For example, after faceguards became mandatory in football in 1970, the Debtors underwent decades of innovative product development and new product introduction, including, but not limited to, the game's first titanium football faceguards. In addition, through their continued R&D efforts, the Debtors developed the world's first helmet with TPU cushioning with the same material traditionally used for military helmets, climate-controlled shoulder pads, and shock-absorbing helmets and faceguards.

### 4. The Debtors' Sales Team

The Debtors utilized a multi-layered sales network, with a lean in-house sales and marketing department consisting of four (4) employees that managed the independent sales representatives. The independent sales representatives managed over 1,000 sales representatives at a local level (the "**Team Dealers**"), many of whom managed sales representatives on the road. Each of the four in-house sales employees was responsible for one of the four broad regions of the United States, managing the independent sales representatives in his region and collectively covering the country from coast to coast. The thirty-one (31) independent sales representatives worked on commission and managed the relationships with an aggregate of more than 1,000 Team Dealers, who marketed, promoted and sold Schutt products to the end customers at the local level. It is estimated that local sales representatives, such as the Team Dealers, sell and distribute over 50% of the $2.5 billion worth of sporting goods equipment sold in the United States annually. Team Dealers consisted of national, regional, and local companies that sell sporting goods and other products to a variety of customers in their respective coverage areas, including recreational leagues, youth sports groups, high schools, colleges, and professional teams. Team Dealers also sold directly to consumer end-users through retail locations.

The institutional sporting equipment market is highly fragmented, and historical relationships and local knowledge are critical to the success in these markets. The Team Dealers had direct relationships with and access to the thousands of high schools, colleges, sports

leagues, and other institutional customers across the country, and often used more than 3,000 road sales representatives to sell product.

The Debtors' sales network was based upon the intimate and long-standing relationship between the Team Dealers and the institutional end-customers, which relationships often spanned decades and provided invaluable insight into the end-customers' needs and purchasing habits. As such, the independent sales representatives and Team Dealers were indispensible components of the Debtors' sales network.

### 5. The Debtors' Sale Cycle

The Debtors' business was extremely seasonal because of the nature of their products. The Debtors' customers generally ordered new equipment in the spring for the upcoming school year. The Debtors' manufacturing and shipping activities usually peaked in August, just before the school year started. The Debtors' sales and manufacturing activities subsided significantly during the months of September through February. The majority of the Debtors' receivables were collected by the end of October.

### B. The Debtors' Corporate Structure

SSI Liquidating and Circle System were the main operating entities of the Debtors. SH Liquidating is the parent entity of all the other Debtors, including SSI Liquidating. The Debtors' corporate organizational chart is attached hereto as Exhibit B.

### C. The Debtors' Capital and Debt Structure

#### 1. Prepetition Secured Loans

As of the Petition Date, Bank of America, N.A., as administrative agent and as lender (the "**Agent**"); along with other lender signatories (collectively and together with the Agent, the "**Prepetition Secured Lenders**"); SSI Liquidating, Mountain View, Circle System, Melas, RDH, and Triangle Sports as borrowers (collectively, the "**Borrowers**"); and SH Liquidating as guarantor; were parties to that certain Amended and Restated Loan and Security Agreement dated as of September 30, 2005 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Prepetition Credit Agreement**"), and all collateral and ancillary documents executed in connection therewith (the "**Prepetition Secured Loan Documents**"), pursuant to which, among other things, the Prepetition Secured Lenders agreed, subject to the terms and conditions set forth in the Prepetition Credit Agreement, to make certain loans and other financial accommodations to the Debtors (the "**Prepetition Secured Loans**").

As of the Petition Date, the principal amount of the Prepetition Secured Loans was not less than $34,820,675.20, plus accrued and unpaid prepetition and postpetition interest, fees, expenses, and other amounts chargeable under the Prepetition Secured Loan Documents. The Prepetition Secured Loans were set to mature on December 31, 2010.

#### 2. Other Secured Debt

The Debtors believe that they have no other secured debt. The Debtors' Schedules list the following as secured Claims: (i) a Claim pursuant to that certain Irrevocable Standby Letter of Credit, dated May 19, 2010, between SSI Liquidating and The Hanover Insurance Company

and/or Massachusetts Bay Insurance Company (the "**Hanover Claim**"); and (ii) a Claim pursuant to that certain Secured Equipment Lease between SSI Liquidating and Balboa Capital Corporation (the "**Balboa Claim**").  The Hanover Claim has been satisfied in full.  The Balboa Claim is disputed and believed to be invalid.

3.    **Unsecured Debt**

(a)    The Windjammer Subordinated Notes

On September 30, 2005, each of the Debtors (other than SH Liquidating) issued, pursuant to a subordinated note agreement (as amended, restated, supplemented, or otherwise modified, the "**Amended and Restated Subordinated Note Agreement**") those certain unsecured notes due 2011 (the "**Prepetition Subordinated Notes**" and, together with the Prepetition Secured Loans, the "**Prepetition Loans**") to Windjammer Mezzanine & Equity Fund II, L.P. ("**Windjammer**").  The Prepetition Subordinated Notes were set to mature on December 31, 2011 and bore interest at the rate of 10% per annum, plus the Applicable PIK Percentage (as defined in the Amended and Restated Subordinated Note Agreement).  Payment of the Prepetition Subordinated Notes is guaranteed by SH Liquidating, the 100% owner of each of the other Debtors.  As of the Petition Date, the Debtors owed $17,357,529 on account of the Prepetition Subordinated Notes.

The Prepetition Subordinated Notes are fully subordinated in right of payment to the Prepetition Secured Loans pursuant to the terms of that certain Amended and Restated Subordination Agreement, dated as of September 30, 2005 (as amended, restated, supplemented, or otherwise modified, the "**Prepetition Subordination Agreement**").

Pursuant to the Prepetition Subordination Agreement, Windjammer, as Holder of 100% of the Prepetition Subordinated Notes, agreed, among other things, that upon the occurrence of any insolvency proceeding: (i) the Agent and the Prepetition Secured Lenders shall be entitled to receive payment in full in cash of any and all of the Prepetition Secured Loans prior to payment of all or any part of the Prepetition Subordinated Notes; (ii) any payment or distribution of any kind or character, whether in cash, securities, or other property, which shall be payable or deliverable upon or with respect to any or all of the Prepetition Subordinated Notes, shall be paid or delivered directly to the Agent for application to any of the Prepetition Secured Loans until the Prepetition Secured Loan have been paid in full; and (iii) the Agent may assert the Subordinated Noteholder's Claims with respect to the Prepetition Subordinated Notes against the Borrowers until all of the Prepetition Secured Loans have been paid in full.

*See* Prepetition Subordination Agreement, § 6.

(b)    The Abeshaus Subordinated Notes

The Schedules list four (4) additional subordinated notes in the following amounts to the following former officers and directors of Circle System: (i) $630,295 to Alan Abeshaus, (ii) $540,235 to Eric Abeshaus, (iii) $540,235 to Mitchell Kurlander, and (iv) $540,235 to David Drill (collectively, the "**Circle Subordinated Notes**").  The Circle Subordinated Notes were issued as deferred purchase price payments for the Circle Acquisition and are disputed and subject to setoff because of the Circle Frauds (as defined and further described below), among other things.

-11-

**(c)** Other Unsecured Debt

As of the Petition Date, the Debtors had aggregate unsecured debt (other than the intercompany debt and certain unliquidated claims described below) of approximately $15.9 million. In addition, Circle System owed SSI Liquidating approximately $10.3 million in intercompany debt, as Circle System, in the ordinary course of its business, purchased from SSI Liquidating various parts and products to be used in its reconditioning business. The Debtors' Schedules also list eight (8) product liability claims, all of which are unliquidated. While the Debtors have insurance coverage for these product liability claims, such insurance coverage becomes available only after a certain level of deductible is exhausted. In addition to the foregoing, pursuant to the Bankruptcy Court's order granting the Rejection Motion, the Debtors rejected certain Executory Contracts. Accordingly, certain rejection damage Claims may arise from such rejection of Executory Contracts.

**4.** **Interests**

The equity interests in each of SSI Liquidating, Mountain View, Circle System, Melas, RDH and Triangle Sports are owned 100% by their parent company, SH Liquidating, whose common stock is owned by the following Entities: (i) 61.6% by GAC Investments, LLC, (ii) 16.4% by Windjammer Capital Investors, (iii) 8.1% by All Sports, LLC, (iv) 1.2% by Jennifer Baker, (v) 1.2% by Stephanie Nimmons, (vi) 2.1% by Alan Abeshaus, (vii) 1.8% by Eric Abeshaus, (viii) 1.8% by Mitchell Kurlander, (xi) 1.8% by David Drill, (x) 1.2% by Eric Ashleman, and (xi) 2.7% by Robert Erb. 100% of SH Liquidating's Preferred Stock Series A & B is owned by Windjammer Capital Investors. SH Liquidating's Preferred Stock Series C is owned by the following Entities: (a) 51.3% by Gridiron Schutt, LLC, (b) 11.4% by Gridiron Capital, LLC, (c) 28.8% by Windjammer Capital Investors, (d) 4.4% by All Sports, LLC, (e) 0.7% by Jennifer Baker, (f) 0.7% by Stephanie Nimmons, and (g) 2.8% by Robert Erb.

**D.** **The Debtors' Remaining Assets**

Subsequent to the Sale, the Debtors have certain liquidated and unliquidated assets remaining in their Estates. As described below, the Debtors have a summary judgment against certain former officers and directors in one of the Circle System Matters, as defined below, and retain other causes of action in connection therewith. The Debtors also retain the Non-Trade Avoidance Actions, as included in the Plan Supplement. The Debtors also believe that they may be entitled to certain tax refunds in an unliquidated amount. Finally, the Debtors estimate that the total cash and deposits remaining in their Estates is approximately $250,000. These remaining assets will be available for Distribution under the Plan.

**E.** **Events Leading up to the Chapter 11 Filing**

**1.** **The Circle Acquisition**

As described above, the Debtors' reconditioning business was expanded through the Circle Acquisition in 2005. The purchase price for the Circle Acquisition was $23.4 million. Although the Circle Acquisition was supported by a strong business rationale, it ended up placing a significant burden on the Debtors because of certain fraudulent activities that had taken place before the Debtors acquired Circle Systems, and that were unknown to the Debtors at the time of the Circle Acquisition.

-12-

In early 2007, the Department of Justice discovered that the prior owners and management of Circle Systems had engaged in certain fraudulent activity (the "**Circle Frauds**"), including, but not limited to, bribery of government officials and various accounting frauds. Such fraudulent activities resulted in an overstatement of Circle System's EBITDA, which was the basis upon which the acquisition price was negotiated.

In addition to overpaying for the Circle Acquisition based on a fraudulently inflated EBITDA, the Debtors had to bear the litigation costs associated with the Circle System Matters,[2] including the Circle Frauds and related cases, which demanded of the Debtors higher cash spending and an inordinate amount of management's time and attention. In addition, the Circle System Matters resulted in significant negative public relations, all of which generated a downward pressure on the Debtors' profitability. Even though a judgment was rendered in the Debtors' favor on the issue of liability against the former management and owners of Circle System, the tangible and intangible costs of the Circle Frauds and the related litigation was a substantial detriment to the Debtors' business and profitability.

## 2. The Economic Crisis

As the Debtors were struggling to survive the negative impact of the Circle Frauds, the global economy started to collapse in the fall of 2008. Because the domestic financial and economic markets went through such an unprecedented downturn, school budgets were significantly reduced, and overall demand for varsity football products decreased substantially. Such reduction in school budgets and decrease in demand resulted in lower sales, lower margins, and ultimately, lower profitability for the Debtors.

## 3. Covenant Violations/Events of Default

As a result of the economic crisis as well as the Circle Frauds, the Debtors were operating with an overleveraged balance sheet and eventually violated certain financial covenants under both of their Prepetition Loans.

The Debtors' Prepetition Secured Loans were to mature on December 31, 2010, and the Debtors were unable to secure an alternative source of financing. In addition, the Debtors failed to meet certain payment obligations under their Prepetition Subordinated Notes. In April 2010, the Debtors failed to make a certain payment under the Prepetition Subordinated Notes relating to the Applicable High Yield Discount Obligation (the "**Subnote Default**"). On July 1, 2010, the Agent for the Prepetition Secured Loans provided notice to the Debtors of an event of default under the Prepetition Credit Agreement (the "**July Secured Loan Default**"). On August 18, 2010, the Agent notified the Debtors of further events of default (together with the Subnote Default and the July Secured Loan Default, the "**Events of Default**"). As a result of the Events

---

[2] The term "**Circle System Matters**" shall mean all matters related to the Circle System Group, Inc. acquisition, including, without limitation, each of the following proceedings (and any and all appeals with respect to each of the following): (i) the breach of employment agreement action filed in the First Judicial District of Pennsylvania, Philadelphia County, styled as *Alan Abeshaus, et al. v. Circle System Group, Inc.*, Case No. 02797; (ii) the breach of stock purchase agreement, securities and common law fraud action filed in First Judicial District of Pennsylvania, Philadelphia County, styled as *Circle System Group, Inc., et al. v. Alan Abeshaus, et al.*, U.S.D.C. Ed of PA, No. 5:08-cv-05376; (iii) the false claims act filed in the United States District Court for the Eastern District of Pennsylvania, styled as *Gerry Dale, et al. v. Circle System Group, Inc., et al.*, No. 06-cv-04747-JKG; and (iv) *Twin City Fire Insurance Company v. Circle System Group, Inc.*, CCP Phila. County, July Term, 2010, No. 2648.

of Default, the Prepetition Secured Lenders were no longer under any obligation to provide any further financing to the Debtors under the Prepetition Secured Loan Documents, and the Agent became entitled to certain rights and remedies, including, without limitation, the right to charge interest to the Debtors at the default rate. Therefore, the Debtors were faced with multiple Events of Default under both their Prepetition Secured Loans and their Prepetition Subordinate Notes.

## 4. The Riddell Litigation

In December 2008, Riddell filed a lawsuit (the "**Helmet Litigation**") against SSI Liquidating, claiming patent infringement on certain specific football helmet features with regard to two of the Debtors' most successful products – its "DNA" and "ION" model football helmets, which were introduced in 2004 and 2007, respectively. Riddell also filed claims against the Debtors asserting violation of the Lanham Act, trade libel, and product disparagement and false and misleading statements to the purchasing public about Riddell's products and about the Debtors. The Helmet Litigation was filed in the United States District Court for the Western District of Wisconsin ("**Wisconsin District Court**"), *Riddell, Inc. v. Schutt Sports, Inc.*, Civil Action No. 3:08-cv-00711-BBC.

The Debtors denied Riddell's allegations, asserted various affirmative defenses, and filed counterclaims against Riddell, including a counterclaim for false advertising and deceptive trade practices. Although the Debtors and their litigation counsel believed that the patent infringement claims were frivolous, following a jury trial, on August 5, 2010, the jury found that the Debtors' "DNA" and "ION" football helmet shells infringed Riddell's "Football Helmet" and "Sports Helmet" patents. On August 9, 2010, the jury awarded Riddell lost profit damages in the amount of $24 million. The jury also awarded Riddell $5 million for sales for which it found Riddell was not entitled to lost profit damages, but was entitled to a reasonable royalty. Finally, the jury awarded Riddell $24,750 in damages for infringement of its "Face Guard For A Sports Helmet" patent. The jury did not find in favor of the Debtors on their counterclaims seeking declarations of invalidity, unenforceability, and non-infringement. The jury did not render any verdicts on Riddell's claims for violation of the Lanham act, trade libel, and product disparagement, nor on the Debtors' counterclaims for false advertising and deceptive trade practices. Shortly after the jury verdict, Riddell made an oral motion for an injunction.

Following the jury verdict, on August 10, 2010, Riddell and SSI Liquidating entered a stipulation to postpone any hearing on Riddell's motion for permanent injunction until August 23, 2010, or as soon thereafter as the Wisconsin District Court's schedule allowed. In addition, on August 10, 2010, SSI Liquidating filed a Motion for Judgment as a Matter of Law of Non-Infringement and, in the alternative, a Motion for a New Trial. Riddell filed its opposition to SSI Liquidating's motion on August 25, 2010, and SSI Liquidating's reply was due on September 7, 2010. Additional post-trial motions (including motions for judgment as a matter of law and motions for a new trial) were due on September 15, 2010.

