# EXHIBIT D

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SSI LIQUIDATING, INC., et al.,[1]** | **Case No. 10-12795 (KJC)** |
| **Debtors.** | **(Jointly Administered)** |

## DISCLOSURE STATEMENT FOR FIRST AMENDED
## JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY THE
## DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

### MARCH 29, 2011

**GREENBERG TRAURIG, LLP**
Keith J. Shapiro
Nancy A. Peterman
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
-and-
Victoria W. Counihan (DE Bar No. 3488)
Sandra G. M. Selzer (DE Bar No. 4283)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801

**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen
Jeffrey D. Prol
Vincent A. D'Agostino
Suzanne Iazzetta
65 Livingston Avenue
Roseland, New Jersey 07068
-and-
1251 Avenue of the Americas
New York, NY 10020

**WOMBLE CARLYLE SANDRIDGE
& RICE, PLLC**
Steven K. Kortanek (DE Bar No. 3106)
James M. Lennon (DE Bar No. 4570)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801

**Counsel for the Debtors and Debtors-in-Possession**

**Counsel for Official Committee of Unsecured Creditors**



THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF THE PLAN. ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. THE DEBTORS AND THE COMMITTEE MAY SUPPLEMENT OR AMEND THIS DISCLOSURE STATEMENT OR ANY EXHIBITS ATTACHED HERETO AT ANY TIME PRIOR TO THE HEARING TO APPROVE THE DISCLOSURE STATEMENT.

---

[1] The new name for each of the Debtors, some of whose names have changed, along with the former name of each such Debtor and the last four digits of each Debtor's tax identification number, are: SSI Liquidating, Inc. (f/k/a Schutt Sports, Inc.) (0521), SH Liquidating, Inc. (f/k/a Schutt Holdings, Inc.) (0276), Mountain View Investment Company of Illinois (3563), Circle System Group, Inc. (7711), Melas, Inc. (9761), R.D.H. Enterprises, Inc. (2752) and Triangle Sports, Inc. (6936).

# IMPORTANT DATES

- Date and time by which Ballots must be received: April 29, 2011 at 5:00 p.m. (Prevailing Eastern Time)

- Date and time by which objections to Confirmation of the Plan must be Filed and served: April 29, 2011 at 4:00 p.m. (Prevailing Eastern Time)

- Hearing on Confirmation of the Plan: May 9, 2011 at 2:30 p.m. (Prevailing Eastern Time)

- Voting Record Date: March 29, 2011 at 5:00 p.m. (Prevailing Eastern Time)

- Date and time by which Claims Estimation Motions must be Filed: April 27, 2011 at 4:00 p.m. (Prevailing Eastern Time)

CHI 60,777,341 V11

# DISCLAIMER

THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF LIQUIDATION FILED BY THE DEBTORS AND THE COMMITTEE, AS CO-PROPONENTS, AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND ANY OTHER PLAN DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT (A) THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF, OR (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS WITH "ADEQUATE INFORMATION" WITHIN THE MEANING OF THE BANKRUPTCY CODE, SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

NOTHING CONTAINED IN THE DISCLOSURE STATEMENT CONSTITUTES AN ADMISSION OR ACKNOWLEDGMENT THAT ANY CLAIMS OR INTERESTS DESCRIBED AND IDENTIFIED IN THE DISCLOSURE STATEMENT ARE VALID, ENFORCEABLE, ALLOWABLE, OR NOT SUBJECT TO DISPUTES, COUNTERCLAIMS OR SETOFFS.

*CHI 60,777,341 V11*

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT, RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS. PARTIES SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS, AND/OR TAX ADVISORS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.

THE DEBTORS AND THE LIQUIDATING TRUSTEE RESERVE THE RIGHT TO OBJECT TO THE AMOUNT OR CLASSIFICATION OF ANY CLAIM OR INTEREST.

THE ESTIMATES SET FORTH IN THIS DISCLOSURE STATEMENT CANNOT BE RELIED ON BY ANY CREDITOR OR INTEREST HOLDER WHOSE CLAIM OR INTEREST IS SUBJECT TO AN OBJECTION. A CLAIM HOLDER WHOSE CLAIM IS SUBJECT TO AN OBJECTION MAY NOT RECEIVE THE SPECIFIED SHARE OF THE ESTIMATED DISTRIBUTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT.

CHI 60,777,341 V11

# TABLE OF CONTENTS

                                                                                    **Page**

I.       INTRODUCTION .......................................................................... 1
    A.   Disclosure Statement Exhibits ......................................................... 2
    B.   Only Impaired Classes Vote ........................................................... 3
    C.   Voting Procedures.......................................................................... 3
    D.   Confirmation Hearing .................................................................... 4

II.     OVERVIEW OF THE PLAN.......................................................... 4
    A.   Summary of Treatment of Claims and Interests under the Plan .......... 4

III.    GENERAL INFORMATION CONCERNING THE DEBTORS...................... 9
    A.   Overview of the Debtors' Businesses Prior to the Sale ...................... 9
       1.   General ................................................................................. 9
       2.   The Debtors' Facilities ...................................................... 10
       3.   The Debtors' Focus on Research and Development ................. 11
       4.   The Debtors' Sales Team .................................................... 11
       5.   The Debtors' Sale Cycle .................................................... 12
    B.   The Debtors' Corporate Structure.................................................. 12
    C.   The Debtors' Capital and Debt Structure........................................ 12
       1.   Prepetition Secured Loans................................................... 12
       2.   Other Secured Debt ........................................................... 12
       3.   Unsecured Debt................................................................. 13
       4.   Interests ........................................................................... 14
    D.   The Debtors' Remaining Assets .................................................... 14
    E.   Events Leading up to the Chapter 11 Filing ................................... 14
       1.   The Circle Acquisition ....................................................... 14
       2.   The Economic Crisis .......................................................... 18
       3.   Covenant Violations/Events of Default ................................. 18
       4.   The Riddell Litigation ....................................................... 18
       5.   The Debtors' Decision to File for Chapter 11 Protection .......... 20

IV.    EVENTS DURING THE CHAPTER 11 CASES ................................. 20
    A.   Continuation of Business after the Petition Date.............................. 20
       1.   First and Second Day Motions.............................................. 20
       2.   Retention Applications........................................................ 22
       3.   Interim Compensation Procedures ........................................ 22
    B.   Appointment of a Creditors' Committee ......................................... 22
    C.   Debtor-in-Possession Financing .................................................... 23
    D.   The Committee's Lien Review ...................................................... 23
    E.   The Debtors' Schedules and the Statements of Financial Affairs ...... 24
    F.   Riddell Disputes......................................................................... 25
    G.   Management Incentive Plan........................................................... 26
    H.   The Sale Motion.......................................................................... 27
       1.   The Auction....................................................................... 27
       2.   Sale Hearing and Closing of Sale.......................................... 27

| | | | |
|---|---|---|---|
| | 3. | Riddell's Qualified Objection | 28 |
| | 4. | Mediation | 29 |
| | 5. | Settlement Motion | 29 |
| I. | | Exclusivity Motion | 30 |
| J. | | Rejection Motion | 31 |
| K. | | The Bar Date Order | 31 |
| L. | | Co-Chief Administrative Officers and Consultants | 32 |
| M. | | Stay Relief Motion | 32 |
| N. | | Easton Lease Motion | 33 |
| O. | | 503(b)(9) Report and Objections | 34 |
| P. | | Late Claim Motion and Limited Objection Thereto | 34 |
| | | | |
| V. | | SUMMARY OF THE PLAN OF LIQUIDATION | 35 |
| A. | | Overview of Chapter 11 | 35 |
| B. | | Plan Objectives | 36 |
| C. | | Overall Structure of the Plan | 36 |
| D. | | Classification and Allowance of Claims and Interests Generally | 36 |
| E. | | Treatment of Unclassified Claims under the Plan | 37 |
| | 1. | Administrative Expense Claims | 37 |
| | 2. | Priority Tax Claims | 38 |
| F. | | Treatment of Classified Claims and Interests under the Plan | 39 |
| | 1. | Class 1: Priority Non-Tax Claims | 39 |
| | 2. | Class 2: Secured Claims | 39 |
| | 3. | Class 3: General Unsecured Claims | 40 |
| | 4. | Class 4: Critical Trade Vendor Claims | 40 |
| | 5. | Class 5: Unsecured Convenience Claims | 41 |
| | 6. | Class 6: Penalty Claims | 41 |
| | 7. | Class 7: Interests | 41 |
| | 8. | Class 8: Intercompany Interests | 42 |
| G. | | Miscellaneous Provisions | 42 |
| | 1. | Reservation of Rights Regarding Claims and Interests | 42 |
| | 2. | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 42 |
| | 3. | Controversy Concerning Impairment | 42 |
| | 4. | Elimination of Vacant Classes | 42 |
| | 5. | Removal of Debtors | 43 |
| H. | | Means of Implementing the Plan | 43 |
| | 1. | Funding of Plan | 43 |
| | 2. | [INTENTIONALLY OMITTED] | 43 |
| | 3. | Liquidating Trust | 43 |
| | 4. | Cancellation of Instruments and Stock | 47 |
| | 5. | Operating Reports | 47 |
| | 6. | Post-Confirmation Professional Fees and Expenses | 47 |
| | 7. | Disposition of Books and Records | 47 |
| | 8. | Corporate Action | 48 |
| | 9. | Dissolution of Debtors | 48 |
| I. | | Reserves and Distributions | 48 |
| | 1. | Establishment of Reserves | 48 |

2. Funding of Reserves.................................................................................. 48
3. Disbursing Agent ..................................................................................... 49
4. Distributions by Liquidating Trustee ...................................................... 49
5. Distributions on Account of the Allowed Windjammer Subordinated Note
   Claim......................................................................................................... 50
6. Distributions on Account of Allowed Critical Trade Vendor Claims........ 50
7. Distributions on Account of Allowed Claims of ZHUHAI PUTUO
   Commerce and Trading Company Limited and Manufacturing Solutions Co.,
   LTD. .......................................................................................................... 50
8. Timing of Distributions............................................................................ 51
9. Distributions upon Allowance of Disputed Claims or Disputed Interests ................. 52
10. Undeliverable and Unclaimed Distributions ........................................... 52
11. Interest on Claims .................................................................................... 53
12. No Distribution in Excess of Allowed Amount of Claim .......................... 53
13. Means of Cash Payment........................................................................... 53
14. Delivery of Distributions.......................................................................... 53
15. Record Date for Distributions ................................................................. 53
16. No Distributions Pending Allowance....................................................... 53
17. Withholding and Reporting Requirements............................................... 54
18. Setoffs ...................................................................................................... 54
19. *De Minimis* Distributions ....................................................................... 54
20. Extensions of Time .................................................................................. 54
J. Provisions for Claims Objections and Estimation of Claims ........................... 55
1. Claims Objection Deadline; Prosecution of Claims Objections ............... 55
2. Estimation of Claims................................................................................ 55