On or about August 19, 2010, a judgment was entered in accordance with the jury verdict. Subsequently, on August 20, 2010, Riddell and SSI Liquidating entered into another stipulation that, among other things, (i) stayed all proceedings in the Helmet Litigation, including any hearing, disposition or order on Riddell's motion for permanent injunction until September 6, 2010; (ii) allowed SSI Liquidating to continue selling the allegedly infringing products in the

ordinary course of business; and (iii) stayed the enforcement of the $29 million judgment until September 10, 2010. On September 1, 2010, Riddell brought another patent infringement lawsuit against SSI Liquidating, claiming that certain of the Debtors' "AiR Flex" shoulder pads infringe upon Riddell's "384 patent" entitled "Shoulder Pad for Contact Sports." Riddell requested, among other things, that it be awarded treble damages with prejudgment interest, attorneys' fees and expenses as well as actual and compensatory damages, that the Debtors be preliminarily and permanently enjoined from producing the allegedly infringing shoulder pads, and that a trial by jury be conducted. This new litigation was filed before the same court that heard the Helmet Litigation, in the United States District Court for the Western District of Wisconsin, *Riddell, Inc. v. Schutt Sports, Inc.*, Civil Action No. 3:10-cv-00504-BBC (the "**Shoulder Pad Litigation**" and together with the Helmet Litigation, the "**Riddell Actions**").

The Debtors Filed for chapter 11 bankruptcy protection on September 6, 2010, with the exception of SH Liquidating which Filed for bankruptcy on September 15, 2010, and such bankruptcy Filings stayed the Riddell Actions.

### 5. The Debtors' Decision to File for Chapter 11 Protection

The combination of deteriorating revenues and margins, the continued burden of excessive litigation costs in connection with the Circle Frauds and the Helmet Litigation, the jury verdict in the Helmet Litigation, the covenant violations and Events of Default under the Debtors' Prepetition Secured Loans and Prepetition Subordinated Notes, the prospect of having no alternative source of financing once their Prepetition Secured Loans matured, and their inability to generate sufficient cash flow to meet their obligations under the Prepetition Loans, made it necessary for the Debtors to consider seeking protection under chapter 11 of the Bankruptcy Code.

The Debtors' board of directors (the "**Board**") ultimately determined that the most effective way to maximize the value of the Debtors' Estates for the benefit of their stakeholders was to seek protection under chapter 11 of the Bankruptcy Code in order to pursue either a sale or a plan, or both, which would result in a strengthened operation, while allowing the Debtors a breathing spell. During a special Board meeting held on September 3, 2010 and continued to September 5, 2010, the Board met and voted to approve a resolution giving authority to File voluntary petitions for relief under chapter 11 of the Bankruptcy Code for each of the Debtors.

## IV.    EVENTS DURING THE CHAPTER 11 CASES

On September 6, 2010, SSI Liquidating, Mountain View, Circle System, Melas, RDH, and Triangle Sports Filed voluntary petitions for reorganization under chapter 11 the Bankruptcy Code in the Bankruptcy Court. On September 15, 2010 (together with September 6, 2010, the "**Petition Date**"), SH Liquidating Filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Debtors' Chapter 11 Cases have been assigned to Chief United States Bankruptcy Judge Kevin J. Carey and have been administratively consolidated under case number 10-12795 (KJC).

The following is a brief description of certain major events that have occurred during the Chapter 11 Cases.

CHI 60,771,838v2 2-18-11

**A.  Continuation of Business after the Petition Date**

**1.  First and Second Day Motions**

Shortly after the Petition Date, the Debtors Filed a number of motions with the Bankruptcy Court, seeking various forms of relief, including, without limitation, the following motions, all of which were approved by the Bankruptcy Court:

**(a)  Joint Administration Motion**: Motion for entry of an order directing joint administration of the Debtors' Chapter 11 Cases [Docket Nos. 3, 60, 87 and 137];

**(b)  Postpetition Obligations Motion**: Motion for entry of an order granting administrative expense status to Debtors' undisputed obligations arising from postpetition delivery of goods ordered prepetition [Docket Nos. 10 and 53];

**(c)  Employee Wage Motion**: Motion for entry of an order (i) authorizing Debtors to pay all prepetition employee obligations and prepetition withholding obligations and (ii) directing banks to honor related transfers [Docket Nos. 5 and 55];

**(d)  Cash Management Motion**: Motion for entry of an order (a) authorizing the maintenance of bank accounts and continued use of existing business forms and checks, (b) authorizing the continued use of existing cash management system, and (c) granting administrative expense status to postpetition Intercompany Claims [Docket Nos. 11 and 52];

**(e)  Utility Motion**: Motion for entry of interim and final orders pursuant to sections 105(a) and 366 of the Bankruptcy Code (i) prohibiting utilities from altering, refusing, or discontinuing service, (ii) deeming utilities adequately assured of future performance, and (iii) establishing procedures for determining adequate assurance of payment [Docket Nos. 6, 54 and 139];

**(f)  Tax Motion**: Motion for an order (i) authorizing the Debtors to pay prepetition sales, use and similar taxes and regulatory fees in the ordinary course of business, and (ii) authorizing banks and financial institutions to honor and process checks and transfers related thereto [Docket Nos. 7 and 59];

**(g)  Insurance Motion**:  Motion for an order authorizing the Debtors to (i) maintain existing insurance policies and pay all policy premiums and brokers' fees arising thereunder, and (ii) continue insurance premium financing programs and pay insurance premium financing obligations arising in connection therewith [Docket Nos. 9 and 56];

**(h)  Critical Vendor Motion**: Motion for an order authorizing (i) the Debtors to pay prepetition claims of critical vendors and (ii) financial institutions to honor and process related checks and transfers [Docket Nos. 68 and 141];

-16-

**(i)      Customer Programs Motion**:  Motion for an order pursuant to sections 105(a), 363(c), 1107(a), and 1108 of the bankruptcy code authorizing the Debtors to honor certain prepetition obligations to customers and to otherwise continue certain customer practices and programs in the ordinary course of business [Docket Nos. 8 and 58];

**(j)      DIP Motion**:  Motion for interim and final orders (i) authorizing (a) secured postpetition financing on a super priority basis pursuant to 11 U.S.C.§ 364; (b) use of cash collateral pursuant to 11 U.S.C. § 363 and (c) grant of adequate protection pursuant to 11 U.S.C. §§ 363 and 364, and (ii) scheduling a final hearing pursuant to Bankruptcy Rule 4001(c) [Docket Nos. 12, 51 and 159].

**2.      Retention Applications**.  Shortly after the Petition Date, the Debtors also requested authorization to retain the following professionals, which retentions were approved by the Bankruptcy Court:

**(a)      Greenberg Traurig, LLP**:  As general bankruptcy counsel to the Debtors [Docket Nos. 70 and 131];

**(b)      Logan & Company, Inc.**:  As Claims, Noticing, and Balloting Agent [Docket Nos. 4 and 57];

**(c)      Oppenheimer & Co.**:  As financial advisor and investment banker to the Debtors [Docket Nos. 71 and 138];

**(d)      Ernst & Young LLP**:  As financial advisors to the Debtors [Docket Nos. 165 and 266]; and

**(e)      Ordinary Course Professionals**:  In addition to the above retention applications for employment of bankruptcy professionals, an application for an order authorizing retention and employment of ordinary professionals was Filed and approved, authorizing the Debtors to retain certain professionals utilized by the Debtors in the ordinary course of business [Docket Nos. 72 and 140].

**3.      Interim Compensation Procedures**.  On September 21, 2010, the Bankruptcy Court entered an order establishing procedures for interim compensation and reimbursement of expenses of professionals [Docket No. 132] (the "**Interim Compensation Order**").  The Interim Compensation Order delineates a procedure for the: (i) Filing of monthly and interim fee applications by all professionals retained in the Debtors' bankruptcy cases; (ii) Filing of objections to interim fee applications; and (iii) payment by the Debtors of fees and reimbursement of expense to Professionals.  The Debtors' and the Committee's various professionals have Filed monthly and interim fee applications in accordance with the Interim Compensation Order throughout these Chapter 11 Cases.

## B.    Appointment of a Creditors' Committee

On September 16, 2010, the Office of the United States Trustee (the "**U.S. Trustee**") appointed the Committee to represent the interests of unsecured creditors of the Debtors.  The appointed members of the Committee are as follows: (i) Ponderosa International Corp.; (ii) Genn Shang Ind. Co., Ltd.; (iii) United Parcel Service; (iv) NOCSAE (Nat'l Operating Committee on Standards for Athletic Equipment); (v) SABIC Innovative Plastics, US LLC; (vi) Scarbrough International, Ltd.; (vii) Zhuhai Putuo Commerce & Trading Company, Ltd.

Shortly after its formation, the Committee applied for Bankruptcy Court authorization to retain Lowenstein Sandler PC and Womble Carlyle Sandridge & Rice, PLLC as its counsel and BDO Consulting, a Division of BDO USA, LLP. as its financial advisor.  The Bankruptcy Court entered orders approving such retentions [Docket Nos. 241 and 254].

Since the Committee's formation, the Debtors have consulted with the Committee concerning the administration of these Chapter 11 Cases and have kept the Committee informed of their operations.

## C.    Debtor-in-Possession Financing

In order to obtain sufficient liquidity to carry on the operation of their businesses during these Chapter 11 Cases and to maximize the value thereto by pursuing an asset sale or a recapitalization, the Debtors negotiated a postpetition financing arrangement (the "**DIP Loans**") with Bank of America, N.A. (in its capacity with respect to the DIP Loans, the "**Postpetition Lender**").  On the Petition Date, the Debtors Filed a motion for entry of an order approving the DIP Loans and associated relief [Docket No. 12] (the "**DIP Financing Motion**").  On September 8, 2010, the Bankruptcy Court entered an interim order granting the relief sought by the DIP Financing Motion on an interim basis (the "**Interim DIP Order**") [Docket No. 51]; and, on September 29, 2010, the Bankruptcy Court entered an order approving the DIP Financing Motion on a final basis [Docket No. 159] (the "**DIP Order**").

Pursuant to the DIP Order, the Debtors were authorized to (i) enter into the DIP Loans with the Postpetition Lender and obtain postpetition financing in an aggregate amount not to exceed $34 million; (ii) grant the Postpetition Lender, pursuant to Bankruptcy Code § 364(c), security interests in all of the Debtors' currently owned and after-acquired property to secure the Debtors' obligations under the DIP Loans, and (iii) grant the Postpetition Lender priority in payment with respect to such obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b).

Pursuant to the DIP Order, the Postpetition Lender agreed to provide credit support for a sale or a recapitalization process, within certain parameters and timeframes described in the DIP Order.

## D.    The Committee's Lien Review

The DIP Order granted the Committee, on the terms set forth therein, until November 19, 2010 (unless extended by agreement between the Committee and the Postpetition Lender or by further order of the Bankruptcy Court) (only as to the Committee, the "**Lien Challenge Deadline**") to File and serve, on behalf of the Debtors' Estates, objections or complaints respecting the validity, extent, priority, avoidability, or enforceability of the Prepetition Secured

Loans or the Prepetition Secured Lenders' prepetition liens on and prepetition security interests in the collateral securing the Prepetition Secured Loans. By agreement of the Committee and the Postpetition Lender, the Lien Challenge Deadline was extended for the Committee through and including December 17, 2010.

The Committee reviewed issues relating to the perfection of the Postpetition Lender's asserted security interests, liens, charges and claims, and investigated the claims, liens and rights asserted by and claims and rights against the Postpetition Lender, including, without limitation, through informal discovery with the Debtors and the Prepetition Secured Lenders. The Committee found no material issues or objections to the Prepetition Secured Loans and Filed no objections or adversary proceedings against the Prepetition Secured Lenders. Moreover, the Purchase Price for the Sale exceeded the balance due and owing under the Prepetition Secured Loans.

Subsequent to the Debtors' Sale of substantially all of their assets, as discussed below, the postpetition credit facility granted under the DIP Order was terminated and the loans and other extensions of credit made thereunder (including all Prepetition Secured Loans) were paid in full on December 16, 2010.

### E. The Debtors' Schedules and the Statements of Financial Affairs

Section 521 of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules require the Debtors to prepare and File schedules of assets and liabilities (the "**Schedules**") and statements of financial affairs (the "**SOFAs**") with the Bankruptcy Court. On October 15, 2010, the Debtors Filed their Schedules and SOFAs. On January 18, 2011, the Debtors Filed certain amendments to their Schedules pursuant to Bankruptcy Rule 1009(a).

As of January 18, 2011, the Debtors' Schedules and SOFAs reflect, *inter alia*, the following:

**SSI Liquidating**

| | | |
|---|---|---|
| Secured Claims | $ | 34,435,344.00 |
| Priority Claims | $ | 220,591.98 |
| Unsecured Claims | $ | 31,127,088.10 |

**SH Liquidating**

| | | |
|---|---|---|
| Secured Claims | $ | 34,435,344.00 |
| Priority Claims | $ | 0.00 |
| Unsecured Claims | $ | 20,005,001.01 |

**Mountain View**

| | | |
|---|---|---|
| Secured Claims | $ | 34,435,344.00 |
| Priority Claims | $ | 0.00 |
| Unsecured Claims | $ | 17,504,000.00 |

### Circle System

| | | |
|---|---|---|
| Secured Claims | $ | 34,435,344.00 |
| Priority Claims | $ | 48,084.63 |
| Unsecured Claims | $ | 29,799,435.48 |

### Melas

| | | |
|---|---|---|
| Secured Claims | $ | 34,435,344.00 |
| Priority Claims | $ | 0.00 |
| Unsecured Claims | $ | 17,504,000.00 |

### RDH

| | | |
|---|---|---|
| Secured Claims | $ | 34,435,344.00 |
| Priority Claims | $ | 0.00 |
| Unsecured Claims | $ | 17,504,000.00 |

### Triangle Sports

| | | |
|---|---|---|
| Secured Claims | $ | 34,435,344.00 |
| Priority Claims | $ | 0.00 |
| Unsecured Claims | $ | 17,504,000.00 |

The Debtors have paid the Prepetition Secured Lenders in full, in Cash, for its prepetition Secured Claims, which the Debtors believe reduces their Secured Claims to $0. The Debtors also believe that most, if not all, Priority Non-Tax Claims have been paid in full during these Chapter 11 Cases, or such amounts were assumed by Purchaser (as defined below) as part of the Sale. Finally, certain General Unsecured Claims have also been paid during the course of these Chapter 11 Cases -- specifically, certain Claims of Critical Trade Vendors and certain prepetition amounts due and owing under contracts assumed and assigned to Purchaser (as defined below).

**F.      Riddell Disputes**

Upon commencement of these Chapter 11 Cases, on September 6, 2010, SSI Liquidating filed the *Verified Complaint for Declaratory and Injunctive Relief* [Docket No. 15] against Riddell (Adversary Proceeding No. 10-52995 (KJC), the "**Adversary Proceeding**") before this Bankruptcy Court. SSI Liquidating also filed its *Motion for Temporary Restraining Order and Preliminary Injunctive Relief* in the Adversary Proceeding [Adversary Proceeding Docket No. 3]. This Bankruptcy Court entered the order, dated September 29, 2010, staying the continuation of the Helmet Litigation [Adversary Proceeding Docket No. 23] (the "**TRO**"). Riddell appealed the TRO, and such appeal was pending before the Delaware District Court, Civil Action No. 10-00969 (the "**TRO Appeal**").

On September 8, 2010, Riddell filed its *Motion for Determination of Core Status* [Docket No. 37] (the "**Core Status Motion**") and *Motion to Withdraw Reference of Adversary*

-20-

*Proceeding* [Docket No. 38] (the "**Withdrawal Motion**"). On September 14, 2010, Riddell filed its *Motion for Relief From Stay* [Docket No. 85] (the "**Stay Relief Motion**"), which was denied by this Court pursuant to the *Order on Riddell, Inc.'s Motion for Relief from Stay* [Docket No. 163], dated September 30, 2010 (the "**Order Denying Stay Relief**"). Riddell appealed the Order Denying Stay Relief, which appeal was pending before the Delaware District Court, Civil Action No. 10-970 (the "**Stay Relief Appeal**").

On October 6, 2010, the Debtors filed their *Motion to Hold Riddell, Inc. in Contempt of Court for Violation of the Automatic Stay* [Docket No. 179] (the "**Contempt Motion**").

On December 10, 2010, Riddell filed its *Renewed Motion for Relief from Stay* [Docket No. 390] (the "**Renewed Stay Relief Motion**"). On December 10, 2010, Riddell also filed its *Motion for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)* [Docket No. 389] (the "**Administrative Claim Motion**"). The Debtors and the Committee objected to the Renewed Stay Relief Motion and the Administrative Claim Motion.

On January 4, 2011, Riddell filed its Qualified Objection (as defined below and, together with the TRO Appeal, Core Status Motion, Withdrawal Motion, Stay Relief Appeal, Renewed Stay Relief Motion, Contempt Motion, and Administrative Claim Motion, the "**Riddell Disputes**"). Windjammer and Gridiron Capital, LLC ("**Gridiron**") informally joined in the Qualified Objection.

On or about February 15, 2011, the all of the Riddell Disputes and the related matters were withdrawn, dismissed, or otherwise closed, in accordance with the Settlement Order (as defined below).