VI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................. 55
A. Executory Contracts and Unexpired Leases Deemed Rejected ....................... 55
B. Bar Date for Rejection Damages ..................................................................... 56

VII. CONFIRMATION AND CONSUMMATION OF THE PLAN............................. 56
A. Conditions Precedent to the Effective Date ................................................... 56
B. Notice of Effective Date .................................................................................. 56
C. Waiver of Conditions Precedent to the Effective Date................................... 56
D. Effect of Non-Occurrence of Effective Date ................................................... 57

VIII. EFFECTS OF CONFIRMATION OF THE PLAN............................................... 57
A. Exculpation and Releases ................................................................................ 57
1. Exculpation and Limitation of Liability................................................... 57
2. Releases by the Debtors ........................................................................... 57
3. Releases by Holders of Claims and Interests ........................................... 58
4. Exceptions to Releases ............................................................................. 59
5. Injunction Related to Exculpation and Releases...................................... 59
B. Injunction ........................................................................................................ 60
C. Consideration .................................................................................................. 60
D. Term of Bankruptcy Injunction or Stays ........................................................ 61
E. Vesting Provision............................................................................................. 61

CHI 60,777,341 V11

IX.     MISCELLANEOUS PLAN PROVISIONS ................................................................ 61
    A.  Retention of Jurisdiction ................................................................................ 61
    B.  Modification of the Plan ................................................................................ 63
    C.  Subordination Rights ..................................................................................... 63
    D.  Dissolution of the Committee ........................................................................ 64
    E.  Exemption from Section 1146 ........................................................................ 64

X.      GENERAL INFORMATION ON VOTING AND CONFIRMATION PROCEDURE.. 65
    A.  Purpose of Disclosure Statement .................................................................. 65
    B.  Voting On the Plan ........................................................................................ 65
    C.  Voting Record Date ....................................................................................... 66
        1.  Who May Vote ........................................................................................ 66
        2.  Eligibility ............................................................................................... 66
        3.  Binding Effect ........................................................................................ 66
    D.  Procedure/Voting Deadlines .......................................................................... 67
    E.  Plan Confirmation Process ............................................................................ 67
        1.  Requirements .......................................................................................... 67
        2.  Confirmation Hearing ............................................................................. 70
        3.  Objections to Confirmation ..................................................................... 71

XI.     RISK FACTORS ................................................................................................... 72
    A.  Bankruptcy Factors ...................................................................................... 72
        1.  Classifications of Claims and Interests .................................................... 72
        2.  Non-Occurrence of the Effective Date ..................................................... 72
        3.  Failure to Receive Requisite Accepting Votes .......................................... 72
        4.  Failure to Confirm the Plan .................................................................... 73
        5.  Risk of Additional or Larger Claims ........................................................ 73
        6.  Alternative Chapter 11 Plan .................................................................... 74
    B.  Other Risk Factors ........................................................................................ 74
        1.  Variances from Projections ..................................................................... 74
        2.  Litigation Risks ...................................................................................... 74

XII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES .................................... 75
    A.  Certain U.S. Federal Income Tax Consequences to the Debtors ..................... 76
    B.  Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims or
        Interests ....................................................................................................... 77
    C.  Importance of Obtaining Professional Tax Assistance .................................... 78

XIII.   ALTERNATIVES TO THE PLAN .......................................................................... 78
    A.  Liquidation under Chapter 7 .......................................................................... 78
    B.  Dismissal ...................................................................................................... 79

XIV.    RECOMMENDATIONS .......................................................................................... 79

XV.     CONCLUSION ...................................................................................................... 79

Exhibit A     The Plan

**Exhibit B**    The Debtors' Corporate Organization Chart

**Exhibit C**    Sources and Uses of Estate Assets Prior to the Effective Date

**Exhibit D**    Liquidation Analysis

# I.    INTRODUCTION

SSI Liquidating, Inc. (f/k/a Schutt Sports, Inc.) ("**SSI Liquidating**"), SH Liquidating, Inc. (f/k/a Schutt Holdings, Inc.) ("**SH Liquidating**"), Mountain View Investment Company of Illinois ("**Mountain View**"), Circle System Group, Inc. ("**Circle System**"), Melas, Inc. ("**Melas**"), R.D.H. Enterprises, Inc. ("**RDH**"), and Triangle Sports, Inc. ("**Triangle Sports**"), the above-captioned debtors and debtors in possession (each, a "**Debtor**" and collectively, the "**Debtors**"), and the Official Committee of Unsecured Creditors (the "**Committee**" and, together with the Debtors, the "**Plan Proponents**") have Filed the First Amended Joint Chapter 11 Plan of Liquidation (the "**Plan**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  A copy of the Plan is annexed hereto as <u>Exhibit A</u>.

The Plan Proponents hereby submit this disclosure statement dated March __, 2011 (the "**Disclosure Statement**") pursuant to the Bankruptcy Code in connection with the solicitation of acceptances on the Plan from certain Holders of Claims against and Interests in the Debtors.

The purpose of this Disclosure Statement is to set forth information (a) regarding the Debtors' history, their businesses and the Chapter 11 Cases, (b) concerning the Plan and alternatives to the Plan, (c) advising the Holders of Claims against and Interests in the Debtors of their rights under the Plan, (d) assisting the Holders of Claims against and Interests in the Debtors in making an informed judgment regarding whether they should vote to accept or reject the Plan and (e) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

Following a hearing held on March 29, 2011, this Disclosure Statement was approved by the Bankruptcy Court as containing "adequate information" in accordance with section 1125 of the Bankruptcy Code.  Pursuant to section 1125(a)(1) of the Bankruptcy Code, "adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests in the relevant class to make an informed judgment about the plan."  NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT.  ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN.

THIS    DISCLOSURE    STATEMENT    CONTAINS    INFORMATION SUPPLEMENTARY TO THE PLAN AND IS NOT INTENDED TO TAKE THE PLACE

OF THE PLAN.  CREDITORS AND INTEREST HOLDERS ARE ADVISED TO STUDY THE PLAN CAREFULLY TO DETERMINE THE PLAN'S IMPACT ON THEIR CLAIMS OR INTERESTS.  THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  ALTHOUGH GREAT EFFORT WAS TAKEN TO ENSURE THE ACCURACY OF THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING PLAN, NEITHER THE DEBTORS, THE COMMITTEE, NOR THEIR RESPECTIVE PROFESSIONALS CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN AND THEREIN IS WITHOUT INACCURACIES OR ERRORS.

This Disclosure Statement contains important information that may bear upon your decision to accept or reject the Plan.  The Disclosure Statement also provides information regarding alternatives to the Plan.  Each Holder of a Claim or Interest should read this Disclosure Statement and the Plan in their entirety, including the conditions precedent to the Effective Date of the Plan contained in Article X of the Plan.

If you are a Holder of a Claim or Interest that is entitled to vote to accept or reject the Plan, a ballot for the acceptance or rejection of the Plan (the "**Ballot**") is enclosed herewith.  After carefully reviewing these documents, please indicate your vote with respect to the Plan on the enclosed Ballot and return it as instructed below and on the Ballot.

The Plan Proponents may supplement or amend this Disclosure Statement or any exhibits, schedules, and appendices attached hereto at any time prior to the hearing to approve this Disclosure Statement.

The information set forth herein is the product of the Debtors' books and records, historical material and public and non-public materials.  Accounting and any valuation methods are as maintained by the Debtors.

UNLESS OTHERWISE DEFINED HEREIN, ALL CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

A.    **Disclosure Statement Exhibits**

Attached hereto as exhibits to this Disclosure Statement are copies of the following documents:

| | |
|---|---|
| Exhibit A | The Plan |
| Exhibit B | The Debtors' Corporate Organization Chart |
| Exhibit C | Sources and Uses of Estate Assets Prior to the Effective Date (including projected wind-down expenses to and including the Effective Date) |
| Exhibit D | Liquidation Analysis |

## B.     Only Impaired Classes Vote

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. If the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such Plan under section 1126(g) of the Bankruptcy Code and therefore, such holders do not cast votes on such Plan. In addition, Classes of Claims or Interests that are "unimpaired" are deemed to have accepted the Plan and do not cast votes on the Plan.

Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and therefore deemed to accept the Plan. Holders of Claims or Interests in Classes 3, 4, 5, 6 and 7 are Impaired and are entitled to vote on the Plan. Holders of Interests in Class 8 are Impaired and are deemed to reject the Plan and are not entitled to vote.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 3, 4, 5, 6 AND 7.

Holders of Claims or Interests may obtain copies of the Plan Supplement that will be Filed with the Bankruptcy Court at least five (5) days prior to the Voting Deadline by: (a) accessing the website of the Debtors' claims, noticing and balloting agent, Logan & Company, Inc. (the "**Claims Agent**") at www.loganandco.com; (b) requesting the Plan Supplement by e-mail to info@loganandco.com; (c) calling the Claims Agent at 973-509-3190; or (d) sending a request by mail to the Claims Agent at 546 Valley Road, Upper Montclair, NJ 07043.

For a summary of the treatment of each Class of Claims and Interests, see Section II of this Disclosure Statement, "Overview of the Plan" below.

## C.     Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot for the acceptance or rejection of the Plan is enclosed for the purpose of voting on the Plan. If you hold Claims or Interests in more than one Class and you are entitled to vote Claims or Interests in more than one Class, you will receive separate Ballots that must be used to vote in each separate Class. If you hold Claims or Interests against multiple Debtors and you are entitled to vote Claims or Interests against such multiple Debtors, you will receive separate Ballots that must be used to vote your Claims or Interests against such multiple Debtors. Please vote and return your Ballot(s) to the Claims Agent at the address set forth below by regular mail, overnight mail, or hand delivery:

Ballot Processing Department
c/o Logan & Company, Inc.
546 Valley Road
Upper Montclair, NJ 070043

TO BE COUNTED, YOUR BALLOT WITH ORIGINAL SIGNATURE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN **MUST BE RECEIVED BY THE CLAIMS**

*CHI 60,777,341 V11*

**AGENT** NO LATER THAN **5:00 P.M. (PREVAILING EASTERN TIME) ON APRIL 29, 2011** (the "Voting Deadline").

If you are a Holder of a Claim or Interest entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact the Claims Agent by e-mail at info@loganandco.com, by phone at 973-509-3190, or by mail to 546 Valley Road, Upper Montclair, NJ 07043.

## D.     Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for May 9, 2011 at 2:30 p.m. (Prevailing Eastern Time) in the Bankruptcy Court, 5th Floor, 824 Market Street, Wilmington, Delaware 19801 (the "**Confirmation Hearing**"). The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and Filed on or before April 29, 2011, at 4:00 p.m. (Prevailing Eastern Time) (the "**Confirmation Objection Deadline**") in the manner described in the Confirmation Hearing Notice accompanying this Disclosure Statement. The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time as to which the Confirmation Hearing has been adjourned or an appropriate Filing on the Bankruptcy Court's docket.