## G.    Management Incentive Plan

Under the terms of the DIP Loans, the Debtors were subject to a tight timeline to complete a sale or plan. In light of the value, size, and complexity of the Debtors' businesses, as well as the issues that arose during the expedited sale and plan process, the Debtors determined that payment of the Awards (defined below) pursuant to the Management Incentive Plan (defined below) was reasonable and responsibly targeted and that the approval of the Management Incentive Plan (defined below) served the best interests of the Debtors' estates, their creditors and all stakeholders.

Accordingly, on October 14, 2010, the Debtors filed a motion for entry of an order, pursuant to sections 105(a), 363(b)(1) and 503(c)(3) of the Bankruptcy Code, (i) approving a performance-based management incentive plan as described herein (the "**Management Incentive Plan**"); (ii) authorizing the Debtors to implement the Management Incentive Plan; and (iii) granting administrative expense status to all Awards (as defined below). With the Debtors' Board taking lead and their financial advisor, Ernst & Young LLP ("**E&Y**"), working in conjunction therewith, the Debtors developed a targeted Management Incentive Plan to incentivize the senior-level executives essential to the success of any sale or plan process in these Chapter 11 Cases (collectively, the "**Participants**"). The Management Incentive Plan was structured to maximize recovery to, and align the interests of the Participants with, the Debtors' creditors and other stakeholders. The Participants were integral to the Debtors' sale and

restructuring processes, and their respective roles in such processes were critical in addressing the challenges and uncertainties presented by the Chapter 11 Cases.

The Management Incentive Plan presented an opportunity to the Participants to receive cash performance bonuses, in the event that the Debtors' businesses are sold or reorganized, with a sliding scale of incremental bonus awards as the proceeds of any sale or plan process increases (collectively, the "**Awards**").  The Management Incentive Plan had a minimum aggregate payout of $842,030, upon meeting a certain minimum target, and a maximum aggregate payout of $2.0 million, as the proceeds of the plan or sale process exceed the minimum target.

On October 21, 2010, the Bankruptcy Court approved the Management Incentive Plan [Docket No. 253].  After the Closing Date, the Participants were paid in Cash in full on account of their respective Awards under the Management Incentive Plan.

## H.     The Sale Motion

On November 22, 2010, the Debtors Filed their Motion for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtors Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief [Docket No. 331] (the "**Sale Motion**").

On December 1, 2010, the Bankruptcy Court entered the *Order (A) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (B) Approving Bid Protections; (C) Scheduling A Hearing to Consider the Sale; (D) Approving the Form and Manner of Notice of Sale By Auction; (E) Establishing Procedures For Noticing And Determining Cure Amounts; And (F) Granting Related Relief* (the "**Bid Procedures Order**") [Docket No. 363].

### 1.     The Auction

On December 14, 2010, the Debtors commenced an auction of the sale of substantially all of their assets (the "**Auction**"), pursuant to the Bid Procedures Order.  Present at the Auction were the Debtors and their representatives, the Committee's counsel and financial advisors, the Prepetition Secured Lenders, and Kranos Intermediate Holding Corporation (the "**Purchaser**") as the stalking horse bidder, along with the two other bidders that had been deemed qualified by the Debtors – Rawlings Sporting Goods Company, Inc. ("**Rawlings**") and Two Point Conversion, LLC/Patriarch Partners ("**Two Point**" and, collectively with the Purchaser and Rawlings, the "**Bidders**"), along with the Bidders' respective representatives.

During the course of the Auction, which lasted a total of approximately twenty (20) hours, the Bidders participated in approximately ten (10) rounds of bidding, resulting in thirty-one (31) separate bids.  Shortly past midnight, Two Point dropped out of the Auction, leaving Rawlings and the Purchaser as the only remaining Bidders.  Bidding continued until early the

morning of December 15, 2010, whereupon the Debtors selected the last bid made by the Purchaser as the highest or otherwise best offer, and declared the Purchaser the winning Bidder.

## 2. Sale Hearing and Closing of Sale

### (a) The Rawlings Objection

After the close of the Auction, Rawlings Filed an *Objection To (A) Sale To Kranos Intermediate Holding Corporation Of The Debtors' Assets Pursuant To The Debtors Motion For Entry Of Orders: (A)(I) Approving Bid Procedures Relating To Sale Of The Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling A Hearing To Consider The Sale; Approving The Form And Manner Of Notice Of Sale By Auction; Establishing Procedures For Noticing And Determining Cure Amounts; And (VI) Granting Related Relief; And (B)(I) Approving Asset Purchase Agreement And Authorizing The Sale Of Certain Assets Of Debtors Outside The Ordinary Course Of Business; (II) Authorizing The Sale Of Assets Free And Clear Of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief; and (b) Request to Re-Open Auction Bidding* (the "**Rawlings Objection**") [Docket No. 428], objecting to certain procedural elements of the Auction.

On the afternoon of December 15, 2010, approximately eight hours after the conclusion of the Auction, the Debtors sought entry of an order approving the Sale of substantially all of their assets to the Purchaser. After a hearing involving extensive argument and three witnesses, the Court approved the Sale to the Purchaser, expressly overruling the Rawlings Objection.

On the morning of December 16, 2010, the Court entered the order approving the Sale to the Purchaser [Docket No. 438] (the "**Sale Order**"). That same afternoon, the Purchaser and the Debtors consummated the Sale of substantially all of the Debtors' assets in accordance with the Sale Order and the asset purchase agreement, dated December 15, 2010, by and among the Debtors and the Purchaser (the "**Asset Purchase Agreement**"). Pursuant to the Asset Purchase Agreement, the Debtors transferred substantially all of their assets to the Purchaser for the aggregate purchase price of $32,925,000 (the "**Purchase Price**"). Pursuant to the terms of the Sale Order and the Asset Purchase Agreement, the Purchaser designated that: (a) $4.5 million of the Purchase Price be set aside for payment of Allowed Claims of Critical Trade Vendors, (b) $2.2 million of the Purchase Price be set aside for payment of Allowed Claims of Trade Creditors; and (c) $800,000 of the Purchase Price be set aside for Allowed Claims of claimants under section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claimants**"). As part of the Sale, the Assigned Avoidance Actions, included in the Plan Supplement, were assigned to the Purchaser and released as of the Closing Date.

## 3. Riddell's Qualified Objection

On January 4, 2011, Riddell Filed its *Qualified Objection to* (A) *Debtors' Motion Extending Exclusivity and (B) Motion for Fixing of Bar Date* [Docket No. 489] (the "**Qualified Objection**"). In the Qualified Objection, Riddell raised numerous challenges to the Sale and, in particular, to the Purchaser's designation of $7.5 million of the proceeds from the Sale for the Allowed Claims of the Critical Trade Vendors, Trade Creditors, and 503(b)(9) Claimants. Windjammer and Gridiron informally joined in the Qualified Objection. The Court convened a

hearing on the Qualified Objection on January 10, 2011, during which the Debtors, Riddell, Windjammer, Gridiron, the Purchaser, and the Committee (collectively, the "**Settlement Parties**") agreed to participate in a non-binding mediation to attempt to resolve their disputes through a settlement (the "**Settlement**").

### 4. Mediation

On January 19, 2011, this Court entered an *Order Appointing Mediator* [Docket No. 576] (the "**Mediator Order**"). The purpose of the mediation was, among other things, to determine whether the Settlement Parties could (a) reach agreement as to the available assets in the Debtors' Estates for Distribution to the Holders of Allowed Claims generally and (b) how the available assets should be allocated among the creditors, including whether the $29 million judgment claim held by Riddell would be compromised as part of the mediation. The Settlement Parties worked cooperatively with the mediator over a two-day period and were able to reach agreement on the terms of the Settlement as described below.

### 5. Settlement Motion

On January 31, 2011, the Debtors Filed their *Motion For Entry of Order, Pursuant to Sections 105, 503(b)(3)(D) and 1107 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002, 6004 and 9019, Authorizing and Approving (A) Settlement By and Among Debtors, Riddell, Windjammer, Gridiron, Purchaser and Committee With Respect to the Global Resolution of Certain Litigation and Claims and (B) Consummation of Transactions Contemplated Thereby* [Docket No. 602] (the "**Settlement Motion**"). The Court approved the Settlement Motion on February 11, 2011 [Docket No. 643] (the "**Settlement Order**").

THE DESCRIPTION OF THE SETTLEMENT SET FORTH BELOW IS ONLY A SUMMARY AND IS QUALIFIED, IN ITS ENTIRETY, BY THE SETTLEMENT ORDER AND ITS RELATED DOCUMENTS. THIS SUMMARY IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

The general terms of the Settlement, which are set forth in more detail in the Settlement Order [Docket No. 643], are as follows:

(a) Riddell was granted an Allowed General Unsecured Claim in the amount of $29,000,000, which Claim, upon approval of the Settlement Motion, was satisfied in full by an immediate cash payment of $1,000,000 from the Debtors' Estates. This payment has been made.

(b) Riddell was granted an Allowed Administrative Expense Claim in the amount of $70,348, which Claim was satisfied in full, upon approval of the Settlement Motion, by an immediate cash payment of $70,348 from the Debtors' Estates from funds held in escrow by the Debtors. This payment has been made.

(c) The judgment entered in favor of Riddell in the Helmet Litigation is to be deemed final; an injunction is to be issued against the Debtors with respect to the infringing helmets; and any and all other disputes between Riddell and the Debtors, including, without limitation, the Shoulder Pad Litigation, any matters pending before this Court and any matters pending before the Bankruptcy Court

are to be deemed resolved. Riddell and the Debtors are in the process of preparing the necessary papers to be filed with the Wisconsin District Court. All pending matters between Riddell and the Debtors before the Bankruptcy Court or Delaware District Court have been dismissed or closed.

(d)     Windjammer was granted an Allowed General Unsecured Claim in the amount of $17,357,529 against each of the Debtors. Windjammer sold its Claim to the Purchaser or one of the Purchaser's affiliates in exchange for a $1,000,000 payment from the Sale proceeds previously escrowed for Distribution to Holders of General Unsecured Claims of Trade Creditors. This payment has been made. The Purchaser will disburse any Distributions received on account of the Windjammer Claim, to Holders of General Unsecured Claims of Trade Creditors and to Windjammer, as set forth in the Settlement Order and further described in Article VII of the Plan.

(e)     Gridiron was granted an Allowed General Unsecured Claim against SH Liquidating in the amount of $300,000 and will participate in Distributions under the Plan.

(f)     Windjammer and Gridiron were granted Allowed Administrative Expense Claims in the amounts of $100,000 and $50,000, respectively, for their substantial contribution to these Chapter 11 Cases, which claims have been paid in full.

(g)     The Purchaser was authorized to direct the Debtors to pay, from the remaining Escrowed Sale Proceeds, at any time after approval of the Settlement Motion and without the need for further court order, $5.3 million to Holders of Allowed Claims of Critical Trade Vendors. These payments have been made or are in the process of being made.

(h)     The Purchaser, the Debtors, and the Committee agreed upon a list of Trade Creditors and, the Debtors were authorized to distribute $400,000 from the remaining escrowed Sale proceeds Pro Rata on account of Allowed General Unsecured Claims of Trade Creditors. These payments are in the process of being made.

(i)     The Debtors were authorized to disburse $800,000 of the Escrowed Sale Proceeds to the Holders of Allowed 503(b)(9) Claims, as such Claims are Allowed.

(j)     To the extent that those Sale proceeds that are currently being held by the Debtors' Estates to pay Administrative Expense Claims, including wind-down expenses, were not used, these Sale proceeds remained in the Estates and are available for Distribution to all Holders of Allowed Claims or Allowed Interests against the Debtors in accordance with the Plan.

(k)     The Settlement further provided for mutual releases amongst all of the Settlement Parties.

## I.    Exclusivity Motion

On December 27, 2010, the Debtors Filed their motion to extend the exclusive periods during which the Debtors may File a chapter 11 plan and solicit acceptances thereof [Docket No. 476] (the "**Exclusivity Motion**").  Riddell Filed a qualified objection to the Exclusivity Motion [Docket No. 489] as further described below, and the Debtors and the Committee each responded to such objection [Docket Nos. 518 and 519].  On February 11, 2011, the Bankruptcy Court entered an order granting the Exclusivity Motion and extending the exclusive Filing period through and including April 4, 2011 and the exclusive solicitation period through and including June 3, 2011 [Docket No. 642] (the "**Exclusivity Order**").

## J.    Rejection Motion

On December 31, 2010, the Debtors Filed their motion to reject certain Executory Contracts [Docket No. 480] (the "**Rejection Motion**").  On January 10, 2011, the Bankruptcy Court entered an order granting the Rejection Motion [Docket No. 527], authorizing the Debtors to reject certain Executory Contracts (the "**Rejected Contracts**") as set forth in the Rejection Motion.

## K.    The Bar Date Order

On January 10, 2011, the Bankruptcy Court entered an order establishing the following Bar Dates [Docket No. 526] (the "**Bar Date Order**"):

- General Unsecured Claim Bar Date:  February 14, 2011 at 5:00 p.m. (Prevailing Eastern Time)

- 503(b)(9) Claims Bar Date:  February 14, 2011 at 5:00 p.m. (Prevailing Eastern Time)

- Governmental Unit Bar Date:  March 14, 2011 at 5:00 p.m. (Prevailing Eastern Time)

The Bar Date Order exempts certain Claims from the provisions of the Bar Date Order, unless otherwise ordered by the Court, as follows:

- Claims already duly Filed in these Chapter 11 Cases with the Debtors' Claims Agent, or with the Clerk of the Bankruptcy Court for the District of Delaware;

- Claims listed in the Debtors' Schedules, or as listed in any supplements or amendments thereto, if the Holder of the Claim does not dispute the amount or manner in which its Claim is listed in the Schedules or the nature of the Claim and if such Claim is not designated as "contingent," "unliquidated," "subject to adjustment," "disputed," or "unknown" (or assigned a zero amount);

- Claims by any Entity holding an interest in any of the Debtors (an "**Interest Holder**"), which interest is based exclusively upon the ownership of stock in any of the Debtors or warrants or rights to purchase, sell or subscribe to such a security or interest (any such security or interest being referred herein as an

"**Interest**"), need not File a proof of claim on or before the General Bar Date; provided, however, that Interest Holders that wish to assert Claims against any of the Debtors that arise out of or relate to the ownership or purchase of an Interest, including Claims arising out of or relating to the sale, issuance or distribution of the Interest, must File proofs of claim on or before the General Bar Date, unless another exception identified herein applies;[3]

- Claims for which a separate deadline is (or has been) fixed by this Court; and

- Claims that have been Allowed by an order of this Court entered on or before the applicable Bar Date.

Finally, the Bar Date Order provides that any Person that is required to File a proof of claim against the Debtors in the Debtors' Chapter 11 Cases, but that fails to properly do so by the applicable bar date, shall not be treated as a Creditor with respect to such Claim for purposes of (a) Distributions pursuant to the Sale Order; or (b) voting upon or receiving Distributions under any plan or plans of reorganization or liquidation in these Chapter 11 Cases.

## V.    SUMMARY OF THE PLAN OF LIQUIDATION

The following sections summarize the salient provisions of the Plan.  This summary refers to, and is qualified in its entirety by, reference to the Plan, a copy of which is attached hereto as Exhibit A.  THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN.

Parties are encouraged to review the Plan in its entirety for a full understanding of its provisions and its impact on Creditors and Interest Holders.

The Court has not yet confirmed the Plan described in this Disclosure Statement.  In other words, the terms of the Plan do not yet bind any person or entity.  **HOWEVER, IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND THE PLAN BECOMES EFFECTIVE, THE PLAN WILL BIND ALL CLAIM AND INTEREST HOLDERS**.

## A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and interest holders, or to conduct an orderly liquidation of its assets to maximize asset recoveries.  Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides

---

[3]    The Debtors reserve the right to establish at a later time a bar date requiring Interest Holders to file proofs of claim.  If such a bar date is established, Interest Holders will be notified of the bar date for filings proofs of claim at the appropriate time.

that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization or liquidation is the principal objective of a chapter 11 case. A plan generally sets forth the means for satisfying claims against and interests in the debtor. Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of, or holder of equity in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan.

After a plan of reorganization or liquidation has been filed in a chapter 11 case, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed decision whether to accept or reject the plan. The Debtors and the Committee are submitting this Disclosure Statement to Holders of Allowed Claims or Interests against each Debtor in order to satisfy the requirements of section 1125 of the Bankruptcy Code.