THE PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 3, 4, 5, 6 AND 7 TO VOTE IN FAVOR OF THE PLAN.    VOTING INSTRUCTIONS ARE DESCRIBED IN SECTION X OF THIS DISCLOSURE STATEMENT.

The classification and treatment of Claims and Interests under the Plan are described in detail below. Because the Plan provides the greatest likelihood of recovery to all Holders of Allowed Claims or Allowed Interests in these Chapter 11 Cases, the Plan Proponents strongly encourage all Holders of Claims or Interests entitled to vote on the Plan to vote to accept the Plan.

## II.     OVERVIEW OF THE PLAN

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN, THE PLAN SUPPLEMENT, AND ANY OTHER PLAN DOCUMENTS.    CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE PLAN ITSELF, AND NOT TO RELY ON THE SUMMARY PROVIDED HEREIN.    IN THE EVENT OF AN INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN SHALL CONTROL.

## A.     Summary of Treatment of Claims and Interests under the Plan

The table below summarizes the classification and treatment of Claims and Interests under the Plan. The table also sets forth the treatment of unclassified Claims.

The estimated recovery percentages set forth below have been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims or Allowed Interests in each Class. The low end of any range for an estimated recovery percentage is based on the face amounts of all liquidated Claims filed against the Debtors within a particular Class and a good-faith estimate of unliquidated Claims combined with the assumption that there will be no recoveries for the Causes of Action. The high end of any range for an estimated recovery percentage is based on the Debtors' estimate of Allowed Claims or Allowed Interests within a particular Class combined with the assumption that there will be some recovery for the Causes of Action. For certain Classes of Claims or Interests, the actual amounts of Allowed Claims or Allowed Interests could materially exceed or could be materially less than the estimated amounts shown in the table below. Therefore, the actual Distributions may differ from the estimates set forth in the table below.

The Plan Proponents have not yet fully reviewed and analyzed all Claims and Interests. Estimated Claim or Interest amounts set forth below are based upon the Debtors' review of the Debtors' books and records and Filed proofs of Claim and include estimates for a number of Claims that are Contingent, Disputed, and/or unliquidated.

For purposes of the estimates set forth below, the Plan Proponents (i) have not assigned any specific value to the Causes of Action, including the Circle System Matters or the Non-Trade Avoidance Actions; and (ii) relied on the projections shown in Sources and Uses of Estate Assets Prior to the Effective Date, attached hereto as Exhibit C, which contains, among other things, projected wind-down expenses for administering these Chapter 11 Cases to and including the Effective Date.

For purposes of brevity and convenience, the classification of Claims and Interests set forth below applies to each Debtor individually. Estimates of aggregate Allowed amount and recovery percentages for Classes 1 through 8 apply to each of the Debtors, unless otherwise indicated.

| Class | Estimated Aggregate Allowed Amount | Treatment Pursuant to the Plan | Estimated Recovery |
|---|---|---|---|
| Unclassified: Administrative Expense Claims | $ 1.8 million | Unimpaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Administrative Expense Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Administrative Expense Claim: (a) Cash equal to the amount of such Allowed Administrative Expense Claim; or (b) such other treatment as to which the Debtors, in consultation with the Committee, or the Liquidating Trustee, as applicable, and the Holder of such Allowed Administrative Expense Claim shall have agreed upon in writing. | 100% |

CHI 60,777,341 V11

| Class | Estimated Aggregate Allowed Amount | Treatment Pursuant to the Plan | Estimated Recovery |
|---|---|---|---|
| Unclassified: Priority Tax Claims | $ 0 | Unimpaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim: (a) Cash equal to the amount of such Allowed Priority Tax Claim; or (b) such other treatment as to which the Debtors, in consultation with the Committee, or the Liquidating Trustee, as appropriate, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing. | 100% |
| Class 1: Priority Non-Tax Claims | $ 0 | Unimpaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Priority Non-Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Debtors, in consultation with counsel to the Committee, or the Liquidating Trustee, as applicable, and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. | 100% |
| Class 2: Secured Claims | $ 0 | Unimpaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Class 2 Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 2 Claim: (A) one of the treatments specified in section 1124 of the Bankruptcy Code; or (B) such other treatment which the Debtors, in consultation with counsel to the Committee, or the Liquidating Trustee, as applicable, and the Holder of such Allowed Secured Claim have agreed upon in writing. | 100% |
| Class 3: General Unsecured Claims [2] | SH: $19.4 mil<br><br>SSI: $28.3 mil<br><br>Circle: $29.7 mil<br><br>Melas: $19.4 mil<br><br>Mt. View: $19.4 mil<br><br>RDH: $19.4 mil<br><br>Triangle: $19.4 mil | Impaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed General Unsecured Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 3 Claim its Pro Rata share of Liquidating Trust Assets remaining after payment in full in Cash of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, Allowed Unsecured Convenience Claims and any expenses of the Liquidating Trust. | SH: 1% to 3%<br><br>SSI: 1% to 3%<br><br>Circle: 1% to 3%<br><br>Melas, Mt. View, RDH and Triangle: Each less than 1% |

---

[2]      The estimated recovery percentages do not include certain additional Distributions to Holders of Allowed Trade Claims as described herein on account of the Allowed Windjammer Subordinated Note Claim and the Trade Creditor Escrow. The Debtors estimate that such Holders of Allowed Trade Claims will receive approximately forty percent (40%) Distributions based upon distributions under the Plan and in accordance with the Settlement Order as described page 8 of this Disclosure Statement.

*CHI 60,777,341 V11*

| Class | Estimated Aggregate Allowed Amount | Treatment Pursuant to the Plan | Estimated Recovery |
|---|---|---|---|
| Class 4: Critical Trade Vendor Claims [3] | SSI: $1.2 mil<br><br>Circle: $100,000<br><br>There is no Class 4 for each of SH, Melas, Mt. View, RDH and Triangle. | Impaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Critical Trade Vendor Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed 4 Class Claim its Pro Rata share of Liquidating Trust Assets remaining after payment in full in Cash of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, Allowed Unsecured Convenience Claims and all expenses of the Liquidating Trust provided, however a Holder of an Allowed Critical Vendor Claim shall not receive any Distribution under the Plan until the Holders of Allowed General Unsecured Claims have received a percentage recovery under the Plan, on account of their Allowed General Unsecured Claims, that equals the percentage recovery received by such Holder of an Allowed Critical Vendor Claim, on account of its Allowed Critical Vendor Claim, from the Critical Trade Vendor Escrow. | Each less than 1% [4] |
| Class 5: Unsecured Convenience Claims [5] | SSI: $210,000<br><br>Circle: $74,000<br><br>There is no Class 5 for each of SH, Melas, Mt. View, RDH and Triangle. | Impaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Unsecured Convenience Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 5 Claim a Distribution from the Liquidating Trust equal to Cash in the amount of eighteen percent (18%) of their Allowed Unsecured Convenience Claim. Holders of Class 5 Unsecured Convenience Claims shall not have any rights or receive any treatment as Holders of Class 3 General Unsecured Claims under the Plan or as Trade Creditors under the Settlement Order. | 18% |

---

[3]     The estimated aggregate Allowed amount represents the remaining amount of Claims held by Critical Trade Vendors after payment of $5.3 million from the Critical Trade Vendor Escrow on account of such Claims in accordance with the Settlement Order.

[4]     In addition to the estimated recovery percentage shown in this table, the Critical Trade Vendors have been paid $5.3 million from the Critical Trade Vendor Escrow in accordance with the Settlement Order.

[5]     "**Unsecured Convenience Claims**" shall mean a Claim against a Debtor that is a General Unsecured Claim in an amount equal to or less than $5,000.

CHI 60,777,341 V11

| Class | Estimated Aggregate Allowed Amount | Treatment Pursuant to the Plan | Estimated Recovery |
|---|---|---|---|
| Class 6: Penalty Claims | SH: $0 to $415 mil<br><br>SSI: $0 to $415 mil<br><br>Circle: $0 to $415 mil<br><br>There is no Class 6 for each of Melas, Mt. View, RDH and Triangle. | Impaired. On the Effective Date, each Holder of an Allowed Penalty Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 6 Claim its Pro Rata share of Liquidating Trust Assets remaining after payment in full in Cash of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, Allowed Unsecured Convenience Claims, Allowed General Unsecured Claims and expenses of the Liquidating Trust. | Less than 1% |
| Class 7: Interests | N/A | Impaired. Within the time period provided in Article VII of the Plan, each Holder of an Allowed Interest, excluding Intercompany Interests, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 7 Interest its Pro Rata share of Liquidating Trust Assets remaining after payment in full in Cash of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, Allowed Unsecured Convenience Claims, Allowed General Unsecured Claims, Allowed Critical Trade Vendor Claims, Allowed Penalty Claims and all expenses of the Liquidating Trust. Each Holder of Allowed Interests shall be paid pursuant to the terms of any documents by and between the Debtors and such Holders, including without limitation, the corporate charter and any shareholder agreements. | Less than 1% |
| Class 8: Intercompany Interests | N/A | Impaired. On the Effective Date, all Intercompany Interests shall be deemed cancelled, extinguished and discharged and of no further force or effect. The Holders of Intercompany Interests shall not be entitled to receive or retain any property on account of such Intercompany Interests. | 0% |

In addition to the estimated recovery shown above, Holders of Allowed Trade Claims in Class 3 will receive Distributions from the Trade Creditor Escrow as set forth in the Settlement Order (as defined below) and Distributions on account of the Allowed Windjammer Subordinated Note Claim as set forth in the Settlement Order and described in Article 7.5 of the Plan and Section V.I.5 of this Disclosure Statement. The Debtors estimate that the percentage recovery to Trade Creditors will be approximately forty percent (40%) in the aggregate, after taking into account Distributions to Trade Creditors as Holders of Class 3 General Unsecured Claims, distributions to Trade Creditors from the Trade Creditor Escrow and distributions to Trade Creditors on account of the Allowed Windjammer Subordinated Note Claim. This estimated recovery also assumes that there will be a recovery in the Circle System Matters. There is no guaranty that any such recovery in the Circle System Matters will be obtained.

CHI 60,777,341 V11

In addition, the estimated recovery percentage shown in the above table for Class 4 Critical Trade Vendors does not take into account the $5.3 million paid to the Critical Trade Vendors from the Critical Trade Vendor Escrow in accordance with the Settlement Order.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

NOTHING IN THE DISCLOSURE STATEMENT SHALL AFFECT THE RIGHTS OF THE DEBTORS, THE COMMITTEE, AND/OR THE LIQUIDATING TRUSTEE TO OBJECT TO ANY PROOF OF CLAIM OR PROOF OF INTEREST ON ANY GROUND OR FOR ANY PURPOSE, INCLUDING IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE PLAN.