## B.      Plan Objectives

The primary objectives of the Plan are to: (i) maximize the value of the ultimate recovery to all Creditors and Interest Holders on a fair and equitable basis, compared to the value they would receive if the assets of the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (ii) settle, compromise or otherwise dispose of certain Claims and Interests on terms believed to be fair and reasonable in the best interests of the Debtors, the Debtors' Creditors and their Interest Holders. The Debtors and the Committee believe that through the Plan, Holders of Allowed Claims and Allowed Interests will obtain a recovery at least equal to, if not better, than any recovery they would receive if the assets of the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

## C.      Overall Structure of the Plan

The Plan provides for the treatment of Claims against the Debtors and Interests in the Debtors. As described in detail in Section VI.H of this Disclosure Statement, the Debtors sold substantially all of their assets pursuant to the Sale Order. Thus, the Plan provides for the wind-down of the Debtors' affairs and the Distribution of the Debtors' remaining assets. The Plan establishes, among other things, a Liquidating Trust that will, *inter alia*, prosecute certain Causes of Action, pursue any objections to Claims or Interests, execute the provisions governing Distributions to Holders of Allowed Claims or Allowed Interests, and facilitate the process for resolving Disputed Claims Filed against the Debtors.

The Plan Proponents believe that the Plan provides the best and most prompt possible recovery to Holders of Claims or Interests. Under the Plan, Claims against and Interests in the Debtors are divided into different Classes. Under the Bankruptcy Code, "claims" and "equity interests" are classified rather than "creditors" and "shareholders" because such entities may hold claims or equity interests in more than one class. For purposes of this Disclosure Statement, the

term "**Holder**" refers to the holder of a Claim or Interest, respectively, in a particular Class under the Plan. If the Plan is confirmed by the Bankruptcy Court and consummated, then on the Effective Date or within the time periods set forth in the Plan, the Debtors and/or the Liquidating Trustee to be appointed at the Confirmation Hearing, shall make Distributions in respect of certain Classes of Claims or Interests as provided for in the Plan. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and Distributions to be made under the Plan are described below.

## D.    Classification and Allowance of Claims and Interests Generally

Section 1123 of the Bankruptcy Code provides that, except for administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes. Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Plan creates several "Classes" of Claims and Interests. These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors. Administrative Expense Claims and Priority Tax Claims are not classified for purposes of voting or receiving Distributions under the Plan, but are treated separately as unclassified Claims.

A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

The Plan provides specific treatment for each Class of Claims and Interests. Only Holders of Allowed Claims and Allowed Interests are entitled to vote on and receive Distributions under the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

The categories of Claims and Interests and their treatment listed below classify Claims and Interests for all purposes, including voting, confirmation and Distribution pursuant to the Plan, except as otherwise provided herein or in the Plan, and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

## E.    Treatment of Unclassified Claims under the Plan

Unclassified Claims are Unimpaired by the Plan. The following are the unclassified Claims: Priority Tax Claims and Administrative Expense Claims.

### 1.    Administrative Expense Claims

Administrative Expense Claims are Claims for costs and expenses of administration of the Chapter 11 Cases Allowed under sections 503(b), 507(b) or, if applicable, 1114(e)(2) of the

Bankruptcy Code, including but not limited to: (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (including, but not limited to, wages, salaries, commissions for services and payments for inventories, leased equipment and premises) and Claims by Governmental Units for taxes (including Claims related to taxes which accrued after the Petition Date, but excluding Claims related to taxes which accrued on or before the Petition Date); (b) compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330, 331, 363 or 503(b) of the Bankruptcy Code to the extent incurred on or prior to the Effective Date; (c) all fees and charges assessed against the Debtors' Estates under section 1930, chapter 123 of title 28 of the United States Code; (d) any 503(b)(9) Claims and (e) any Claims that have been designated "Administrative Expense Claims" by order of this Court.

**Bar Date for Administrative Expense Claims.** Holders of Administrative Expense Claims, other than Administrative Expense Claims arising under section 503(b)(9) of the Bankruptcy Code, and Administrative Expense Claims arising pursuant to the allowance and payment of Professional Fee Claims, shall file with the Claims Agent and serve on the Liquidating Trustee requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, **so as to actually be received on or before the Administrative Expense Bar Date**. Any such Claim not filed by the Administrative Expense Bar Date shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Administrative Expense Bar Date and shall constitute notice of such Bar Date. The Liquidating Trustee shall have thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Expense Bar Date to review and object to such Administrative Expense Claims.

**Bar Date for Applications for Professional Fees.** Professional Fee Claims are Administrative Expense Claims and all applications for allowance and payment of Professional Fee Claims shall be Filed with the Bankruptcy Court on or before the Professional Fee Bar Date. If an application for a Professional Fee Claim is not Filed by the Professional Fee Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Professional Fee Bar Date and shall constitute notice of such Bar Date.

The Bankruptcy Code does not require that administrative expense claims be classified under a plan. It does require, however, that allowed administrative expense claims be paid in full in cash in order for a plan to be confirmed, unless the holder of such claim consents to different treatment.

Treatment: Within the time period provided in Article VII of the Plan, each Holder of an Allowed Administrative Expense Claim shall receive in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Expense Claim: (a) Cash equal to the amount of such Allowed Administrative Expense Claim; or (b) such other treatment as to

which the Debtors, in consultation with the Committee, or the Liquidating Trustee, as applicable, and the Holder of such Allowed Administrative Expense Claim shall have agreed upon in writing.

### 2. Priority Tax Claims

A Priority Tax Claims is a Claim or a portion of a Claim for which priority is asserted under section 507(a)(8) of the Bankruptcy Code.

The taxes entitled to priority are: (a) taxes on income or gross receipts that meet the requirements of section 507(a)(8)(A); (b) property taxes meeting the requirements of section 507(a)(8)(B); (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C); (d) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to section 507(a)(4), to the extent such taxes also meet the requirements of section 507(a)(8)(D); (e) excise taxes of the kind specified in section 507(a)(8)(E); (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F); and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G).

The Bankruptcy Code does not require that Priority Tax Claims be classified under a plan. It does require, however, that such claims receive the treatment described below in order for a plan to be confirmed unless the holder of such claims consents to different treatment.

Treatment: Within the time period provided in Article VII of the Plan, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim: (a) Cash equal to the amount of such Allowed Priority Tax Claim; or (b) such other treatment as to which the Debtors, in consultation with the Committee, or the Liquidating Trustee, as appropriate, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

### F. Treatment of Classified Claims and Interests under the Plan

The treatment of Claims against and Interests in the Debtors is set forth in detail in Article IV of the Plan. A summary of that treatment is provided below.

Unless the Holder of an Allowed Claim or Allowed Interest and the Debtors (in consultation with the Committee), or the Liquidating Trustee, as applicable, agree to a different treatment, each Holder of an Allowed Claim will receive the following Distributions in accordance with Article VII of the Plan:

### 1. Class 1: Priority Non-Tax Claims

Classification: Class 1 shall consist of Priority Non-Tax Claims against the Debtors. Class 1 Claims are Unimpaired by the Plan and the Holders of Allowed Class 1 Claims are deemed to accept the Plan and, therefore, are not entitled to vote on the Plan.

Treatment: Within the time period provided in Article VII of the Plan, each Holder of an Allowed Priority Non-Tax Claim shall receive in full and final satisfaction of such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Debtors, in consultation with counsel to the Committee, or the

Liquidating Trustee, as applicable, and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing.

Voting:  Not entitled to vote.  Deemed to accept the Plan.

### 2.      Class 2: Secured Claims

Classification:   Class 2 consists of the Allowed Secured Claims against the Debtors. Class 2 Claims are Unimpaired by the Plan and the Holders of Class 2 Claims are not entitled to vote on the Plan.

Treatment:  Within the time period provided in Article VII of the Plan, each Holder of an Allowed Class 2 Claim shall receive (A) one of the treatments specified in section 1124 of the Bankruptcy Code; or (B) such other treatment which the Debtors, in consultation with counsel to the Committee, or the Liquidating Trustee, as applicable, and the Holder of such Allowed Secured Claim have agreed upon in writing.

Voting:  Not entitled to vote.  Deemed to accept the Plan.

### 3.      Class 3: General Unsecured Claims

Classification:  Class 3 shall consist of all Allowed General Unsecured Claims.  Class 3 Claims are Impaired by the Plan and the Holders of Class 3 Claims are entitled to vote on the Plan.

Treatment:  Within the time period provided in Article VII of the Plan, each Holder of an Allowed General Unsecured Claim shall receive in full and final satisfaction of such Allowed Class 3 Claim its Pro Rata share of Liquidating Trust Assets remaining after payment in full in Cash of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, Allowed Unsecured Convenience Claims and any expenses of the Liquidating Trust.

Voting:  Entitled to vote.

### 4.      Class 4: Critical Trade Vendor Claims

Classification:  Class 4 shall consist of all Allowed Critical Trade Vendor Claims.  Class 4 Claims are Impaired by the Plan and the Holders of Class 4 Claims are entitled to vote on the Plan.

Treatment:  Within the time period provided in Article VII of the Plan, each Holder of an Allowed Critical Trade Vendor Claim shall receive in full and final satisfaction of such Allowed 4 Class Claim its Pro Rata share of Liquidating Trust Assets remaining after payment in full in Cash of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, Allowed Unsecured Convenience Claims and all expenses of the Liquidating Trust provided, however  a Holder of an Allowed Critical Vendor Claim shall not receive any Distribution under the Plan until the Holders of Allowed General Unsecured Claims have received a percentage recovery under the Plan, on account of their Allowed General Unsecured Claims, that equals the percentage recovery received by such

Holder of an Allowed Critical Vendor Claim, on account of its Allowed Critical Vendor Claim, from the Critical Trade Vendor Escrow.

Voting: Entitled to vote.

**5.      Class 5: Unsecured Convenience Claims**

Classification: Class 5 shall consist of all Allowed Unsecured Convenience Claims against the Debtors. Class 5 Claims are Impaired by the Plan and the Holders of Class 5 Claims are entitled to vote on the Plan.

Treatment: Within the time period provided in Article VII of the Plan, each Holder of an Allowed Unsecured Convenience Claim shall receive in full and final satisfaction of such Allowed Class 5 Claim a Distribution from the Liquidating Trust equal to Cash in the amount of fifty (50%) of their Allowed Unsecured Convenience Claim. In order to elect into Class 5, a Holder of a General Unsecured Claim in excess of $_____ may elect to reduce such Claim to $_____ on the ballot accepting or rejecting the Plan, no later than the Voting Deadline.

Voting: Entitled to vote.

**6.      Class 6: Intercompany Claims**

Classification: Class 6 shall consist of all Intercompany Claims. Because Holders of Class 6 Claims will receive no Distribution under the Plan, Holders of Class 6 Claims are deemed to reject the Plan, and, therefore, are not entitled to vote on the Plan. To the extent that the Debtors are not administratively consolidated in accordance with Article 6.2 of the Plan, Class 6 shall be deemed deleted and removed from the Plan and the Holders of Claims in Class 6 will be deemed Holders of Claims in Class 3.

Treatment: On the Effective Date, all Intercompany Claims shall be deemed canceled, extinguished and discharged and of no force or effect, and the Holders of Intercompany Claims shall not be entitled to receive or retain any property on account of such Intercompany Claims.

Voting: Not entitled to vote. Deemed to reject the Plan.

**7.      Class 7: Interests**

Classification: Class 7 shall consist of all Interests. Class 7 Interests are Impaired by the Plan and the Holders of Class 7 Interests are entitled to vote on the Plan.

Treatment: Within the time period provided in Article VII of the Plan, each Holder of an Allowed Interest shall receive in full and final satisfaction of such Allowed Class 7 Interest its Pro Rata share of Liquidating Trust Assets remaining after payment in full in Cash of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, Allowed Unsecured Convenience Claims, Allowed General Unsecured Claims, Allowed Critical Trade Vendor Claims and all expenses of the Liquidating Trust. The Holder of Allowed Interests shall be paid pursuant to the terms of any documents by and between the Debtors and such Holders, including without limitation, the corporate charter and any shareholder agreements.

CHI 60,771,838v2 2-18-11

Voting:  Entitled to vote.

## G. Miscellaneous Provisions

### 1. Reservation of Rights Regarding Claims

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

### 2. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Plan Proponents reserve the right to request Confirmation of the Plan, as it may be modified from time to time, pursuant to section 1129(b) of the Bankruptcy Code.  The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement or any schedule or exhibit, including amending or modifying as necessary to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

### 3. Controversy Concerning Impairment

If a controversy arises as to whether any Claim or Interest is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 4. Elimination of Vacant Classes

Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## H. Means of Implementing the Plan

### 1. Funding of Plan

The Plan will be funded by the Cash held by the Debtors as of the Effective Date, after making the necessary Distributions on the Effective Date and thereafter by the proceeds of the Liquidating Trust Assets.

### 2. Administrative Consolidation

Upon the Effective Date, the Debtors' Estates and all of the debts of all of the Debtors will be administratively consolidated for purposes of treatment of the Claims pursuant to Articles III and IV of the Plan, including for the purposes of voting, confirmation and Distribution of the Liquidating Trust Assets to Holders of Allowed Claims.  The effect of administratively consolidating the Debtors' Estates will include that (a) any Intercompany Claims are canceled and extinguished, (b) the Holders of Claims against multiple Debtors for the same debt will hold

only one Claim, and (c) the Interests of SH Liquidating in each of the other Debtors shall be deemed cancelled and extinguished.

The Plan Proponents believe that such consolidation would significantly add to the administrative convenience and lead to a more efficient implementation of and Distribution under the Plan, especially in light of the fact that, after the Sale of substantially all of the Debtors' assets, the proceeds from the Sale were not allocated among the Debtors and the Debtors have been administering these Chapter 11 Cases on a consolidated basis. Without an administrative consolidation as described above, there would be large Intercompany Claims due and owing to SSI Liquidating by the Debtors other than SSI Liquidating.

If the Bankruptcy Court determines that the Plan is confirmable except for Article 6.2 of the Plan, the Plan Proponents shall seek confirmation of the Plan without administrative consolidation so that (a) Distributions under the Plan shall be made to Holders of Allowed Claims against each Debtor separately from Distributions in the Chapter 11 Cases of the other Debtors, (ii) each of the Classes in the Plan shall be deemed to be a Class as to each of the Debtors, and (iii) the Intercompany Claims shall not be canceled, extinguished, or discharged, and instead shall be treated as Class 3 General Unsecured Claims under the Plan.

### 3. Liquidating Trust

(a) **Appointment of the Liquidating Trustee.** The Debtors and the Committee shall identify the proposed Liquidating Trustee in the Plan Supplement, who shall be mutually acceptable to the Debtors and the Committee, whose appointment shall be approved in the Confirmation Order and whose appointment shall be as of the Effective Date.

In accordance with the Liquidating Trust Agreement, the Liquidating Trustee shall serve in such capacity through the earlier of (i) the date the Liquidating Trust, the Disputed Administrative Priority Tax, Priority Non-Tax, and Secured Claims Reserve, the Disputed General Unsecured Claims Reserve and the Liquidating Trust Expense Reserve are dissolved in accordance with Article 7.8 of the Plan and (ii) the date such Liquidating Trustee resigns, is terminated or is otherwise unable to serve, <u>provided</u>, <u>however</u>, that, in the event that the Liquidating Trustee resigns, is terminated or is unable to serve, then the Court, upon the motion of any party-in-interest, shall approve a successor to serve as the Liquidating Trustee, and such successor Liquidating Trustee shall serve in such capacity until the Liquidating Trust is dissolved.

(b) **Establishment of a Liquidating Trust.** On the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall have established the Liquidating Trust pursuant to the Plan. In the event of any conflict between the terms of Article 6.3 of the Plan and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall control.

(c) **Liquidating Trust Assets.** Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidating Trust Assets become available, the Debtors shall be deemed to have automatically transferred to the Liquidating Trust all of their right, title and interest in and to all of the Liquidating Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the Liquidating Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the Liquidating Trust Beneficiaries as set forth in the Plan and the expenses of the Liquidating Trust as provided in the Liquidating Trust

Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

In connection with any Causes of Action that are included in the Liquidating Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications thereto (whether written or oral) shall also exist for the benefit of the Liquidating Trust and shall vest in the Liquidating Trustee and its representatives, and shall also be preserved for and as to the Debtors. The Liquidating Trustee is authorized to take all necessary actions to benefit from such privileges.

**(d)   Treatment of Liquidating Trust for Federal Income Tax Purposes; No Successor in-Interest**. The Liquidating Trust shall be established for the primary purpose of liquidating its assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, including the Causes of Action, make timely Distributions to the Liquidating Trust Beneficiaries and not unduly prolong its duration. The Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.

The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets by the Debtors to the Liquidating Trust, as set forth in the Liquidating Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims or Interests of Liquidating Trust Beneficiaries entitled to Distributions from the Liquidating Trust Assets, followed by a transfer by such Holders to the Liquidating Trust. Thus, the Liquidating Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

As soon as reasonably practicable after the Effective Date, the Liquidating Trustee (to the extent that the Liquidating Trustee deems it necessary or appropriate in his or her sole discretion) shall value the Liquidating Trust Assets based on the good faith determination of the value of such Liquidating Trust Assets. The valuation shall be used consistently by all parties (including the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidating Trust Assets.