## III.    GENERAL INFORMATION CONCERNING THE DEBTORS

### A.    Overview of the Debtors' Businesses Prior to the Sale

As further described in Section IV.H of this Disclosure Statement, substantially all of the Debtors' assets were sold on a going-concern basis (the "Sale"), in accordance with the Bankruptcy Court's order, dated December 16, 2010, approving such Sale [Docket No. 438]. The below background on the Debtors describes the Debtors' pre-sale businesses. As of the date hereof, the Debtors no longer operate any businesses as a going-concern, but continue to administer certain assets remaining in their Estates for liquidation and Distribution to the Creditors and Interest Holders under the Plan.

### 1.    General

Founded in 1918, the Debtors started as a manufacturer of basketball goals and dry line markers out of Mr. Bill Schutt's hardware store in Litchfield, Illinois. Over the past century, the Debtors grew to be a market leader in their industry with approximately $69 million of total revenue as of the fiscal year ending 2009, 80% of which was generated by the Debtors' manufacturing division and the rest by their reconditioning division. The Debtors employed approximately 360 permanent employees and approximately 160 additional temporary employees in months when they needed additional workforce to fulfill their seasonal production needs. The Debtors were the second largest employer in Litchfield, Illinois, and the third largest employer in Salem, Illinois, thereby providing significant economic stability to those regions.

Prior to the Sale, the Debtors were a leading designer, manufacturer, distributor, and marketer of team sporting equipment, offering an extensive line of protective gear and complementary accessories, most prominently in football. The Debtors served a broad range of clientele, including youth, high school, college, and professional teams throughout the United States. The Debtors also served clients overseas, including those in Canada, Germany and Japan, but the vast majority of the Debtors' customers were located within the United States.

The Debtors' presence in the football helmet and faceguard markets was unparalleled. The Debtors' product lines were anchored by their football helmet offering, for which the

Debtors had a top position in the country, both in terms of technological advancement and market share. For example, in football, the Debtors held a number-one position in the youth and face-guard markets and a number-two position in the varsity market and reconditioning business. The Debtors' market-leading position in football gear was sustained by their superior products, robust new product pipeline, and significant investment in technology and intellectual property.

Their leading position in the football market enabled the Debtors to penetrate other sporting equipment markets with significant demand for high-performance protective gear, such as baseball and softball. The Debtors also maintained leading and growing market positions in shoulder pads, women's fast-pitch softball equipment, baseball protective gear, baseball bases, and sports collectibles.

During their tenure as the market leader, the Debtors possessed a unique combination of advanced product technology and an unparalleled distribution network. The Debtors' sales network structure, which consisted of a lean in-house sales force, regional independent sales representatives and a vast network of local Team Dealers (as defined below), combined with the Debtors' market-leading innovation and technology, enabled the Debtors to be one of the top two competitors in the football equipment market.

## 2. The Debtors' Facilities

The Debtors utilized a domestic manufacturing strategy for their product lines, for which quality control was critical, and for which speed-to-market and customization offered a significant competitive advantage.

### (a) The Debtors' Manufacturing Facilities

The Debtors' products were manufactured in Litchfield, Illinois and Salem, Illinois and warehoused initially in their warehousing facility in Litchfield, Illinois. From their warehouse in Litchfield, the Debtors distributed their products through Team Dealers (as defined below) and other retail accounts. The central location of the Debtors' manufacturing division in Illinois provided efficient nationwide reach via land and air transportation for distribution.

### (b) The Debtors' Reconditioning Facilities

The Debtors' reconditioning business operated mainly through their facilities in Easton, Pennsylvania. The Debtors originally had a small reconditioning division, but acquired Circle System Group, Inc. ("Circle System") in September 2005 (the "Circle Acquisition"). Circle System was the second largest athletic equipment reconditioning business in the United States after Riddell, Inc. ("Riddell"), which was the Debtors' largest competitor. Through Circle System, the Debtors provided value-added reconditioning services to their customers in order to maximize the useful life of the Debtors' various products. The Debtors' reconditioning services ranged from helmet refurbishing and recertification to shoulder pad refurbishing to in-season laundry, providing various youth teams, schools, and leagues with viable alternatives to purchasing new equipment. The Debtors had a network of reconditioning dealers with wide coverage within the United States.

10

### 3. The Debtors' Focus on Research and Development

The Debtors invested heavily in their research and development ("**R&D**") and intellectual property to achieve their superior product quality and robust new product pipeline. The four core areas of the Debtors' R&D focus were protection, impact absorption, weight, and environment, all of which enhanced the user's on-field experience by lessening impact, reducing fatigue and injuries, improving temperature control, and ultimately maximizing performance. Each year, the Debtors introduced and phased new technology into their premier product lines. For example, after faceguards became mandatory in football in 1970, the Debtors underwent decades of innovative product development and new product introduction, including, but not limited to, the game's first titanium football faceguards. In addition, through their continued R&D efforts, the Debtors developed the world's first helmet with TPU cushioning with the same material traditionally used for military helmets, climate-controlled shoulder pads, and shock-absorbing helmets and faceguards.

### 4. The Debtors' Sales Team

The Debtors utilized a multi-layered sales network, with a lean in-house sales and marketing department consisting of four (4) employees that managed the independent sales representatives. The independent sales representatives managed over one-thousand (1,000) sales representatives at a local level (the "**Team Dealers**"), many of whom managed sales representatives on the road. Each of the four in-house sales employees was responsible for one of the four broad regions of the United States, managing the independent sales representatives in his region and collectively covering the country from coast to coast. The thirty-one (31) independent sales representatives worked on commission and managed the relationships with an aggregate of more than one-thousand (1,000) Team Dealers, who marketed, promoted and sold the Debtors' products to the end customers at the local level. It is estimated that local sales representatives, such as the Team Dealers, sell and distribute over 50% of the $2.5 billion worth of sporting goods equipment sold in the United States annually. Team Dealers consisted of national, regional, and local companies that sell sporting goods and other products to a variety of customers in their respective coverage areas, including recreational leagues, youth sports groups, high schools, colleges, and professional teams. Team Dealers also sold directly to consumer end-users through retail locations.

The institutional sporting equipment market is highly fragmented, and historical relationships and local knowledge are critical to the success in these markets. The Team Dealers had direct relationships with and access to the thousands of high schools, colleges, sports leagues, and other institutional customers across the country, and often used more than three-thousand (3,000) road sales representatives to sell product.

The Debtors' sales network was based upon the intimate and long-standing relationship between the Team Dealers and the institutional end-customers, which relationships often spanned decades and provided invaluable insight into the end-customers' needs and purchasing habits. As such, the independent sales representatives and Team Dealers were indispensible components of the Debtors' sales network.

11

### 5. The Debtors' Sale Cycle

The Debtors' businesses were extremely seasonal because of the nature of their products. The Debtors' customers generally ordered new equipment in the spring for the upcoming school year. The Debtors' manufacturing and shipping activities usually peaked in August, just before the school year started. The Debtors' sales and manufacturing activities subsided significantly during the months of September through February. The majority of the Debtors' receivables were collected by the end of October.

## B. The Debtors' Corporate Structure

SSI Liquidating and Circle System were the main operating entities of the Debtors. SH Liquidating is the parent entity of the Debtors. The Debtors' corporate organizational chart is attached hereto as <u>Exhibit B</u>.

## C. The Debtors' Capital and Debt Structure

### 1. Prepetition Secured Loans

As of the Petition Date, Bank of America, N.A., as administrative agent and as lender (the "**Agent**"), along with other lender signatories (collectively and together with the Agent, the "**Prepetition Secured Lenders**"), SSI Liquidating, Mountain View, Circle System, Melas, RDH, and Triangle Sports as borrowers (collectively, the "**Borrowers**"), and SH Liquidating as guarantor, were parties to that certain Amended and Restated Loan and Security Agreement dated as of September 30, 2005 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Prepetition Credit Agreement**"), and all collateral and ancillary documents executed in connection therewith (the "**Prepetition Secured Loan Documents**"), pursuant to which, among other things, the Prepetition Secured Lenders agreed, subject to the terms and conditions set forth in the Prepetition Credit Agreement, to make certain loans and other financial accommodations to the Debtors (the "**Prepetition Secured Loans**").

As of the Petition Date, the principal amount of the Prepetition Secured Loans was not less than $34,820,675.20, plus accrued and unpaid prepetition and postpetition interest, fees, expenses, and other amounts chargeable under the Prepetition Secured Loan Documents. The Prepetition Secured Loans were set to mature on December 31, 2010.

### 2. Other Secured Debt

The Debtors believe that they have no other secured debt. The Debtors' Schedules list the following as secured Claims: (i) a Claim pursuant to that certain Irrevocable Standby Letter of Credit, dated May 19, 2010, between SSI Liquidating and The Hanover Insurance Company and/or Massachusetts Bay Insurance Company (the "**Hanover Claim**"); and (ii) a Claim pursuant to that certain Secured Equipment Lease between SSI Liquidating and Balboa Capital Corporation (the "**Balboa Claim**"). The Hanover Claim has been satisfied in full. The Balboa Claim is disputed and believed to be invalid.

CHI 60,777,341 V11

### 3. Unsecured Debt

#### (a) The Windjammer Subordinated Notes

On September 30, 2005, each of the Debtors (other than SH Liquidating) issued, pursuant to a subordinated note agreement (as amended, restated, supplemented, or otherwise modified, the "**Amended and Restated Subordinated Note Agreement**") those certain unsecured notes due 2011 (the "**Prepetition Subordinated Notes**" and, together with the Prepetition Secured Loans, the "**Prepetition Loans**") to Windjammer Mezzanine & Equity Fund II, L.P. ("**Windjammer**"). The Prepetition Subordinated Notes bore interest at the rate of 10% per annum, plus the Applicable PIK Percentage (as defined in the Amended and Restated Subordinated Note Agreement). Payment of the Prepetition Subordinated Notes was guaranteed by SH Liquidating, the 100% owner of each of the other Debtors. The Prepetition Subordinated Notes were set to mature on December 31, 2011. As of the Petition Date, the Debtors owed $17,357,529 on account of the Prepetition Subordinated Notes.

The Prepetition Subordinated Notes are fully subordinated in right of payment to the Prepetition Secured Loans pursuant to the terms of that certain Amended and Restated Subordination Agreement, dated as of September 30, 2005 (as amended, restated, supplemented, or otherwise modified, the "**Prepetition Subordination Agreement**"). Pursuant to the Prepetition Subordination Agreement, Windjammer, as Holder of 100% of the Prepetition Subordinated Notes, agreed, among other things, that upon the occurrence of any insolvency proceeding: (i) the Agent and the Prepetition Secured Lenders shall be entitled to receive payment in full in cash of any and all of the Prepetition Secured Loans prior to payment of all or any part of the Prepetition Subordinated Notes; (ii) any payment or distribution of any kind or character, whether in cash, securities, or other property, which shall be payable or deliverable upon or with respect to any or all of the Prepetition Subordinated Notes, shall be paid or delivered directly to the Agent for application to any of the Prepetition Secured Loans until the Prepetition Secured Loans have been paid in full; and (iii) the Agent may assert Windjammer's Claims with respect to the Prepetition Subordinated Notes against the Borrowers until all of the Prepetition Secured Loans have been paid in full. *See* Prepetition Subordination Agreement, § 6.