The right and power of the Liquidating Trustee to invest the Liquidating Trust Assets transferred to the Liquidating Trust, the proceeds thereof, or any income earned by the Liquidating Trust, shall be limited to the right and power to invest such Liquidating Trust Assets (pending Distributions in accordance with the Plan) in Permissible Investments; provided, however, that the scope of any such Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS

guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

(e) **Responsibilities of Liquidating Trustee; Litigation.** The responsibilities of the Liquidating Trustee shall include, but shall not be limited to:

1.   the making of Distributions as contemplated herein;

2.   establishing and maintaining the Disputed Administrative, Priority Tax, Priority Non-Tax and Secured Claims Reserve, the Disputed General Unsecured Claims Reserve and the Liquidating Trust Expense Reserve in accordance with the terms of the Plan;

3.   conducting an analysis of Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Secured Claims and prosecuting objections thereto or settling or otherwise compromising such Claims if necessary and appropriate in accordance with Articles 8.1 and 11.4 of the Plan;

4.   conducting an analysis of the General Unsecured Claims and prosecuting objections thereto or settling or otherwise compromising such Claims if necessary and appropriate in accordance with Articles 8.1 and 11.4 of the Plan;

5.   filing appropriate tax returns in the exercise of its fiduciary obligations;

6.   retaining such professionals as are necessary and appropriate in furtherance of its fiduciary obligations; and

7.   taking such actions as are necessary and reasonable to carry out the purposes of the Liquidating Trust.

(f) **Expenses of Liquidating Trustee.** Fees and expenses incurred by the Liquidating Trustee shall be paid from the Liquidating Trust Expense Reserve in accordance with Article VII of the Plan.

(g) **Bonding of Liquidating Trustee.** The Liquidating Trustee shall not be obligated to obtain a bond but may do so, in his or her sole discretion, in which case the expense incurred by such bonding shall be paid by the Liquidating Trust.

(h) **Fiduciary Duties of the Liquidating Trustee.** Pursuant to the Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders all Claims that will receive Distributions pursuant to the terms of the Plan.

(i) **Dissolution of the Liquidating Trust.** The Liquidating Trust shall be dissolved no later than three (3) years from the Effective Date unless the Bankruptcy Court, upon a motion Filed prior to the third anniversary or the end of any extension period approved by the Bankruptcy Court (the Filing of which shall automatically extend the term of the Liquidating

-37-

Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets. After (a) the final Distribution of the Liquidating Trust Expense Reserve pursuant to the Plan, and (b) the Filing by or on behalf of the Liquidating Trust of a certification of dissolution with the Bankruptcy Court in accordance with the Plan, the Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

**(j)** **Liability, Indemnification of the Liquidating Trust Protected Parties.** The Liquidating Trust Protected Parties shall not be liable for any act or omission of any other member, designee, agent, or representative of such Liquidating Trust Protected Parties, nor shall such Liquidating Trust Protected Parties be liable for any act or omission taken or not taken in his or her capacity as a Liquidating Trust Protected Party other than for specific acts or omissions resulting from such Liquidating Trust Protected Parties' willful misconduct, gross negligence or fraud. The Liquidating Trustee may, in connection with the performance of his or her functions, and in his or her sole and absolute discretion, consult with his or her attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such entities, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, the Liquidating Trustee shall not be under any obligation to consult with its attorneys, accountants, financial advisors and agents, and his or her determination not to do so shall not result in the imposition of liability on the Liquidating Trustee or the Liquidating Trust Protected Parties, unless such determination is based on willful misconduct, gross negligence or fraud. The Liquidating Trust shall indemnify and hold harmless the Liquidating Trust Protected Parties from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses (including, without limitation, reasonable attorney's fees, disbursements and related expenses), which such Entities may incur or to which such Entities may become subject to in connection with any action, suit, proceeding, or investigation brought by or threatened against such Entities arising out of or due to their acts or omissions or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidating Trust or the Plan or the discharge of their duties under the Plan; provided, however, that no such indemnification will made to such Entities for actions or omissions as a result of their willful misconduct, gross negligence, or fraud.

**(k)** **Full and Final Satisfaction against Liquidating Trust.** On and after the Effective Date, the Liquidating Trust shall have no liability on account of any Claims or Interests except as set forth in the Plan and in the Liquidating Trust Agreement. All payments and all Distributions made by the Liquidating Trustee under the Plan shall be in full and final satisfaction, settlement and release of all Claims against the Liquidating Trust; provided, however, that nothing contained in the Plan shall be deemed to constitute or shall result in a discharge of any Debtor under section 1141(d) of the Bankruptcy Code.

CHI 60,771,838v2 2-18-11

### 4. Cancellation of Instruments and Stock

On the Effective Date, all instruments evidencing or creating any indebtedness or obligation of the Debtors, except such instruments that are authorized, or issued under the Plan, shall be canceled and extinguished. Additionally, as of the Effective Date, all Interests, and any and all warrants, options, rights or interests with respect to Interests that have been issued, could be issued, or that have been authorized to be issued but that have not been issued, shall be deemed canceled and extinguished without any further action of any party. The Holders of or parties to the canceled notes, share certificates and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.

### 5. Operating Reports

Prior to the Effective Date, the Debtors shall timely File all reports, including without limitation, monthly operating reports required by the Bankruptcy Court, Bankruptcy Code, Bankruptcy Rules or the Office of the United States Trustee. On and after the Effective Date, the Liquidating Trustee shall timely File all reports, including without limitation, quarterly operating reports as required by the Bankruptcy Court, Bankruptcy Code, Bankruptcy Rules, or Office of the United States Trustee until entry of an order closing or converting the Chapter 11 Cases.

### 6. Post-Confirmation Professional Fees and Expenses

Professionals that perform post-Effective Date services for the Liquidating Trustee shall provide monthly invoices to the Liquidating Trustee describing the services rendered, and the fees and expenses incurred in connection therewith, on or before the 20th day following the end of the calendar month during which such services were performed. Such post-Effective Date professionals of the Liquidating Trustee who timely tender such invoices shall be paid by the Liquidating Trustee for such services, subject to Article VII of the Plan, not less than ten (10) days after the submission to the Liquidating Trustee by such professionals of said monthly invoices, unless, within said ten (10) day period, a written objection to said payment is made by the Liquidating Trustee. To the extent a written objection to such professional's monthly invoice cannot be resolved by the professional and the Liquidating Trustee, payment of such invoice shall be made only upon Final Order of the Bankruptcy Court.

### 7. Disposition of Books and Records

After the Effective Date, the Debtors shall transfer all of the Debtors' books and records in their possession, if any, relating to the conduct of the Debtors' business prior to the Effective Date to the Liquidating Trustee. From and after the Effective Date, the Liquidating Trustee shall continue to preserve and maintain all documents and electronic data transferred to the Liquidating Trustee by the Debtors and the Liquidating Trustee shall not destroy or otherwise abandon any such documents and records (in electronic or paper format) absent further order of the Court after a hearing upon 30 days notice to parties-in-interest.

### 8. Corporate Action

On the Effective Date, all matters expressly provided for under the Plan that would otherwise require approval of the shareholders or directors of one or more of the Debtors, including but not limited to, the dissolution or merger of any of the Debtors, shall be deemed to

-39-

have occurred and shall be in effect upon the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors are incorporated without any requirement of action by the shareholders or directors of the Debtors. On the Effective Date, the Debtors shall be deemed dissolved for all purposes without the necessity for other or further actions to be taken by or on behalf of the Debtors; provided that in the sole discretion of the Liquidating Trustee, the Liquidating Trustee, on behalf of the Debtors, may (but shall not be required to) file a certificate of dissolution with the Office of the Secretary of State for the applicable state.

## I. Reserves and Distributions

### 1. Establishment of Reserves

**(a)** On the Effective Date of the Plan and prior to making any Distributions, the Liquidating Trustee shall establish the Disputed Administrative, Priority Tax, Priority Non-Tax, and Secured Claims Reserve and shall transfer thereto the amount of Cash as deemed necessary by the Liquidating Trustee to fund the Disputed Administrative, Priority Tax, Priority Non-Tax, and Secured Claims Reserve.

**(b)** On the Effective Date of the Plan and prior to making any Distributions, the Liquidating Trustee shall establish the Liquidating Trust Expense Reserve, and shall transfer thereto the amount of Cash as deemed necessary by the Liquidating Trustee to fund the expenses of the Liquidating Trust.

**(c)** As soon as reasonably practicable, but not to exceed thirty (30) days after the Effective Date, the Liquidating Trustee shall establish the Disputed General Unsecured Claims Reserve and shall transfer thereto the amount of Cash necessary to fund the Disputed General Unsecured Claims Reserve.

**(d)** With respect to the Disputed Administrative, Priority Tax, Priority Non-Tax and Secured Claims Reserve and the Disputed General Unsecured Claims Reserve, the amount of Cash deposited into each of the foregoing reserves shall be equal to the percentage of Cash that Holders of Disputed Claims in each reserve would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as authorized by a Final Order. With respect to the Liquidating Trust Expense Reserve, the amount of Cash deposited into such reserve shall be equal to the amount of Cash necessary to fund the expenses expected to be incurred by the Liquidating Trust. For the purposes of effectuating the provisions of Article VII of the Plan and the Distributions to Holders of Allowed Claims, the Liquidating Trustee may, at any time and regardless of whether an objection to a Disputed Claim has been brought, request that the Bankruptcy Court estimate, set, fix or liquidate the amount of such Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so estimated, fixed or liquidated shall be deemed the Allowed amounts of such Claims for purposes of Distribution under the Plan and establishment of the necessary reserve. In lieu of estimating, fixing or liquidating the amount of any Disputed General Unsecured Claim, the Bankruptcy Court may determine the amount to be reserved for such Disputed General Unsecured Claim (singularly or in the aggregate), or such amount may be fixed by an agreement in writing by and between the Liquidating Trustee and the Holder of such Disputed General Unsecured Claim.

**(e)** Notwithstanding the foregoing, nothing in the Plan or the Confirmation Order, or any related document, agreement, instrument or order shall prohibit the Liquidating Trustee from using Liquidating Trust Assets and other reserve amounts to fund Liquidating Trust Expenses. The Liquidating Trustee may File a motion to extend any deadlines for the making of Distributions or reserves under the Plan prior to the occurrence of any such deadlines, to the extent necessary, which deadlines shall be deemed automatically extended after the Filing of such motion, and pending the entry of an order by the Bankruptcy Court extending any such deadline.

### 2. Disbursing Agent

The Liquidating Trustee may employ or contract with other Persons or Entities to assist in or make the Distributions required by the Plan.

### 3. Distributions by Liquidating Trustee

Within the time periods provided in Article 7.8 of the Plan, the Liquidating Trustee shall make periodic and final Distributions of the Liquidating Trust Assets on hand and the Permitted Investments, except such amounts as are necessary to maintain the Liquidating Trust Expense Reserve, the Disputed Administrative, Priority Tax, Priority Non-Tax, and Secured Claims Reserve, and the Disputed General Unsecured Claims Reserve, in accordance with the terms of the Plan. The Liquidating Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Liquidating Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

The Liquidating Trustee shall require any Liquidating Trust Beneficiary or other distributee to furnish to the Liquidating Trustee in writing his or its Employer Identification Number or Taxpayer Identification Number as assigned by the Internal Revenue Service and the Liquidating Trustee may condition any Distribution to any Liquidating Trust Beneficiary or other distributee upon receipt of such identification number.

### 4. Waterfall

The Liquidating Trustee shall cause the proceeds of the Liquidating Trust Assets to be distributed to Holders of Allowed Claims and Interests as follows (to the extent that such Claims and Interests have not been paid on or prior to the Effective Date):

(a)     first, to pay all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims;

(b)     second, to pay all expenses of administering the Liquidating Trust;

(c)     third, to pay all Allowed Unsecured Convenience Claims;

(d)     fourth, to pay all Allowed General Unsecured Claims; and

(e)     fifth, to pay all Allowed Interests.

### 5. Distributions on Account of the Allowed Windjammer Subordinated Note Claim

Distributions on account of the Allowed Windjammer Subordinated Note Claim shall be as follows:

(a)     The Distributions on account of the Allowed Windjammer Subordinated Note Claim from the Liquidating Trust Assets that are not proceeds of Excluded Assets shall be disbursed as follows (i) the first to $200,0000 to Purchaser and (ii) the balance shall be distributed Pro Rata to Trade Creditors on account of their Allowed General Unsecured Claims, and

(b)     The Distributions on account of the Allowed Windjammer Subordinated Note Claim from the Liquidating Trust Assets that are proceeds of Excluded Assets shall be disbursed as follows:  (i) the first $2 million shall be distributed 50% to Windjammer and 50% to the Holders of Allowed Trade Claims, to be distributed on a Pro Rata basis on account of their Allowed General Unsecured Trade Claims; (ii) the next $1 million shall be distributed to Windjammer; and (iii) any additional amounts shall be distributed 50% to Windjammer and 50% to the Holders of Allowed Trade Claims, to be distributed on a Pro Rata basis on account of the Allowed General Unsecured Trade Claims.

### 6.     Distributions on Account of Allowed Critical Trade Vendor Claims

A Holder of an Allowed Critical Vendor Claim shall not receive any Distribution under the Plan until the Holders of Allowed General Unsecured Claims have received a percentage recovery under the Plan, on account of their Allowed General Unsecured Claims, that equals the percentage recovery received by such Holder of an Allowed Critical Vendor Claim, on account of its Allowed Critical Vendor Claim, from the Critical Trade Vendor Escrow.

### 7.     Distributions on Account of Allowed General Unsecured Claims of ZHUHAI PUTO Commerce and Trading Company Limited and Manufacturing Solutions Co., LTD.

Distributions on Account of Allowed General Unsecured Claims of ZHUHAI PUTO Commerce and Trading Company Limited and Manufacturing Solutions Co., LTD shall be made in accordance with the Order on Petitioner/Father's Emergency Petition For Immediate Modification of Custody of Minor Child and For Freezing of Assets entered in the State of Indiana, County of Lake, In re the Marriage of Jackie D. Jent, II, Petitioner/Father and Yan Wu, Respondent/Mother, Cause No. 45D03-810-DR-1120.

### 8.     Timing of Distributions

(a)     The Debtors shall pay each Allowed Administrative Expense Claim, Allowed Priority Non-Tax Claim and Allowed Secured Claim on the later of:

1.  the Effective Date of the Plan,

2.  the date on which such Claim becomes an Allowed Claim by Final Order,

3.  the date on which, in the ordinary course of business, such Allowed Claim becomes due, or

4.  such other date as may be agreed upon by the Debtors, in consultation with the Committee, or the Liquidating Trustee, as applicable, and the Holder of such Allowed Claim.

-42-

**(b)** The Debtors shall pay each Allowed Priority Tax Claim on the later of:

    1. the Effective Date of the Plan,

    2. the date on which such Claim becomes an Allowed Claim by Final Order,

    3. the date on which, in the ordinary course of business, such Allowed Claim becomes due, or

    4. on such other date as may be agreed upon by the Debtors, in consultation with the Committee, or the Liquidating Trustee, as applicable, and the Holder of such Allowed Claim.

**(c)** As soon as reasonably practicable, but not to exceed sixty (60) days after the establishment of the Liquidating Trust Expense Reserve, the Disputed Administrative, Priority Tax, Priority Non-Tax and Secured Claims Reserve, and the Disputed General Unsecured Claims Reserve, the Liquidating Trustee shall make an initial Distribution of the available Cash component of the Liquidating Trust Assets in accordance with the provisions of the Plan and the Confirmation Order, to the extent practicable in the sole discretion of the Liquidating Trustee, to the Holders of Allowed General Unsecured Claims, Allowed Unsecured Convenience Claims and Allowed Interests to the extent of available Cash. The Liquidating Trustee shall make periodic Distributions thereafter to Holders of Allowed General Unsecured Claims and Allowed Unsecured Convenience Claims, as appropriate, in his or her discretion.

**(d)** Any Cash remaining in the Disputed Administrative, Priority Tax, Priority Non-Tax and Secured Claims Reserve, the Disputed General Unsecured Claims Reserve, and the Liquidating Trust Expense Reserve, after all Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, Disputed Secured Claims, and Disputed General Unsecured Claims have been resolved and the costs and expenses of the Liquidating Trust have been fully paid, shall be available for Distributions in accordance with the Plan. Once all Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims and Disputed Secured Claims have been resolved, the Disputed Administrative, Priority Tax, Priority Non-Tax and Secured Claims Reserve shall be dissolved. Once the Disputed General Unsecured Claims have been resolved, the Disputed General Unsecured Claims Reserve shall be dissolved. Once all costs and expenses of the Liquidating Trust have been paid in full in Cash and the Liquidating Trust has been dissolved, the Liquidating Trust Expense Reserve shall be dissolved.