#### (b) The Abeshaus Subordinated Notes

The Debtors' Schedules (as defined below) list four (4) additional subordinated notes in the following amounts to the following former officers and directors of Circle System: (i) $630,295 to Alan Abeshaus, (ii) $540,235 to Eric Abeshaus, (iii) $540,235 to Mitchell Kurlander, and (iv) $540,235 to David Drill (collectively, the "**Circle Subordinated Notes**"). The Circle Subordinated Notes were issued as deferred purchase price payments for the Circle Acquisition and are disputed and, the Debtors assert, subject to setoff because of the Circle Frauds (as defined and further described below), among other things.

#### (c) Other Unsecured Debt

As of the Petition Date, the Debtors had additional aggregate unsecured debt (other than the intercompany debt and certain unliquidated claims described below) of at least $15.9 million. In addition, Circle System owed SSI Liquidating approximately $10.3 million in intercompany

debt, as Circle System, in the ordinary course of its business, purchased from SSI Liquidating various parts and products to be used in its reconditioning business. The Debtors' Schedules (as defined below) also list eight (8) product liability claims, all of which are unliquidated. While the Debtors have insurance coverage for these product liability claims, such insurance coverage becomes available only after a certain level of deductible is exhausted. In addition to the foregoing, pursuant to the Bankruptcy Court's order granting the Rejection Motion (as defined below), the Debtors rejected certain Executory Contracts. Accordingly, certain rejection damage Claims may arise from such rejection of Executory Contracts.

4.      **Interests**

The equity Interests in each of SSI Liquidating, Mountain View, Circle System, Melas, RDH and Triangle Sports are owned 100% by their parent company, SH Liquidating, whose common stock is owned by the following Entities: (i) 61.6% by GAC Investments, LLC, (ii) 16.4% by Windjammer Capital Investors, (iii) 8.1% by All Sports, LLC, (iv) 1.2% by Jennifer Baker, (v) 1.2% by Stephanie Nimmons, (vi) 2.1% by Alan Abeshaus, (vii) 1.8% by Eric Abeshaus, (viii) 1.8% by Mitchell Kurlander, (xi) 1.8% by David Drill, (x) 1.2% by Eric Ashleman, and (xi) 2.7% by Robert Erb. Windjammer Capital Investors owns 100% of SH Liquidating's Preferred Stock Series A and B. SH Liquidating's Preferred Stock Series C is owned by the following Entities: (a) 51.3% by Gridiron Schutt, LLC, (b) 11.4% by Gridiron Capital, LLC, (c) 28.8% by Windjammer Capital Investors, (d) 4.4% by All Sports, LLC, (e) 0.7% by Jennifer Baker, (f) 0.7% by Stephanie Nimmons, and (g) 2.8% by Robert Erb.

D.      **The Debtors' Remaining Assets**

Subsequent to the Sale, the Debtors have certain liquidated and unliquidated assets remaining in their Estates. As described below, the Debtors obtained a summary judgment against certain former officers and directors in one of the Circle System Matters (as defined below). The Debtors believe that this summary judgment likely is the most significant asset remaining in the Debtors' Estates. The Abeshaus Parties dispute that the summary judgment has any value to the Debtors' Estates. The Debtors also retain the Non-Trade Avoidance Actions, as identified in the Plan Supplement. The Debtors believe that they may be entitled to certain tax refunds in an unliquidated amount. Finally, the Debtors estimate that the total cash and deposits remaining in their Estates, after payment of Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims, will be approximately $347,000. These remaining assets will be available for Distribution under the Plan.

E.      **Events Leading up to the Chapter 11 Filing**

1.      **The Circle Acquisition**

As described above, the Debtors' reconditioning business was expanded through the Circle Acquisition in 2005. The purchase price for the Circle Acquisition was $23.4 million. Although the Circle Acquisition was supported by a strong business rationale, it ended up placing a significant burden on the Debtors because of certain fraudulent activities that took place before the Debtors acquired Circle Systems and were unknown to the Debtors at the time of the Circle Acquisition.

14

In early 2007, the Department of Justice began an investigation into Circle System's business practices, which practices the Debtors assert constituted certain fraudulent activities (the "**Circle Frauds**"), including, but not limited to, bribery of government officials and various accounting frauds. The Debtors assert that such alleged fraudulent activities resulted in an overstatement of Circle System's EBITDA, which was the basis upon which the acquisition price was negotiated.

The Debtors believe that they overpaid for the Circle Acquisition based on a fraudulently inflated EBITDA. In addition, the Debtors had to bear the litigation costs associated with the Circle System Matters,[6] including the Circle Frauds and related cases, which demanded of the Debtors higher cash spending and an inordinate amount of management's time and attention. In addition, the Circle System Matters resulted in significant negative public relations for the Debtors. Even though a judgment was rendered in the Debtors' favor on the issue of liability against the former management and owners of Circle System, the tangible and intangible costs of the Circle Frauds and the related litigation was a substantial detriment to the Debtors' business and profitability.

      (a)    *Alan Abeshaus et al. v. Circle System, et al.*, No. 02797 (October Term 2008, Court of Common Pleas, Philadelphia County) (the "**State Court Action**")

On October 22, 2008, Alan Abeshaus, Eric Abeshaus, Mitchell Kurlander (collectively, the "**Abeshaus Parties**") and David Drill ("**Drill**") brought certain claims against Circle System, SH Liquidating and Thomas Burger ("**Burger**"), alleging that the Abeshaus Parties and Drill were unlawfully terminated from their employment with Circle System and that they were owed money in bonuses and under Circle Subordinated Notes as part of the Circle Acquisition. Circle System and SH Liquidating asserted counterclaims against the Abeshaus Parties and Drill based on various fraudulent business practices including, *inter alia*, securities fraud claims, common law fraud, breach of the representations and warranties in the stock purchase agreement associated with the Circle Acquisition (the "**Stock Purchase Agreement**") as well as rescission of the employment agreements and the Circle Subordinated Notes. Cross-motions for summary judgment were filed.

The Abeshaus Parties were granted judgment only on their bonus claims against Circle System and on the rescission counterclaims asserted by SH Liquidating and Circle System. With regard to claims by SH Liquidating and Circle System against Drill, summary judgment on liability was granted in favor of Circle System and SH Liquidating in each of the following: (i) violation of the Pennsylvania and Delaware Securities Acts, (ii) intentional misrepresentation and common law fraud, (iii) breach of the Stock Purchase Agreement, and (iv) declaratory

---

[6]    The term "**Circle System Matters**" shall mean all matters related to the Circle Acquisition, including, without limitation, each of the following proceedings (and any and all appeals with respect to each of the following): (i) the breach of employment agreement action filed in the First Judicial District of Pennsylvania, Philadelphia County, styled as *Alan Abeshaus, et al. v. Circle System Group, Inc.*, Case No. 02797; (ii) the breach of stock purchase agreement, securities and common law fraud action filed in First Judicial District of Pennsylvania, Philadelphia County, styled as *Circle System Group, Inc., et al. v. Alan Abeshaus, et al.*, U.S.D.C. Ed of PA, No. 5:08-cv-05376; (iii) the false claims act filed in the United States District Court for the Eastern District of Pennsylvania, styled as *Gerry Dale, et al. v. Circle System Group, Inc., et al.*, No. 06-cv-04747-JKG; and (iv) *Twin City Fire Insurance Company v. Circle System Group, Inc.*, CCP Phila. County, July Term, 2010, No. 2648.

judgment of rightful termination under Drill's employment agreement with Circle System. SH Liquidating and Circle System moved for summary judgment (the "**Summary Judgment Motion**") on liability only against the Abeshaus Parties based on the joint and several liability in the indemnification and hold harmless provision of the Stock Purchase Agreement and were successful.

Damages sought by Circle System and SH Liquidating in the State Court Action are broken into five categories: (i) non-recurring operating expenses (approximately $1,800,000 plus interest); (ii) professional fees and out-of-pocket costs (approximately $3,800,000 plus interest continuing to accrue); (iii) excess cost of capital (approximately $3,300,000 plus interest); (iv) Circle System value impairment and loss of goodwill (approximately $13,000,000 plus interest); and (v) SH Liquidating enterprise value impairment and loss of sale opportunity (approximately $24,000,000 plus interest). Total damages claimed are in excess of $52,000,000 plus interest.

The Abeshaus Parties disagree with the Plan Proponents' foregoing description of the State Court Action. As set forth in the *Objection to Approval of Disclosure Statement for Joint Chapter 11 Plan of Liquidation Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 757] filed by the Abeshaus Parties on March 23, 2011, the Abeshaus Parties assert the following:

> The order and opinion (the "**Summary Judgment Order**") related to the numerous motions and cross-motions for summary judgment in the State Court Action granted, among other things, summary judgment against Circle System and SH Liquidating, in favor of the Abeshaus Parties. Among other things, the Summary Judgment Order recognized that Circle System and SH Liquidating owe the Abeshaus Parties $2,270,005 on account of bonuses and Circle Subordinated Notes. There has not been a finding that the Abeshaus Parties committed any wrongdoing while they were the owners of Circle System or at any other time. The Abeshaus Parties vigorously deny any such wrongdoing on their part. Trial has not yet been scheduled in the State Court Action, which has been stayed since the Petition Date. The Abeshaus Parties have already established in the State Court Action that SH Liquidating and Circle System owe them $2,270,005 in principal on account of bonuses and Circle Subordinated Notes, plus interest. The Abeshaus Parties are seeking additional damages for other lost compensation and benefits. Any judgment awarded to the Debtors would be subject to setoff by the amounts awarded to the Abeshaus Parties. When allowable interest is factored in, the Debtors would need to obtain a judgment in excess of $6 million before the Abeshaus Parties would have any liability to the Debtors.

The Debtors and the Committee disagree with the above characterization of the State Court Action and the related allegations by the Abeshaus Parties.

CHI 60,777,341 V11

**(b)** *SH Liquidating, et al v. Alan Abeshaus et al*, Civil Action No. 08-5376 (E.D.Pa.) (the "**Federal Court Action**")

The Federal Court Action is duplicative of the State Court Action, except that SH Liquidating and Circle System are the plaintiffs and there is a federal securities fraud claim in addition to the other claims that were asserted in the State Court Action. The Federal Court Action is effectively placed "on hold" pending the results of the State Court Action.