**(e)** If there are any residual Unclaimed Distributions at the time of the dissolution of the Liquidating Trust, such residual Unclaimed Distributions shall be donated to the ABI Endowment Fund, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.

**9.** **Distributions upon Allowance of Disputed General Unsecured Claims**

The Holder of a Disputed General Unsecured Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive a Distribution from the Disputed General Unsecured Claims Reserve as soon as reasonably practicable following the date on which such

-43-

Disputed General Unsecured Claim becomes an Allowed Claim pursuant to a Final Order or by agreement of the parties in accordance with Article VII of the Plan. Such Distributions shall be made in accordance with the Plan based upon the Distributions that would have been made to such Holder under the Plan if the Disputed General Unsecured Claim had been an Allowed Claim on or prior to the Effective Date. No Holder of a Disputed General Unsecured Claim shall have any Claim against the Disputed General Unsecured Claims Reserve, the Liquidating Trustee, the Liquidating Trust or the Debtors or the Estates with respect to such Claim until such Disputed General Unsecured Claim becomes an Allowed Claim, and no Holder of a Disputed General Unsecured Claim shall have any right to interest, dividends or other Distributions on such Disputed General Unsecured Claim except as provided in the Plan.

## 10. Undeliverable and Unclaimed Distributions

### (a) Holding Undeliverable and Unclaimed Distributions.

If the Distribution to any Holder of an Allowed Claim is returned to the Liquidating Trustee as undeliverable or is otherwise unclaimed, no additional Distributions shall be made to such Holder unless and until the Liquidating Trustee is notified in writing of such Holder's then current address. Nothing contained in the Plan shall require the Debtors or the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim.

### (b) After Distributions Become Deliverable.

To the extent that a Distribution has become deliverable or has been claimed on or after the Distribution Date, the Liquidating Trustee shall make such Distribution as soon as reasonably practicable after such Distribution has become deliverable or has been claimed.

### (c) Failure to Claim Unclaimed/Undeliverable Distributions.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable or unclaimed Distribution within six (6) months after the Distribution Date shall be deemed to have forfeited its right to such undeliverable or unclaimed Distribution and any subsequent Distribution on account of its Allowed Claim and shall be forever barred and enjoined from asserting any such Claim for an undeliverable or unclaimed Distribution or any subsequent Distribution on account of its Allowed Claim against the Debtors, their Estates, the Liquidating Trust or their property. In such cases, Unclaimed Distributions shall be paid to Holders of Allowed Claims on a Pro Rata basis according to the parameters set forth in Article IV of the Plan within the time periods provided in Article 7.8 of the Plan, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.

## 11. Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

CHI 60,771,838v2 2-18-11

## 12. No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary in the Plan or in the Disclosure Statement, no Holder of an Allowed Claim will receive, in respect of such Claim, Distributions under the Plan in excess of the Allowed amount of such Claim.

## 13. Means of Cash Payment

Cash payments made pursuant to the Plan shall be in U.S. funds, by the means, including by check or wire transfer, determined by the Disbursing Agent.

## 14. Delivery of Distributions

Except as otherwise set forth in the Plan, Distributions to Holders of Allowed Claims shall be made (a) at the addresses set forth on the Proofs of Claim Filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is Filed or if the Disbursing Agent has been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent, or (c) if no Proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address, at the addresses reflected in the Schedules, if any.

## 15. Record Date for Distributions

The Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes in the Plan to recognize and distribute only to those Holders of Allowed Claims that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

## 16. No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payments or Distributions by the Disbursing Agent shall be made with respect to all or any portion of a Disputed Claim unless and until all Objections to such Disputed Claim have been settled or withdrawn by agreement of the parties or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim; provided however, that the Debtors, with the consent of the Committee, or the Liquidating Trustee, may in their discretion, pay any undisputed portion of a Disputed Claim.

## 17. Withholding and Reporting Requirements

In connection with the Plan and all Distributions under the Plan, the Disbursing Agent shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding and reporting requirements. The Disbursing Agent shall be authorized to take any and all actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements. Each Holder of an Allowed Claim or Allowed Interest shall be required to provide any information necessary to effect information

-45-

reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim or Allowed Interest that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.

### 18. Setoffs

The Debtors or the Liquidating Trustee, as applicable, may, but shall not be required to, setoff against any Claim or Interest and the payment or other Distribution to be made pursuant to the Plan in respect of such Claim or Interest, claims of any nature whatsoever that a Debtor may have against the Holder of such Claim or Interest; provided, however, neither the failure to do so nor the allowance of any Claim or Interest under the Plan shall constitute a waiver or release by the Disbursing Agent of any such claim that the Disbursing Agent may have against such Holder, unless otherwise agreed to in writing by such Holder and the Debtors or the Liquidating Trustee, as applicable.

### 19. *De Minimis* Distributions

Notwithstanding any provision in the Plan to the contrary, no payment of less than twenty-five dollars ($25.00) shall be made on account of any Allowed Claim. All Distributions not made pursuant to Article 7.19 of the Plan shall be treated as Unclaimed Distributions and are subject to Article 7.10 of the Plan.

### J. Claims Objections and Estimation of Claims

### 1. Claims Objection Deadline; Prosecution of Claims Objections

Except as otherwise provided for in the Plan, as soon as reasonably practicable after the Effective Date, but in no event later than the Claims Objection Deadline (unless extended, after notice to those Creditors who requested notice in accordance with Bankruptcy Rule 2002, by an Order of the Bankruptcy Court), the Liquidating Trustee shall File Objections to Claims and serve such objections upon the Holders of each of the Claims to which Objections are made. The Liquidating Trustee shall be authorized to resolve all Disputed Claims by withdrawing or settling such Objections thereto, or by litigating to judgment in the Bankruptcy Court, or such other court having competent jurisdiction, the validity, nature, and/or amount thereof. If the Liquidating Trustee agrees with the Holder of a Disputed Claim to compromise, settle, and/or resolve a Disputed Claim by granting such Holder an Allowed Claim in the amount of $100,000 or less, then the Liquidating Trustee may compromise, settle, and/or resolve such Disputed Claim without Bankruptcy Court approval. Otherwise, the Liquidating Trustee may only compromise, settle, and/or resolve such Disputed Claim with Bankruptcy Court approval.

### 2. Estimation of Claims

The Disbursing Agent may, at any time, request that the Bankruptcy Court estimate any Contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors, the Committee or the Liquidating Trustee previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation or a hearing

concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any Contingent or unliquidated Claim, the amount so estimated shall constitute the maximum allowed amount of such Claim. If the estimated amount constitutes the maximum allowed amount of such Claim, the Debtors or the Liquidating Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## VI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Executory Contracts and Unexpired Leases Deemed Rejected

On the Effective Date, all of the Debtors' Executory Contracts and unexpired leases will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except to the extent: (a) the Debtors previously have assumed, assumed and assigned or rejected such Executory Contract or unexpired lease, or (b) prior to the Effective Date, the Debtors have Filed a motion to assume, assume and assign, or reject an Executory Contract or unexpired lease on which the Bankruptcy Court has not ruled. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts and unexpired leases pursuant to Article 9.1 of the Plan and sections 365(a) and 1123 of the Bankruptcy Code.

### B. Bar Date for Rejection Damages

If the rejection by the Debtors of an Executory Contract or an unexpired lease results in damages to the other party or parties to such Executory Contract or unexpired lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or their properties or agents, successors, or assigns, unless a Proof of Claim is filed with the Claims Agent **so as to actually be received on or before** the Rejection Bar Date.

## VII. CONFIRMATION AND CONSUMMATION OF THE PLAN

### A. Conditions Precedent to the Effective Date

Each of the following is a condition precedent to the occurrence of the Effective Date:

**(a)** the Confirmation Order, in a form and substance reasonably acceptable to the Debtors and the Committee, shall have been entered by the Bankruptcy Court;

**(b)** all documents, instruments, and agreements provided under, or necessary to implement, the Plan shall have been executed and delivered by the applicable parties and shall be in a form and substance reasonably acceptable to the Debtors and the Committee; and

**(c)** the Debtors and the Liquidating Trustee shall have executed the Liquidating Trust Agreement and shall have established the Liquidating Trust pursuant to Article 6.3 of the Plan and shall be in a form and substance reasonably acceptable to the Debtors and the Committee.

## B. Notice of Effective Date

On or before five (5) Business Days after the Effective Date, the Liquidating Trustee shall mail or cause to be mailed to all Holders of Claims or Interests and cause to be published in the Wall Street Journal National Edition a notice that informs such Persons of (a) the entry of the Confirmation Order, (b) the occurrence of the Effective Date, (c) notice of the Administrative Expense Bar Date, Professional Fee Bar Date and Rejection Bar Date; and (d) such other matters as the Debtors deem appropriate or as may be ordered by the Bankruptcy Court.

## C. Waiver of Conditions Precedent to the Effective Date

The Debtors, subject to consent of the Committee, which consent shall not be unreasonably withheld, may at any time, without notice or authorization of the Bankruptcy Court, waive in writing any or all of the conditions precedent to the Effective Date set forth in Article 10.1 of the Plan, whereupon the Effective Date shall occur without further action by any Person, provided, however, that the condition specified in Article 10.1(a) of the Plan may not be waived. The Plan Proponents reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date of the Plan.

## D. Effect of Non-Occurrence of Effective Date

If each of the conditions specified in Article 10.1 of the Plan have not been satisfied or waived in the manner provided in Article 10.3 of the Plan within thirty (30) calendar days after the Confirmation Date (as such date may be agreed to by the Debtors and the Committee), then: (i) the Confirmation Order shall be vacated and of no further force or effect; (ii) no Distributions under the Plan shall be made; (iii) the Debtors and all Holders of Claims and Interests in the Debtors shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to Claims and Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, and the Plan shall be deemed withdrawn. Upon such occurrence, the Debtors shall File a written notification with the Bankruptcy Court and serve it upon such parties as the Bankruptcy Court may direct.

## VIII. EFFECTS OF CONFIRMATION OF THE PLAN

### A. Exculpation and Releases

#### 1. Exculpation and Limitation of Liability

Notwithstanding any other provision of the Plan, the Released Parties shall not have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or Affiliates, or any of their successors or assigns, for any act or omission relating to, in any way, or arising from (i) these Chapter 11 Cases, (ii) formulating, negotiating or implementing the Plan (including the Disclosure Statement), any contract, instrument, release or other agreement or document created or entered into in connection with the Plan; (iii) any other post-petition act taken or omitted to be

taken in connection with or in contemplation of the restructuring or liquidation of the Debtors; (iv) the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or (v) the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct as determined by a Final Order, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.

## 2. Releases by the Debtors

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors, on their own behalf and as a representative of their respective Estate, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Release Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, their respective assets, property and Estates or the Chapter 11 Cases, that may be asserted by or on behalf of any of the Debtors or their respective Estates, against any of the Released Parties; provided, however, that nothing in Article 11.1 of the Plan shall be construed to release any Released Party from willful misconduct or gross negligence as determined by a Final Order.

## 3. Releases by Holders of Claims and Interests

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest, or other right of a Holder of an equity security or other ownership Interest that is terminated, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally each and all of the Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether liquidated or unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors or their respective assets, property and Estates, the Chapter 11 Cases or the Plan or the Disclosure Statement; provided, however, that each Person that has submitted a ballot may elect, by checking the appropriate box on its ballot, not to grant the releases set forth in Article 11.1(c) of the Plan with respect to the Released Parties and their respective successors and assigns (whether by operation

-49-

of law or otherwise); and provided, further, however, that nothing in Article 11.1(c) of the Plan shall be construed to release any party from willful misconduct or gross negligence as determined by a Final Order. Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims will be deemed to be bound to the releases in Article 11.1(c) of the Plan.

### 4. Exceptions to Releases

Notwithstanding the releases set forth in Articles 11.1(a), (b) and (c) of the Plan, the following Claims and Causes of Action are expressly excepted from such releases:

**(a) any and all claims relating to or arising from the Circle System Matters, provided that the Debtors and the Liquidating Trustee shall have no right to pursue, and hereby expressly waive their right to pursue, Gridiron Capital, LLC, Windjammer or their respective current and former officers, directors, shareholders, Affiliates, employees, legal counsel, accountants, other professionals, agents and representatives of any kind, predecessors-in-interest, successors, assigns, for any matters relating to or arising from the Circle System Matters; and**

**(b) any and all Non-Trade Avoidance Actions, provided that the Debtors and the Liquidating Trustee are expressly releasing Riddell, Inc., Gridiron Capital, LLC, Windjammer and the Purchaser from any such Non-Trade Avoidance Actions.**

### 5. Injunction Related to Exculpation and Releases

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, causes of action or liability of any nature whatsoever, relating to any of the Debtors or any of their respective assets, property and Estates, that is released or enjoined pursuant to Article XI of the Plan and (ii) all other parties in interest in these Chapter 11 Cases are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property on account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities:

**(a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum;**

**(b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order;**

**(c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any lien;**

(d)     setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Article 11.1 of the Plan; and

(e)     commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

B.     Injunction

Except as expressly contemplated by the Plan or the Confirmation Order, from and after the Effective Date, all Persons or Entities who have held, currently hold or may hold Claims against or Interests in the Debtors or their Estates that arose prior to the Effective Date (including, but not limited to, Governmental Units, and any official, employee or other entity acting in an individual or official capacity on behalf of any Governmental Unit) are permanently enjoined from:

(a)     commencing or continuing in any manner, directly, or indirectly, any action or other proceeding against the Debtors, the Estates or the Liquidating Trust Protected Parties;

(b)     enforcing, attaching, executing, collecting or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against the Debtors, the Estates or the Liquidating Trust Protected Parties;

(c)     creating, perfecting, or enforcing, directly or indirectly, any lien or encumbrance of any kind against the Debtors, the Estates or the Liquidating Trust Protected Parties;

(d)     asserting or effecting, directly or indirectly, any setoff or right of subrogation of any kind against any obligation due to the Debtors, the Estates or the Liquidating Trust Protected Parties; and

(e)     any act, in any manner, in any place whatsoever, that does not conform to, comply with, or is inconsistent with the provisions of the Plan in respect of the Debtors, the Estates or the Liquidating Trust Protected Parties.

Any Entity injured by any willful violation of such injunction shall recover actual damages, including, but not limited to, costs and attorneys' fees and expenses, and, in appropriate circumstances, may recover punitive damages from the willful violator.  Nothing contained in Article XI of the Plan shall prohibit the Holder of a Disputed Claim from litigating its right to seek to have such a Disputed Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan or the Liquidating Trust Agreement, or enjoin or prohibit the enforcement by the Holder of such Disputed Claim of any of the obligations of any Liquidating Trust Protected Party under the Plan.

## C.	Term of Bankruptcy Injunction or Stays

Pursuant to Article 11.3 of the Plan, all injunctions or stays provided for in these Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## D.	Vesting Provision

Any and all Liquidating Trust Assets accruing to the Debtors or assertable as accruing to the Debtors shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall be transferred to and vest in the Liquidating Trust. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidating Trust and the Liquidating Trustee shall have the right to pursue or not to pursue, or, subject to the terms of the Plan and the Liquidating Trust Agreement or compromise or settle any Liquidating Trust Assets. From and after the Effective Date, the Liquidating Trust and the Liquidating Trustee may commence, litigate and settle any Causes of Action, Claims or Causes of Action relating to the Liquidating Trust Assets or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Liquidating Trust and Liquidating Trustee after the Effective Date, except as otherwise expressly provided in the Plan and the Liquidating Trust Agreement. Other than as set forth herein, no other Person may pursue such Liquidating Trust Assets after the Effective Date. The Liquidating Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for either the Committee or each Debtor in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Liquidating Trust Asset without the need for Filing any motion for such relief.