**(c)** *Gerry Dale and Patricia Dale v. SSI Liquidating, et al*, Civil Action No. 06-CV-4747 (E.D. Pa.) (the "**Qui Tam Action**")

The Qui Tam Action involves three (3) counts against the Abeshaus Parties and Drill and thirteen (13) claims against SH Liquidating, Circle System and SSI Liquidating (collectively, the "**Debtor Defendants**") by Gerry Dale and Patricia Dale (collectively, the "**Dales**"). The Dales asserted against the Abeshaus Parties, Drill and the Debtor Defendants a claim under each of the following: (i) False Claims Act, 31 U.S.C. § 3729 *et seq.* (ii) 31 U.S.C. § 3729(a) as amended by the Fraud Enforcement and Recovery Act of 2009 (FERA), and (iii) 31 U.S.C. § 3730(H) for allegedly retaliating against Gerry Dale by demoting him and creating a hostile work environment once it was discovered that he was the "whistleblower" who instigated the Department of Justice investigation with regard to the Circle Frauds.

The Dales alleged against the Debtor Defendants (a) a retaliation claim under various federal environmental laws, including Section 322(a)(1 -3) of the Clean Air Act, 42 U.S.C. § 7622 and Section 110(a) of the Comprehensive Environmental Responsive, Compensation and Liability Act, 42 U.S.C. § 9610, and (b) the following state False Claims Act violations under the following state laws: (i) Delaware False Claims and Reporting Act, DEL. CODE. ANN. tit. 6, ec 1201 *et seq.* (2000) (ii) District of Columbia False Claims Act, D.C. CODE ANN. Sec 1-1188.13 *et seq.* (2000) (iii) Florida False Claims Act, FLA. STAT. 68.081 *et seq.* (2000) (iv) Illinois Whistleblower Reward and Protection Act, 740 ILL. COMP. STAT. ANN. Sec 175/1 *et seq.* (2000) (v) Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5 (vi) Tennessee False Claims Act, TENN. CODE. ANN. Sec 71-5-181 *et seq.* (vii) VIRGINIA Fraud Against Taxpayers Act, (viii) New York False Claims Act § 187 *et seq.*, and (ix) New Jersey False Claims Act, Title 2A of New Jersey Statutes.

Motions to dismiss are pending in the Qui Tam Action. Oral argument on the motions to dismiss is scheduled in June, 2011, which will occur only if the automatic stay is lifted. On November 23, 2010, the Dales filed a motion to lift stay in order to establish liability of the Debtors in the Qui Tam Action [Docket No. 338] and subsequently withdrew such motion on March 7, 2011 [Docket Nos. 697 and 708].

**(d)** *Twin City Fire Ins. Co. v. Circle System*, No. 2648 (July Term 2010, Court of Common Pleas, Philadelphia County)

On July 23, 2010, Twin City Fire Insurance Company (a/k/a The Hartford) ("**Twin City**") brought a declaratory judgment action against Circle System, the Abeshaus Parties and the Dales relating to a Directors and Officers liability policy ("**D&O Policy**"). Only a few months prior to the Petition Date, it was discovered that Twin City had paid the full amount of

the $1,000,000 million D&O Policy out to the Abeshaus Parties for the Abeshaus Parties' defense costs in the Federal Court Action and the State Court Action, even though the Debtors assert that the D&O Policy specifically forbade payment of defense costs for claims between the insured (Circle System) and its own officers and directors. Circle System contends that such payout of coverage was violative of the clear terms of the D&O Policy and that Twin City is liable for $1,000,000 plus interest and potential bad faith damages as Twin City did not consult with Circle System prior to paying out the entire D&O Policy to the Abeshaus Parties. The answer and counterclaims have not been filed as of the Petition Date. The Debtors believe that this lawsuit is another asset that may be pursued by the Liquidating Trustee.

## 2. The Economic Crisis

As the Debtors were struggling to survive the negative impact of the Circle Frauds, the global economy started to collapse in the fall of 2008. Because the domestic financial and economic markets went through such an unprecedented downturn, school budgets were significantly reduced, and overall demand for varsity football products decreased substantially. Such reduction in school budgets and decrease in demand resulted in lower sales, lower margins, and ultimately, lower profitability for the Debtors.

## 3. Covenant Violations/Events of Default

As a result of the economic crisis as well as the Circle Frauds, the Debtors were operating with an overleveraged balance sheet and eventually violated certain financial covenants under both of their Prepetition Loans.

The Debtors' Prepetition Secured Loans were to mature on December 31, 2010, and the Debtors were unable to secure an alternative source of financing. In addition, the Debtors failed to meet certain payment obligations under their Prepetition Subordinated Notes. In April 2010, the Debtors failed to make a certain payment under the Prepetition Subordinated Notes relating to the Applicable High Yield Discount Obligation (the "**Subnote Default**"). On July 1, 2010, the Agent for the Prepetition Secured Loans provided notice to the Debtors of an event of default under the Prepetition Credit Agreement (the "**July Secured Loan Default**"). On August 18, 2010, the Agent notified the Debtors of further events of default (together with the Subnote Default and the July Secured Loan Default, the "**Events of Default**"). As a result of the Events of Default, the Prepetition Secured Lenders were no longer under any obligation to provide any further financing to the Debtors under the Prepetition Secured Loan Documents, and the Agent became entitled to certain rights and remedies, including, without limitation, the right to charge interest to the Debtors at the default rate. Therefore, the Debtors were faced with multiple Events of Default under both their Prepetition Secured Loans and their Prepetition Subordinate Notes.

## 4. The Riddell Litigation

In December 2008, Riddell filed a lawsuit (the "**Helmet Litigation**") against SSI Liquidating, claiming patent infringement on certain specific football helmet features with regard to two of the Debtors' most successful products – its "DNA" and "ION" model football helmets, which were introduced in 2004 and 2007, respectively. Riddell also filed claims against the

Debtors asserting violation of the Lanham Act, trade libel, and product disparagement and false and misleading statements to the purchasing public about Riddell's products and about the Debtors. The Helmet Litigation was filed in the United States District Court for the Western District of Wisconsin ("**Wisconsin District Court**"), *Riddell, Inc. v. Schutt Sports, Inc.*, Civil Action No. 3:08-cv-00711-BBC.

The Debtors denied Riddell's allegations, asserted various affirmative defenses, and filed counterclaims against Riddell, including a counterclaim for false advertising and deceptive trade practices. Although the Debtors and their litigation counsel believed that the patent infringement claims were frivolous, following a jury trial, on August 5, 2010, the jury found that the Debtors' "DNA" and "ION" football helmet shells infringed Riddell's "Football Helmet" and "Sports Helmet" patents. On August 9, 2010, the jury awarded Riddell lost profit damages in the amount of $24 million. The jury also awarded Riddell $5 million for sales, for which it found Riddell was not entitled to lost profit damages, but was entitled to a reasonable royalty. Finally, the jury awarded Riddell $24,750 in damages for infringement of its "Face Guard For A Sports Helmet" patent. The jury did not find in favor of the Debtors on their counterclaims seeking declarations of invalidity, unenforceability, and non-infringement. The jury did not render any verdicts on Riddell's claims for violation of the Lanham act, trade libel, and product disparagement, nor on the Debtors' counterclaims for false advertising and deceptive trade practices. Shortly after the jury verdict, Riddell made an oral motion for an injunction.

Following the jury verdict, on August 10, 2010, Riddell and SSI Liquidating entered a stipulation to postpone any hearing on Riddell's motion for permanent injunction until August 23, 2010, or as soon thereafter as the Wisconsin District Court's schedule allowed. In addition, on August 10, 2010, SSI Liquidating filed a Motion for Judgment as a Matter of Law of Non-Infringement and, in the alternative, a Motion for a New Trial. Riddell filed its opposition to SSI Liquidating's motion on August 25, 2010, and SSI Liquidating's reply was due on September 7, 2010. Additional post-trial motions (including motions for judgment as a matter of law and motions for a new trial) were due on September 15, 2010.

On or about August 19, 2010, a judgment was entered in accordance with the jury verdict. Subsequently, on August 20, 2010, Riddell and SSI Liquidating entered into another stipulation that, among other things, (i) stayed all proceedings in the Helmet Litigation, including any hearing, disposition or order on Riddell's motion for permanent injunction until September 6, 2010; (ii) allowed SSI Liquidating to continue selling the allegedly infringing products in the ordinary course of business; and (iii) stayed the enforcement of the $29 million judgment until September 10, 2010.

On September 1, 2010, Riddell brought another patent infringement lawsuit against SSI Liquidating, claiming that certain of the Debtors' "AiR Flex" shoulder pads infringe upon Riddell's "384 patent" entitled "Shoulder Pad for Contact Sports." Riddell requested, among other things, that it be awarded treble damages with prejudgment interest, attorneys' fees and expenses as well as actual and compensatory damages, that the Debtors be preliminarily and permanently enjoined from producing the allegedly infringing shoulder pads, and that a trial by jury be conducted. This new litigation was filed before the same court that heard the Helmet Litigation, in the United States District Court for the Western District of Wisconsin, *Riddell, Inc.*

19

*v. Schutt Sports, Inc.*, Civil Action No. 3:10-cv-00504-BBC (the "**Shoulder Pad Litigation**" and together with the Helmet Litigation, the "**Riddell Actions**").

The Debtors Filed for chapter 11 bankruptcy protection on September 6, 2010, with the exception of SH Liquidating which Filed for bankruptcy on September 15, 2010, and such bankruptcy Filings stayed the Riddell Actions.

### 5.   The Debtors' Decision to File for Chapter 11 Protection

The combination of deteriorating revenues and margins, the continued burden of excessive litigation costs in connection with the Circle Frauds and the Helmet Litigation, the jury verdict in the Helmet Litigation, the covenant violations and Events of Default under the Debtors' Prepetition Loans, the prospect of having no alternative source of financing once their Prepetition Secured Loans matured, and their inability to generate sufficient cash flow to meet their obligations under the Prepetition Loans, made it necessary for the Debtors to consider seeking protection under chapter 11 of the Bankruptcy Code.

The Debtors' board of directors (the "**Board**") ultimately determined that the most effective way to maximize the value of the Debtors' Estates for the benefit of their stakeholders was to seek protection under chapter 11 of the Bankruptcy Code in order to pursue either a sale or a plan, or both, which would result in a strengthened operation, while allowing the Debtors a breathing spell. During a special Board meeting held on September 3, 2010 and continued to September 5, 2010, the Board met and voted to approve a resolution giving authority to File voluntary petitions for relief under chapter 11 of the Bankruptcy Code for each of the Debtors with the exception of SH Liquidating. On September 14, 2010, the Board met and continued the Board meeting to September 15, 2010, at which meeting the Board voted to approve a resolution giving authority to File a voluntary petition for SH Liquidating's chapter 11 case.