## IX.	MISCELLANEOUS PLAN PROVISIONS

## A.	Retention of Jurisdiction

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, these Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

> **(a)**	allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether filed before or after the Effective Date and whether or not Contingent, Disputed or unliquidated or for contribution, indemnification or reimbursement), including the compromise, settlement and resolution of any request for payment of any Claims, the resolution of any Objections to the allowance or priority of Claims or Interests and to hear and determine any other issue presented by the Plan or arising under the Plan, including during the pendency of any appeal relating to any Objection to such Claim or Interest to the extent permitted under applicable law;

> **(b)**	grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

**(c)** hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, and consider and act upon the compromise and settlement of any Claim, or Cause of Action;

**(d)** determine and resolve controversies related to the Liquidating Trust;

**(e)** determine and resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or unexpired lease to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising there from;

**(f)** ensure that all Distributions to Holders of Allowed Claims under the Plan and the performance of the provisions of the Plan are accomplished as provided in the Plan and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

**(g)** construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and Consummation of the Plan and all contracts, instruments, releases, other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan in accordance with sections 524 and 1141 of the Bankruptcy Code following the occurrence of the Effective Date;

**(h)** determine and resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation, implementation or enforcement of the Plan (and all exhibits and schedules to the Plan) or the Confirmation Order, including the releases and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

**(i)** modify the Plan, the Disclosure Statement, and/or the Confirmation Order before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, as well as any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

**(j)** issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity

with Consummation, implementation or enforcement of the Plan or the Confirmation Order;

**(k)** enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

**(l)** determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

**(m)** determine such other matters and for such other purposes as may be provided in the Confirmation Order;

**(n)** hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

**(o)** enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with these Chapter 11 Cases;

**(p)** determine and resolve controversies related to the Estates, the Debtors or the Liquidating Trust from and after the Effective Date;

**(q)** hear and determine any other matter relating to the Plan; and

**(r)** enter a final decree closing these Chapter 11 Cases.

## B.    Modification of the Plan

The Debtors and the Committee may alter, amend, or modify the Plan or any exhibits or schedules hereto under section 1127(a) of the Bankruptcy Code at any time prior to or after the Confirmation Date but prior to the substantial Consummation of the Plan, <u>provided</u>, <u>however</u>, that any such alteration, amendment or modification does not materially and adversely affect the treatment of Holders of Claims or Interests under the Plan.  Any Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

## C.    Subordination Rights

The classification and manner of satisfying all Claims and Interests and the respective Distributions and treatments under the Plan take into account and/or conform to the relative priority and rights of the Claims and Interests in each Class in connection with the contractual, legal and equitable subordination rights relating thereto, whether arising under contract, general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.  All subordination rights that a Holder of a Claim or Interest may have with respect to any Distribution to be made under the Plan shall be implemented through the Plan, and all actions by such Holder of a Claim or Interest related to the enforcement of such subordination

-54-

rights shall be enjoined permanently. The provisions of any contractual or structural subordination of Claims shall remain enforceable by the Liquidating Trustee on behalf of the Liquidating Trust after the occurrence of the Effective Date. Without limitation hereunder, the Liquidating Trustee, on behalf of the Liquidating Trust, may likewise enforce any right of the Debtors or their Estates to equitably or otherwise subordinate Claims under section 510 of the Bankruptcy Code, which rights are deemed transferred to, remain and are preserved in the Liquidating Trust, except as otherwise expressly set forth herein or as expressly provided in a Final Order of the Bankruptcy Court in the Chapter 11 Cases.

### D. Dissolution of the Committee

The Committee shall dissolve on the Effective Date and the members of such Committee shall be released and discharged from all further rights and duties arising from or related to these Chapter 11 Cases, except with respect to, and to the extent of any applications for Professional Fee Claims or expense reimbursements for members of such Committee. The Professionals retained by the Committee shall not be entitled to assert any Administrative Expense Claims nor shall they have an Allowed Administrative Expense Claims for any services rendered or expenses incurred after the Effective Date except in respect of the preparation and prosecution of or any objection to any Filed fee application.

### E. Exemption from Section 1146

Pursuant to section 1146(a) of the Bankruptcy Code, under the Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; (ii) the creation, modification, consolidation or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment or recording of any lease or sublease; or (iv) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, mortgage recording tax, stamp tax or similar government assessment, and the appropriate state or local government official or agent shall be directed by the Bankruptcy Court to forego the collection of any such tax or government assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or government assessment. To the extent that the Liquidating Trustee elects to sell any property prior to or including the date that is one (1) year after the Confirmation Date, such sales of property will be exempt from any transfer taxes in accordance with section 1146(c) of the Bankruptcy Code.

All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases shall be deemed to be or have been done in furtherance of the Plan.

CHI 60,771,838v2 2-18-11

# X.   GENERAL INFORMATION ON VOTING
## AND CONFIRMATION PROCEDURE

## A.   Purpose of Disclosure Statement

The Disclosure Statement is generally provided to all Holders of Claims and Interests entitled to vote upon the Plan pursuant to section 1125 of the Bankruptcy Code to enable such Holders to make an informed decision concerning the Plan Proponents' solicitation of acceptances of the Plan.  After notice and a hearing conducted on [_____], 2011, by order dated [_____], 2011, the Bankruptcy Court approved this Disclosure Statement as containing "adequate information" (as defined in section 1125(a) of the Bankruptcy Code) of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the Holders of Claims against the Debtors to make an informed decision in voting to accept or reject the Plan. Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation to accept or reject the Plan.

## B.   Voting On the Plan

The following is a summary of the procedures and requirements that have been established for voting on the Plan.  If you are entitled to vote to accept or reject the Plan, you should receive a Ballot for the purpose of voting on the Plan.  If you hold Claims or Interests in more than one Class and you are entitled to vote such Claims or Interests in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims or Interests.  If you are entitled to vote and did not receive a Ballot, or you received a damaged Ballot, or you lost your Ballot, please contact the Claims Agent, Logan & Company, Inc. by one of these methods:    (a) by telephone at 973-509-3190; (b) by sending an e-mail to info@loganandco.com; (c) by visiting the Claims Agent's website at www.loganandco.com; or (d) by requesting a ballot by mail to the Claims Agent at Logan & Company, Inc., 546 Valley Road, Upper Montclair, NJ 07043.

Votes <u>cannot</u> be transmitted orally, by facsimile or by electronic mail (e-mail). Accordingly, you are urged to return your signed and completed Ballot promptly.  Any executed Ballot that does not indicate either an acceptance or a rejection of the Plan, or that indicates both an acceptance and a rejection of the Plan, will not be counted as a vote to either accept or reject the Plan.

THE DEBTORS RESERVE THE RIGHT TO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE IN THE EVENT ANY OF CLASSES 3, 4, 5, OR 7 VOTE TO REJECT THE PLAN, AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION.

SUBJECT TO THE TERMS AND CONDITIONS OF THE PLAN, THE DEBTORS RESERVE THE RIGHT TO AMEND THE PLAN EITHER BEFORE OR AFTER THE PETITION DATE.

AMENDMENTS TO THE PLAN THAT DO NOT MATERIALLY AND ADVERSELY AFFECT THE TREATMENT OF CLAIMS MAY BE APPROVED BY THE BANKRUPTCY

CHI 60,771,838v2 2-18-11

COURT AT THE CONFIRMATION HEARING WITHOUT THE NECESSITY OF RESOLICITING VOTES.  IN THE EVENT RESOLICITATION IS REQUIRED, THE DEBTORS WILL FURNISH NEW BALLOTS TO BE USED TO VOTE TO ACCEPT OR REJECT THE PLAN, AS AMENDED.

## C.  Voting Record Date

Consistent with the provisions of Rule 3018(b) of the Bankruptcy Rules, the Bankruptcy Court has fixed [_____], 2011 as the "**Voting Record Date**" for the determination of the Holders of Claims and Interests entitled to vote to accept or reject the Plan.

### 1.  Who May Vote

Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims or Interests in Classes that are Impaired by, and are receiving Distributions under, the Plan may vote on the Plan.  Holders of Claims or Interests that are Unimpaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan.  Holders of Claims or Interests that receive no recovery under the Plan are deemed to reject the Plan and are not entitled to vote on the Plan.  Administrative Expense Claims and Priority Tax Claims are not generally classified for purposes of voting or receiving Distributions under the Plan.

**In this case, Holders of Claims in Classes 3, 4, and 5 and Interest in Class 7 are entitled to vote to accept or reject the Plan.**  If you are entitled to vote to accept or reject the Plan, a Ballot has been enclosed for the purpose of voting.

### 2.  Eligibility

In order to vote to accept or reject the Plan, a Holder of an Allowed Claim must have timely Filed or been assigned a timely Filed proof of claim, unless its Claim is listed on the Debtors' Schedules and is not identified therein as disputed, unliquidated or contingent or has not been objected to prior to the Confirmation Hearing.  Creditors or Interest Holders having an Allowed Claim or an Allowed Interest in more than one Class may vote in each Class in which they hold a separate Claim or Interest by casting a Ballot in each Class.

### 3.  Binding Effect

Whether a Holder of an Allowed Claim or Allowed Interest votes on the Plan or not, such Holder shall be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court.  Unless a Ballot is completed and returned in accordance with approved Bankruptcy Court procedures, a Holder of an Allowed Claim or Allowed Interest that submits a vote on the Plan shall not be included in the vote or purposes of accepting or rejecting the Plan or for purposes of determining the number of Creditors and Interest Holders voting on the Plan.

## D.  Procedure/Voting Deadlines

In order for your vote to be counted, you must complete, date, sign and properly mail or deliver the enclosed Ballot to the Claims Agent, Logan & Company, Inc., at the address set forth below:

Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that original Ballots for the acceptance or rejection of the Plan must be received by ordinary mail, courier service or hand delivery to the Claims Agent, at the appropriate address set forth above on or before 5:00 p.m., (Prevailing Eastern Time) on [_____], 2011 (the "**Voting Deadline**"). **Facsimile or electronically submitted Ballots will not be counted.**

Once you have delivered your Ballot to the Claims Agent, you may not change your vote after the Voting Deadline, except upon cause shown to the Bankruptcy Court after notice and a hearing or upon the agreement of the Plan Proponents.

You are urged to timely complete, date, sign and promptly return the enclosed Ballot by mail, courier service or hand delivery.

Please be sure to complete the Ballot properly and legibly, identifying the exact amount of your Claim or Interest, the Class or Classes in which the Claim(s) or Interest(s) is/are classified under the Plan and the name of the Creditor or Interest Holder.

Each Holder of a Claim or Interest that votes against the Plan may elect, by checking the appropriate box provided on the Ballot, not to grant the releases set forth in Article 11.1 of the Plan.

## E.     Plan Confirmation Process

### 1.     Requirements

The requirements for confirmation of the Plan are set forth in detail in section 1129 of the Bankruptcy Code.  The following summarizes some of the pertinent requirements:

(a)     Acceptance by All Impaired Classes

Except as noted below, each Impaired Class of Claims must vote to either accept the Plan or be deemed to accept the Plan.  "Impaired" is defined in section 1124 of the Bankruptcy Code. A Claim or Interest is Impaired unless the Plan leaves unaltered the legal, equitable, or contractual rights of the Holder.  Under the Plan, Claims and Interests in Class 3, Class 4, Class 5, Class 6, and Class 7 are impaired.  Holders of Claims in Class 3, Class 4, and Class 5 and Holders of Interests in Class 7 are entitled to vote, separately, to accept or reject the Plan. Holders of Claims in 6 receive no Distributions under the Plan and, therefore, are deemed under section 1126(g) of the Bankruptcy Code to have rejected the Plan.

As a voting Creditor or Interest Holder, your acceptance of the Plan is important.  In order for the Plan to be accepted by an Impaired Class of Claims, Creditors holding a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan.  At least one Impaired Class of Creditors, excluding the votes of

Insiders (if any), must actually vote to accept the Plan. In order for the Plan to be accepted by an Impaired Class of Interests, Interest Holders holding two-thirds in dollar amount of the Interests voting (of each Impaired Class of Interests) must vote to accept the Plan.

**(b)** Feasibility

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must determine, among other things, that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan (unless such liquidation or reorganization is proposed in the Plan). In addition, section 1129(a)(13) requires that all fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan. These conditions are often referred to as the "feasibility" of the Plan. The Plan is a liquidating plan and, accordingly, all of the Debtors' remaining assets will be distributed to Holders of Allowed Claims or Allowed Interests pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the Estates will no longer exist to be subject to future reorganization or liquidation. As a result, the Plan satisfies the feasibility test. Moreover, the Plan provides for payment of all statutory fees due and owing to the United States Trustee. Accordingly, the Plan Proponents believe that the Plan satisfies the requirements of feasibility under section 1129(a) of the Bankruptcy Code.

**(c)** "Best Interests" Test

Pursuant to section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court must find that the Plan is in the best interests of Creditors and Interest Holders (commonly referred to as the "Best Interests" test). To satisfy the "Best Interests" test, the Bankruptcy Court must determine that each Holder of an Impaired Claim or Impaired Interest either: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such Holder would receive if the Debtors' property were liquidated under chapter 7 of the Bankruptcy Code on that date.

The first step in meeting the "Best Interests" test is to determine the proceeds that would be generated from the hypothetical liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation. The gross amount of cash and cash equivalents available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the time of the commencement of their chapter 7 cases. Such amount is reduced by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtors' businesses and the use of chapter 7 for the purposes of a liquidation.

(i) Costs and Expenses of Liquidation

In a chapter 7 liquidation, a trustee in bankruptcy would be appointed. The net amount generated from the liquidation of the Debtors' remaining assets would be reduced by the administrative expenses of both the chapter 7 cases and the Chapter 11 cases, including the fees and commissions of the chapter 7 trustee, as well as those of counsel and other professionals that

might be retained by the chapter 7 trustee, in addition to unpaid expenses incurred by the Debtors and the Committee during the Chapter 11 Cases. These expenses and costs would reduce the net proceeds available to Holders of Allowed Claims or Allowed Interests.

Any remaining net Cash would be allocated to creditors and stockholders in strict accordance with the priorities set forth in section 726 of the Bankruptcy Code. The present value of such allocation of the hypothetical liquidation proceeds (after deducting the amounts described above) is then compared with the present value of the proposed Distributions under the Plan to each of the Classes of Claims and Interests to determine if the Plan is in the best interests of each Creditor or Holder of an Interest.

If the present value of the Distributions available to unsecured creditors under the hypothetical liquidation is less than or equal to the present value of the Distributions available to unsecured creditors under the Plan, then the Plan is in the best interests of creditors and can be considered in the "best interests of creditors" by the Bankruptcy Court.

(ii)  The Plan Meets the Best Interests Test

The Plan Proponents believe that the Plan will produce a recovery for Holders of Claims that would be equal to or better than would be achieved in a chapter 7 liquidation. The Plan Proponents are not seeking to require Holders of Claims or Interests to accept non-cash consideration so that the Estates could pursue going concern value. During the course of these Chapter 11 cases, the Debtors have liquidated their businesses.

Importantly, a chapter 7 liquidation would likely result in an increase in Claims because there would be an additional tier of Administrative Expense Claims by the chapter 7 trustee and his or her professionals. The chapter 7 trustee's professionals, including legal counsel and accountants, would add administrative expenses that would be entitled to be paid ahead of Allowed Claims or Allowed Interests against the Debtors. Although the Debtors have already incurred many of the expenses associated with liquidating the Debtors' assets, the Cash to be distributed to Creditors and Interest Holders would be reduced by the chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the chapter 7 trustee. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors and the Committee during these Chapter 11 Cases (such as compensation for professionals) which are allowed in the chapter 7 case. Additionally, it is likely that distributions from a chapter 7 estate would be significantly deferred. As a result, the present value of such distributions is likely to be lower than if made under the Plan.

For the reasons set forth above, the Plan Proponents believe that the Plan provides a recovery at least equal to, if not better, for Holders of Claims and Interests, and the Plan meets the requirements of the Best Interest Test. A Liquidation Analysis to the same effect is provided in the Plan Supplement.

**(d)**  "Cramdown" Provisions

Pursuant to section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan even though a class of claims or equity interests has not voted to accept the plan, as long

-60-

as one impaired class of claims has accepted the plan (excluding the votes of Insiders, if any) and the plan is "fair and equitable" and "does not discriminate unfairly" against the non-accepting classes.

The Plan only impairs certain Classes of Claims and Interests. Therefore, the Plan Proponents may, if applicable, pursue confirmation through a "cramdown" provision only under section 1129(b)(2)(B), which states, in pertinent part, that a plan is "fair and equitable" to a class if, among other things, the plan provides, with respect to unsecured claims and equity interests, that the holder of any such claim or equity interest that is junior to the claims or equity interests of such class, will not receive or retain, on account of such junior claim or equity interest, any property unless the senior class is paid in full.

A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to receive on account of its claim or interest. The Plan Proponents will invoke the "cramdown" provisions of section 1129(b)(2)(B) of the Bankruptcy Code should any voting Class fail to accept the Plan.

## 2. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. To confirm the Plan, the Bankruptcy Court must determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code (the "**Confirmation Hearing**"). The Bankruptcy Court has set _____, **2011 at _:00 _.m. (Prevailing Eastern Time)** for the Confirmation Hearing. The Confirmation Hearing will be conducted in the courtroom of the Honorable Kevin J. Carey, Chief United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Courtroom 5, Wilmington, Delaware, 19801.