## IV.   EVENTS DURING THE CHAPTER 11 CASES

On September 6, 2010, SSI Liquidating, Mountain View, Circle System, Melas, RDH, and Triangle Sports Filed voluntary petitions for reorganization under chapter 11 the Bankruptcy Code in the Bankruptcy Court. On September 15, 2010 (together with September 6, 2010, the "**Petition Date**"), SH Liquidating Filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Debtors' Chapter 11 Cases were assigned to Chief United States Bankruptcy Judge Kevin J. Carey and have been administratively consolidated under case number 10-12795 (KJC).

The following is a brief description of certain major events that have occurred during the Chapter 11 Cases.

## A.   Continuation of Business after the Petition Date

### 1.   First and Second Day Motions

Shortly after the Petition Date, the Debtors Filed a number of motions with the Bankruptcy Court, seeking various forms of relief, including, without limitation, the following motions, all of which were approved by the Bankruptcy Court:

(a)     **Joint Administration Motion**: Motion for entry of an order directing joint administration of the Debtors' Chapter 11 Cases [Motions: Docket Nos. 3 and 87, Orders: Docket Nos. 60 and 137];

(b)     **Postpetition Obligations Motion**: Motion for entry of an order granting administrative expense status to Debtors' undisputed obligations arising from postpetition delivery of goods ordered prepetition [Motion: Docket No. 10, Order: Docket No. 53];

(c)     **Employee Wage Motion**: Motion for entry of an order (i) authorizing Debtors to pay all prepetition employee obligations and prepetition withholding obligations and (ii) directing banks to honor related transfers [Motion: Docket No. 5, Order: Docket No. 55];

(d)     **Cash Management Motion**: Motion for entry of an order (a) authorizing the maintenance of bank accounts and continued use of existing business forms and checks, (b) authorizing the continued use of existing cash management system, and (c) granting administrative expense status to postpetition Intercompany Claims [Motion: Docket No. 11, Order: Docket No. 52];

(e)     **Utility Motion**: Motion for entry of interim and final orders pursuant to sections 105(a) and 366 of the Bankruptcy Code (i) prohibiting utilities from altering, refusing, or discontinuing service, (ii) deeming utilities adequately assured of future performance, and (iii) establishing procedures for determining adequate assurance of payment [Motion: Docket No. 6, Bridge Order: Docket No. 65, Final Order: Docket No. 139];

(f)     **Tax Motion**: Motion for an order (i) authorizing the Debtors to pay prepetition sales, use and similar taxes and regulatory fees in the ordinary course of business, and (ii) authorizing banks and financial institutions to honor and process checks and transfers related thereto [Motion: Docket No. 7, Order: Docket No. 59];

(g)     **Insurance Motion**: Motion for an order authorizing the Debtors to (i) maintain existing insurance policies and pay all policy premiums and brokers' fees arising thereunder, and (ii) continue insurance premium financing programs and pay insurance premium financing obligations arising in connection therewith [Motion: Docket No. 9, Order: Docket No. 56];

(h)     **Critical Vendor Motion**: Motion for an order authorizing (i) the Debtors to pay prepetition claims of critical vendors and (ii) financial institutions to honor and process related checks and transfers [Motion: Docket No. 68, Order: Docket No. 141];

(i)     **Customer Programs Motion**: Motion for an order pursuant to sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code authorizing the Debtors to honor certain prepetition obligations to customers and to otherwise continue certain customer practices and programs in the ordinary course of business [Motion: Docket No. 8, Order: Docket No. 58];

(j)     **DIP Motion**: Motion for interim and final orders (i) authorizing (a) secured postpetition financing on a super priority basis pursuant to 11 U.S.C.§ 364; (b) use of cash collateral pursuant to 11 U.S.C. § 363 and (c) grant of adequate protection pursuant to 11

U.S.C. §§ 363 and 364, and (ii) scheduling a final hearing pursuant to Bankruptcy Rule 4001(c) [Motion: Docket No. 12, Interim Order: Docket No. 51, Final Order: Docket No. 159].

2. **Retention Applications.** Shortly after the Petition Date, the Debtors also requested authorization to retain the following professionals, which retentions were approved by the Bankruptcy Court:

(a) **Greenberg Traurig, LLP**: As general bankruptcy counsel to the Debtors [Application: Docket No. 70, Order: Docket No. 131];

(b) **Logan & Company, Inc.**: As Claims, Noticing, and Balloting Agent [Application: Docket No. 4, Order: Docket No. 57];

(c) **Oppenheimer & Co.**: As financial advisor and investment banker to the Debtors [Application: Docket No. 71, Order: Docket No. 138];

(d) **Ernst & Young LLP**: As financial advisors to the Debtors [Application: Docket No. 165, Order: Docket No. 266]; and

(e) **Ordinary Course Professionals**: In addition to the above retention applications for employment of bankruptcy professionals, an application for an order authorizing retention and employment of ordinary professionals was Filed and approved, authorizing the Debtors to retain certain professionals utilized by the Debtors in the ordinary course of business [Motion: Docket No. 72, Order: Docket No. 140].

3. **Interim Compensation Procedures.** On September 21, 2010, the Bankruptcy Court entered an order establishing procedures for interim compensation and reimbursement of expenses of professionals [Docket No. 132] (the "**Interim Compensation Order**"). The Interim Compensation Order delineates a procedure for the: (i) Filing of monthly and interim fee applications by all professionals retained in the Debtors' bankruptcy cases; (ii) Filing of objections to interim fee applications; and (iii) payment by the Debtors of fees and reimbursement of expense to Professionals. The Debtors' and the Committee's various professionals have Filed monthly and interim fee applications in accordance with the Interim Compensation Order throughout these Chapter 11 Cases.

## B. Appointment of a Creditors' Committee

On September 16, 2010, the Office of the United States Trustee (the "**U.S. Trustee**") appointed the Committee to represent the interests of unsecured creditors of the Debtors. The appointed members of the Committee are as follows: (i) Ponderosa International Corp.; (ii) Genn Shang Ind. Co., Ltd.; (iii) United Parcel Service; (iv) NOCSAE (National Operating Committee on Standards for Athletic Equipment); (v) SABIC Innovative Plastics, US LLC; (vi) Scarbrough International, Ltd.; and (vii) Zhuhai Putuo Commerce & Trading Company, Ltd.

Shortly after its formation, the Committee applied for Bankruptcy Court authorization to retain Lowenstein Sandler PC and Womble Carlyle Sandridge & Rice, PLLC as its counsel and BDO Consulting, a Division of BDO USA, LLP, as its financial advisor. The Bankruptcy Court entered orders approving such retentions [Docket Nos. 241 and 254].

Since the Committee's formation, the Debtors have consulted with the Committee concerning the administration of these Chapter 11 Cases and have kept the Committee informed of their operations.

## C.     Debtor-in-Possession Financing

In order to obtain sufficient liquidity to carry on the operation of their businesses during these Chapter 11 Cases and to maximize the value thereto by pursuing an asset sale or a recapitalization, the Debtors negotiated a postpetition financing arrangement (the "**DIP Loans**") with Bank of America, N.A. (in its capacity with respect to the DIP Loans, the "**Postpetition Lender**"). On the Petition Date, the Debtors Filed a motion for entry of an order approving the DIP Loans and associated relief [Docket No. 12] (the "**DIP Financing Motion**"). On September 8, 2010, the Bankruptcy Court entered an interim order granting the relief sought by the DIP Financing Motion on an interim basis (the "**Interim DIP Order**") [Docket No. 51]; and, on September 29, 2010, the Bankruptcy Court entered an order approving the DIP Financing Motion on a final basis [Docket No. 159] (the "**DIP Order**").

Pursuant to the DIP Order, the Debtors were authorized to (i) enter into the DIP Loans with the Postpetition Lender and obtain postpetition financing in an aggregate amount not to exceed $34 million; (ii) grant the Postpetition Lender, pursuant to section 364(c) of the Bankruptcy Code, security interests in all of the Debtors' currently owned and after-acquired property to secure the Debtors' obligations under the DIP Loans, and (iii) grant the Postpetition Lender priority in payment with respect to such obligations over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code.

Pursuant to the DIP Order, the Postpetition Lender agreed to provide credit support for a sale or a recapitalization process, within certain parameters and timeframes described in the DIP Order.

## D.     The Committee's Lien Review

The DIP Order granted the Committee, on the terms set forth therein, until November 19, 2010, unless extended by agreement between the Committee and the Postpetition Lender or by further order of the Bankruptcy Court (the "**Lien Challenge Deadline**") to File and serve, on behalf of the Debtors' Estates, objections or complaints respecting the validity, extent, priority, avoidability, or enforceability of the Prepetition Secured Loans or the Prepetition Secured Lenders' prepetition liens on and prepetition security interests in the collateral securing the Prepetition Secured Loans. By agreement of the Committee and the Postpetition Lender, the Lien Challenge Deadline was extended for the Committee through and including December 17, 2010.

The Committee reviewed issues relating to the perfection of the Postpetition Lender's asserted security interests, liens, charges and claims, and investigated the claims, liens and rights asserted by and claims and rights against the Postpetition Lender, including, without limitation, through informal discovery with the Debtors and the Prepetition Secured Lenders. The Committee found no material issues or objections to the Prepetition Secured Loans and Filed no objections or adversary proceedings against the Prepetition Secured Lenders. Moreover, the

Purchase Price for the Sale exceeded the balance due and owing under the Prepetition Secured Loans.

Subsequent to the Debtors' Sale of substantially all of their assets, as discussed below, the postpetition credit facility granted under the DIP Order was terminated and the loans and other extensions of credit made thereunder (including all Prepetition Secured Loans) were paid in full on December 16, 2010.

## E. The Debtors' Schedules and the Statements of Financial Affairs

Section 521 of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules require the Debtors to prepare and File schedules of assets and liabilities (the "**Schedules**") and statements of financial affairs (the "**SOFAs**") with the Bankruptcy Court. On October 15, 2010, the Debtors Filed their Schedules and SOFAs. On January 18, 2011, the Debtors Filed certain amendments to their Schedules pursuant to Bankruptcy Rule 1009(a).