## 3. Objections to Confirmation

Any party in interest may object to confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection. The Bankruptcy Court has set _____ 2011 at _:00 _.m. (prevailing Eastern time) as the deadline for Filing and serving objections upon the Debtors' attorneys. Objections to confirmation must be Filed with the Bankruptcy Court electronically or at the following address:

> **UNITED STATES BANKRUPTCY COURT**
> District of Delaware
> 824 Market Street
> Wilmington, Delaware 19801

with a copy simultaneously served upon the attorneys for the Debtors at the addresses below:

> **GREENBERG TRAURIG, LLP**
> The Nemours Building
> 1007 North Orange Street, Suite 1200
> Wilmington, Delaware 19801
> Attn: Victoria W. Counihan and Sandra G. M. Selzer

-and-

**GREENBERG TRAURIG, LLP**
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Attn: Nancy A. Peterman and Keith Shapiro

and a copy simultaneously served upon the attorneys for the Committee at the addresses below:

**LOWENSTEIN SANDLER PC**
65 Livingston Avenue
Roseland, New Jersey 07068
Attn: Jeffrey D. Prol

-and-

**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Attn: Steven K. Kortanek

and a copy simultaneously served upon the Office of the United States Trustee at the address below:

**OFFICE OF THE UNITED STATES TRUSTEE**
844 King Street, Suite 2207, Lockbox 35
Wilmington, Delaware 19801
Attn: Mark S. Kenney

# XI.    RISK FACTORS

ALL IMPAIRED HOLDERS OF CLAIMS OR INTERESTS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

## A.    Bankruptcy Factors

### 1.    Classifications of Claims and Interests

Parties in interest may object to the Plan Proponents' classification of Claims and Interests. Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors and the Committee believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

-62-

## 2. Non-Occurrence of the Effective Date

If the conditions precedent to the Effective Date, which are discussed in detail in Article 10.1 of the Plan, have not been satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order. THERE CAN BE NO ASSURANCE THAT ALL OF THE VARIOUS CONDITIONS PRECEDENT TO THE EFFECTIVE DATE OF THE PLAN WILL BE TIMELY SATISFIED OR WAIVED. In the event that the conditions precedent to the Effective Date have not been timely satisfied or waived, the Plan would be deemed null and void and the Debtors may propose or solicit votes on an alternative plan that may not be as favorable to parties-in-interest as the current Plan, convert these Chapter 11 Cases or dismiss these Chapter 11 Cases.

## 3. Failure to Receive Requisite Accepting Votes

There can be no assurance that the requisite acceptances to confirm the Plan will be received. In order for the Plan to be accepted, of those Holders of Claims who cast ballots, the affirmative vote of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims in each voting Class is required; and of those Holders of Interests who may cast ballots, the affirmative vote of at least two-thirds (2/3) in amount of Allowed Interests in each voting Class is required.

If the requisite votes are not received, these Chapter 11 Cases could be converted into cases under chapter 7 of the Bankruptcy Code or dismissed. There can be no assurance that the distributions under a chapter 7 liquidation or dismissal would be similar to or as favorable to Holders of Claims or Interests as those proposed in the Plan. The Plan Proponents believe that Distributions to Creditors and Interest Holders would be reduced and delayed under a chapter 7 liquidation, as discussed in Section V of this Disclosure Statement.

## 4. Failure to Confirm the Plan

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or equity holder of the Debtors might challenge the confirmation of the Plan or the balloting procedures and/or voting results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that the Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes and that the value of Distributions to non-accepting Holders of Claims or Interests within a particular Class under the Plan will not be less than the value of Distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Plan Proponents believe that non-accepting Holders within each Class under the Plan will receive Distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such chapter 7 case.

If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests ultimately would receive with respect to their Claims. If an alternative Plan could not be agreed to, it is possible that the Debtors would convert these Chapter 11 Cases to chapter 7 cases or dismiss these Chapter 11 Cases, in which case it is likely that Holders of Claims or Interests would receive substantially less favorable treatment than they would receive under the Plan.

In addition, in the event that the Plan is not confirmed, the Debtors will incur substantial expenses related to the development and confirmation of a new plan and possibly the approval of a new disclosure statement. This would only unnecessarily prolong the administration of the Debtors' assets and negatively affect Creditors' and Interest Holders recoveries on their Claims and Interests.

Similarly, as described above, in the event these Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, the Debtors will incur substantial expenses related to hiring additional professionals and paying the fees of the chapter 7 trustee. As the Debtors' assets have already been liquidated, the additional cost will only serve to reduce Distributions to Creditors and Interest Holders.

### 5. Risk of Additional or Larger Claims

Claims in Classes _____ are subject to the risk of dilution if the total amount of the Claims against the Debtors is higher than the Debtors' estimate. The Disclosure Statement and the attached exhibits necessarily include estimates, including estimates of future events and unliquidated Claims. These estimates include, but are not limited to, estimates as to the total amount of Claims that will be asserted against the Debtors and the outcome of Disputed Claims. The Plan Proponents believe that the estimates presented are reasonable and appropriate under the circumstances. Nevertheless, there is a risk that unforeseen future events may cause one or more of these estimates to be materially inaccurate. Among the potential risks are that: (i) additional prepetition or Administrative Expense Claims may be asserted; (ii) Disputed Claims may be resolved at higher amounts than expected; or (iii) the resolution of Claims may require the expenditure of unanticipated professional fees.

### 6. Alternative Chapter 11 Plan

If the Plan is not confirmed, any other party-in-interest may attempt to formulate an alternative chapter 11 plan, which might provide for the liquidation of the Debtors' remaining assets other than as provided by the Plan. However, the Plan Proponents believe that such an alternative chapter 11 plan will necessarily be substantially similar to the Plan jointly proposed herewith. The prosecution of an alternative chapter 11 plan would unnecessarily delay Creditors' and Interest Holders' receipt of Distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller Distributions to Holders of Allowed Claims in Classes 3, 4, 5 and Allowed Interests in Class 7 than are currently provided for in the Plan. Accordingly, the Plan Proponents believe that the Plan will enable all Creditors and Interest Holders to realize the greatest possible recovery on their respective Claims and Interests with the least delay.

CHI 60,771,838v2 2-18-11

## B. Other Risk Factors

### 1. Variances from Projections

As noted in this Disclosure Statement, the Debtors have estimated Distributions to Holders of Allowed Claims and Interests based upon certain financial projections. The projections reflect assumptions concerning, among other things, the Debtors' and the Liquidating Trustee's ability to control expenses. The Plan Proponents believe that the assumptions underlying the projections are reasonable; however, unanticipated events occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtors or the Liquidating Trust.

### 2. Litigation Risks

The Plan provides, among other things, for the Litigation Claims to be conveyed into the Liquidating Trust. Although the Plan Proponents anticipate that the Liquidating Trustee will, in time, resolve the Causes of Action and Disputed Claims on a basis that provides a substantial net benefit to the Debtors' Estates, there can be no guarantee that the result will be favorable. Fees and expenses incurred by the Liquidating Trustee shall be paid from the Liquidating Trust Expense Reserve in accordance with Article VI of the Plan. There also can be no assurance that the funds available in the Liquidating Trust Expense Reserve will be sufficient to fund completely the prosecution of the Causes of Action and the Disputed Claims.

## XII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain material United States federal income tax aspects of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), proposed Treasury Regulations promulgated thereunder, and administrative rulings and court decisions, all as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the United States federal income tax consequences of the Plan. To the extent that the following discussion relates to the consequences to Holders of Allowed Claims or Interests, it is limited to Holders that are United States persons within in the meaning of the IRC. For purposes of the following discussion, a "United States person" is any of the following:

- An individual who is a citizen or resident of the United States;

- A corporation created or organized under the laws of the United States or any state or political subdivision thereof;

- An estate, the income of which is subject to federal income taxation regardless of its source; or

- A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No ruling has been requested or obtained from the Internal Revenue Service (the "**IRS**") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. Thus, no assurance can be given as to whether the IRS will agree with the assertions and conditions discussed herein. No representations or assurances are being made to the Holders of Claims or Interests with respect to the United States federal income tax consequences described herein.

This summary is limited to those Holders of Claims or Interests who have held such Claims and Interest as capital assets. Certain Holders (including, among others, insurance companies, banks, tax exempt organizations, financial institutions, broker-dealers, small business investment companies, regulated business companies, investors in pass-through entities, foreign companies, persons who are not citizens or residents of the United States, dealers in securities or foreign currency, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction) may be subject to special rules and are not discussed below. In addition, this summary does not address other federal taxes or the foreign, state, or local tax consequences of the Plan.

Any discussion of United States federal tax issues set forth in this Disclosure Statement is written solely in connection with the confirmation of the Plan. **To ensure compliance with Treasury Department Circular 230, Holders of Claims are hereby notified that: (a) any discussion of federal tax issues in this disclosure statement is not intended or written to be relied upon, and cannot be relied upon, by claimholders for the purpose of avoiding penalties that may be imposed on claimholders under the Internal Revenue Code; (b) such discussion is being used in connection with the promotion or marketing (within the meaning of Circular 230) by the debtors of the transactions or matters addressed herein; and (c) a Holder of a Claim should seek advice based on their particular circumstances from an independent tax advisor.**

## A. Certain U.S. Federal Income Tax Consequences to the Debtors

Under the IRC, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("**COD Income**") realized during the taxable year. Section 108 of the IRC provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the bankruptcy court and the cancellation is granted by the court or is pursuant to a plan approved by the court.

Section 108 of the IRC requires the amount of COD Income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers (collectively, "**NOLs**"), certain tax credits and most tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and foreign tax credit carryovers. Attribute

reduction is calculated only after the tax for the year of the discharge has been determined. Section 108 of the IRC further provides that a taxpayer does not realize COD Income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Under the Plan, Holders of Allowed Claims or Interests are expected to receive less than full payment on their Claims or Interests. The Debtors' liability to the Holders of Claims or Interests in excess of the amount satisfied by Distributions under the Plan will be canceled and therefore, will result in COD Income to the Debtors. The Debtors should not realize any COD Income, however, to the extent that payment of such Claims would have given rise to a deduction to the Debtors had such amounts been paid. In addition, any COD Income that the Debtors realize should be excluded from the Debtors' gross income pursuant to the bankruptcy exception to section 108 of the IRC described above, because the cancellation will occur in a case under the Bankruptcy Code, while the taxpayer is under the jurisdiction of the bankruptcy court, and the cancellation is granted by the court or is pursuant to a plan approved by the court.

The exclusion of the COD Income, however, will result in a reduction of certain tax attributes of the Debtors, such as the NOLs, as described above. Because attribute reduction is calculated only after the tax for the year of discharge has been determined, the COD Income realized by the Debtors under the Plan should not diminish the NOLs and other tax attributes that may be available to offset any income and gains recognized by the Debtors in the taxable year that includes the Effective Date.

## B. Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims

A Holder of an Allowed Claim or Interest will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on a Claim or Interest but was not previously paid by the Debtors or included in income by the Holder of the Allowed Claim or Interest. A Holder of an Allowed Claim or Interest will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Claim or Interest and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The amount realized will equal the sum of Cash and the fair market value of other consideration received (or to be received).

The character of any gain or loss that is recognized as such will depend upon a number of factors, including the status of the Creditor or Interest Holder, the nature of the Claim or Interest in the Creditor's or Interest Holder's hands, whether the Claim or Interest was purchased at a discount, whether and to what extent the Creditor or Interest Holder has previously claimed a bad debt deduction with respect to the Claim or Interest, and the Creditor's or Interest Holder's holding period of the Claim or Interest. If the Claim or Interest in the Creditor's or Interest Holder's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Creditor or Interest Holder held such Claim or Interest for longer than one year, or short-term capital gain or loss if the Creditor or Interest Holder held such Claim or Interest for less than one year.

A Holder of an Allowed Claim or Interest who receives, in respect of its Claim or Interest, an amount that is less than its tax basis in such Claim or Interest may be entitled to a bad

CHI 60,771,838v2 2-18-11

debt deduction if either: (i) the Holder is a corporation; or (ii) the Claim or Interest constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the Holder or (b) a debt the loss from the worthlessness of which is incurred in the Holder's trade or business. A Holder that has previously recognized a loss or deduction in respect of its Claim or Interest may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Claim or Interest.

Holders of Claims or Interests who were not previously required to include any accrued but unpaid interest with respect to a Claim or Interest may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. Holders previously required to include in their gross income any accrued but unpaid interest with respect to a Claim or Interest may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

Holders of a Claim or Interest constituting any installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of section 453B of the IRC.

The Holders of Claims in Class 3, Class 4, and Class 5 and Interests in Class 7 are expected to receive only a partial Distribution of their Allowed Claims, and Holders of Class 6 Claims are expected to not receive any Distributions under the Plan on account of their Claims or Interests. Whether the Holder of such Claims and Interests will recognize a loss, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to the nature of each Holder and its Claims. Accordingly, the Holders of Class 3, 4, 5, and 6 and Interests in Class 7 should consult their own tax advisors.

## C. Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOREGOING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE UNCERTAIN IN MANY CASES AND MAY VARY DEPENDING ON A CLAIM HOLDER'S OR INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS AND INTEREST HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XIII. ALTERNATIVES TO THE PLAN

The Plan Proponents have determined that the Plan is the most practical means of providing for maximum recoveries to the Holders of Allowed Claims and Interests. Alternatives to the Plan that have been considered and evaluated by the Plan Proponents during the course of the Chapter 11 Cases include (i) liquidation of the Debtors' remaining assets under chapter 7 of

-68-

the Bankruptcy Code and (ii) dismissal of these Chapter 11 Cases. Through consideration of these alternatives to the Plan, the Plan Proponents have concluded that the Plan, in comparison, will likely provide a greater recovery to Holders of Allowed Claims and Interests on a more expeditious timetable, and in a manner that minimizes certain risks inherent in any other course of action available to the Plan Proponents.

## A.      Liquidation under Chapter 7

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under sections 1129(a) and (b) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, and a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for Distribution to Holders of Allowed Claims and Interests pursuant to chapter 7 of the Bankruptcy Code. If a trustee is appointed and the remaining assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, all Creditors in Classes 3, 4, 5, and 7 may receive Distributions of a lesser value on account of their Allowed Claims and Allowed Interests and may have to wait a longer period of time to receive such Distributions than they would under the Plan.

## B.      Dismissal

If these Chapter 11 Cases are dismissed, the protections of the Bankruptcy Code would disappear, thereby resulting in costly, uncontrolled and protracted litigation in various jurisdictions among and between the Debtors and the Holders of Claims and Interests. Therefore, the Plan Proponents believe that dismissal of the Chapter 11 Cases is not a viable alternative to Confirmation of the Plan.

## XIV.   RECOMMENDATIONS

The Debtors and the Committee believe that the Plan is substantially preferable to any other plan, preferable to liquidation under chapter 7 of the Bankruptcy Code, and preferable to a dismissal of these Chapter 11 Cases. Conversion of these Chapter 11 Cases to cases under chapter 7 would result in substantial delays in the distribution of proceeds available and would significantly increase administrative costs, and, therefore, would materially reduce Creditor and Interest Holder recoveries. Therefore, the Debtors and the Committee strongly recommend that you vote in favor of the Plan.

## XV.    CONCLUSION

It is important that you exercise your right to vote on the Plan. The Debtors and the Committee believe that the Plan fairly and equitably provides for the treatment of all Claims against, and Interests in, the Debtors and recommends that you cast your Ballot in favor of the Plan.

Dated: February 18, 2011
Wilmington, Delaware

SSI Liquidating, Inc.
Debtor and Debtor-in-Possession

By: _____
Steve Day
Co-Chief Administrative Officer

SH Liquidating, Inc.
Debtor and Debtor-in-Possession

By: _____
Steve Day
Co-Chief Administrative Officer

Mountain View Investment Company of Illinois
Debtor and Debtor-in-Possession

By: _____
Steve Day
Co-Chief Administrative Officer

Circle System Group, Inc.
Debtor and Debtor-in-Possession

By: _____
Steve Day
Co-Chief Administrative Officer

Melas, Inc.
Debtor and Debtor-in-Possession

By: _____
Steve Day
Co-Chief Administrative Officer

**R.D.H. Enterprises, Inc.**
**Debtor and Debtor-in-Possession**

By: _____

    Steve Day
    Co-Chief Administrative Officer


**Triangle Sports, Inc.**
**Debtor and Debtor-in-Possession**

By: _____

    Steve Day
    Co-Chief Administrative Officer

*Victoria W Counihan*

**GREENBERG TRAURIG, LLP**
Victoria W. Counihan (DE Bar No. 3488)
Sandra G. M. Selzer (DE Bar No. 4283)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801

- and -

Keith J. Shapiro
Nancy A. Peterman
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601

Counsel for the Debtors and Debtors-in-Possession

**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen
Jeffrey D. Prol
Vincent A. D'Agostino
Suzanne Iazzetta
65 Livingston Avenue
Roseland, New Jersey 07068
-and-
1251 Avenue of the Americas
New York, NY 10020

- and -

**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**
Steven K. Kortanek (DE Bar No. 3106)
James M. Lennon (DE Bar No. 4570)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801

Counsel for Official Committee of Unsecured Creditors