As of January 18, 2011, the Debtors' Schedules and SOFAs reflect, *inter alia*, the following:

### SSI Liquidating

| | | |
|---|---|---|
| Secured Claims: | $ | 34,435,344.00 |
| Priority Claims: | $ | 220,591.98 |
| Unsecured Claims: | $ | 31,127,088.10 |

### SH Liquidating

| | | |
|---|---|---|
| Secured Claims: | $ | 34,435,344.00 |
| Priority Claims: | $ | 0.00 |
| Unsecured Claims: | $ | 20,005,001.01 |

### Mountain View

| | | |
|---|---|---|
| Secured Claims: | $ | 34,435,344.00 |
| Priority Claims: | $ | 0.00 |
| Unsecured Claims: | $ | 17,504,000.00 |

### Circle System

| | | |
|---|---|---|
| Secured Claims: | $ | 34,435,344.00 |
| Priority Claims: | $ | 48,084.63 |
| Unsecured Claims: | $ | 29,799,435.48 |

CHI 60,777,341 V11

**Melas**

| | | |
|---|---|---|
| Secured Claims: | $ | 34,435,344.00 |
| Priority Claims: | $ | 0.00 |
| Unsecured Claims: | $ | 17,504,000.00 |

**RDH**

| | | |
|---|---|---|
| Secured Claims: | $ | 34,435,344.00 |
| Priority Claims: | $ | 0.00 |
| Unsecured Claims: | $ | 17,504,000.00 |

**Triangle Sports**

| | | |
|---|---|---|
| Secured Claims: | $ | 34,435,344.00 |
| Priority Claims: | $ | 0.00 |
| Unsecured Claims: | $ | 17,504,000.00 |

The Debtors have paid the Prepetition Secured Lenders in full, in Cash, for their prepetition Secured Claims, which the Debtors believe reduces such Secured Claims to $0. The Debtors also believe that most, if not all, Priority Non-Tax Claims have been paid in full during these Chapter 11 Cases, or such amounts were assumed by Purchaser (as defined below) as part of the Sale. Finally, certain General Unsecured Claims have also been paid during the course of these Chapter 11 Cases -- specifically, certain Claims of Critical Trade Vendors and certain prepetition amounts due and owing under contracts assumed and assigned to Purchaser (as defined below).

**F.**     **Riddell Disputes**

Upon commencement of these Chapter 11 Cases, on September 6, 2010, SSI Liquidating filed the *Verified Complaint for Declaratory and Injunctive Relief* [Docket No. 15] against Riddell (Adversary Proceeding No. 10-52995 (KJC), the "**Adversary Proceeding**") before this Bankruptcy Court. SSI Liquidating also filed its *Motion for Temporary Restraining Order and Preliminary Injunctive Relief* in the Adversary Proceeding [Adversary Proceeding Docket No. 3]. This Bankruptcy Court entered the order, dated September 29, 2010, staying the continuation of the Helmet Litigation [Adversary Proceeding Docket No. 23] (the "**TRO**"). Riddell appealed the TRO, and such appeal was pending before the Delaware District Court, Civil Action No. 10-00969 (the "**TRO Appeal**").

On September 8, 2010, Riddell filed its *Motion for Determination of Core Status* [Docket No. 37] (the "**Core Status Motion**") and *Motion to Withdraw Reference of Adversary Proceeding* [Docket No. 38] (the "**Withdrawal Motion**"). On September 14, 2010, Riddell filed its *Motion for Relief From Stay* [Docket No. 85] (the "**Stay Relief Motion**"), which was denied by this Court pursuant to the *Order on Riddell, Inc.'s Motion for Relief from Stay* [Docket No. 163], dated September 30, 2010 (the "**Order Denying Stay Relief**"). Riddell appealed the Order Denying Stay Relief, which appeal was pending before the Delaware District Court, Civil Action No. 10-970 (the "**Stay Relief Appeal**").

CHI 60,777,341 V11

On October 6, 2010, the Debtors filed their *Motion to Hold Riddell, Inc. in Contempt of Court for Violation of the Automatic Stay* [Docket No. 179] (the "**Contempt Motion**").

On December 10, 2010, Riddell filed its *Renewed Motion for Relief from Stay* [Docket No. 390] (the "**Renewed Stay Relief Motion**"). On December 10, 2010, Riddell also filed its *Motion for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)* [Docket No. 389] (the "**Administrative Claim Motion**"). The Debtors and the Committee objected to the Renewed Stay Relief Motion and the Administrative Claim Motion.

All of the foregoing matters were resolved pursuant to the Settlement Order, as discussed in Section IV.H.5 herein.

## G.    Management Incentive Plan

Under the terms of the DIP Loans, the Debtors were subject to a tight timeline to complete a sale or plan. In light of the value, size, and complexity of the Debtors' businesses, as well as the issues that arose during the expedited sale and plan process, the Debtors determined that payment of the Awards (defined below) pursuant to the Management Incentive Plan (defined below) was reasonable and responsibly targeted and that the approval of the Management Incentive Plan (defined below) served the best interests of the Debtors' estates, their creditors and all stakeholders.

Accordingly, on October 14, 2010, the Debtors filed a motion for entry of an order, pursuant to sections 105(a), 363(b)(1) and 503(c)(3) of the Bankruptcy Code, (i) approving a performance-based management incentive plan as described herein (the "**Management Incentive Plan**"); (ii) authorizing the Debtors to implement the Management Incentive Plan; and (iii) granting administrative expense status to all Awards (as defined below). With the Debtors' Board taking lead and their financial advisor, Ernst & Young LLP ("**E&Y**"), working in conjunction therewith, the Debtors developed a targeted Management Incentive Plan to incentivize the senior-level executives essential to the success of any sale or plan process in these Chapter 11 Cases (collectively, the "**Participants**"). The Management Incentive Plan was structured to maximize recovery to, and align the interests of the Participants with, the Debtors' creditors and other stakeholders. The Participants were integral to the Debtors' Sale and restructuring processes, and their respective roles in such processes were critical to addressing the challenges and uncertainties presented by the Chapter 11 Cases.

The Management Incentive Plan presented an opportunity to the Participants to receive cash performance bonuses (collectively, the "**Awards**"), in the event that the Debtors' businesses were sold or reorganized. In the case of a Sale, the Participants were to receive a sliding scale of Awards as the proceeds of such Sale increased. The Management Incentive Plan had a minimum aggregate payout of $842,030, upon meeting a certain minimum target, and a maximum aggregate payout of $2.0 million, as the proceeds of the plan or sale process exceeded the minimum target.

On October 21, 2010, the Bankruptcy Court approved the Management Incentive Plan [Docket No. 253]. After the Closing Date, the Participants were paid in Cash in full on account of their respective Awards under the Management Incentive Plan.

## H. The Sale Motion

On November 22, 2010, the Debtors Filed their *Motion for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtors Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Docket No. 331] (the "**Sale Motion**").

On December 1, 2010, the Bankruptcy Court entered the *Order (A) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (B) Approving Bid Protections; (C) Scheduling A Hearing to Consider the Sale; (D) Approving the Form and Manner of Notice of Sale By Auction; (E) Establishing Procedures For Noticing And Determining Cure Amounts; And (F) Granting Related Relief* (the "**Bid Procedures Order**") [Docket No. 363].

### 1. The Auction

On December 14, 2010, the Debtors commenced an auction of the sale of substantially all of their assets (the "**Auction**"), pursuant to the Bid Procedures Order. Present at the Auction were representatives of the Debtors, the Committee, the Prepetition Secured Lenders, Kranos Intermediate Holding Corporation (the "**Purchaser**") as the stalking horse bidder, and two other bidders that had been deemed qualified by the Debtors -- Rawlings Sporting Goods Company, Inc. ("**Rawlings**") and Two Point Conversion, LLC/Patriarch Partners ("**Two Point**" and, collectively with the Purchaser and Rawlings, the "**Bidders**").

During the course of the Auction, which lasted a total of approximately twenty (20) hours, the Bidders participated in approximately ten (10) rounds of bidding, resulting in thirty-one (31) separate bids. Shortly past midnight, Two Point dropped out of the Auction, leaving Rawlings and the Purchaser as the only remaining Bidders. Bidding continued until early the morning of December 15, 2010, whereupon the Debtors selected the last bid made by the Purchaser as the highest or otherwise best offer, and declared the Purchaser the winning Bidder.

### 2. Sale Hearing and Closing of Sale

#### (a) The Rawlings Objection

After the close of the Auction, Rawlings Filed an *Objection to (A) Sale to Kranos Intermediate Holding Corporation of the Debtors' Assets Pursuant to the Sale Motion for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; Approving the Form and Manner of Notice of Sale by Auction; Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtors Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims,*

CHI 60,777,341 V11

Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief; and (b) Request to Re-Open Auction Bidding (the "**Rawlings Objection**") [Docket No. 428], objecting to certain procedural elements of the Auction.

On the afternoon of December 15, 2010, approximately eight hours after the conclusion of the Auction, the Debtors sought entry of an order approving the Sale of substantially all of their assets to the Purchaser. After a hearing involving extensive argument and three witnesses, the Court approved the Sale to the Purchaser, expressly overruling the Rawlings Objection.

On the morning of December 16, 2010, the Court entered the order approving the Sale to the Purchaser [Docket No. 438] (the "**Sale Order**"). That same day, the Purchaser and the Debtors consummated the Sale of substantially all of the Debtors' assets in accordance with the Sale Order and the asset purchase agreement, dated December 15, 2010, by and among the Debtors and the Purchaser (the "**Asset Purchase Agreement**"). Pursuant to the Asset Purchase Agreement, the Debtors transferred substantially all of their assets to the Purchaser for the aggregate purchase price of $32,925,000 (the "**Purchase Price**"). Pursuant to the terms of the Sale Order and the Asset Purchase Agreement, the Purchaser designated that: (a) $4.5 million of the Purchase Price be set aside for payment of Allowed Claims of Critical Trade Vendors, (b) $2.2 million of the Purchase Price be set aside for payment of Allowed Claims of Trade Creditors; and (c) $800,000 of the Purchase Price be set aside for Allowed Claims of claimants under section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claimants**"). As part of the Sale, the Assigned Avoidance Actions, as identified in the Plan Supplement, were assigned to the Purchaser and released as of the Closing Date.

As part of the Sale Order, the Debtors were authorized to assume and assign executory contracts and unexpired leases to the Purchaser. On December 31, 2010, the Debtors filed their Rejection Motion [Docket No. 480] (as defined below), identifying, among other things, those Executory Contracts that were assumed and assigned to the Purchaser, pursuant to the Sale Order [Docket No. 480, Exhibit A].

3.    **Riddell's Qualified Objection**

On January 4, 2011, Riddell Filed its *Qualified Objection to (A) Debtors' Motion Extending Exclusivity and (B) Motion for Fixing of Bar Date* [Docket No. 489] (the "**Qualified Objection**"). In the Qualified Objection, Riddell raised numerous challenges to the Sale and, in particular, to the Purchaser's designation of $7.5 million of the proceeds from the Sale for the Allowed Claims of the Critical Trade Vendors, Trade Creditors, and 503(b)(9) Claimants. Windjammer and Gridiron Capital, LLC ("**Gridiron**") informally joined in the Qualified Objection. The Court convened a hearing on the Qualified Objection on January 10, 2011, during which the Debtors, Riddell, Windjammer, Gridiron, the Purchaser, and the Committee (collectively, the "**Settlement Parties**") agreed to participate in a non-binding mediation to attempt to resolve their disputes through a settlement (the "**Settlement**").